## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | |
|---|---|
| **THE DAILY WIRE, LLC;**<br><br>**FDRLST MEDIA, LLC; and**<br><br>**THE STATE OF TEXAS, by and through its Attorney General, Ken Paxton,**<br><br>       *Plaintiffs*,<br><br>    v.<br><br>**DEPARTMENT OF STATE;**<br><br>**GLOBAL ENGAGEMENT CENTER;**<br><br>**ANTONY BLINKEN, in his official capacity as Secretary of State;**<br><br>**LEAH BRAY, in her official capacity as Deputy Coordinator of the State Department's Global Engagement Center;**<br><br>**JAMES P. RUBIN, in his official capacity as Coordinator for the Global Engagement Center of the State Department;**<br><br>**DANIEL KIMMAGE, in his official capacity as the Principal Deputy Coordinator for the Global Engagement Center at the State Department;**<br><br>**ALEXIS FRISBIE, in her official capacity as Senior Technical Advisor of the Technology Engagement Team for the Global Engagement Center at the State Department;**<br><br>**PATRICIA WATTS, in her official capacity as the Director of the Technology Engagement Team at the Global Engagement Center at the State Department,**<br><br>       *Defendants*. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Case No. _____ |

## COMPLAINT

## NATURE OF THE ACTION

Plaintiffs The Daily Wire, LLC ("The Daily Wire"), FDRLST Media, LLC ("The Federalist"), (jointly "Media Plaintiffs"), and the State of Texas bring this civil action to halt one of the most egregious government operations to censor the American press in the history of the nation against the above-named Defendants for declaratory and injunctive relief, and other appropriate relief, and allege as follows:

1.    The U.S. Department of State ("State Department"), through its Global Engagement Center ("GEC"), is actively intervening in the news-media market to render disfavored press outlets unprofitable by funding the infrastructure, development, and marketing and promotion of censorship technology and private censorship enterprises to covertly suppress speech of a segment of the American press.

2.    Defendants have been granted no statutory authority to fund or promote censorship technology or censorship enterprises that target the American press, tarring disfavored domestic news organizations as purveyors of "disinformation." There is no enumerated general power to censor speech or the press found in the United States Constitution, and the First Amendment expressly forbids it, providing: "Congress shall make no law … abridging the freedom of speech or of the press." U.S. CONST. amend. I.

3.    The full breadth of Defendant GEC's censorship scheme is currently unknown. At a minimum, Defendant GEC has funded, promoted, and/or marketed two American censorship enterprises: the Disinformation Index Inc., operating under the name Global Disinformation Index ("GDI"), and NewsGuard Technologies, Inc. ("NewsGuard"). These entities generate blacklists of ostensibly risky or unreliable American news outlets for the purpose of discrediting and

demonetizing the disfavored press and redirecting money and audiences to news organizations that publish favored viewpoints.

4.     Media Plaintiffs are branded "unreliable" or "risky" by the government-funded and government-promoted censorship enterprises of GDI and NewsGuard, injuring Media Plaintiffs by starving them of advertising revenue and reducing the circulation of their reporting and speech—all as a direct result of Defendants' unlawful censorship scheme.

5.     Defendant State Department's censorship funding and promotion also undermines Texas law, which requires social media companies with market power to act as common carriers. Thus, it interferes with the State of Texas's sovereign interest in creating and enforcing a legal code.

6.     This lawsuit seeks injunctive relief to halt the unconstitutional and *ultra vires* actions of the State Department and put an end to one of the most audacious, manipulative, secretive, and gravest abuses of power and infringements of First Amendment rights by the federal government in American history.

## JURISDICTION AND VENUE

7.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because the federal claims arise under the Constitution and laws of the United States and pursuant to 28 U.S.C. § 1402 because the United States is a defendant in this action.

8.     Plaintiffs seek declaratory and injunctive relief under 28 U.S.C. §§ 2201-2202.

9.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because Plaintiff the State of Texas is located in this District, and a substantial part of the events or omissions giving rise to its claims occurred here.

10.    This Court is authorized to award the requested declaratory relief and grant permanent injunctive relief under 5 U.S.C. §§ 702 and 706, 28 U.S.C. §§ 1361 and 2201-2202, and its inherent equitable powers.

## PARTIES

11.    Plaintiff The Daily Wire, LLC is a Texas limited liability company with its principal place of business in Nashville, Tennessee.

12.    Plaintiff FDRLST Media, LLC is a Delaware limited liability company with its principal place of business in Washington, D.C.

13.    Plaintiff State of Texas (hereinafter "Texas") is a sovereign state of the United States of America entitled to the protections of the United States Constitution.

14.    Plaintiff Texas, through its Attorney General Ken Paxton, brings this lawsuit to protect its sovereign interest in creating and enforcing its legal code that regulates social media companies with market power as common carriers. Paxton is authorized by Texas law to sue on the State's behalf. His offices can be reached at P.O. Box 12548 (MC 009), Austin, Texas 78711-2548.

15.    Defendant U.S. Department of State is a cabinet-level executive agency of the United States of America.

16.    Defendant Antony Blinken is the Secretary of State of the United States. He is sued in his official capacity.

17.    Defendant Global Engagement Center ("GEC") is an interagency center housed in, and funded by, the State Department.

18.    Defendant Leah Bray is sued in her official capacity as Deputy Coordinator of the State Department's GEC.

19.    Defendant James P. Rubin is sued in his official capacity as the Coordinator of the State Department's GEC.

20.    Defendant Daniel Kimmage is sued in his official capacity as the Principal Deputy Coordinator for the State Department's GEC.

21.    Defendant Alexis Frisbie is sued in her official capacity as Senior Technical Advisor for the Technology Engagement Team at the State Department's GEC.

22.    Defendant Patricia Watts is sued in her official capacity as the Director of the Technology Engagement Team at the State Department's GEC.

23.    Hereinafter, the State Department, GEC, Antony Blinken, Leah Bray, James P. Rubin, Daniel Kimmage, Alexis Frisbie, and Patricia Watts will be referred to jointly as the "State Department Defendants."

## GENERAL ALLEGATIONS

24.    Since the Founding, Americans have relied on a free and open press to provide a check on government abuses. The independence of the press from government licensing or control was so central to this nation's founding that many of the former colonies incorporated declarations into their state constitutions.

25.    In the mid-20th century, the American press was dominated by only a few networks and wire services. For instance, in 1960, the United States' market was limited to three TV networks, ABC, CBS, and NBC,[1] and the majority of the national print news came from one wire service— the Associated Press.[2]

26.    In the late 20th century, the press was largely dominated by national corporate interests,

---

[1] Katie McLaughlin, *5 Things That 1960s TV Changed,* CNN, *available at* https://www.cnn.com/2014/05/29/showbiz/tv/sixties-five-things-television/index.html (last visited on November 21, 2023).
[2] Associated Press, *Our Story*, *available at* https://www.ap.org/about/our-story/ (last visited on November 21, 2023).

and, in the 1990s, increasingly absorbed by global mergers.[3]

27.     With the 21st century came a rise in the digital era which led to "a proliferation of news providers and platforms," with approximately 6,000 jobs created in digital-only newsrooms between 2008 and 2019—a 79% increase over the period.[4]

28.     Americans, in turn, increasingly rely on this new digital media for their source of news: As of 2023, "a large majority of U.S. adults (86%) say they often or sometimes get news from a smartphone, computer or tablet, including 56% who say they do so often." This compares to only 37% of U.S. adults who often or sometimes get news from print publications.[5]

29.     Upon information and belief, Facebook has over 180 million users throughout the United States, with a Pew Research study noting 66% of adults report using Facebook, and 31% of U.S. adults say they regularly obtain information about current events from the site.[6]

30.     Upon information and belief, X, previously known as Twitter, has approximately 70 million users in the United States,[7] with 27% of U.S. adults saying they use X, and 12% of U.S. adults saying they regularly get news on X.[8]

31.     Forty percent of U.S. adults say they use Instagram,[9] and 16% of U.S. adults say that they regularly get news from the site.[10]

---

3 Jonathan Hardy, *Journalism in the 21st Century*, *The Psychology of Journalism* (July 22, 2021), *available at* https://doi.org/10.1093/oso/9780190935856.003.0002 (last visited on November 21, 2023).

4 *Id.*

5 Jacob Liedke & Luxuan Wang, *News Platform Fact Sheets,* Pew Res. Ctr. (Nov. 15, 2023), *available at* https://www.pewresearch.org/journalism/fact-sheet/news-platform-fact-sheet/.

6 *See* Mason Walker & Katerina Eva Matsa, *News Consumption Across Social Media in 2021*, Pew Res. Ctr. (Sept. 20, 2021), *available at* https://www.pewresearch.org/journalism/2021/09/20/news-consumption-across-social-media-in-2021/.

7 Shradha Dinesh & Meltem Odabas, *8 Facts about Americans and Twitter as it Rebrands to X*, Pew Res. Ctr. (July 26, 2023), *available at* https://www.pewresearch.org/short-reads/2023/07/26/8-facts-about-americans-and-twitter-as-it-rebrands-to-x/.

8 Jacob Liedke & Luxuan Wang, *Social Media and News Fact Sheet*, Pew Res. Ctr. (Nov. 15, 2023), *available at* https://www.pewresearch.org/journalism/fact-sheet/social-media-and-news-fact-sheet/.

9 Shradha Dinesh & Meltem Odabas, *supra* note 7.

10 Liedke & Wang, *supra* note 8.

32.    TikTok has over 150 million users in the United States, with 21% of U.S. adults saying they use TikTok[11] and 14% of U.S. adults saying they regularly get news from the site.[12]

33.    Eighty-two percent of U.S. adults say that they use YouTube, and 26% of U.S. adults say that they regularly get news on YouTube.[13]

34.    Of those who indicated they get their news digitally, 67% said they often or sometimes use news websites or apps as a news source, 50% said they often or sometimes use social media as a news sources, and 71% responded that they use Google or other search engines to get the news.[14]

35.    Google and other search engines use algorithms to rank search results, and those algorithms can be customized to down-rank disfavored digital press outlets.[15]

36.    As the new media gained strength, the federal government, upon information and belief, conspired with the legacy media, technology giants, social media companies, and software and technology developers to censor the press that do not adhere to the preferred views of federal officials.

37.    Social media and other digital platforms are widely considered the modern public square. However, over the last year, between the release of the internal communications at Twitter (commonly referred to as the "Twitter Files"), the preliminary discovery in *Missouri v. Biden*, the House of Representatives' release of the "Facebook Files," and ongoing responses to FOIA requests, Americans have learned the federal government has coerced social media platforms to censor disfavored press and viewpoints.[16]

---

[11] Brooke Auxier & Monica Anderson, *Social Media Use in 2021*, Pew Res. Ctr. (Apr. 7, 2021), *available at* https://www.pewresearch.org/internet/2021/04/07/social-media-use-in-2021/.

[12] Liedke & Wang, *supra* note 8.

[13] *Id.*

[14] Liedke & Wang, *supra* note 5.

[15] Jonathan Hardy, *Journalism in the 21st Century*, *The Psychology of Journalism* (July 22, 2021), *available at* https://doi.org/10.1093/oso/9780190935856.003.0002 (last visited on November 21, 2023).

[16] *Missouri v. Biden,* 22-cv-01213, Plaintiffs' Reply Memorandum in Support of Preliminary Injunction, *available at* https://storage.courtlistener.com/recap/gov.uscourts.lawd.189520/gov.uscourts.lawd.189520.276.0.pdf

38.     This lawsuit focuses on a different wing of the government's Censorship-Industrial Complex: the State Department Defendants' funding and promotion of censorship technologies and private censorship enterprises that blacklist Media Plaintiffs, negatively impacting Media Plaintiffs' ability to circulate and distribute their publications to both current and potential audiences, and intentionally destroying Media Plaintiffs' ability to obtain advertisers.

***Media Plaintiffs: The Daily Wire and The Federalist***

39.     Plaintiff The Daily Wire's news and media business was founded in 2015 and operates a website and platform distributing written news, commentary, podcasts, and premium subscription video-on-demand.

40.     Plaintiff The Daily Wire embraces high standards of journalism[17] but "does not claim to be without bias." Rather, it is a "right-of-center media" organization that prides itself on being "opinionated," "noisy," and "having a good time."

41.     Founded in 2013, Plaintiff FDRLST Media, LLC is a digital-only media outlet operating as The Federalist and covering such things as politics, policy, culture, and religion.

42.     Plaintiff The Federalist also adopts high standards of journalism while embracing its right-of-center perspective.

43.     The First Amendment guarantees Media Plaintiffs' Freedom of Speech and Freedom of the Press, without regard to their political leanings.

44.     Media Plaintiffs rely heavily on social media outlets, web browsers, internet search tools, and other computer technology to distribute their content.

---

[17] https://www.dailywire.com/standards-policies (last visited November 21, 2023).

***Federal Government Conspires with Big Tech & Social Media Outlets to Silence New Media***

45.    The federal government's efforts to silence the new media have been detailed in the *Missouri v. Biden* lawsuit, with preliminary evidence showing a vast and unprecedented government-censorship complex unparalleled in American history.[18]

46.    The preliminary evidence, including numerous emails, reports, and evidence of regular meetings, phone calls, and information exchanges between government officials and social media platforms, produced in *Missouri v. Biden,* shows that myriad federal government agencies and officials have engaged in a coordinated effort to suppress speech on social media that runs counter to the federal government's preferred narrative. Indeed, having threatened and cajoled social media platforms for years to censor disfavored viewpoints and speakers, government officials across numerous federal agencies have moved into a phase of open collusion with the social media companies to suppress speakers, viewpoints, and content that question the government's positions or policies under the guise of preventing the spread of so-called disinformation, misinformation, and mal-information.[19]

47.    The evidence reveals that federal officials have likewise teamed up with private research institutions, backed by substantial resources and federal funding, to establish a mass-surveillance and mass-censorship enterprise that utilizes sophisticated techniques to review hundreds of millions of American citizens' electronic communications in real time, working closely with tech platforms to covertly censor millions of individuals.[20]

---

[18] *See Missouri v. Biden,* ----F.Supp.3d----, 2023 WL 4335270 (W.D. LA July 4, 2023), *rev'd in part*, No. 23-30445, --- F.4th --, 2023 WL 5821788 (5th Cir. Sept. 8, 2023), *cert. granted* in *Murthy v. Missouri*, 601 U.S. ----, --- S.Ct. ----, 2023 WL 6935337 (Mem).
[19] *Id.*
[20] *Id.*

***State Department's GEC Leads One Arm of the Government's Censorship Complex, Targeting Speech by Americans, to Americans, in America.***

48.     In addition to its role in pushing social media companies to censor speech, Defendant GEC has taken the lead in coordinating the government's efforts to silence speech.[21]

49.     Defendant GEC, a multi-agency center housed within Defendant State Department, originated in 2011 as the Center for Strategic Counterterrorism Communications (CSCC), following the Obama administration's issuance of an executive order that created the center to support federal agency communications in targeting "violent extremism and terrorist organizations."[22]

50.     In 2016, the Obama administration issued a second executive order morphing the CSCC into GEC but leaving its counterterrorism mission intact.[23]

51.     When Congress created GEC through its passage of the National Defense Authorization Act ("NDAA") for fiscal year 2017, the Center's purpose was expanded beyond its original mandate of countering the influence of international terrorists, such as the Islamic State, al-Qaeda, and other foreign extremists. Specifically, the 2017 NDAA directed GEC to "coordinate efforts of the Federal Government" to counter foreign state and nonstate "propaganda and disinformation efforts aimed at undermining United States national security interests."[24]

52.     In 2019, the NDAA further expanded GEC's mission, authorizing it to counter foreign "propaganda and disinformation" that undermines not only the United States' national security interests, but also the "policies, security, or stability" of the U.S. and our allies.[25]

---

[21] About Us—Global Engagement Center, *available at* https://www.state.gov/about-us-global-engagement-center-2/ (last visited June 17, 2023).
[22] *Id.*
[23] *Id.*
[24] *Id.*; National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, § 1287, 130 Stat. 2000, 2546-48 (2016).
[25] John S. McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. No. 115-232, § 1284, 132 Stat. 1636, 2076 (2018).

53.    While Congress dramatically expanded the breadth of GEC's mission, its purpose remained limited to combatting "foreign" disinformation. Congress explicitly included a limitation in the spending bills that provided: "None of the funds authorized to be appropriated or otherwise made available to carry out this section shall be used for purposes other than countering ***foreign*** propaganda and misinformation that threatens United States national security."[26] (emphasis added).

### GEC Violates Its Congressional Mandate by Targeting Americans' Speech

54.    While Congress forbade GEC from using funds appropriated or otherwise made available to it to counter Americans' speech, as detailed throughout this complaint, many of GEC's activities and initiatives targeted speech spoken in America among Americans, including Media Plaintiffs' speech and press rights.

### Disinfo Cloud: State Department's Alter Ego

55.    Many of GEC's activities and initiatives were performed by Defendant State Department's alter ego: the private, for-profit, and now-shuttered entity Park Capital Investment Group, LLC, also known as Park Advisors or Disinfo Cloud, which the State Department funded with a $3,000,000 contract.[27]

56.    Among other things, GEC used Park Advisors to funnel money to, and serve as a sales representative for, censorship technologies and private censorship enterprises.[28]

---

[26] National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, § 1287, 130 Stat. at 2548, (2016).
[27] Margot Cleveland, *Meet the Shadowy Group That Ran the Federal Government's Censorship Scheme*, The Federalist (April 19, 2023), *available at* https://thefederalist.com/2023/04/19/meet-the-shadowy-group-that-ran-the-federal-governments-censorship-scheme/; Defeat Disinfo, *available at* https://www.state.gov/defeat-disinfo/ (last visited November 21, 2023); Office of Inspector General, United States Department of State, *Audit of Global Engagement Center Federal Assistance Award Management and Monitoring,* April 2020, *available at* https://www.stateoig.gov/uploads/report/report_pdf_file/aud-mero-20-26_7.pdf (last visited November 21, 2023).
[28] Margot Cleveland, *Government is Marketing Censorship Tools to Big Tech to Gag Conservatives*, The Federalist (April 11, 2023), *available at* https://thefederalist.com/2023/04/11/government-is-marketing-censorship-tools-to-big-tech-to-gag-conservatives/ (last visited November 21, 2023).

57.     GEC also used Park Advisors to develop and manage multiple initiatives of GEC under the moniker "Disinfo Cloud," also known as Disinformation Cloud.[29]

58.     According to the Office of the Inspector General of the State Department, GEC's Technology Engagement Team ("TET") "funded and supported the Disinformation Cloud website, an open-source platform that GEC's grantee partner maintained."[30]

59.     Disinfo Cloud represented the brand under which the for-profit business, Park Advisors, funneled money from the State Department to various entities, such as the $100,000 awarded to GDI in connection with its 2021 "U.S.-Paris Tech Challenge," GEC's invitation-only annual event[31] to "counter propaganda and disinformation use" in Europe.[32] That 2021 event was sponsored by GEC, in collaboration with U.S. Embassy Paris, the Atlantic Council's Digital Forensic Research Lab (DFR Lab), the Cybersecurity and Infrastructure Security Agency (CISA), the North Atlantic Treaty Organization (NATO), the U.K. Department for Digital, Culture, Media and Sport, the Office of the Tech Ambassador of Denmark, and the Digital Communication Network, as well as Park Advisors and Disinfo Cloud.[33]

---

[29] Margot Cleveland, *Meet the Shadowy Group That Ran the Federal Government's Censorship Scheme*, The Federalist (April 19, 2023), *available at* https://thefederalist.com/2023/04/19/meet-the-shadowy-group-that-ran-the-federal-governments-censorship-scheme/ (last visited November 21, 2023).

[30] Office of Inspector General, United States Department of State, *Inspection of the Global Engagement Center,* September 2022, at 21, *available at* https://www.stateoig.gov/uploads/report/report_pdf_file/isp-i-22-15.pdf (last visited November 21, 2023).

[31] Gabe Kaminsky, *Disinformation Inc.: State Department Bankrolls Group Secretly Blacklisting Conservative Media*, Washington Examiner (Feb. 9, 2023), *available at https://www.washingtonexaminer.com/restoring-america/equality-not-elitism/disinformation-group-secretly-blacklisting-right-wing-outlets-bankrolled-state-department*.

[32] U.S. Department of State website- U.S. Paris Tech Challenge, *available at* https://www.state.gov/upcoming-events-technology-engagement-division/.

[33] *Id.*

60.     Christina Nemr, a former State Department employee who had been a founding member of the State Department's Countering Violent Extremism (CVE) program, served as the director of Park Advisors and as the administrator of Disinfo Cloud.[34]

61.     Although the State Department has confirmed that it paid Park Advisors to manage Disinfo Cloud, a search of the government's official webpage for grants, contracts, or awards, USASpending.gov, reveals no grants or contracts awarded to Disinfo Cloud, Park Advisors, or Park Capital Investment Group. Rather, the only documented payment to any of those entities is a COVID-era loan of nearly $40,000 to Park Capital Investment Group in 2020.[35]

62.     An audit of GEC by the State Department's Inspector General revealed Park Capital Investment Group received a $2,997,345 award for the performance period from September 25, 2018, through September 18, 2020.[36]

63.     The Office of Inspector General's report on GEC found GEC lacked oversight of contractors and had insufficient internal controls "to ensure contractors did not perform inherently governmental functions"—which, upon information and belief, the State Department deemed to include funding the development of censorship technology and the widespread marketing efforts to silence disfavored speakers and media outlets.[37]

---

[34] Margot Cleveland, *Meet the Shadowy Group That Ran the Federal Government's Censorship Scheme*, The Federalist (April 19, 2023), *available at* https://thefederalist.com/2023/04/19/meet-the-shadowy-group-that-ran-the-federal-governments-censorship-scheme/ (last visited November 21, 2023).
[35] *Id.*
[36] Office of Inspector General, United States Department of State, *Audit of Global Engagement Center Federal Assistance Award Management and Monitoring* at 32, April 2020, *available at* https://www.stateoig.gov/uploads/report/report_pdf_file/aud-mero-20-26_7.pdf (last visited November 21, 2023).
[37] Office of Inspector General, United States Department of State, *Inspection of the Global Engagement Center,* at 8, September 2022, *available at* https://www.stateoig.gov/uploads/report/report_pdf_file/isp-i-22-15.pdf (last visited November 21, 2023).

***Disinfo Cloud Served as a De Facto Arm of GEC's TET***

64.    Disinfo Cloud operated as a de facto government entity, launching, managing, and/or marketing several initiatives of TET, illustrated below.[38]



65.    Disinfo Cloud's management of the "Disinfo Cloud" platform—one of TET's six historical initiatives—consisted of creating and launching the Disinfo Cloud webpage, which, among other things, acted "as a repository to catalog an ever-growing list of CPD tools and technologies." ("CPD" stands for "Countering Propaganda and Disinformation.")[39]

---

[38] Mad Scientist: Weaponized Information Virtual Conference, July 21, 2020, at 15:45, *available at* 2.09 MadSci Weaponized Information: Technology Engagement Team & Disinfo Cloud - Ms. Frisbie & Nemr - YouTube.
[39] Technology Engagement Team, *available at* https://2017-2021.state.gov/bureaus-offices/under-secretary-for-public-diplomacy-and-public-affairs/global-engagement-center/technology-engagement-team/index.html (last visited November 21, 2023).

66.    The State Department website describes Disinfo Cloud as "an unclassified platform used by the U.S. government, foreign partners, and technology providers to identify and learn about technologies to counter adversarial propaganda and disinformation."[40]

67.    The State Department claimed that Disinfo Cloud users included "Congress and over a dozen federal agencies, including the Departments of Defense, Energy, Treasury, and the FBI," as well as "foreign partners, such as the Australian Government, Estonian Government, European Union, and the United Kingdom Government," and, significant to this complaint, "Providers," "including Academia, Private Sector, and Tech Vendors."[41]

68.    Upon information and belief, the Disinfo Cloud repository of CPD tools and technologies included many that targeted American speech, including Media Plaintiffs.

69.    The CPD tools included supposed fact-checking technologies, media literacy tools, media intelligence platforms, social network mapping, and machine learning/artificial intelligence technology.[42]

70.    Disinfo Cloud assessed the various CPD tools and technologies, first by completing open-source research to learn about the tool, its manufacturer, and the technology involved. The team would then summarize the research in a one-to-three-page summary.[43]

71.    Disinfo Cloud would subsequently conduct more probing research of these censorship tools and technologies, contacting the tools' creators, requesting a remote demonstration, and obtaining

---

[40] Disinfo Cloud, *available at* https://2017-2021.state.gov/disinfo-cloud-launch/index.html (last visited November 21, 2023).
[41] *Id.*
[42] Defeat Disinfo, *available at* https://www.state.gov/defeat-disinfo/ (last visited November 21, 2023).
[43] Mad Scientist: Weaponized Information Virtual Conference, July 21, 2020, at 19:35, *available at* 2.09 MadSci Weaponized Information: Technology Engagement Team & Disinfo Cloud - Ms. Frisbie & Nemr - YouTube.

more intricate technical details. Disinfo Cloud would then compile a ten to twelve-page report on the technology.[44]

72.    Disinfo Cloud "identified and assessed over 365 tools and technologies."[45]

73.    The Disinfo Cloud webpage was originally available only to ".mil and .gov" users, but access was later opened to the private sector, "including private industry, social media companies, academic, and civil society, with more than 2,000 users provided access to Disinfo Cloud."[46]

74.    Park Advisors' Director Christina Nemr, who served as the Administrator of Disinfo Cloud, stated the Disinfo Cloud platform was originally "meant to be just .mil and .gov but then we realized that was a bit limiting. We want these tools to be tools that anyone working in the counter-disinformation space is aware of . . . ."[47]

***GEC Takes Its Censorship Team on the Road***

75.    In 2019, GEC established a satellite office in Silicon Valley as part of its "Silicon Valley Engagement" initiative.

76.    Through its Silicon Valley Engagement initiative, GEC marketed censorship technology to American companies, including the major social media companies, such as Twitter (now X), Meta, LinkedIn, and others. Those American companies were then encouraged to join Disinfo Cloud to identify "a technological solution" suited to the specific tech company's needs to "counter propaganda and disinformation."[48]

---

[44] *Id.* at 20:40.

[45] The Disinfo Cloud Digest, Dec. 21, 2021, *available at* https://myemail.constantcontact.com/Thank-you-and-farewell--for-now-.html?soid=1134000290001&aid=ixx_30MZGGU (last visited at November 21, 2023).

[46]*Id.*; Mad Scientist: Weaponized Information Virtual Conference, July 21, 2020, at 30:15, *available at* 2.09 MadSci Weaponized Information: Technology Engagement Team & Disinfo Cloud - Ms. Frisbie & Nemr - YouTube.

[47]*Id.*; Mad Scientist: Weaponized Information Virtual Conference, July 21, 2020, at 30:15, *available at* 2.09 MadSci Weaponized Information: Technology Engagement Team & Disinfo Cloud - Ms. Frisbie & Nemr - YouTube.

[48] Margot Cleveland, *Government Is Marketing Censorship Tools to Big Tech To Gag Conservatives*, April 11, 2023, *available at* https://thefederalist.com/2023/04/11/government-is-marketing-censorship-tools-to-big-tech-to-gag-conservatives/ (last visited November 21, 2023).

***The State Department Gifts the Tech Industry GEC's Censorship Infrastructure***

77.    As part of its "Silicon Valley Engagement" initiative, GEC pushed social media companies to join Disinfo Cloud,[49] a platform established for .mil and .gov users.

78.    Discovery in *Missouri v. Biden* also revealed GEC had maintained a Senior Advisor, Samaruddin K. Stewart ("Stewart"), as a permanent disinformation liaison between the government and Silicon Valley. Stewart held a series of meetings with LinkedIn to discuss "countering disinformation," and set up similar meetings with other social media platforms. Among other things, he offered the social media companies access to Disinfo Cloud, encouraging them to use it to "identify[], understand[], and address[] misinformation."[50]

79.    Disinfo Cloud marketed itself to users as a place "to identify and learn about technologies to counter adversarial propaganda and disinformation."[51]

80.    Defendant State Department's website further states that Disinfo Cloud allowed "stakeholders to search for assessed tools or technologies that fit identified needs or requirements,"[52] and offered users help in "identify[ing] appropriate counter propaganda and disinformation tools and technologies to suit different groups' needs."[53]

81.    Defendant State Department's web page requested users, including American technology companies: "Write to inform TET or Disinfo Cloud what your office needs to counter propaganda and disinformation. Ask us for assistance in identifying a technological solution."[54]

---

[49] *Id.*
[50] *Id.*
[51] Defeat Disinfo, *available at* https://www.state.gov/defeat-disinfo/ (last visited November 21, 2023).
[52] Disinfo Cloud Flyer, *available at* https://www.state.gov/wp-content/uploads/2021/04/Disinfo-Cloud-flyer-April-042921.pdf (last visited November 21, 2023).
[53] Defeat Disinfo, *available at* https://www.state.gov/defeat-disinfo/ (last visited November 21, 2023).
[54] *Id.*

82.    In addition to its repository of censorship tools and technologies, Disinfo Cloud broadcast

a "news feed of the latest research, news and related events published by third parties."[55]

***Saying the Quiet Part Out Loud***

83.    A representative from GEC's TET, Alexis Frisbie, explained the importance of its Silicon

Valley Engagement initiative when asked during a presentation she and Nemr gave on how the

"GEC bridges the gap to domestic U.S. tech mis/dis information" given that the "Department of

State programs are focused on foreign disinformation technology by policy and laws."[56] Frisbie

replied:

> The way I want to approach that is by talking about the way we engage in outreach.
> And that is done not only at the technology engagement team level, where we have
> a Silicon Valley embed from our team who's out there to engage not only with other
> interagency representatives in the area but to also engage more closely with the
> companies in the region, clearly. But on top of that we also have a really great
> leadership of GEC which is regularly looking to engage with you know private
> industry and looking to have conversations to ensure that there is discussion
> occurring so I think that you know those are in terms of interaction that's talking
> about at a domestic level.[57]

84.    While Frisbie claimed GEC is "certainly not looking to influence anything on the national

level," upon information and belief, GEC used, and continues to use, its Silicon Valley

Engagement initiative to domestically promote and market to the tech industry censorship

technologies and censorship enterprises that silence, down-rank, de-amplify, deplatform, de-boost,

demonetize, or denigrate segments of the American press and Americans' speech, including Media

Plaintiffs.

85.    In addition to TET's meetings with Silicon Valley private entities, Defendant Frisbie

revealed "GEC's front office and senior leadership meets with social-media platforms every few

---

[55] *Id.*
[56] Mad Scientist: Weaponized Information Virtual Conference, July 21, 2020, at 33:58, *available at* 2.09 MadSci
Weaponized Information: Technology Engagement Team & Disinfo Cloud - Ms. Frisbie & Nemr - YouTube.
[57] *Id.*

months, sometimes quarterly," and these "meetings focus on the 'tools and techniques' of stopping the spread of disinformation on social media . . . ."[58]

86.     Upon information and belief, the "tools and techniques" highlighted by GEC's front office and senior leadership include censorship tools that abridged Media Plaintiffs' First Amendment rights.

***Disinfo Cloud's Other Censorship-Promoting Activities***

87.     Disinfo Cloud—Defendant State Department's alter ego—also maintained a Twitter account, which remains publicly available. The Disinfo Cloud Twitter feed promoted the censorship enterprises of NewsGuard and GDI, and amplified GDI's post that expressly acknowledged its goal was to ensure websites deemed "disinformation websites" would be unable to profit from digital ads.[59]



---

[58] *See Missouri v. Biden,* ----F.Supp.3d----, 2023 WL 4335270 *36 (W.D. LA July 4, 2023), *rev'd in part*, No. 23-30445, --- F.4th --, 2023 WL 5821788 (5th Cir. Sept. 8, 2023), *cert. granted* in *Murthy v. Missouri*, 601 U.S. ----, ---S.Ct. ----, 2023 WL 6935337 (Mem).

[59] @DisinfoCloud Tweets, Dec. 14, 2021, Dec. 20, 2021, *available at* *https://twitter.com/DisinfoIndex/status/1472947344865906696*; *https://twitter.com/DisinfoCloud/status/1472957094961848324* *https://twitter.com/NewsGuardRating/status/1470799423462596611.*

88.    Disinfo Cloud promoted censorship technologies and censorship enterprises through its weekly "Disinfo Cloud Digest" which began publishing for the State Department in December 2020. That digest summarized "the latest news, events, funding opportunities, and other updates related to disinformation, including from the tech vendors featured on Disinfo Cloud."[60]

89.    The Disinfo Cloud Digest featured censorship tools and technologies that reached American outlets, such as NewsGuard's "Responsible Advertising for News Segment (RANS)" tool which Disinfo Cloud promoted in its April 6, 2021 Digest, stating that such technology "help[s] advertising companies avoid websites known to host or produce mis/disinformation."[61]

### *Disinfo Cloud Served as Defendant State Department's Alter Ego in Running TET's Testbed*

90.    Defendant State Department's alter ego Disinfo Cloud also managed TET's "tech testbed" initiative, using DisinfoCloud.com as a "gateway" to access the testbed.[62]

91.    According to GEC's webpage, the testbed "tests specific tools or technologies against a submitted proposal" over the course of six to eight weeks to see how successful the tools are in countering supposed propaganda in "real operational" situations.[63]

92.    The testbed initiative seeks "to rapidly identify, assess, test, and implement" censorship technology by running pilots using the various technologies.[64]

93.    Upon information and belief, the technology piloted on the testbed targets both foreign and domestic speech, including Media Plaintiffs' speech.

94.    Upon information and belief, the State Department Defendants assisted the companies

---

[60] The Disinfo Cloud Digest, Dec. 21, 2021, *available at https://myemail.constantcontact.com/Thank-you-and-farewell--for-now-.html?soid=1134000290001&aid=ixx_30MZGGU* (last visited November 21, 2023).

[61] The Disinfo Cloud Digest, Apr. 6, 2021, *available at* https://myemail.constantcontact.com/New-tools--a--29M-counter-disinfo-fund--and-a-musical.html?soid=1134000290001&aid=6VULxmHPp-M.

[62] Defeat Disinfo, *available at* https://www.state.gov/defeat-disinfo/ (last visited November 21, 2023).

[63] Programs—Technology Engagement Division, *available at* https://www.state.gov/programs-technology-engagement-division/ (last visited November 21, 2023).

[64] Disinfo Cloud, *available at* https://2017-2021.state.gov/disinfo-cloud-launch/index.html (last visited November 21, 2023).

using the testbed to further develop and refine their media censorship technology, including censorship technology that targets the domestic press and domestic speech.

95.    Disinfo Cloud users, which included members of academia, the private sector, and tech vendors located in the United States, were encouraged to submit requests to test the technology against their needs, and the webpage directed users to ask Disinfo Cloud for assistance in drafting "a test proposal for a tool."[65]

### GEC Hosted Tech Challenges to Find and Fund Censorship Technology Through Its Alter Ego Disinfo Cloud

96.    GEC's TET also used its alter ego Disinfo Cloud to run its "tech challenges" initiative.[66]

97.    The tech challenge initiative sought to identify and "advance" "innovative counter-disinformation tech solutions."[67]

98.    Disinfo Cloud organized three international tech challenges that allowed GEC to identify over 110 censorship tools and technologies.[68]

99.    The censorship tools and technologies identified through the tech challenges target both foreign and domestic media organizations and speech, and include certain tools and technology used to target Media Plaintiffs.

100.    GEC has identified the "tech challenges" as one of its initiatives. Inexplicably, GEC used Disinfo Cloud to transfer the government prize money to the various censorship enterprises that won GEC tech challenges.[69]

---

[65] *Id.*

[66] The Disinfo Cloud Digest, Dec. 21, 2021, *available at* <u>*https://myemail.constantcontact.com/Thank-you-and-farewell--for-now-.html?soid=1134000290001&aid=ixx_30MZGGU*</u> (last visited November 21, 2023).

[67] Events—Technology Engagement Division, *available at* <u>https://www.state.gov/upcoming-events-technology-engagement-division/</u> (last visited November 21, 2023).

[68] The Disinfo Cloud Digest, Dec. 21, 2021, *available at* <u>*https://myemail.constantcontact.com/Thank-you-and-farewell--for-now-.html?soid=1134000290001&aid=ixx_30MZGGU*</u> (last visited November 21, 2023).

[69] Mad Scientist: Weaponized Information Virtual Conference, July 21, 2020, at 15:45, *available at* <u>2.09 MadSci Weaponized Information: Technology Engagement Team & Disinfo Cloud - Ms. Frisbie & Nemr - YouTube</u>;

*At Least Two Censorship Technologies Funded and/or Promoted*
*by GEC Targeted Media Plaintiffs*

101.    More than 365 tools and technologies were transferred to the Disinfo Cloud repository and funded, promoted, and/or marketed by the State Department Defendants, including two media rating companies—GDI and NewsGuard—which are widely used to suppress Media Plaintiffs' speech and the distribution of Media Plaintiffs' reporting, as well as to destroy Media Plaintiffs' advertising opportunities.

102.    Upon information and belief, GDI and NewsGuard work with the World Federation of Advertisers (WFA) and its subsidiary, Global Alliance for Responsible Media (GARM) to steer blue-chip advertisers away from Media Plaintiffs. WFA's membership includes, but is not limited to: "Best Buy, Chobani, Dell Technologies, Exxon Mobil, General Mills, Hilton, Kellogg, Levi's, MasterCard, Nike, PepsiCo and Verizon." WFA's subsidiary GARM includes more than 60 leading advertisers and major social media platforms such as Facebook, YouTube, Reddit, Snapchat, TikTok and LinkedIn.[70]

103.    In 2022, GARM boasted that it "drove an agreement across advertisers, agencies, and platforms to set a framework that limits advertising support" for content it determined did not belong online. It set the standards with categories of "harmful and sensitive content" that included "misinformation," "debated sensitive social issues," "arms and ammunition," "death, injury, or military conflict," and "hate speech and acts of aggression." Each category has a "suitability" level for social media platforms to restrict content or a "safety floor [for] where ads should not appear."[71]

---

Margot Cleveland, *Meet the Shadowy Group That Ran the Federal Government's Censorship Scheme*, The Federalist (April 19, 2023), *available at* https://thefederalist.com/2023/04/19/meet-the-shadowy-group-that-ran-the-federal-governments-censorship-scheme/.

[70] Susan Ferrechio, *Subjective rankings sap conservative news assets*, THE WASHINGTON TIMES, Aug. 15, 2023, at A1.

[71] *Id*. at A7.

104.    The State Department Defendants' active intervention in the news media market to render disfavored media unprofitable thus has devastating consequences to targeted media.

***GDI's Blacklist***

105.    According to its webpage, GDI's "core output" is its Dynamic Exclusion List of websites and applications that purportedly hold a "high risk for disinformation."[72]

106.    GDI's webpage further explains that it licenses its Dynamic Exclusion List to ad tech companies and platforms so the "worst offenders" are defunded and down-ranked, "thus disrupting the ad-funded disinformation business model."[73]

107.    Upon information and belief, GDI provides its Dynamic Exclusion List to subscribers on a monthly basis.

108.    The Dynamic Exclusion List identifies multiple American media outlets as having a "high risk for disinformation,"[74] including, upon information and belief, Media Plaintiffs.

109.    The Dynamic Exclusion List blacklists media outlets. As GDI explicitly stated in a document submitted to the United Nations' Office of the High Commissioner on Human Rights, GDI seeks "to defund disinformation" and destroy "the incentive to create it for the purpose of garnering advertising revenues."[75]

---

[72] The Global Disinformation Index, *What We Do, available at* https://www.disinformationindex.org/product (last visited on November 21, 2023).
[73] *Id.*
[74] Gabe Kaminsky, *Disinformation Inc: Read One of the 'Blacklists' Used Secretly to Defund Conservative News*, THE WASHINGTON EXAMINER (Feb. 10, 2023), *available at* https://www.washingtonexaminer.com/restoring-america/equality-not-elitism/disinformation-inc-read-one-of-the-blacklists-used-secretly-to-defund-conservative-news.
[75] Response to the Special Rapporteur on the Promotion and Protection of the Right to Freedom of Opinion and Expression, *available at* https://www.ohchr.org/sites/default/files/Documents/Issues/Expression/disinformation/2-Civil-society-organisations/The-Global-Disinformation-Index.pdf (last visited on November 21, 2023).

110.    Advertising companies that subscribe to GDI's blacklist refuse to place ads with disfavored news sources, cutting off revenue streams and leaving the blacklisted outlets unable to compete with the approved "low risk" media outlets—often legacy news.[76]

111.    Oracle and the Microsoft-owned ad company Xandr both subscribed to GDI's blacklist.[77]

112.    According to emails obtained by the *Washington Examiner*, in 2022, Xandr informed companies it was adopting GDI's exclusion list to avoid placing ads with outlets that are "morally reprehensible or patently offensive," lack "redeeming social value," or that "could include false or misleading information."[78]

113.    Companies that ignore GDI's list and continue to advertise with the disfavored media outlets are singled out and shamed by GDI.[79]

---

[76] Gabe Kaminsky, *Disinformation Inc: Microsoft Suspends Relationship With Group Blacklisting Conservative News*, THE WASHINGTON EXAMINER (Feb. 11, 2023), *available at* https://www.washingtonexaminer.com/policy/technology/disinformation-inc-microsoft-xander-conservative-defunded-outlets (last visited on November 21, 2023).

[77] *Id.*; Gabe Kaminsky, *Disinformation Inc: Massive Corporation Oracle Severs Ties With Conservative Blacklist Group*, THE WASHINGTON EXAMINER (April 19, 2023), *available at* https://www.washingtonexaminer.com/news/oracle-ends-global-disinformation-index-partnership-blacklisting-conservatives.

[78] Gabe Kaminsky, *Disinformation Inc: Read One of the 'Blacklists' Used Secretly to Defund Conservative News*, THE WASHINGTON EXAMINER (Feb. 10, 2023), *available at* https://www.washingtonexaminer.com/restoring-america/equality-not-elitism/disinformation-inc-read-one-of-the-blacklists-used-secretly-to-defund-conservative-news.

[79] Gabe Kaminsky, *Meet the Groups Hauling in Cash to Secretly Blacklist Conservative News*, THE WASHINGTON EXAMINER (Feb. 9, 2023), *available at* https://www.washingtonexaminer.com/restoring-america/equality-not-elitism/disinformation-conservative-media-censored-blacklists (last visited November 21, 2023).



114.    GDI, which created and champions its Dynamic Exclusion List, was funded and promoted by the State Department Defendants, and this list operates to defund, deplatform, and discredit American news outlets, including, upon information and belief, Media Plaintiffs.

*GDI's Less Secret Blacklist*

115.    While the Dynamic Exclusion List is hidden from the public, GDI published a separate report that designated the supposed top ten "riskiest" American online news outlets. In previewing that report, GDI stressed its methodology was "developed to assist advertisers and the ad tech industry in assessing the reputational and brand risk when advertising with online media outlets and to help them avoid financially supporting disinformation online."[80]

---

[80] Brief: Disinformation Risk in the United States Online Media Market, October 2022, *available at* https://www.disinformationindex.org/research/2022-10-21-brief-disinformation-risk-in-the-united-states-online-media-market-october-2022/ (last visited on November 21, 2023).

116.    GDI's December 16, 2022, report entitled "Disinformation Risk Assessment: The Online News Market in the United States," targeted Media Plaintiffs, rating them in the top ten of the supposedly "riskiest" outlets.[81]

| Least risky sites | Riskiest sites |
| --- | --- |
| NPR | New York Post |
| AP News | Reason Magazine |
| The New York Times | RealClearPolitics |
| ProPublica | The Daily Wire |
| Insider | TheBlaze |
| USA Today | One America News Network |
| The Washington Post | The American Conservative |
| BuzzFeed News | The Federalist |
| Wall Street Journal | Newsmax |
| HuffPost | The American Spectator |

*NewsGuard's Rating Service Also Seeks to Censor Speech*

117.    GDI is not the only government-funded and government-promoted blacklisting service: NewsGuard also compiles a list of American press outlets it characterizes as "unreliable."[82]

118.    According to its webpage, NewsGuard licenses its reliability ratings to advertisers "to make decisions about which news sources to advertise on."[83]

119.    In a recent press release, NewsGuard was more forthcoming with its goal: NewsGuard's Co-CEO Gordon Crovitz was quoted as stating the company's world-wide expansion "empower[s]

---

[81] *Id.*
[82] NewsGuard FAQ, *available at* https://www.newsguardtech.com/newsguard-faq/ (last visited November 21, 2023).
[83] *Id.*

governments, brands, advertising agencies, and non-profit organizations with human-vetted insights to support quality journalism and systemically defund sources of harmful misinformation."[84]

120.    NewsGuard also admitted its goal to deprive disfavored news sites of revenue in its description of its Library Partnership Initiative provided to the Alaska Department of Education, writing: "We are also licensing our White List of legitimate news sites to advertisers, which will cut off revenues to fake news sites."[85]

121.    NewsGuard asserts that its "licensees include search engines and platforms, internet service providers, advertising companies, health and medical institutions, educational organizations, cybersecurity companies, governments, researchers and more."[86]

122.    Currently, NewsGuard ranks The Daily Wire and The Federalist as "unreliable" media outlets.

### The Press Non Grata

123.    NewsGuard and GDI's blacklists reduce Media Plaintiffs' revenue, and upon information and belief, their visibility on social media, and ranking results from browser searches, thereby reducing their circulation, readership, and reach, and otherwise negatively impacting their operations.

124.    These censorship-by-risk-rating technologies and entities discriminate against the press based on content and viewpoint and function to silence opposing views, including those of the Media Plaintiffs'.

---

[84] NewsGuard Press Release, March 15, 2023, *available at* https://www.newsguardtech.com/press/newsguard-expands-service-to-australia-new-zealand/ (last visited November 29, 2023).
[85] NewsGuard Library Partnership Initiative, *available at*
https://library.alaska.gov/documents/webinars/dev/newsguard/webinar-slides.pdf (last visited December 1, 2023).
[86] *Id.*

***GEC Funds GDI***

125.    GEC appears to have first funded GDI in 2021 through its U.S.-Paris Tech Challenge.[87]

126.    While the tech challenges were international and purported to fund foreign-based technology and technology companies, the U.S.-Paris Challenge awarded cash prizes to GDI which blacklisted Media Plaintiffs.[88]

127.    GEC awarded GDI $100,000 after it competed in the U.S.-Paris Tech Challenge, where GDI pitched its technology that purported to assess the "disinformation risk" of media outlets.[89]

128.    At the 2021 U.S.-Paris Tech Challenge, GDI's founders explained the goal of the risk-rating technology: to disrupt the funding of so-called disinformation by steering away "ad dollars" from disfavored media outlets to supposedly "quality" journalism.[90]

129.    Danny Rogers, the American partner in GDI, stressed in the team's U.S.-Paris Tech Challenge presentation that "over a dozen ad-tech companies," covering "20 different media markets," used GDI's technology and that its technology succeeded in "cutting the number of ad options" by over half, "redirecting millions of dollars away from disinformation peddlers toward quality journalism."[91]

[87] U.S.-Paris Tech Challenge 2021, Sept. 30, 2021, *available at https://www.atlanticcouncil.org/event/u-s-paris-tech-challenge/*, at 1:09:30 (last visited November 21, 2023).
[88] U.S.-Paris Tech Challenge 2021, Sept. 30, 2021, *available at https://www.atlanticcouncil.org/event/u-s-paris-tech-challenge/* (last visited November 21, 2023).
[89] Gabe Kaminsky, *Disinformation Inc.: State Department Bankrolls Group Secretly Blacklisting Conservative Media*, Washington Examiner (Feb. 9, 2023), *available at https://www.washingtonexaminer.com/restoring-america/equality-not-elitism/disinformation-group-secretly-blacklisting-right-wing-outlets-bankrolled-state-department*.
[90] U.S.-Paris Tech Challenge 2021, Sept. 30, 2021, *available at https://www.atlanticcouncil.org/event/u-s-paris-tech-challenge/*, at 1:10 (last visited November 21, 2023).
[91] U.S.-Paris Tech Challenge 2021, Sept. 30, 2021, *available at https://www.atlanticcouncil.org/event/u-s-paris-tech-challenge/*, at 1:10:25 (last visited November 21, 2023).

130.    Clare Melford, Rogers's partner and CEO of GDI, similarly stated in a March 2022 podcast that the blacklist "had a significant impact on the advertising revenue that has gone to those sites."[92]

131.    After learning GEC had selected GDI as one of the winners of the U.S.-Paris Tech Challenge, Melford explained that the award, in addition to allowing GDI to increase its "language coverage capability," would also allow GDI to expand its risk assessments into video news and strengthen GDI's "infrastructure" to "support market-wide deployment so that the ad-tech space can offer advertisers the chance to choose which sites their ads support."[93]

132.    In closing out the U.S.-Paris Tech Challenge, Patricia Watts, the Director of TET at GEC, championed GDI and the other censorship enterprises featured, saying: "To all of you listening, we encourage you to engage with all eight companies featured during the tech challenge to determine if there are opportunities to support their counter-disinformation work. Their work benefits us all in building a better information environment, so please do reach out to them or to us."[94]

133.    In addition to funding and promoting GDI through its U.S.-Paris Tech Challenge, Defendant State Department, through its alter ego Disinfo Cloud, promoted GDI on its Twitter feed.[95]

---

[92] Gabe Kaminsky, *Disinformation Inc.: State Department Bankrolls Group Secretly Blacklisting Conservative Media*, Washington Examiner (Feb. 9, 2023), *available at* *https://www.washingtonexaminer.com/restoring-america/equality-not-elitism/disinformation-group-secretly-blacklisting-right-wing-outlets-bankrolled-state-department*.

[93] U.S.-Paris Tech Challenge 2021, Sept. 30, 2021, *available at* *https://www.atlanticcouncil.org/event/u-s-paris-tech-challenge/*, at 1:25:30 (last visited November 21, 2023).

[94] U.S.-Paris Tech Challenge 2021, Sept. 30, 2021, *available at* *https://www.atlanticcouncil.org/event/u-s-paris-tech-challenge/*, at 1:26:15 (last visited November 21, 2023).

[95] *See supra* at 20.

***GDI's Government-Sponsored Blacklist Is Exposed***

134.    In addition to GEC's funding of GDI, *Washington Examiner* investigative reporter Gabe Kaminsky revealed in a series of articles entitled "*Disinformation, Inc.*"[96] that the State Department had funneled grant money amounting to hundreds of thousands of dollars to an organization operating as GDI, through the State-Department-funded National Endowment for Democracy or "NED."[97]

***NED's Funding of the Disinformation Index, Inc.***

135.    On February 11, 2022, NED issued a list of grants awarded in 2021 and disclosed that it had provided "Disinformation Index, Inc." $315,570 that year for "strengthening digital integrity in the digital space."[98]

136.    Upon information and belief, during 2023, NED stealth-edited its list of grant awards, deleting reference to the $315,570 award to Disinformation Index, Inc."[99]

137.    Disinformation Index, Inc. is an American entity that, upon information and belief, operates GDI in partnership with the British entity, Disinformation Index, Ltd.[100]

138.    In 2020, NED granted $230,000 to AN Foundation. Upon information and belief, AN Foundation also goes by the name "Disinformation Index Foundation" (DIF).[101]

---

[96] Gabe Kaminsky, *Disinformation Inc: Watchdog Launches Sweeping Investigation Into Conservative Blacklists*, THE WASHINGTON EXAMINER (Feb. 22, 2023), *available at* https://www.washingtonexaminer.com/news/disinformation-inc-watchdog-investigation-into-conservative-blacklists-global-disinformation-index.

[97] *Id.*

[98] https://web.archive.org/web/20221129053645/https://www.ned.org/region/global-2021/.

[99] Compare https://www.ned.org/region/global-2021/ with https://web.archive.org/web/20221129053645/https://www.ned.org/region/global-2021/.

[100] Global Disinformation Index, Our Story, *available at* https://www.disinformationindex.org/about; GOV.UK site: Disinformation Index Ltd., *available at* https://find-and-update.company-information.service.gov.uk/company/11297397/officers; GuideStar, Disinformation Index Inc., *available at* https://www.guidestar.org/profile/85-2450338.

[101] NED Awarded Grants Searched, *available at* https://www.ned.org/wp-content/themes/ned/search/grant-search.php?organizationName=an+Foundation&region=&projectCountry=&amount=&fromDate=&toDate=&projectFocus%5B%5D=&search=&maxCount=25&orderBy=Year&start=1&sbmt=1; Gabe Kaminsky, *Disinformation*

139.    Upon information and belief, AN Foundation was founded and is managed by the directors of GDI and also provides financial support to GDI.

140.    Upon news breaking of NED's involvement with GDI, NED immediately announced its "mandate is to work around the world and not in the United States," and thus, it would "no longer provide financial support to GDI."[102]

141.    Congresswoman Elise Stefanik, who sits on the board of NED, noted that the "State Department should not be funding woke organizations who seek to censor and demonetize conservative outlets."[103]

### Disinfo Cloud Funneled Money to Other American Censorship Companies

142.    In addition to its international tech challenges, the State Department co-sponsored a "COVID-19 misinformation and disinformation" tech challenge in the spring and summer of 2020.[104]

143.    The three winners of the COVID-19 misinformation and disinformation tech challenge were NewsGuard, Peak Metrics, and Omelas—all American companies which offer censorship technologies that target Americans' speech broadcast to Americans.[105]

---

Inc.: State Department Bankrolls Group Secretly Blacklisting Conservative Media, Washington Examiner (Feb. 9, 2023), available at https://www.washingtonexaminer.com/restoring-america/equality-not-elitism/disinformation-group-secretly-blacklisting-right-wing-outlets-bankrolled-state-department; AN Foundation, available at https://www.causeiq.com/organizations/disinformation-index-foundation,832235831/#form990s (last visited on November 21, 2023).

[102] https://www.foxnews.com/media/state-department-backed-group-stop-funding-disinformation-index-targeted-right-leaning-sites (last visited on November 29, 2023).

[103] Gabe Kaminsky, Disinformation Inc.: State Department Bankrolls Group Secretly Blacklisting Conservative Media, Washington Examiner (Feb. 9, 2023), available at https://www.washingtonexaminer.com/restoring-america/equality-not-elitism/disinformation-group-secretly-blacklisting-right-wing-outlets-bankrolled-state-department.

[104] NSIN Challenge—Countering COVID19 Disinformation, available at https://www.nsin.mil/events/disinfo-challenge/ (last visited November 21, 2023).

[105] NewsGuard Press Release, Aug. 17, 2020, available at https://www.newsguardtech.com/press/newsguard-wins-pentagon-state-department-contest-for-detecting-covid-19-misinformation-and-disinformation/ (last visited November 21, 2023).

144.    The COVID-19 tech challenge's prize package included a $25,000 government-funded award, which the State Department paid through its alter ego, Disinfo Cloud.

145.    Winners also received the opportunity to further test and refine their technology by piloting the technology on the Disinfo Cloud "testbed."[106]

146.    In a press release, NewsGuard explained that it would "help" the State Department by identifying and flagging those spreading alleged COVID disinformation and "hoaxes."[107]

147.    NewsGuard's technology relied on its ratings of news websites, including of American media outlets, such as Media Plaintiffs.[108]

148.    PeakMetrics, the second winner of the COVID-19 tech challenge, boasts on its website that its technology "provides a unique monitoring and measuring tool to detect misinformation campaigns before they cause harm."[109]

149.    PeakMetrics's "proprietary data pipeline" and "machine learning algorithms" "ingest millions of data points per day from news articles, social media posts and TV + Radio broadcasts."[110]

150.    Upon information and belief, the technology that PeakMetrics entered in the COVID-19 tech challenge monitors American speech, including that of the American press.

---

[106] NSIN Challenge—Countering COVID19 Disinformation, *available at* https://www.nsin.mil/events/disinfo-challenge/ (last visited June 24, 2023).
[107] NewsGuard Press Release, Aug. 17, 2020, *available at* https://www.newsguardtech.com/press/newsguard-wins-pentagon-state-department-contest-for-detecting-covid-19-misinformation-and-disinformation/ (last visited November 21, 2023).
[108] NewsGuard Press Release, Aug. 17, 2020, *available at* https://www.newsguardtech.com/press/newsguard-wins-pentagon-state-department-contest-for-detecting-covid-19-misinformation-and-disinformation/ (last visited November 21, 2023).
[109] PeakMetrics Press Release, *available at* https://www.peakmetrics.com/insights/peakmetrics-accepted-into-air-force-accelerator-powered-by-techstars (last visited November 21, 2023).
[110] PeakMetrics Contract, *available at* https://www.highergov.com/contract/FA864920P0539/ (last visited November 21, 2023).

151.    The $25,000 award from GEC to PeakMetrics was funneled to PeakMetrics from Disinfo Cloud and funded PeakMetrics's continued development of its censorship technology through further testing on the Disinfo Cloud "testbed."[111]

152.    The third winner of the COVID-19 challenge was Omelas, a Washington, D.C.-based company that develops "comprehensive technology" to address "malicious influence on the web."[112]

153.    The $25,000 award from GEC to Omelas was funneled to Omelas from Disinfo Cloud and supported the continued development of Omelas censorship technology through further testing on the Disinfo Cloud "testbed."

154.    Defendant State Department, through Disinfo Cloud, promoted the censorship technology and software of, among others, GDI, NewsGuard, PeakMetrics, and Omelas: Upon information and belief, said entities are either American companies or operate through a related American entity, and they all offer technology that targets the speech of Americans, in America, published to and for Americans.

### *Disinfo Cloud: Cheerleaders for NewsGuard*

155.    Disinfo Cloud also promoted NewsGuard on its Twitter feed, amplifying NewsGuard's announcement of its partnership with IPG Media Brands—a partnership forged to rate American TV news programming designed to prompt the defunding of certain press outlets by advertisers.[113]

---

[111] NewsGuard Press Release, Aug. 17, 2020, *available at* https://www.newsguardtech.com/press/newsguard-wins-pentagon-state-department-contest-for-detecting-covid-19-misinformation-and-disinformation/ (last visited November 21, 2023).
[112] Omelas, About, *available at* https://www.omelas.io/about (last visited on November 21, 2023).
[113] *See supra* at 20.

156.    Additionally, Disinfo Cloud featured NewsGuard in at least one Disinfo Cloud Digest, highlighting the for-profit's censorship technology.[114]

***GEC Funded and Promoted Hundreds of Censorship Tools***

157.    Upon information and belief, in addition to promoting GDI and NewsGuard, the Disinfo Cloud platform was used to develop, research, test, promote, and/or market other censorship tools and technology designed to silence, down-rank, de-amplify, deplatform, de-boost, demonetize, denigrate, or otherwise abridge Media Plaintiffs' First Amendment rights.

158.    Upon information and belief, Disinfo Cloud used Twitter (now known as X) and other social media entities to promote the use of other censorship tools and technology designed to silence, down-rank, de-amplify, deplatform, de-boost, demonetize, denigrate, or otherwise abridge Media Plaintiffs' First Amendment rights.

159.    Upon information and belief, Disinfo Cloud used its Disinfo Cloud Digest to promote other censorship tools and technology designed to silence, down-rank, de-amplify, deplatform, de-boost, demonetize, denigrate, or otherwise abridge Media Plaintiffs' First Amendment rights.

***Media Plaintiffs Suffer Ongoing Harm from Alter Ego Disinfo Cloud's***
***Abridgement of Their First Amendment Rights***

160.    In December of 2021, the State Department announced that "GEC's Disinfo Cloud platform and the Disinfo Cloud Digest have been retired as GEC-sponsored efforts," but noted the "GEC's work to elevate technology solutions to disinformation challenges continue with new projects designed to adapt to the current environment," telling the public to "stay tuned for more information on the next iteration of this program!"

---

[114] The Disinfo Cloud Digest, Apr. 6, 2021, *available at* https://myemail.constantcontact.com/New-tools--a--29M-counter-disinfo-fund--and-a-musical.html?soid=1134000290001&aid=6VULxmHPp-M

161.    While Defendant GEC discontinued the Disinfo Cloud platform and the Disinfo Cloud Digest, Disinfo Cloud's Twitter account remains live, displaying posts promoting GDI and NewsGuard, as well as providing links to the Disinfo Cloud Digest that promotes NewsGuard and other tools and technologies that target Americans.

162.    Upon information and belief, GEC continues to use the research and reports Disinfo Cloud authored about the 350-plus available censorship tools and technologies, including ones that target Media Plaintiffs. Thus, Media Plaintiffs continue to suffer the adverse effects of Defendants' illegal conduct.

163.    Upon information and belief, Defendant State Department continues to promote censorship tools and technology that it funded, developed, reviewed, analyzed and/or tested directly or indirectly through Disinfo Cloud, and these censorship tools and technologies seek to silence, down-rank, de-amplify, deplatform, de-boost, demonetize, denigrate, or otherwise abridge Media Plaintiffs' First Amendment rights.

164.    By recommending censorship technology to the private sector, which then targets the American press and/or Americans' speech, the State Department Defendants are inducing the censorship of speech. There is no legal distinction between the State Department inducing tech companies to downrank Plaintiff The Daily Wire and Plaintiff The Federalist, and the State Department inducing tech companies to use technology that downranks Media Plaintiffs as "unreliable" or "risky" media outlets. The State Department cannot lawfully abridge speech indirectly via private partners any more than it can abridge speech directly itself.

***Defendants Continue to Infringe on Media Plaintiffs' First Amendment Rights***

165.    While DisinfoCloud.com is no longer publicly accessible, upon information and belief, the information available at DisinfoCloud.com, including information about censorship tools and

technologies that target the American press and Americans' speech, was moved to another platform.[115]

166.    In its audit of GEC, the Office of Inspector General faulted GEC for allowing a contractor to decide to use .com, as opposed to .gov, on a GEC-sponsored webpage.[116]

***The Censorship Continues***

167.    While GEC's TET discontinued Disinfo Cloud and Disinfo Cloud Digest, it continues to promote censorship tools and technology to the private sector, including, upon information and belief, censorship tools and technology designed to silence, down-rank, de-amplify, deplatform, de-boost, demonetize, denigrate, or otherwise abridge Media Plaintiffs' First Amendment rights.

168.    Defendant GEC claims it has "developed a dedicated effort for the U.S. Government to identify, assess, test and implement technologies against the problems of foreign propaganda and disinformation, in cooperation with foreign partners, private industry and academia."[117]

169.    Upon information and belief, Defendant GEC does not limit its efforts to "identify, assess, test, and implement technologies" to tools and technologies focused on "foreign propaganda and disinformation."

170.    Defendant TET also continues to host the tech challenges and, upon information and belief, continues to award grants to fund the development of censorship technology or censorship enterprises that target the American press and Americans' speech.

171.    Upon information and belief, Defendant GEC continues to operate the testbed.

---

[115] The Disinfo Cloud Digest, Dec. 21, 2021, *available at* *https://myemail.constantcontact.com/Thank-you-and-farewell--for-now-.html?soid=1134000290001&aid=ixx_30MZGGU* (last visited on November 21, 2023).
[116] Office of Inspector General, United States Department of State, *Inspection of Global Engagement Center*, Sept. 2022, at 22, *available at* https://www.stateoig.gov/uploads/report/report_pdf_file/isp-i-22-15.pdf (last visited November 21, 2023).
[117] United States Department of State, *Other AI Initiatives at the Department of States*, *available at* https://www.state.gov/artificial-intelligence/ (last visited November 21, 2023).

172.    Upon information and belief, the testbed continues to test and/or develop censorship technology that targets the American press and Americans' speech.

173.    Upon information and belief, Defendant GEC maintains a platform of censorship technology and tools, including those that target segments of the American press and Americans' speech.

174.    Defendant GEC also highlights on its .gov webpage several organizations and resources that the State Department represents as "counter-disinfo resources" that "offer commercial, non-profit, think tank, and academic technology solutions, dashboards, and research," including the Alliance for Security (*sic*) Democracy, the Atlantic Council's Digital Forensic Research Lab, the CredCatalog, Fighting Disinformation Online, MediaWell, and Misinformation Review. These "counter-disinfo" "solutions, dashboards, and research" all target the American press and/or American speakers, including some which promote NewsGuard[118] and GDI.[119]

175.    GEC also maintains a "Silicon Valley location" and, upon information and belief, continues to promote and market censorship tools and technology that target segments of the American press and Americans' speech to the tech industry, the private sector, and academia.

---

[118] Misinformation Review, June 6, 2023, *Less Reliable Media Drive Interest in Anti-Vaccine Information*, *available at* https://misinforeview.hks.harvard.edu/article/less-reliable-media-drive-interest-in-anti-vaccine-information/ (last visited November 21, 2023).
[119] Fighting Disinformation Online, *available at* https://www.rand.org/research/projects/truth-decay/fighting-disinformation/search.html#q=global+disinformation+index (last visited November 21, 2023).

# Locations



***Meet the New Boss, Same as the Old Boss***

176.    While GEC claims to no longer uses Disinfo Cloud to "sponsor" the tech challenges and to funnel State Department money to awardees, such as GDI, Disinfo Cloud's replacement,[120] Becera was founded in January 2022 by Disinfo Cloud administrator and Park Advisor director, Christine Nemr.[121]

177.    Nemr describes her new venture, Becera, as improving "public-private collaboration through tech innovation.[122]

---

[120] U.S.-Africa Tech Challenge, *available at* *https://www.becera.co/west-africa-tech-challenge* (last visited on November 21, 2023).
[121] Becera, *available at* https://www.linkedin.com/in/christina-nemr-33213015/ (last visited on November 21, 2023).
[122] Becera, *available at* *https://www.becera.co/* (last visited on November 21, 2023).

178.    Nemr's new company Becera has received awards of over $1 million from the State Department as a sub-grantee since its January 2022 founding, indicating her continued involvement in the State Department Defendants' operations.[123]

179.    Upon information and belief, Defendant Alexis Frisbie continues to oversee, coordinate, and/or execute TET initiatives.

180.    Upon information and belief, Defendant Patricia Watts continues to oversee, coordinate, and/or execute TET initiatives.


## RELEVANT PRINCIPLES

### I.    THE FIRST AMENDMENT PROHIBITS ABRIDGEMENT OF THE RIGHT TO FREEDOM OF SPEECH AND FREEDOM OF THE PRESS

181.    The First Amendment prohibits the federal government from "abriding the freedom of speech, or of the press." U.S. CONST. amend. I.

182.    The prohibition against the abridgment of Freedom of Speech and Freedom of the Press applies to all branches of the government, government entities, and government actors. *See Matal v. Tam*, 137 S. Ct. 1744, 1757 (2017).

183.    The right to Freedom of Speech is robust, *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964), ensuring "that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham v. North Carolina*, 127 S. Ct. 1730, 1735 (2017).

---

[123] Becera Sub-Grant Awards, *available at* *https://www.usaspending.gov/search/?hash=3957586233c127076e037bea8a4b1da6.*

184.    And "as a general matter, social media is entitled to the same First Amendment protections as other forms of media." *Knight First Amend. Inst. v. Trump*, 928 F.3d 226, 237 (2d Cir. 2019), *vacated on other grounds*, 141 S. Ct. 1220 (2021).

185.    Further, the right to Freedom of Speech reaches all "field[s] of human interest," *Thomas v. Collins*, 323 U.S. 516, 531 (1945), and, "[]as a general matter, … government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002) (citation omitted).  "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

186.    "[D]ecisions [by governmental officials] to list particular publications as objectionable" constitute an unconstitutional "system of prior administrative restraints" without judicial oversight. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70–71 (1963).

187.    Governmental expression of opinions about particular social media posts publicly and transparently is generally legal. Doing so contributes to the national debate by subjecting those expressions to the marketplace of ideas and to criticism. But when federal officials blacklist, especially behind closed doors, where no one else knows or can criticize the blacklist, they unlawfully participate in shutting down debate.

188.    Further, while federal officials generally have the authority to publicly express disagreement with private speech or the press, that does not imply the authority—overtly or covertly—to fund and promote censorship tools that blacklist the press or Americans' speech.

189.    The Supreme Court has held that even "false statements, as a general rule" are not "beyond constitutional protection." *United States v. Alvarez*, 567 U.S. 709, 718 (2012). Thus, merely labeling disfavored speech as "disinformation," "misinformation," or "mal-information" does not strip it of First Amendment protection.

190.    "This comports with the common understanding that some false statements are inevitable if there is to be an open and vigorous expression of views in public and private conversation, expression the First Amendment seeks to guarantee." *Id.* (quoting *United States v. Stevens*, 559 U.S. 460, 470 (2010)).

191.    "Were the Court to hold that the interest in truthful discourse alone is sufficient to sustain a ban on speech … it would give government a broad censorial power unprecedented in this Court's cases or in our constitutional tradition. The mere potential for the exercise of that power casts a chill, a chill the First Amendment cannot permit if free speech, thought, and discourse are to remain a foundation of our freedom." *Id.* at 723.

192.    "The theory of our Constitution is 'that the best test of truth is the power of the thought to get itself accepted in the competition of the market.'" *Id.* at 728 (quoting *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)).

193.    "The First Amendment itself ensures the right to respond to speech we do not like, and for good reason. Freedom of Speech and thought flows [*sic*] not from the beneficence of the state but from the inalienable rights of the person. And suppression of speech by the government can make exposure of falsity more difficult, not less so. Society has the right and civic duty to engage in open, dynamic, rational discourse. These ends are not well served when the government seeks to orchestrate public discussion through content-based mandates." *Id.* at 728.

194.    The Press Clause also "comprehends every sort of publication which affords a vehicle of

information and opinion," *Lovell v. Griffin*, 303 U.S. 444, 452 (1938), and the guarantee of Freedom of the Press does not change depending on the publication's characteristics or third-party ratings, for "freedom to publish means freedom for all and not for some." *Assoc. Press v. United States*, 326 U.S. 1, 20 (1945).

195.    Further, Freedom of the Press "rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public, that a free press is a condition of a free society." *Id.*

196.    To that end, the constitutional protection of Freedom of the Press is exceedingly broad and while it undoubtedly protects against prior restraints on publication, it is not limited to "any particular way of abridging" the right, for "[t]he evils to be prevented were not the censorship of the press merely, but any action of the government by means of which it might prevent such free and general discussion of public matters as seems absolutely essential to prepare the people for an intelligent exercise of their rights as citizens." *Grosjean v. American Press Co.*, 297 U.S. 233, 249-50 (1936) (quoting 2 Cooley's Constitutional Limitations, 8th ed., p. 886).

197.    As such, the Supreme Court has long accorded constitutional protection to the press to disseminate the news, for "liberty of circulating" is essential to a free press, and "without the circulation, the publication would be of little value." *Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938) (quoting *Ex Parte Jackson*, 96 U.S. 727, 733 (1877)).

198.    The government abridges Freedom of the Press by "penalizing the publishers and curtailing the circulation of a selected group of newspapers." *Grosjean*, 297 U.S. at 251.

II.    **THE GOVERNMENT MAY NOT DIRECTLY OR INDIRECTLY ABRIDGE THE FIRST AMENDMENT RIGHTS OF ITS CITIZENS**

**Defendant State Department's Own Conduct Abridged Plaintiffs' Rights**

199.    The State Department Defendants have no statutory authority to censor speech and the press. It follows that they also lack the power to *attempt* to censor speech and the press, and they lack the power to *ask others* to censor speech and the press.

200.    Media Plaintiffs need not establish that they were censored, suppressed, or silenced directly by government action; they need only establish the State Department Defendants abridged their First Amendment rights.

201.    The First Amendment itself establishes that principle: It bars any law or government policy from "abridging" Freedom of Speech or Freedom of the Press. Thus, what matters in assessing whether *the government* has violated the First Amendment is whether the government's actions have had the consequence of *abridging* Freedom of Speech or Freedom of the Press, not whether it has acted directly, not whether a private partner has become a government actor, and not whether government has acted coercively or with undue pressure—for it is "axiomatic" that the government may not "induce, encourage, or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973).

202.    Indeed, whereas the First Amendment bars the government from "prohibiting" the free exercise of religion, it forbids the government from even so much as "abridging" Freedom of Speech or Freedom Press. Const. amend I. Accordingly, in a First Amendment claim against the government, the constitutional question is simply whether the government has been *abridging* (*i.e.*, diminishing) protect speech or the press.

203.    As detailed above and as further explained in the individual counts, the State Department Defendants' own actions abridge Media Plaintiffs' First Amendment rights.

204.    Courts can enjoin federal officials who censor speech and the press. *See Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902) (reversing the dismissal of a request for an injunction against the Postmaster General's alleged censorship of mail); *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015) ("[F]ederal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law. But that has been true not only with respect to violations of federal law by state officials, but also with respect to violations of federal law by federal officials.").

205.    Further, "the history of past censorship provides strong evidence that the threat of future censorship is not illusory or speculative," making declaratory and injunctive relief appropriate.[124]

***The State Department Defendants Are Also Responsible for Private Censorship Efforts***

206.    Public officials also violate the First Amendment when they "deliberately set out to achieve the suppression of publications" through "informal sanctions," including "the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66-67 (1963) (even where private party is "free" to ignore government's "advice" because its refusal would violate no law, it is still state action when the government induces a private party to suppress speech).

207.    It is enough to show that the government's funding, support, and collusion with private parties "cast disapproval on particular viewpoints" and "risk[ed] the suppression of free speech and creative inquiry." *Rosenberger*, 515 U.S. at 836.

208.    Additionally, the actions of private actors are imputed to the government when (i) it provides "significant encouragement" to the private actors, *Blum v. Yaretsky*, 457 U.S. 991, 1004;

---

[124] *See Missouri v. Biden,* ----F.Supp.3d----, 2023 WL 4335270 *60 (W.D. LA July 4, 2023), *rev'd in part*, No. 23-30445, --- F.4th --, 2023 WL 5821788 (5th Cir. Sept. 8, 2023), *cert. granted* in *Murthy v. Missouri*, 601 U.S. ----, ---S. Ct. ----, 2023 WL 6935337 (Mem).

(ii) when the private actors operated as willful participants in joint activity with the government, *Lugar v. Edmondson Oil Co.*, 457 U.S. 992, 941 (1982); or (iii) when private actors jointly engaged with government actors to carry out constitutionally forbidden actions. *Dennis v. Sparks*, 449 U.S. 24 (1980).

209.    State action through joint engagement also occurs when the government "knowingly accepts the benefits derived from unconstitutional behavior." *Kirtley v. Rainey*, 326 F.3d 1088, 1093 (9th Cir. 2003).

210.    Joint action may also be proven by showing that government officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights. *See, e.g.*, *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1453 (10th Cir. 1995).

211.    Further, private acts may constitute joint state action if the private parties "have conspired with a state official." *Sims v. Jefferson Downs Racing Ass'n, Inc.*, 778 F.2d 1068, 1076 (5th Cir. 1985). To establish a conspiracy, "[i]t is enough that [a private party] is a willful participant in joint activity with the State or its agents." *Id.* (citing *United States v. Price*, 383 U.S. 787, 794 (1966)).

212.    Joint activity also occurs when the government has "so far insinuated itself" into the private affairs of a non-governmental entity that the line between public and private action is blurred. *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 357 (1974). In such circumstances, the government's entanglement with the management and control of private entities will impute private action to the government. *Evans v. Newton*, 382 U.S. 296, 299 (1966).

213.    Likewise, the government is responsible for private action "when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed that of the State," *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). As recognized

in *Trinity Lutheran v. Comer*, 582 U.S. 449, 450, 463 (2017), such coercive power includes "indirect coercion," such as a very minor monetary inducement.

214.    Thus, private action may be rendered state action in many ways including where the government finances and assists in the development of censorship technology, promoting censorship technology, and/or providing government technology and resources to private actors to effectuate a censorship scheme. *See, e.g. Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 606, 606-12, 615 (1989) ("Government did more than adopt a passive position toward the underlying private conduct.").

215.    Upon information and belief, the State Department Defendants have provided "significant encouragement" to social media, web browsers, and other technology companies to limit the circulation and/or distribution of Media Plaintiffs' news reporting and speech. Upon information and belief, this encouragement has directly resulted in the private companies downranking Media Plaintiffs' journalism in search results, and de-amplifying, deplatforming, de-boosting, demonetizing, suspending, shadow banning, restricting, or limiting access, and/or posting warnings on their news reports and coverage. Such private conduct thus constitutes state action imputed to the State Department Defendants.

216.    Through the efforts described above, the State Department Defendants have also become entwined in the management and control of those entities that developed censorship technology— technology that work to limit the distribution of Media Plaintiffs' reporting. This further establishes that the private companies' censorship activities qualify as state action imputed to the State Department Defendants.

217.    The private actors whose censorship technology the State Department Defendants have funded, marketed, and promoted—in particular, GDI and NewsGuard, but also unknown and

untold others—have operated as willful participants in joint activity with the State Department Defendants to unconstitutionally censor the American press and Americans' speech. Therefore, their conduct is imputed to the State Department Defendants as state action, as well.

218.    The private actors that joined Disinfo Cloud, coordinated with the Silicon Valley Engagement liaison, or otherwise participated in the State Department Defendants' efforts to censor American press outlets and speakers, operated as willful participants in joint (unconstitutional) activity with the State Department Defendants. Their conduct thus also constitutes state action that is imputed to the State Department Defendants.

219.    Even if the State Department Defendants did not censor by means of contract and encouragement (they did), they violated the First Amendment by offering coordination. Even if the State Department Defendants were not seeking censorship (they were), and even if the censorship was performed independently by private corporations (it wasn't), private corporate censorship cannot be effective unless it is coordinated across different platforms. The platforms need coordination to ensure they are all censoring the same sorts of materials and not just driving customers to competitors. But the companies themselves cannot coordinate without antitrust difficulties. So, they need government coordination. By supplying such coordination, the State Department Defendants are abridging Media Plaintiffs' Freedom of Speech and Freedom of the Press.

220.    "Further, the government actor need not have direct power to take adverse action over a targeted entity for comments to constitute a threat, provided the government actor has the power to direct or encourage others to take such action." *Nat'l Rifle Ass'n of Am. v. Cuomo*, 350 F.Supp.3d 94, 115 (N.D.N.Y. 2018).

221.    Where the government financed, encouraged, and rewarded private actors for adopting the government's preferred policy, there is "significant encouragement, overt or covert[,]" constituting government action. *Mathis v. Pacific Gas & Electric Co.*, 891 F.2d 1429, 1431 (9th Cir. 1989).

### III.    AGENCIES ARE ONLY PERMITTED TO EXERCISE CONGRESSIONALLY DELEGATED AUTHORITY

222.    [A]gency actions beyond delegated authority are *ultra vires* and should be invalidated." *Detroit International Bridge Company v. Government of Canada*, 192 F.Supp.3d 54, 65 (D.D.C. 2016). "At common law, the *ultra vires* exception to sovereign immunity provides that where the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions. Such actions are *ultra vires* [i.e. beyond] his authority and therefore may be made the object of specific relief. To invoke this exception, a plaintiff must do more than simply allege that the actions of the officer are illegal or unauthorized. Rather, the complaint must allege facts sufficient to establish that the officer was acting without any authority whatever, or without any colorable basis for the exercise of authority. Under the common-law *ultra vires* doctrine, then, a strong merits argument is needed to overcome sovereign immunity—even at the pleading stage." *Apter v. Dep't of Health & Human Services*, 80 F.4th 579, 587–88 (5th Cir. 2023) (cleaned up, citations omitted).

223.    Courts look to an agency's enabling statute to determine whether the agency has exceeded its authority, and enabling legislation is "generally not an 'open book to which the agency [may] add pages and change the plot line.'" *Midship Pipeline Co., L.L.C. v. FERC*, 45 F.4th 867, 876 (5th Cir. 2022) (quoting *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022)).

224.    Where there is "no clear expression of congressional intent" in an agency's enabling statute to convey broad authority, a court will not infer it. *BST Holdings, L.L.C. v. Occupational Safety & Health Admin., United States Dep't of Lab.*, 17 F.4th 604, 618 (5th Cir. 2021).

225.    This principle dates to the nation's founding. As Alexander Hamilton explained, in a constitutional order that assigns the lawmaking and appropriations powers to the legislature, "no money can be expended, but for an *object*, to an *extent*, and out of a *fund*, which the laws have prescribed." Alexander Hamilton, Explanation, in The Works of Alexander Hamilton, Vol. 8, p.128 (Henry Cabot Lodge ed., 2d ed. 1903) (emphases in original).

226.    Defendant State Department's organic statute charges its Secretary with enumerated duties "respecting foreign affairs."[125] According to Defendant State Department, its mission is "[t]o protect and promote U.S. security, prosperity, and democratic values and shape an international environment in which all Americans can thrive." Congress appropriates funds to the State Department for "the administration of foreign affairs."[126]

227.    The statute which confers authority upon the State Department provides that:

> The Secretary of State shall perform such duties as shall from time to time be enjoined on or intrusted [*sic*] to him by the President relative to correspondences, commissions, or instructions to or with public ministers or consuls from the United States, or to negotiations with public ministers from foreign states or princes, or to memorials or other applications from foreign public ministers or other foreigners, or to such other matters *respecting foreign affairs* as the President of the United States shall assign to the Department, and he shall conduct the business of the Department in such manner as the President shall direct.
>
> 22 U.S.C. § 2656 (emphasis added).

---

[125] 22 U.S.C. § 2656.
[126] Department of State, Foreign Operations, and Related Programs Appropriations Act, 2023.

228.    State Department disinformation tools were developed not merely to assist in gathering information, but as tools of warfare—information warfare—to shape the perceptions and opinions of others. These mechanisms of information warfare, which were developed in the context of national security, foreign relations, and to combat American adversaries *abroad*, have been misappropriated and misdirected to be used at home against domestic political opponents and members of the American press with viewpoints conflicting with federal officials. By targeting domestic political disagreement, the State Department Defendants violate the organic statute, as well as the most fundamental principles upon which our Constitution was founded.

229.    Any government scheme designed to fund, support, and encourage private companies for the purpose of censoring, degrading, or demonetizing American press outlets falls outside the statutory authority of the State Department. The statutory language also does not authorize the State Department to encourage the private sector to adopt censorship technology that will suppress certain content and viewpoints of the American press. Nor could it, consistent with the federal government's enumerated powers and the First Amendment.

230.    Further, even if such a scheme were lawful—which it never could be—its funding would require a lawful appropriation by Congress, without which such funding would violate the Anti-Deficiency Act, which prohibits federal agencies from obligating or expending federal funds outside of, in advance of, or in excess of an appropriation. 31 U.S.C. §§ 1341(a), 1342 and 1517. Thus, the provision of government funds and technology to outside entities to violate the First Amendment is doubly prohibited by law.

## IV.    CONGRESS MAY NOT DELEGATE AUTHORITY VIOLATIVE OF THE CONSTITUTION

231.    Congress's authority is "limited to those powers enumerated in the Constitution," as the Constitution withholds from Congress "a plenary police power that would authorize enactment of every type of legislation." *United States v. Lopez*, 514 U.S. at 566; *see also* Const. art. I, § 8.

232.    "The powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written." *Marbury v. Madison*, 1 Cranch 137, 176 (1803).

233.    Congress is prohibited from conferring on a federal agency power or authority that is contrary to the Constitution, *Bowsher v. Synar*, 478 U.S. 714, 736 (1986), and Congressional enactments that exceed Congress's constitutional bounds are invalid. *Id*. at 607; *see also United States v. Lopez*, 514 U.S. 549 (1995).


## V.    DEFENDANTS' UNLAWFUL ACTIONS INTERFERE WITH TEXAS'S SOVEREIGN INTERESTS

234.    Federal officials who fund, develop, market, and/or promote censorship tools, technology and censorship enterprises also interfere with Texas's efforts to enforce HB 20, which became effective on December 2, 2021 (although it has been enjoined by a district court).

235.    Since December 2, 2021, federal officials who fund, develop, market, and/or promote censorship tools, technology and censorship enterprises interfere with Texas's enforcement of a Texas statute that regulates social media companies as common carriers and prohibits them from censoring speech and press on their platforms. *See NetChoice*, *LLC v. Paxton*, 49 F.4th 438, 445–46 (2022).

236.    "[S]tates have a sovereign interest in 'the power to create and enforce a legal code.'" *Tex. Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393, 449 (5th Cir. 1999) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982)). "Pursuant to that interest, states may have standing based on (1) federal assertions of authority to regulate matters they believe they

control, (2) federal preemption of state law, and (3) federal interference with the enforcement of state law." *Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015).

237.    Defendants' censorship efforts implicate at least the first two standing bases. Defendants assert authority to induce social media companies to violate HB 20, and Defendants must believe that whatever authority they claim to have preempts state law.

238.    Defendants' unlawful censorship efforts inflict an injury-in-fact on Texas. *Va. ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 269 (4th Cir. 2011) ("[W[hen a federal law interferes with a state's exercise of its sovereign 'power to create and enforce a legal code' [] it inflict[s] on the state the requisite injury-in-fact"). This injury to Texas's sovereign interest is continuing and ongoing and "necessarily" irreparable. *See*, *e.g.*, *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013) ("When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws.").

239.    Texas has standing to vindicate its sovereign interest in creating and enforcing HB 20 and to seek an injunction against federal officials from funding, developing, marketing, and promoting censorship tools, technologies, and censorship enterprises to tech companies to induce the censorship of private speech and the press.


## VI.    DEFENDANTS' FUNDING, DEVELOPMENT, MARKETING, AND PROMOTION OF PRIVATE CENSORSHIP TOOLS, TECHNOLOGIES, AND CENSORSHIP ENTERPRISES IS A NON-FINAL, UNLAWFUL AGENCY ACTION THAT MUST BE ENJOINED

240.    Under the Administrative Procedure Act ("APA"), sovereign immunity is waived to non-monetary claims challenging non-final agency action as *ultra vires*.

241.    State Department Defendants' censorship scheme is *ultra vires* and must be enjoined.

242.    Litigants can use the APA to assert *ultra vires* claims against government actors and overcome sovereign immunity that would otherwise protect those government actors. *Apter*, 80 F.4th at 587.

243.    "Section 702 of '[t]he APA generally waives the Federal Government's immunity from a suit "seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority."'" *Id*. at 589 (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012), in turn quoting 5 U.S.C. § 702)).

244.    "[A] non-statutory cause of action under the APA (that is, an *ultra vires* claim that uses the APA as a vehicle to sue an agency)" is a "distinct type[] of claim[]" from "a cause of action under the APA's general provisions." *Id*. at 592 (citing *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 489 (5th Cir. 2014)).

245.    The 1976 amendment to 5 U.S.C. § 702 "waived sovereign immunity for suits seeking nonmonetary relief through nonstatutory judicial review of agency action." *Geyen v. Marsh*, 775 F.2d 1303, 1307 (5th Cir. 1985).

246.    Section 702's waiver "applies when judicial review is sought pursuant to a statutory or non-statutory cause of action that arises completely apart from the general provisions of the APA. There is no requirement of 'finality' for this type of waiver to apply." *Alabama-Coushatta Tribe*, 757 F.3d at 489.

247.    "When a plaintiff uses the APA to assert a 'non-statutory cause of action'—such as an *ultra vires* claim—section 702 contains two separate requirements for establishing a waiver of sovereign immunity. First, the plaintiff must identify some 'agency action' affecting him in a specific way. The action need not be final. Second, the plaintiff must show that he has been adversely affected

or aggrieved by that action. To satisfy this second requirement, the plaintiff must establish that the injury he complains of falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Apter*, 80 F.4th at 589–90 (cleaned up, citations omitted).

248.    Under the APA, "'agency action' includes the whole or a part of an agency … relief." 5 U.S.C. § 551(13).

249.    "'[R]elief' means the whole or a part of an agency grant of money, assistance, license, authority, exemption, exception, privilege, or remedy." 5 U.S.C. § 551(4).

250.    Thus, the State Department Defendants' funding, development, marketing, and promotion of censorship tools, technologies, and censorship enterprises is "relief" under the APA, and therefore constitutes "agency action."

251.    Plaintiffs' injuries are in the APA's "zone of interests."

252.    In keeping with Congress's evident intent when enacting the APA to make agency action presumptively reviewable, the zone-of-interests test is not especially demanding. *Apter*, 80 F.4th at 592; *Texas v. United States* (*DACA Case*), 50 F.4th 498, 520-21 (5th Cir. 2022). The test is satisfied if the claims are arguably within the zone of interests to be protected by the statute. *Apter*, *supra*; *DACA* at 521. The Supreme Court has always conspicuously included the word arguably in the test to indicate that the benefit of any doubt goes to the plaintiff. *Apter*, *supra*; *DACA*, *supra*. Review is foreclosed only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit. *Apter*, *supra*; *DACA*, *supra*.

253.    This challenge is within the APA's zone of interests. For Media Plaintiffs, State Department Defendants' illegal relief limits their ability to distribute and profit from their speech. For Texas, Defendants' illegal relief interferes with its ability to enforce HB 20.

254.    Moreover, illegal relief is explicitly covered by the APA, and thus Defendants' *ultra vires* relief explicitly falls within the APA's zone of interests, as do the injuries resulting from that *ultra vires* relief.

255.    Consequently, Defendants lack sovereign immunity to Plaintiffs' claims.


**VII.    IN THE ALTERNATIVE, DEFENDANTS' FUNDING OF PRIVATE CENSORSHIP TOOLS IS FINAL AGENCY ACTION THAT MUST BE SET ASIDE AND VACATED**

256.    The APA authorizes courts to hold unlawful and set aside final agency action found to be: "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law … " 5 U.S.C. § 706(2)(A)-(D). The State Department Defendants' conduct violates each of these prohibitions.

257.    In the Fifth Circuit, the "final agency action" requirement is a jurisdictional threshold, not a merits inquiry, and is guided by the Supreme Court's interpretation of the APA's finality requirement as 'flexible' and 'pragmatic.'" *Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 440–41 (5th Cir. 2019) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)).

258.    Even agency advisory opinions can be deemed to have "consummated the Department's decisionmaking process." *Data Mktg. P'ship, LP v. United States Dep't of Lab.*, 45 F.4th 846, 853 (5th Cir. 2022).

259.     Further, "the mere possibility that an agency might reconsider" its advisory "in light of 'informal discussion' and invited contentions of inaccuracy does not suffice to make an otherwise final agency action nonfinal." *Sackett v. EPA*, 566 U.S. 120, 127 (2012).

260.     The State Department Defendants' secretive scheme to suppress, defame, defund, discredit, and reduce the circulation of a segment of the press by, among other things, funding, marketing, and/or promoting censorship tools, technology and censorship enterprises operating in the United States—specifically the censorship-by-risk-rating technology and entities—constitutes final agency action under the APA.

261.     The State Department Defendants' scheme as alleged herein constitutes "final agency action" because no further action is needed and it thus "marks the consummation of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted).

262.     Further, the State Department Defendants' scheme as alleged herein entails actions by which "rights or obligations have been determined," and "from which legal consequences will flow." *Id.*

263.     The State Department Defendants' scheme alleged herein clearly constitutes "consummation" of the agency's decisionmaking process and is not tentative or interlocutory. *See Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992).

264.     Nothing in the governing statutes gives or purports to give the State Department Defendants the power to fund or participate in this scheme. The State Department Defendants' conduct thus exceeds any statutory authority and is unlawful under the APA. *See* 5 U.S.C. §§ 706(2)(B), (C).

265.    Further, the State Department Defendants' conduct is "contrary to constitutional right, power, privilege, or immunity" because it violates the First Amendment rights of Media Plaintiffs, as set forth above. 5 U.S.C. § 706(2)(B).

266.    Moreover, under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

267.    Agency action is arbitrary and capricious if the agency fails to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983) (cleaned up).

268.    The State Department Defendants' censorship scheme is arbitrary and capricious because it has been entirely secretive and non-transparent. Defendants have not even attempted to explain, let alone satisfactorily, how it serves the agency's remit to manage foreign affairs. Nor could it, as this scheme has regulated domestic media content and speech without any basis in law to do so.

269.    The State Department Defendants' scheme is also arbitrary and capricious because it is being deployed to promote the federal government's preferred viewpoints while suppressing dissent therefrom.

270.    For the foregoing reasons, The State Department Defendants' conduct is arbitrary, capricious, and an abuse of discretion and must be set aside.

271.    In sum, the entire initiative described above exceeds any conceivable statutory authority and is therefore invalid under the APA. *See* 5 U.S.C. §§ 706(2)(A)-(D).

### COUNT ONE: ABRIDGEMENT OF MEDIA PLAINTIFFS' RIGHT TO FREEDOM OF SPEECH

272.    Media Plaintiffs incorporate by reference all the preceding material as though fully set forth herein.

273.    The text of the Constitution is explicit that: "Congress shall make no law … *abridging* freedom of speech." U.S. CONST. amend. I. (emphasis added). Any law or policy that "abridges" or reduces the sphere of constitutionally protected speech thus violates the First Amendment.

274.    The State Department Defendants have abridged Media Plaintiffs' right to Freedom of Speech by funding and assisting in the development of, marketing, and/or promoting censorship technologies—in particular, the censorship-by-risk-rating technology and related entities—that is used to censor Media Plaintiffs' speech.

275.    Media Plaintiffs each face blacklisting, reduced advertising revenue, reduced potential growth, reputational damage, economic cancellation, reduced circulation of reporting and speech, and social media censorship—all as a direct result of the State Department Defendants' unlawful conduct.

276.    Media Plaintiffs suffered and continue to suffer imminent, continuing, and irreparable injuries and losses as the direct and proximate result of the State Department Defendants' conduct. The State Department Defendants' conduct is the cause-in-fact, legal cause, and but-for cause of these injuries, which include past, ongoing, and imminent future injuries.

### COUNT TWO: ABRIDGEMENT OF MEDIA PLAINTIFFS' RIGHT TO FREEDOM OF THE PRESS

277.    Media Plaintiffs incorporate by reference all the preceding material as though fully set forth herein.

278.    The First Amendment to the United States Constitution prohibits Congress from making laws "abridging" the Freedom of the Press, U.S. CONST. amend. I. Any law or policy that

"abridges" or reduces the sphere of constitutionally protected Freedom of the Press thus violates the First Amendment.

279.    The State Department Defendants have abridged Media Plaintiffs' right to Freedom of the Press by funding and assisting in the development of, marketing, and/or promoting censorship technologies—in particular, the censorship-by-risk-rating technology and entities—that are used to censor Media Plaintiffs' reporting.

280.    The State Department Defendants' conduct inflicted past injury, and continues to inflict present, ongoing, imminent, and continuing irreparable injury on Media Plaintiffs by, among other things, reducing the revenue, reach, readership, and circulation of their reporting and speech, and otherwise negatively impacting the operations of Media Plaintiffs.

281.    Media Plaintiffs each face blacklisting, reduced advertising revenue, reduced potential growth, reputational damage, economic cancellation, reduced circulation of reporting and speech, and social media censorship—all as a direct result of Defendants' unlawful conduct.

282.    Media Plaintiffs suffered and continue to suffer imminent, continuing, and irreparable injuries and losses as the direct and proximate result of Defendants' conduct. Defendants' conduct is the cause-in-fact, legal cause, and but-for cause of these injuries, which include past, ongoing, and imminent future injuries.

### COUNT THREE (ALL PLAINTIFFS):
### *ULTRA VIRES* NON-FINAL AGENCY ACTION BEYOND STATUTORY AUTHORITY

283.    Plaintiffs incorporate by reference all the preceding material as though fully set forth herein.

284.    The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. CONST. art. I § 1.

285.    As the Supreme Court has recently clarified, "[t]he nondelegation doctrine bars Congress

from transferring its legislative power to another branch of Government." *Gundy v. United States*,

139 S. Ct. 2116, 2121 (2019).

286.    Nonetheless, within the confines of the nondelegation doctrine, Congress may seek

assistance from another branch, but "an agency's power is no greater than that delegated to it by

Congress." *Lyng v. Payne*, 476 U.S. 926, 937 (1986).

287.    No federal statute authorizes the State Department Defendants to engage in the conduct

alleged herein.

288.    The State Department Defendants' funding, development, marketing, and promotion of

private censorship tools, technology, and censorship enterprises constitutes "relief" under the

APA, and is therefore "agency action."

289.    Further, just as it "strains credulity" to accept the CDC's position that a "decades-old

statute that authorizes it to implement measures like fumigation and pest extermination,"

authorizes the CDC to "impose[] a nationwide moratorium on evictions," it "strains credulity," to

imagine Defendant State Department's organic statute authorizes a secretive scheme to fund the

development of censorship tools, technology and enterprises—or to promote, test, and market that

technology and those censorship enterprises to the American private sector, including web

browsers and social media companies. *Cf. Alabama Ass'n of Realtors v. Dep't of Health and Hum.

Servs.*, 594 U.S. ___, 1 (2021) (slip op.).

290.    This conclusion is reinforced by the fact Defendant State Department's scheme is

unprecedented in history. Indeed, its organic statute has never been interpreted to authorize the

regulation of the American press, much less a multi-agency scheme to fund the development of

censorship tools and technology designed to silence speech by Americans, in America, for

Americans and then to promote, test, and market such technology to the private sector. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) ("When an agency claims to discover in a long-extant statute an unheralded power to regulate … we typically greet its announcement with a measure of skepticism.").

291.    Not only is this action unauthorized by Congress, but Congress expressly prohibited the funds, appropriated or otherwise, made available to GEC from being used other than to counter "foreign" propaganda or disinformation.

292.    Congress likewise limited NED's use of grant funds to those activities consistent with its statutorily defined purposes, 22 U.S.C. § 4412. Importantly, by statute, NED's purpose is solely to further Democracy *abroad*. 22 U.S.C. § 4411.

293.    Moreover, Article I, § 9, of the Constitution provides: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." This Clause seeks "to assure that public funds will be spent according to the letter of the budgetary judgments reached by Congress as to the common good and not according to the individual favor of Government agents or the individual pleas of litigants." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 428 (1990). Accordingly, "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Id.* at 424 (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)).

294.    "All funds belonging to the United States—received from whatever source, however obtained, and whether in the form of cash, intangible property, or physical assets—are public monies, subject to public control and accountability." *See generally*, Kate Stith, *Congress' Power of the Purse*, 97 YALE L.J. 1343, 1356 (1988). Executive agencies may spend funds on a program only if they can convince Congress to appropriate the money. This applies not only to direct grants,

but also to the vast diversion of government technology, support, employee time, and promotion efforts.

295.    Appropriations "shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a). "A law may be construed to make an appropriation out of the Treasury … only if the law specifically states that an appropriation is made[.]" *Id.* at § 1301(d).

296.    The expenditure of public funds that were not lawfully appropriated for that purpose violates the Anti-Deficiency Act's prohibition against federal agencies obligating or expending federal funds outside of, in advance of, or in excess of an appropriation. 31 U.S.C. §§ 1341(a), 1342 and 1517. Federal employees who violate the Act are subject to sanctions, including removal from office, fines, imprisonment, or both. *See Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 430 (1990). "The misappropriation or disposition of public funds, or of any money or thing of value of the United States, or of any department or agency thereof, or any property made under contract for any department or agency thereof for an unauthorized use" constitutes a federal crime punishable by fines and imprisonment. *See* 18 U.S.C. § 641.

297.    By funding censorship tools and technology and censorship enterprises that seek to silence members of the American press and speech, the Defendants acted in an *ultra vires* manner.

298.    Defendant GEC further acted in an *ultra vires* manner by using misappropriated funds to develop, promote, test, and/or market censorship tools and technology and censorship enterprises to the private sector, including web browsers and social media companies, seeking the silencing of disfavored elements of the American press.

299.    Because no Act of Congress "specifically states that an appropriation is made" to fund this censorship scheme, Defendant State Department's expenditure of public funds, as well as its

expenditure of government technology and resources, including human resources, through GEC is unconstitutional.

300.    Because Defendant GEC's actions are *ultra vires*, these actions must be declared invalid and enjoined.

### COUNT FOUR (ALL PLAINTIFFS):
### UNLAWFUL FINAL AGENCY ACTION IN VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT

301.    Plaintiffs incorporate by reference all the preceding material as though fully set forth herein.

302.    The State Department Defendants' conduct violates the APA because its conduct constitutes final agency action and is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

303.    The State Department Defendants' conduct also violates the APA because its conduct constitutes final agency action and is "(B) contrary to constitutional right, power, privilege, or immunity" of Plaintiffs. 5 U.S.C. § 706(2)(B).

304.    Additionally, the State Department Defendants' conduct violates the APA because its conduct constitutes final agency action and is "(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

305.    Further, the State Department Defendants' conduct violates the APA because its conduct constitutes final agency action and Defendants failed to observe the "procedure required by law … " 5 U.S.C. § 706(2)(D).

306.    In sum, the entire initiative described above violates the APA in every conceivable way and is therefore invalid. *See* 5 U.S.C. §§ 706(2)(A)-(D).

### COUNT FIVE (ALL PLAINTIFFS): *ULTRA VIRES* ACTION BEYOND CONSTITUTIONAL BOUNDS

307.    Plaintiffs incorporate by reference all the preceding material as though fully set forth herein.

308.    Congress's authority is "limited to those powers enumerated in the Constitution." The Constitution withholds from Congress "a plenary police power that would authorize enactment of every type of legislation." *United States v. Lopez*, 514 U.S. 549 (1995); *see also* Const. art. I, § 8.

309.    Although Congress enjoys authority under the Commerce Clause to regulate the channels and instrumentalities of commerce among the states, *Gibbons v. Ogden*, 22 U.S. 1, 91 (1824), including electronic channels and instrumentalities, it may not regulate noneconomic matters, such as speech, that were never within the scope of the Commerce Clause and that only indirectly have a substantial effect on interstate commerce. *See* James Wilson, State House Yard Speech (Oct. 6, 1787).

310.    Congress is prohibited from conferring upon a federal agency power or authority that is contrary to the Constitution. *See, e.g.*, *Bowsher v. Synar*, 478 U.S. 714, 736 (1986) ("[T]he fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution").

311.    The State Department Defendants' censorship scheme violates Media Plaintiffs' First Amendment rights as detailed above.

312.    Therefore, even if (contrary to what is alleged above) the State Department Defendants' censorship scheme were within the bounds of the statutory authority delegated by Congress—it is not—the State Department Defendants' conduct would, and does, remain *ultra vires* in violation of any conceivable constitutional authority.

313.    For these reasons, the State Department Defendants proceeded without any authority, much

less delegated authority (which, in fact, Congress could never grant them), so their action is *ultra*

*vires* and must be declared invalid and enjoined.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court enter judgment in their favor and grant the

following relief:

A.    Declare the State Department Defendants' funding, development, marketing, and

promotion of censorship tools, technologies, and censorship enterprises constitutes *ultra vires*

action lacking statutory authority and exceeding constitutional authority;

B.    Declare the State Department Defendants' funding, development, marketing, and

promotion of censorship tools, technologies, and censorship enterprises interferes with Texas's

sovereign right to create and enforce a legal code, namely, HB 20;

C.    Declare the State Department Defendants' funding, development, marketing, and

promotion of censorship tools, technologies, and censorship enterprises violates Media Plaintiffs'

rights to Freedom of the Press and Freedom of Speech under the First Amendment of the

Constitution;

D.    Declare Defendants' funding, development, marketing, and promotion of censorship tools,

technologies, and censorship enterprises violates the Appropriations Laws of the United States,

specifically the Anti-Deficiency Act, 31 U.S.C. §§ 1341(a), 1342 and 1517 and the laws respecting

misappropriation of public money, 18 U.S.C. § 641;

E.    Declare Defendants' conduct violates the Administrative Procedure Act and therefore is

unlawful and invalid;

F.      Preliminarily and permanently enjoin Defendants, their officers, officials, agents, servants, employees, attorneys, and all persons acting in concert or participation with them, *see* Fed. R. Civ. P. 65(d)(2), from further engaging in the unlawful conduct as alleged herein;

G.      Preliminarily and permanently enjoin Defendants, their officers, officials, agents, servants, employees, attorneys, and all persons acting in concert or participation with them, *see* Fed. R. Civ. P. 65(d)(2), from developing, funding, testing, maintaining, storing, highlighting, promoting, using, or encouraging, urging, pressuring, or otherwise inducing others to use, technology to track, rate, rank, silence, assess, counter, amplify, de-amplify, deplatform, de-boost, demonetize, suspend, shadow ban, de-boost, restrict, limit, reduce access to, or otherwise abridge the lawful speech of the American press and Americans;

H.      Attorney's fees pursuant to 42 U.S.C. § 1988; and

I.       Any other just and proper relief.


                                Respectfully submitted,

                                /s/ *Margaret A. Little*
                                Margaret A. Little
                                Lead Attorney
                                Senior Litigation Counsel
                                Connecticut Bar # 303494
                                NEW CIVIL LIBERTIES ALLIANCE
                                1225 19th Street NW, Suite 450
                                Washington, DC 20036
                                Telephone: (202) 869-5210
                                 Facsimile: (202) 869-5238
                                Peggy.Little@ncla.legal

                                /s/ *Margot J. Cleveland*
                                Margot J. Cleveland,
                                Of Counsel
                                Michigan Bar #P83564
                                NEW CIVIL LIBERTIES ALLIANCE
                                Margot.Cleveland@ncla.legal

/s/ *Casey Norman*
Casey Norman*
*Pro hac vice forthcoming*
Litigation Counsel
New York Bar #5772199
Casey.Norman@ncla.legal

*Attorneys for Plaintiffs the Daily Wire Entertainment LLC and FDRLST Media LLC*

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General of Texas

Grant Dorfman
Deputy First Assistant Attorney General of Texas

Ralph Molina
Deputy Attorney General for Legal Strategy

Ryan D. Walters
Chief, Special Litigation Division

/s/ *Susanna Dokupil*
Susanna Dokupil
Lead Attorney
Special Counsel
Texas State Bar No. 24032801

Amy S. Hilton
Special Counsel
Texas State Bar No. 24097834

Johnathon Stone
Special Counsel
Texas State Bar No. 24071779

*Attorneys for Plaintiff the State of Texas*