**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | |
|---|---|
| **THE DAILY WIRE, LLC;** <br><br> **FDRLST MEDIA, LLC; and** <br><br> **THE STATE OF TEXAS, by and through its Attorney General, Ken Paxton,** <br><br><br> *Plaintiffs*, <br><br> v. <br><br> **DEPARTMENT OF STATE;** <br><br> **GLOBAL ENGAGEMENT CENTER;** <br><br> **ANTONY BLINKEN, in his official capacity as Secretary of State;** <br><br> **LEAH BRAY, in her official capacity as Deputy Coordinator of the State Department's Global Engagement Center;** <br><br> **JAMES P. RUBIN, in his official capacity as Coordinator for the Global Engagement Center of the State Department;** <br><br> **DANIEL KIMMAGE, in his official capacity as the Principal Deputy Coordinator for the Global Engagement Center at the State Department;** <br><br> **ALEXIS FRISBIE, in her official capacity as Senior Technical Advisor of the Technology Engagement Team for the Global Engagement Center at the State Department;** <br><br> **PATRICIA WATTS, in her official capacity as the Director of the Technology Engagement Team at the Global Engagement Center at the State Department,** <br><br><br> *Defendants*. | **Civil Action No.: 6:23-cv-00609** <br><br><br> **MOTION FOR PRELIMINARY INJUNCTION** |

1

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, Plaintiffs The Daily Wire, LLC, FDRLST Media, LLC, and the State of Texas hereby move to preliminarily enjoin Defendants from continuing to fund, test, market, promote, host on its platform, and/or otherwise assist with or encourage the development or use of technology that targets in whole, or in part, Americans' speech or the American press.   As explained in detail in the accompanying memorandum in support of this motion, Plaintiffs will suffer irreparable harm absent the requested injunctive relief as a direct result of Defendants' *ultra vires* actions, which have also gravely violated, and continue to violate, Media Plaintiffs' First Amendment rights to freedom of speech and of the press.[1]

WHEREFORE, Plaintiffs respectfully request that the Court grant the foregoing Motion for Preliminary Injunction.

DATED: February 6, 2024

Respectfully submitted,

/s/ *Margaret A. Little*

Margaret A. Little
Lead Attorney
Senior Litigation Counsel
Connecticut Bar # 303494
NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street NW, Suite 450
Washington, DC 20036
Telephone: (202) 869-5210
Facsimile: (202) 869-5238
Peggy.Little@ncla.legal

---

[1] Plaintiffs will separately file a Motion for Expedited Discovery to obtain limited and targeted discovery.  Such expedited discovery is essential for the Court to assess what additional and tailored preliminary injunctive relief is appropriate and necessary to fully address the details and scope of Defendants' *ultra vires* and unconstitutional conduct and to prevent further irreparable harm to Plaintiffs.

2

/s/ *Margot J. Cleveland*

Margot J. Cleveland,
Of Counsel
Michigan Bar #P83564
NEW CIVIL LIBERTIES ALLIANCE
Margot.Cleveland@ncla.legal

/s/ *Casey Norman*

Casey Norman
*Pro hac vice pending*
Litigation Counsel
New York Bar #5772199
NEW CIVIL LIBERTIES ALLIANCE
Casey.Norman@ncla.legal

*Attorneys for Plaintiffs the Daily Wire Entertainment LLC and FDRLST Media LLC*

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General of Texas

GRANT DORFMAN
Deputy First Assistant Attorney General of Texas

RALPH MOLINA
Deputy Attorney General for Legal Strategy

RYAN D. WALTERS
Chief, Special Litigation Division

/s/ *Susanna Dokupil*

SUSANNA DOKUPIL
Lead Attorney
Special Counsel
Texas State Bar No. 24034419

AMY S. HILTON
Special Counsel
Texas State Bar No. 24097834

3

JOHNATHAN STONE
Special Counsel
Texas State Bar No. 24071779

*Attorneys for Plaintiff the State of Texas*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on February 6, 2024, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ Margot J. Cleveland*

## **CERTIFICATE OF CONFERENCE**

I hereby certify that, on February 5, 2024, I, along with my NCLA colleagues' Peggy Little and Casey Norman, as well as counsel for the State of Texas, Susanna Dokupil, conferenced with counsel for Defendants, Cristen Handley and Kody Knapp, via a Microsoft Teams conference call as required by Local Rule CV-7(h). Defense Counsel oppose Plaintiffs' Motion for Preliminary Injunction.  Discussions have conclusively ended in an impasse, leaving an open issue for the court to resolve.

*/s/ Margot J. Cleveland*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

|  |  |
|---|---|
| **THE DAILY WIRE, LLC;** <br> **FDRLST MEDIA, LLC; and** <br> **THE STATE OF TEXAS, by and through its** <br> **Attorney General, Ken Paxton,** <br>         *Plaintiffs,* <br>    v. <br> **DEPARTMENT OF STATE;** <br> **GLOBAL ENGAGEMENT CENTER;** <br> **ANTONY BLINKEN, in his official capacity as** <br> **Secretary of State;** <br> **LEAH BRAY, in her official capacity as Deputy** <br> **Coordinator of the State Department's Global** <br> **Engagement Center;** <br> **JAMES P. RUBIN, in his official capacity as** <br> **Coordinator for the Global Engagement Center of the** <br> **State Department;** <br> **DANIEL KIMMAGE, in his official capacity as the** <br> **Principal Deputy Coordinator for the Global** <br> **Engagement Center at the State Department;** <br> **ALEXIS FRISBIE, in her official capacity as Senior** <br> **Technical Advisor of the Technology Engagement** <br> **Team for the Global Engagement Center at the State** <br> **Department;** <br> **PATRICIA WATTS, in her official capacity as the** <br> **Director of the Technology Engagement Team at the** <br> **Global Engagement Center at the State Department,** <br>         *Defendants*. | **Civil Action No.: 6:23-cv-00609** <br><br><br> **MEMORANDUM IN** <br> **SUPPORT OF MOTION FOR** <br> **PRELIMINARY INJUNCTION** <br><br><br> **Oral Argument Requested** |

## <u>MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION</u>

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION ............................................................................................................. 1

FACTS ............................................................................................................................... 3

ARGUMENT ................................................................................................................... 16

    I.     PLAINTIFFS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS ............ 17

          A.     The State Department's Initiatives Targeting Americans' Speech and the American Press Are *Ultra Vires* ............................................................. 17

          B.     The State Department's Initiatives Abridge Media Plaintiffs' First Amendment Rights to Freedom of Speech and Freedom of Press ........................................... 21

    II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION ................................................................................................ 34

    III.   THE BALANCE OF EQUITIES (INCLUDING THE PUBLIC INTEREST) WEIGHS HEAVILY IN PLAINTIFFS' FAVOR ....................................................................................... 35

CONCLUSION ................................................................................................................ 36

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez,*
    458 U.S. 592 (1982) ........................................................................................................... 20

*Ashcroft v. ACLU,*
    535 U.S. 564 (2002) ........................................................................................................... 24

*Ass'n of Club Executives of Dallas, Inc. v. City of Dallas,*
    604 F. Supp. 3d 414 (N.D. Tex. 2022) ............................................................................. 36

*Bantam Books, Inc. v. Sullivan,*
    372 U.S. 58 (1963) ............................................................................. 27, 28, 31, 32, 33

*Bates v. Cty. of Little Rock,*
    361 U.S. 516 (1960) ........................................................................................................... 31

*Biden v. Nebraska,*
    143 S. Ct. 2355 (2023) ...................................................................................................... 20

*Blum v. Yaretsky,*
    457 U.S. 991 (1982) ........................................................................................................... 32

*Briscoe v. Bank of Commonwealth of Ky.,*
    36 U.S. 257 (1837) ............................................................................................................ 30

*BST Holdings, L.L.C. v. Occupational Safety & Health Admin., U.S. Dep't of Lab.,*
    17 F.4th 604 (5th Cir. 2021) ............................................................................................. 36

*Citizens United v. FEC,*
    558 U.S. 310 (2010) ........................................................................................................... 27

*City of Arlington v. FCC,*
    569 U.S. 290 (2013) .................................................................................................... 19, 20

*City of Providence v. Barr,*
    |954 F.3d 23 (1st Cir. 2020) .............................................................................................. 20

*Cooper v. Aaron,*
    358 U.S. 1 (1958) .............................................................................................................. 31

*Dart v. United States,*
    848 F.2d 217 (D.C. Cir.1988) ........................................................................................... 21

*Dennis v. Sparks,*
    449 U.S. 24 (1980) ............................................................................................................ 32

*Detroit Int'l. Bridge Co. v. Gov't. of Can.,*
    192 F. Supp. 3d 54 (D.D.C. 2016) .................................................................................... 17

*Dobbs v. Jackson Women's Health Org.,*
    142 S. Ct. 2228 (2022) ...................................................................................................... 21

*Elrod v. Burns,*
    427 U.S. 347 (1976) ........................................................................................................... 34

*Evans v. Newton,*
    382 U.S. 296 (1966) ........................................................................................................... 33

*First Nat'l. Bank of Bos. v. Bellatti,*
    435 U.S. 765 (1978) ........................................................................................................... 27

iii

*Free Enter. Fund v. PCAOB*,
   561 U.S. 477 (2010) ........................................................................ 21

*Gallagher v. Neil Young Freedom Concert*,
   49 F.3d 1442 (10th Cir. 1995) ...................................................... 33

*Gibbons v. Ogden*,
   22 U.S. 1 (1824) ............................................................................ 21

*Grosjean v. Am. Press Co.*,
   297 U.S. 233 (1936) ...................................................................... 25

*Healy v. James*,
   408 U.S. 169 (1972) ...................................................................... 31

*Hill v. Colorado*,
   530 U.S. 703 (2000) ...................................................................... 26

*Int'l Women's Day March Planning Comm. v. City of San Antonio*,
   619 F.3d 346 (5th Cir. 2010) ........................................................ 26

*Jackson v. Metro. Edison Co.*,
   419 U.S. 345 (1974) ...................................................................... 33

*Kirtley v. Rainey*,
   326 F.3d 1088 (9th Cir. 2003) ...................................................... 33

*Ladd v. Livingston*,
   777 F.3d 286 (5th Cir. 2015) ........................................................ 17

*Lovell v. City of Griffin*,
   303 U.S. 444 (1938) ...................................................................... 25

*Lugar v. Edmondson Oil Co.*,
   457 U.S. 922 (1982) ...................................................................... 32

*Lying v. Nw. Ind. Cemetery Prot. Ass'n*,
   485 U.S. 439 (1988) ...................................................................... 23

*Lyng v. Payne*,
   476 U.S. 926 (1986) ...................................................................... 17

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   142 S. Ct. 2111 (2002) .................................................................. 21

*NAACP v. Alabama*,
   357 U.S. 449 (1958) ...................................................................... 31

*Nastase v. Barr*,
   964 F.3d 313 (5th Cir. 2020) ........................................................ 19

*Nat'l. Fed'n of Indep. Bus. v. OSHA*,
   595 U.S. 109 (2022) ...................................................................... 21

*Near v. Minnesota ex rel. Olson*,
   283 U.S. 697 (1931) ................................................................ 28, 32

*NetChoice, L.L.C. v. Paxton*,
   49 F.4th 439 (5th Cir. 2022) ........................................................ 20

*Netchoice, LLC v. Paxton*,
   216 L. Ed. 2d 1313 (Sept. 29, 2023) ............................................ 20

*New York Times Co. v. Sullivan*,
   376 U.S. 254 (1964) ...................................................................... 24

*Nken v. Holder*,
   556 U.S. 418 (2009) ...................................................................... 35

iv

*Norwood v. Harrison,*
   413 U.S. 455 (1973)................................................................................ 30

*Phelps–Roper v. Nixon,*
   545 F.3d 685 (8th Cir. 2008) ............................................................... 34

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott,*
   734 F.3d 406 (5th Cir. 2013) ............................................................... 35

*R.A.V. v. City of St. Paul,*
   505 U.S. 377 (1992)............................................................................. 26

*Richmond Newspapers, Inc. v. Virginia,*
   448 U.S. 555 (1980)............................................................................. 24

*Rosenberger v. Rectors and Visitors of Univ. of Va.,*
   515 U.S. 819 (1995)............................................................................. 28

*Sailors v. Bd. of Educ. of Kent Cty.,*
   387 U.S. 105 (1967)............................................................................. 31

*Smith v. Turner,*
   48 U.S. 283 (1849)............................................................................... 30

*Speech First, Inc. v. Fenves,*
   979 F.3d 319 (5th Cir. 2020) ............................................................... 28

*Texans for Free Enter. v. Tex. Ethics Comm'n.,*
   732 F.3d 535 (5th Cir. 2013) ............................................................... 36

*Trottie v. Livingston,*
   766 F.3d 450 (5th Cir. 2014) ............................................................... 17

*United States v. Alvarez,*
   567 U.S. 709 (2012)............................................................................. 24

*United States v. Assoc. Press,*
   52 F. Supp. 362 (S.D.N.Y. 1943)................................................... 24, 25

*Va. ex rel. Cuccinelli v. Sebelius,*
   656 F.3d 253 (4th Cir. 2011) ............................................................... 20

*W. Va. State Bd. of Educ. v. Barnette,*
   319 U.S. 624 (1943)............................................................................. 23

*Wages & White Lion Invs., LLC,*
   16 F.4th 1130 (5th Cir. 2021) ............................................................. 35

*Winter v. NRDC,*
   555 U.S. 7 (2008)........................................................................... 34, 35

## Statutes

22 U.S.C. § 2656............................................................................. 1, 4, 18

31 U.S.C. § 1341....................................................................................... 19

31 U.S.C. §1342........................................................................................ 19

31 U.S.C. §1517........................................................................................ 19

5 U.S.C. § 706.................................................................................... 17, 20

Consolidated Appropriations Act, 2023,
   Pub. L. No. 117-328, § 1287, 136 Stat. 4459 (2022)....................... 1

John S. McCain National Defense Authorization Act for Fiscal Year 2019,
   Pub. L. No. 115-232, § 1284, 132 Stat. 1636 (2018)................... 5, 18

National Defense Authorization Act for Fiscal Year 2017,
   Pub. L. No. 114-328, § 1287, 130 Stat. 2000 (2016)............................................ 2, 5, 6, 18, 19

**Other Authorities**

Philip Hamburger,
     *Courting Censorship*, 4 J. FREE SPEECH L. 195 (forthcoming 2024)................................. 22, 23

**Constitutional Provisions**

U.S. CONST. amend. I ........................................................................................ 1, 21
U.S. CONST. art. I § 1 .............................................................................................. 17

## INTRODUCTION

Pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, Plaintiffs The Daily Wire, LLC, FDRLST Media, LLC, and the State of Texas seek a preliminary injunction to halt one of the most egregious government operations to abridge Americans' speech and the American press in the history of the nation. The U.S. Department of State ("State Department"), through its Global Engagement Center ("GEC"), is actively intervening in the news-media market to limit the reach of, the circulation of, and render unprofitable, disfavored press outlets by funding the infrastructure, development, and marketing and promotion of censorship technology and private censorship enterprises to covertly suppress speech of a segment of the American press. Defendants lack any statutory authority to fund or promote censorship technology or censorship enterprises that target the American press and tar disfavored domestic news organizations as purveyors of "disinformation." No enumerated general power to censor speech or the press is found in the United States Constitution, and the First Amendment expressly forbids it, providing: "Congress shall make no law … abridging the freedom of speech or of the press." U.S. CONST. amend. I.

Further, the State Department's statutory authority is limited to "foreign affairs," 22 U.S.C. § 2656, and Congress' appropriation to the State Department provides for the spending of taxpayer dollars solely for the "administration of foreign affairs."[1] Moreover, in appropriating funds to the State Department's Global Engagement Center ("GEC" or the "Center"), Congress included an express limitation, providing "none of the funds authorized to be appropriated or otherwise made available to carry out this section shall be used for purposes other than

---

[1] Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, § 1287, 136 Stat. 4459, 4974 (2022).

countering ***foreign*** propaganda and misinformation that threatens United States national security" or the "policies, security, or stability" of the United States and its allies.[2]

Yet, without authority and in direct violation of Congress' statutory appropriation, Defendants have converted State Department resources and tools of warfare—information warfare—which were developed in the context of national security, foreign relations, and to combat American adversaries *abroad*, to use at home against domestic political opponents and members of the American press with viewpoints conflicting with federal officials holding the reins of this unlawful administrative power. Defendants have misappropriated and misused government resources, technology, funding, employees, and contractors to counter supposed domestic "misinformation," including by researching, assessing, funding, testing, marketing, promoting, hosting on a State Department platform, and/or otherwise assisting with or encouraging the development and/or use of technology that targets in whole, or in part, Americans' speech and the American press. Defendants' *ultra vires* censorship scheme causes irreparable harm to Media Plaintiffs who have been branded "unreliable" and "risky" by technology promoted by the State Department.

The State Department's censorship scheme also abridges Media Plaintiffs' First Amendment rights to freedom of speech and freedom of the press by negatively affecting Media Plaintiffs' circulation of publications, readership, and subscriber and advertising support, and, as such, also causes irreparable harm. Further, Texas suffers irreparable harm from Defendants' *ultra vires* censorship scheme which interferes in Texas' sovereign right to create and enforce a legal code, namely HB 20, which requires social media companies with market power to act as

---

[2] National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, § 1287, 130 Stat. 2000, 2546-48 (2016).

common carriers. The public interest also suffers from Defendants' *ultra vires* and unconstitutional conduct, as the First Amendment's guarantee of freedom of speech and freedom of the press represents a structural limitation on government power designed to preserve and protect individual and national liberty.

Accordingly, this Court should preliminarily enjoin Defendants, the Department of State, the Global Engagement Center, Antony Blinken, Leah Bray, James P. Rubin, Daniel Kimmage, Alexis Frisbie, and Patricia Watts, who are sued in their official capacities, from continuing to research, assess, fund, test, market, promote, host on its government platform, and/or otherwise assist with or encourage the development or use of technology that targets in whole, or in part, Americans' speech or the American press.

## FACTS

### *The Internet—the New Media & the New Public Square*

The advent of the internet has forever changed how the press publishes and the public receives news. Media Plaintiffs in this case, The Daily Wire, LLC ("The Daily Wire"), and FDRLST Media, LLC ("The Federalist"), hereinafter jointly "Media Plaintiffs," represent but two members of the "New Media" that operate in the twenty-first-century digital landscape by publishing on the internet. ECF1 at ¶ 39-42. Due to the public's rapidly increasing reliance on the internet for news, Media Plaintiffs depend heavily on web browsers and social media companies to circulate their reporting, obtain new readers, and receive subscriber and advertising support for their work. ECF1 at ¶ 44.

Indeed, recent polls show most Americans rely on the digital media for their source of news, with 86% of U.S. adults stating they often or sometimes get news from a smartphone, computer or tablet, and a majority of 56% noting they often use digital technology as a source

for their news. ECF1 at ¶ 28.[3] In contrast, only 37% of U.S. adults reported that they often or sometimes get news from print publications. *Id.* Of those who indicated that they receive news digitally, 50% said they often or sometimes use social media as news sources, and 71% responded that they use Google or other search engines to get the news. ECF1 at ¶ 34.[4] X (formerly known as Twitter), Facebook, YouTube, and Instagram, are among the social media companies Americans report using for following the news, ranging from 12% who rely on X to 31% of respondents who obtain their news from Facebook. ECF1 at ¶¶ 29-33.[5]

### *The State Department's Ultra Vires Activities Subvert the Digital Marketplace of Ideas.*

Defendant State Department's organic statute charges its Secretary with enumerated duties "respecting foreign affairs." 22 U.S.C. § 2656. The statute which confers authority upon the State Department provides that:

> The Secretary of State shall perform such duties as shall from time to time be enjoined on or intrusted [*sic*] to him by the President relative to correspondences, commissions, or instructions to or with public ministers or consuls from the United States, or to negotiations with public ministers from foreign states or princes, or to memorials or other applications from foreign public ministers or other foreigners, or to such other matters *respecting foreign affairs* as the President of the United States shall assign to the Department, and he shall conduct the business of the Department in such manner as the President shall direct.

*Id.* (emphasis added).

In funding the State Department, Congress appropriated tax dollars to the State Department solely for the "administration of foreign affairs."[6]

---

[3] Exh. A at App. 1, Jacob Liedke & Luxuan Wang, *News Platform Fact Sheets,* Pew Res. Ctr. (Nov. 15, 2023), *available at* https://www.pewresearch.org/journalism/fact-sheet/news-platform-fact-sheet/.
[4] Exh. A at App. 1, *supra* n.3.
[5] Exh. B at App. 9, Jacob Liedke & Luxuan Wang, *Social Media and News Fact Sheet*, Pew Res. Ctr. (Nov. 15, 2023), *available at* https://www.pewresearch.org/journalism/fact-sheet/social-media-and-news-fact-sheet/.
[6] Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, § 1287, 136 Stat. 4459, 4974 (2022).

Defendant GEC is a multi-agency center housed within Defendant State Department. GEC's origins date to 2011, when the Obama Administration created the Center for Strategic Counterterrorism Communications ("CSCC"), by executive order to support federal agency communications in targeting "violent extremism and terrorist organizations." ECF1 at ¶ 49.[7] In 2016, the Obama Administration issued a second executive order morphing the CSCC into GEC but leaving its counterterrorism mission intact. ECF1 at ¶ 50.[8]

However, "[w]hen Congress created GEC through its passage of the National Defense Authorization Act ("NDAA") for fiscal year 2017, the Center's purpose was expanded beyond its original mandate of countering the influence of international terrorists, such as the Islamic State, al-Qaeda, and other foreign extremists. Specifically, the 2017 NDAA directed GEC to 'coordinate efforts of the Federal Government to counter foreign state and non-state propaganda and disinformation efforts aimed at undermining United States national security interests.'" ECF1 at ¶ 51.[9] "In 2019, the NDAA further expanded GEC's mission, authorizing it to counter foreign 'propaganda and disinformation' that undermines not only the United States' national security interests, but also the 'policies, security, or stability' of the U.S. and our allies." ECF1 at ¶ 52.[10]

"While Congress dramatically expanded the breadth of GEC's mission, its purpose remained limited to combatting 'foreign' disinformation." ECF1 at ¶ 53. And "Congress explicitly included a limitation in the spending bills that provided: 'None of the funds authorized to be appropriated or otherwise made available to carry out this section shall be used for purposes

---

[7] Exh. C at App. 15, About Us—Global Engagement Center, *available at* https://www.state.gov/about-us-global-engagement-center-2/ (last visited June 17, 2023).

[8] *Id.*

[9] *Id.*; National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, § 1287, 130 Stat. 2000, 2546-48 (2016).

[10] John S. McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. No. 115-232, § 1284, 132 Stat. 1636, 2076 (2018).

other than countering ***foreign*** propaganda and misinformation that threatens United States national security.'" ECF1 at ¶ 53.[11] (emphasis added).

While Defendant State Department's authority and funding is statutorily limited to "foreign affairs," and while Congress expressly forbade Defendant GEC from using funds appropriated or otherwise made available to it for anything "other than countering ***foreign*** propaganda and disinformation," *id.*, Defendants' activities and initiatives also target Americans' speech and the American press, including Media Plaintiffs' speech and circulation of their respective publications. As the Complaint details at length, *see* ECF1, among other things, Defendants researched, assessed, funded, investigated, evaluated, tested, marketed, and/or promoted over 365 so-called Countering Propaganda and Disinformation or "CPD" tools and technologies, including tools and technologies that target American speech and the American press. These tools and technologies include so-called fact-checking technologies, media literacy tools, media intelligence platforms, social network mapping, and machine learning/artificial intelligence technology. ECF1 at ¶ 69.[12]

Further, Defendants created a government platform, called Disinfo Cloud, that served as a repository for these tools and technologies. ECF1 at ¶ 57-58, 65-67.[13] Defendants then encouraged social media and technology companies to access the database, to test the featured products on the State Department's "test bed" hosted on Disinfo Cloud, to seek Defendant GEC's assistance in

---

[11] National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, § 1287, 130 Stat. at 2548, (2016).
[12] Exh. D at App. 18, Defeat Disinfo, *available at* https://www.state.gov/defeat-disinfo/ (last visited November 21, 2023).
[13] Exh. E at App. 22, Disinfo Cloud, *available at* https://2017-2021.state.gov/disinfo-cloud-launch/index.html (last visited November 21, 2023).

finding the best CPD tool or technology to meet the company's "needs," and to adopt the featured CPD tools and technologies. ECF1 at ¶¶ 73-74, 76-77, 79-81.[14]

At this early stage of litigation, Media Plaintiffs do not know how many of the 365-plus tools and technologies that Defendants researched, assessed, funded, tested, developed, hosted on its platform, marketed, and/or developed negatively impacted Media Plaintiffs' speech. ECF1 at ¶¶ 3, 217. However, open-source information indicates two such tools and technologies—those developed by the Global Disinformation Index ("GDI") and NewsGuard—were among the CPD technology entwined in the State Department Defendants' censorship scheme. ECF1 at ¶¶ 3-4.

### *A Sampling of the State Department's Repository of CPD Tools and Technologies*

GDI is one of the known entities whose product the State Department included in its repository of 365-plus CPD tools and technologies. ECF1 at ¶¶ 72, 101. "According to its webpage, GDI's 'core output' is its Dynamic Exclusion List of websites and applications that purportedly hold a 'high risk for disinformation.'" ECF1 at ¶ 105.[15] GDI's webpage "explains that it licenses its Dynamic Exclusion List to ad tech companies and platforms so that the 'worst offenders' are defunded and down-ranked, … thus disrupting the ad-funded disinformation business model." ECF1 at ¶ 106.[16] "Advertising companies that subscribe to GDI's blacklist refuse to place ads with disfavored news sources, cutting off revenue streams and leaving the blacklisted outlets unable to compete with the approved 'low risk' media outlets—often legacy news." ECF1 at ¶ 110.[17] "Oracle

---

[14] Exh. F at App. 26, Margot Cleveland, Government Is Marketing Censorship Tools to Big Tech To Gag Conservatives, April 11, 2023, available at https://thefederalist.com/2023/04/11/government-is-marketing-censorship-tools-to-big-tech-to-gag-conservatives/ (last visited November 21, 2023).

[15] Exh. G at App. 34, The Global Disinformation Index, *What We Do, available at* https://www.disinformationindex.org/product (last visited on November 21, 2023).

[16] *Id.*

[17] Exh. H at App. 45, Gabe Kaminsky, *Disinformation Inc: Microsoft Suspends Relationship With Group Blacklisting Conservative News*, THE WASHINGTON EXAMINER (Feb. 11, 2023), *available at* https://www.washingtonexaminer.com/policy/technology/disinformation-inc-microsoft-xander-conservative-defunded-outlets (last visited on November 21, 2023).

and the Microsoft-owned ad company Xandr both subscribed to GDI's blacklist," ECF1 at ¶ 111,[18] with Xandr in 2022 informing companies "it was adopting GDI's exclusion list to avoid placing ads with outlets that are 'morally reprehensible or patently offensive,' lack 'redeeming social value,' or that 'could include false or misleading information.'" ECF1 at ¶ 112.[19]

"The Dynamic Exclusion List identifies multiple American media outlets as having a 'high risk for disinformation.'" ECF1 at ¶ 108.[20] While the Dynamic Exclusion List remains unavailable to the public, ECF1 at ¶ 115,[21] GDI published a separate report on December 16, 2022, entitled "Disinformation Risk Assessment: The Online News Market in the United States," which branded Media Plaintiffs as among the top ten "riskiest" American online outlets, as excerpted below. ECF1 at ¶ 116.[22] It thus stands to reason that GDI similarly identified Media Plaintiffs as posing a "high risk for disinformation" on its non-public Dynamic Exclusion List, which, as described above, guides advertising companies on which media outlets to blacklist.

---

[18] *Id.*; Exh. I at App. 48, Gabe Kaminsky, *Disinformation Inc: Massive Corporation Oracle Severs Ties With Conservative Blacklist Group*, THE WASHINGTON EXAMINER (April 19, 2023), *available at* https://www.washingtonexaminer.com/news/oracle-ends-global-disinformation-index-partnership-blacklisting-conservatives.

[19] Exh. J at App. 51, Gabe Kaminsky, *Disinformation Inc: Read One of the 'Blacklists' Used Secretly to Defund Conservative News*, THE WASHINGTON EXAMINER (Feb. 10, 2023), *available at* https://www.washingtonexaminer.com/restoring-america/equality-not-elitism/disinformation-inc-read-one-of-the-blacklists-used-secretly-to-defund-conservative-news.

[20] *Id.*

[21] Exh. K at App. 57, Brief: Disinformation Risk in the United States Online Media Market, October 2022, *available at* https://www.disinformationindex.org/research/2022-10-21-brief-disinformation-risk-in-the-united-states-online-media-market-october-2022/ (last visited on November 21, 2023).

[22] *Id.*

**GDI's Disinformation Risk Assessment:**
**The Online News Market in the United States.**

| Least risky sites | Riskiest sites |
|---|---|
| NPR | New York Post |
| AP News | Reason Magazine |
| The New York Times | RealClearPolitics |
| ProPublica | The Daily Wire |
| Insider | TheBlaze |
| USA Today | One America News Network |
| The Washington Post | The American Conservative |
| BuzzFeed News | The Federalist |
| Wall Street Journal | Newsmax |
| HuffPost | The American Spectator |

"NewsGuard also compiles a list of American press outlets it characterizes as 'unreliable.'" ECF1 at ¶ 117.[23] In March of 2023, NewsGuard's Co-CEO Gordon Crovitz praised his company for "empowering governments, brands, advertising agencies, and non-profit organizations with human-vetted insights to support quality journalism and systemically defund sources of harmful misinformation." ECF1 at ¶ 119.[24] NewsGuard asserts that its "licensees include search engines and platforms, internet service providers, advertising companies, health and medical institutions,

---

[23] Exh. L at App. 72, NewsGuard FAQ, *available at* https://www.newsguardtech.com/newsguard-faq/ (last visited November 21, 2023).
[24] Exh. M at App. 81, NewsGuard Press Release, March 15, 2023, *available at* https://www.newsguardtech.com/press/newsguard-expands-service-to-australia-new-zealand/ (last visited November 29, 2023).

educational organizations, cybersecurity companies, governments, researchers and more." ECF1 at ¶ 121.[25]

"Currently, NewsGuard ranks The Daily Wire and The Federalist as 'unreliable' media outlets." ECF1 at ¶ 122.  Specifically, NewsGuard assigned The Federalist a rating of 12.5 out of 100, telling users to "Proceed with Maximum Caution" and stating "[t]his website is unreliable because it severely violates basic journalistic standards."[26]  NewsGuard's 12.5 rating is overlaid on the browser search result for every The Federalist article on all computers that have installed NewsGuard's software. *Id.* Likewise, computers carrying the NewsGuard software superimpose its 12.5 rating on The Federalist articles posted on X.  *Id.* By hovering about the NewsGuard rating, users see NewsGuard's "Proceed with Maximum Caution" rating and its claim that The Federalist is unreliable.  *Id.* NewsGuard's warning appears no matter the topic or the author involved. Consequently, articles authored by Professor Philip Hamburger or Senator Rand Paul appearing at The Federalist receive 12.5 ratings, while Op-Eds authored by those same gentlemen reach a 100 rating when published at the Washington Post or the Wall Street Journal. *Id.*

NewsGuard currently rates The Daily Wire at 49.5 out of 100:  According to NewsGuard's rating level, such outlets are "unreliable because [they] fail to adhere to several basic journalistic standards."[27]  As is the case with The Federalist and all other outlets rated by NewsGuard, the software overlays The Daily Wire's rating on the browser search results for every The Daily Wire article on all computers that have installed NewsGuard's software.[28] Computers carrying the NewsGuard software similarly superimpose its 49.5 unreliability rating on The Daily Wire articles

---

[25] Exh. N at App. 86, NewsGuard Library Partnership Initiative, *available at* https://library.alaska.gov/documents/webinars/dev/newsguard/webinar-slides.pdf (last visited December 1, 2023).
[26] Exh. KK at App. 343, Screengrabs: Examples of Search Engine Results from Computer with NewsGuard Installed
[27] Exh. BB at App. 206, NewsGuard, *Website Rating Process and Criteria*, available at https://www.newsguardtech.com/ratings/rating-process-criteria/
[28] Exh. KK at App. 343, *supra* n.26.

posted on X.  *Id.* By hovering about the NewsGuard rating, users see NewsGuard's "Proceed with Caution" rating and its assertion that The Daily Wire "generally fails to maintain basic standards of accuracy and accountability."  *Id.* Again, NewsGuard's warning appears no matter the topic or the author involved. *Id.* Consequently, articles authored by Professor Philip Hamburger or Senator Rand Paul appearing at The Daily Wire receive 49.5 ratings, while Op-Eds authored by those same gentlemen receive ratings of 100 when published at the Washington Post or the Wall Street Journal. *Id.*

According to NewsGuard, more than 800 public libraries use its software on their computers.[29] An unknown number of public schools likewise have installed NewsGuard on their computers.[30] NewsGuard also brags that its negative ratings reduce the number of individuals who read articles from low-rated media outlets.[31,32] Similarly, NewsGuard notes that a majority of users say they are less likely to share an article with friends and families if it is from a source NewsGuard rated unreliable.  *Id.*

In addition to rating media outlets, both GDI and NewsGuard reportedly both "work with the World Federation of Advertisers (WFA) and its subsidiary, Global Alliance for Responsible Media (GARM) to steer blue-chip advertisers away from outlets like Media Plaintiffs. WFA's membership includes, but is not limited to: 'Best Buy, Chobani, Dell Technologies, Exxon Mobil, General Mills, Hilton, Kellogg, Levi's, MasterCard, Nike, PepsiCo and Verizon.'" ECF1 at ¶

---

[29] Exh. EE at App. 231, NewsGuard, Industries, *available at* https://www.newsguardtech.com/industries/media-literacy/

[30] Exh. FF at App. 234, NewsGuard, NewsGuard for Schools and Universities, *available at* https://www.newsguardtech.com/industries/media-literacy-schools-and-universities/

[31] Exh. CC at App. 218, Gallup, NewsGuard's Online Source Rating Tool: User Experience, available at https://www.newsguardtech.com/wp-content/uploads/2019/01/Gallup-NewsGuards-Online-Source-Rating-Tool-User-Experience-1.pdf

[32] Exh. BB at App. 206, NewsGuard, Website Rating Process and Criteria, available at https://www.newsguardtech.com/ratings/rating-process-criteria/

102.[33] "GARM includes more than 60 leading advertisers and major social media platforms such as Facebook, YouTube, Reddit, Snapchat, TikTok and LinkedIn." *Id.*

In addition to featuring NewsGuard and GDI on its Disinfo Cloud platform, Defendants promote NewsGuard and GDI through the Disinfo Cloud Twitter account. ECF1 at ¶ 87.[34] That Twitter account even amplified a GDI post that expressly acknowledged that "its goal was to ensure websites deemed 'disinformation websites' would be unable to profit from digital ads." *Id.* Similarly, GEC's State Department-funded contractor promoted censorship tools and technologies through its weekly "Disinfo Cloud Digest" that launched in December 2020. ECF1 at ¶ 88.[35] The Disinfo Cloud Digest summarized "the latest news, events, funding opportunities, and other updates related to disinformation, including from the tech vendors featured on [the] Disinfo Cloud" platform. *Id.* The Disinfo Cloud Digest featured censorship tools and technologies that reach American outlets, such as NewsGuard's "Responsible Advertising for News Segment (RANS)" tool which Disinfo Cloud promoted in its April 6, 2021 Digest, stating that such technology "help[s] advertising companies avoid websites known to host or produce mis/disinformation." ECF1 at ¶ 89.[36]

---

[33] Exh. O at App.  101, Susan Ferrechio, *Subjective rankings sap conservative news assets*, THE WASHINGTON TIMES, Aug. 15, 2023, at A1.

[34] Exh. P at App. 105, @DisinfoCloud Tweets, Dec. 14, 2021, Dec. 20, 2021, *available at* *https://twitter.com/DisinfoIndex/status/1472947344865906696*; *https://twitter.com/DisinfoCloud/status/1472957094961848324* *https://twitter.com/NewsGuardRating/status/147079942346259661l.*

[35] Exh. Q at App.  112, The Disinfo Cloud Digest, Dec. 21, 2021, *available at* *https://myemail.constantcontact.com/Thank-you-and-farewell--for-now-* *.html?soid=1134000290001&aid=ixx_30MZGGU* (last visited November 21, 2023).

[36] Exh. R at App. 116, The Disinfo Cloud Digest, Apr. 6, 2021, *available at* https://myemail.constantcontact.com/New-tools--a--29M-counter-disinfo-fund--and-a-musical.html?soid=1134000290001&aid=6VULxmHPp-M.

Defendant GEC also sponsors a "tech challenge" initiative which seeks to identify and "advance" "innovative counter-disinformation tech solutions." ECF1 at ¶ 97.[37] These tech challenges allowed GEC to identify over 110 censorship tools and technologies, including the technology developed by GDI which targets both foreign and domestic media organizations and speech, including the speech, circulation of publications, and subscription and advertisement support of Media Plaintiffs. ECF1 at ¶¶ 98-100, 125-132.

After GEC announced its selection of GDI as an award recipient, GDI's CEO Clare Melford, explained that the award, in addition to allowing GDI to increase its "language coverage capability," would also allow GDI to expand its risk assessments into video news and strengthen GDI's "infrastructure" to "support market-wide deployment so that the ad-tech space can offer advertisers the chance to choose which sites their ads support." ECF1 at ¶ 131.[38] Melford's statement indicates GDI used some of the $100,000 State Department award to fund the infrastructure supporting the Dynamic Exclusion List. *Id.*; ECF1 at ¶ 127.[39]

Further, in closing out the U.S.-Paris Tech Challenge, Patricia Watts, a State Department employee serving as the Director of Technology Engagement Team or TET[40] at GEC, championed GDI and the other censorship enterprises featured, saying: "To all of you listening, we encourage you to engage with all eight companies featured during the tech challenge to determine if there are

---

[37] Exh. S at App. 122, Events—Technology Engagement Division, *available at* https://www.state.gov/upcoming-events-technology-engagement-division/ (last visited November 21, 2023).
[38] Exh. T at App. 128, U.S.-Paris Tech Challenge 2021, Sept. 30, 2021, *available at* *https://www.atlanticcouncil.org/event/u-s-paris-tech-challenge/*, at 1:25:30 (last visited November 21, 2023).
[39] Exh. U at App. 132, Gabe Kaminsky, *Disinformation Inc.: State Department Bankrolls Group Secretly Blacklisting Conservative Media*, Washington Examiner (Feb. 9, 2023), *available at* *https://www.washingtonexaminer.com/restoring-america/equality-not-elitism/disinformation-group-secretly-blacklisting-right-wing-outlets-bankrolled-state-department*.
[40] The Technology Engagement Team has rebranded itself as the Technology Engagement Division: TET and TED will thus be used interchangeably throughout to reference this group within GEC.

opportunities to support their counter-disinformation work. Their work benefits us all in building a better information environment, so please do reach out to them or to us." ECF1 at ¶ 132.[41]

In addition to its international tech challenges, the State Department co-sponsored a "COVID-19 misinformation and disinformation" tech challenge in the spring and summer of 2020. ECF1 at ¶ 142.[42] The three winners of the COVID-19 misinformation and disinformation tech challenge were NewsGuard, Peak Metrics, and Omelas—all American companies which offer technologies that target Americans' speech broadcast to Americans. ECF1 at ¶ 143.[43] The COVID-19 tech challenge's prize package included a $25,000 State Department-funded award. Winners also received the opportunity to further test and refine their technology by piloting the technology on the Disinfo Cloud testbed. ECF1 at ¶¶ 144–45.[44] According to GEC's webpage, the State Department uses the testbed to "test[] specific tools or technologies against a submitted proposal" over the course of six to eight weeks to see how successful the tools are in countering supposed propaganda in "real operational" situations. ECF1 at ¶ 91.[45]

In a press release announcing it had won the COVID tech challenge, NewsGuard explained that it would "help" the State Department by identifying and flagging those spreading alleged COVID disinformation and "hoaxes." ECF1 at ¶ 146.[46] "NewsGuard's technology relied on its ratings of news websites, including of American media outlets, such as Media Plaintiffs." ECF1 at ¶ 147.[47]

---

[41] Exh. T at App. 128, *supra* n.38
[42] Exh. V at App. 137, NSIN Challenge—Countering COVID19 Disinformation, *available at* https://www.nsin.mil/events/disinfo-challenge/ (last visited November 21, 2023).
[43] Exh. W at App. 140, NewsGuard Press Release, Aug. 17, 2020, *available at* https://www.newsguardtech.com/press/newsguard-wins-pentagon-state-department-contest-for-detecting-covid-19-misinformation-and-disinformation/ (last visited November 21, 2023).
[44] Exh. V at App. 137, *supra* n.42
[45] Exh. X at App. 145, Programs—Technology Engagement Division, *available at* https://www.state.gov/programs-technology-engagement-division/ (last visited November 21, 2023).
[46] Exh. W at App. 140, *supra* n.43
[47] *Id.*

The State Department further marketed and promoted the 365-plus tools and technologies that it had previously researched, reviewed, assessed, and tested through its "Silicon Valley Engagement" initiative, which the State Department's TET established in December 2019, "to facilitate public-private partnership coordination and broker constructive engagements between the U.S. government and the tech sector, academia, and research." ECF1 at ¶¶ 75–78.[48] As part of the Silicon Valley Engagement initiative, Defendant GEC established a "Silicon Valley location" and embedded a State Department employee there. *Id.*

While publicly sourced documents do not identify the State Department employee stationed in Silicon Valley, Defendant Alexis Frisbie from TET stated during a virtual conference available on YouTube that GEC's embedded employee would encourage American tech companies to join Disinfo Cloud to identify "a technological solution" suited to the specific tech company's needs to "counter propaganda and disinformation." ECF1 at ¶ 76.[49] The employee embedded in Silicon Valley met with the major social media companies, such as Twitter (now X), Meta, LinkedIn, and others, as well tech companies providing web browsers services, such as Google. ECF1 at ¶ 76, 78, 83–84.[50] Leadership of Defendant GEC also regularly engaged with members of industry, discussing domestic speech and "the tools and techniques of stopping the spread of disinformation on social media . . . ." ECF1 at ¶ 83[51] (footnote omitted).

Further, Defendant GEC highlights on its .gov webpage several organizations and resources that the State Department represents to be "counter-disinfo resources" that "offer

---

[48] Exh. X at App. 145, *supra* n.45
[49] Exh. F at App. 26, *supra* n.14
[50] Exh. F at App. 26, *supra* n.14; Mad Scientist: Weaponized Information Virtual Conference, July 21, 2020, at 33:58, *2.09 MadSci Weaponized Information: Technology Engagement Team & Disinfo Cloud - Ms. Frisbie & Nemr* – YouTube, *available at* https://www.youtube.com/watch?v=YoeHq5gX0dA.
[51] Mad Scientist: Weaponized Information Virtual Conference, July 21, 2020, at 33:58, *2.09 MadSci Weaponized Information: Technology Engagement Team & Disinfo Cloud - Ms. Frisbie & Nemr* – YouTube, *available at* https://www.youtube.com/watch?v=YoeHq5gX0dA..

commercial, non-profit, think tank, and academic technology solutions, dashboards, and research," including the Alliance for Security [*sic*] Democracy, the Atlantic Council's Digital Forensic Research Lab, the CredCatalog, Fighting Disinformation Online, MediaWell, and Misinformation Review. ECF1 at ¶ 174.[52] Merely following GEC's link to these "counter-disinfo" "solutions, dashboards, and research" confirms this sampling of featured resources all target the American press and/or American speakers, *id.*, including some which promote NewsGuard[53] and GDI, both of which directly target Media Plaintiffs.[54] *Id.*

The State Department also funded a seminar in Germany that provided virtual training to American teachers on so-called media literacy. "The 'Medialogues on Propaganda' training sessions, funded by a grant from the U.S. Embassy in Berlin, consisted of 11 online meetings from June 2021 to April 2022, with an audience of 700 schoolteachers."[55] Among other things, the State-Department funded seminars "pushed a 'Data Detox Kit,' which instructs teachers to install NewsGuard …"[56]

## ARGUMENT

A movant is entitled to a preliminary injunction pursuant to Rule 65(a) of the Federal Rules of Civil Procedure upon establishing "(1) a likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury if the injunction is denied outweighs any

---

[52] Exh. GG at App. 238, Resources—Technology Engagement Division, *available at* https://www.state.gov/resources-technology-engagement-division/
[53] Exh. Y at App. 150, Misinformation Review, June 6, 2023, *Less Reliable Media Drive Interest in Anti-Vaccine Information*, *available at* https://misinforeview.hks.harvard.edu/article/less-reliable-media-drive-interest-in-anti-vaccine-information/ (last visited November 21, 2023); *See* Exh. Z at App. 165, Credibility Catalog, *available at* https://credibilitycoalition.org/credcatalog/ (last visited January 9, 2024).
[54] Exh. AA at App. 204, Fighting Disinformation Online, *available at* https://www.rand.org/research/projects/truth-decay/fighting-disinformation/search/items/disinformation-index.html (last visited November 21, 2023).
[55] Exh. HH at App. 242, Luke Rosiak, *State Department Paid Germans To Bring Censorship And Propaganda To U.S. Schools*, The Daily Wire, Jan. 9, 2024, *available at* https://www.dailywire.com/news/state-department-paid-germans-to-bring-censorship-and-propaganda-to-u-s-schools (last visited January 10, 2024).
[56] *Id.*

harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest.[]" *Ladd v. Livingston*, 777 F.3d 286, 288 (5th Cir. 2015) (footnote omitted) (quoting *Trottie v. Livingston*, 766 F.3d 450, 452 (5th Cir. 2014)). As detailed below, these four factors all favor Plaintiffs, entitling them to injunctive relief.

I.       PLAINTIFFS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.

A.       **The State Department's Initiatives Targeting Americans' Speech and the American Press Are *Ultra Vires*.**

Plaintiffs have a substantial likelihood of success on the merits of their claims that Defendants are acting *ultra vires*, in plain excess of their statutory authority (counts three and four), beyond their constitutional authority (counts four and five) and expending government funds and resources beyond their appropriated authority (counts three and four).

The Administrative Procedure Act (APA), 5 U.S.C. § 500 et seq., establishes a cause of action and authorizes a court to "hold unlawful and set aside agency action[]" that, among other things, is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C. § 706(2)(C).

Because the Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States," U.S. CONST. art. I § 1, to determine whether an agency has exceeded its authority, courts must look to an agency's enabling statute and subsequent legislation. *See Lyng v. Payne*, 476 U.S. 926, 937 (1986) ("[A]n agency's power is no greater than that delegated to it by Congress.") . "Agency actions beyond delegated authority are *ultra vires* and should be invalidated." *Detroit Int'l Bridge Co. v. Gov't of Can.*, 192 F. Supp. 3d 54, 65 (D.D.C. 2016).

In this case, Defendant State Department's organic statute charges its Secretary with enumerated duties "respecting foreign affairs," providing:

> The Secretary of State shall perform such duties as shall from time to time be enjoined on or intrusted [*sic*] to him by the President relative to correspondences, commissions, or instructions to or with public ministers or consuls from the United States, or to negotiations with public ministers from foreign states or princes, or to memorials or other applications from foreign public ministers or other foreigners, or to such other matters *respecting foreign affairs* as the President of the United States shall assign to the Department, and he shall conduct the business of the Department in such manner as the President shall direct.

22 U.S.C. § 2656 (emphasis added).

Similarly, Congress appropriates funds to the State Department solely for the "administration of foreign affairs."[57] Further, the authority of GEC, which is a State Department Center, is statutorily limited to countering foreign "propaganda and disinformation efforts aimed at undermining or influencing the policies, security, or stability of the United States and [our] allies[.]"[58] And Congress expressly provided "none of the funds authorized to be appropriated or otherwise made available to carry out this section shall be used for purposes other than countering *foreign* propaganda and misinformation that threatens United States national security."[59]

Nothing in these statutes authorizes Defendants to research, assess, test, market, or promote tools and technologies that target Americans' speech or the American press. Nor do these statutes authorize the State Department to help develop technology and technology companies that target Americans' speech or the American press either by funding such development or the infrastructures of such companies, or by hosting such companies on a State

---

[57] Consolidated Appropriations Act, 2023.

[58] John S. McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. No. 115-232, § 1284, 132 Stat. 1636, 2076 (2018).

[59] National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, § 1287, 130 Stat. 2000, 2548, (2016) (emphasis added).

Department "testbed" platform where they can refine such technology. Defendants also lack any statutory authority, as part of the Silicon Valley Engagement initiative, to discuss with tech companies concerns about Americans' speech or the American press, or to share information with tech companies about CPD tools that can be used to target Americans. Accordingly, Defendants' conduct is *ultra vires*. *See Nastase v. Barr*, 964 F.3d 313, 318 (5th Cir. 2020) (quoting *City of Arlington v. FCC*, 569 U.S. 290, 298 (2013)) ("[A]n agency acts *ultra vires* when it 'go[es] beyond what Congress has permitted it to do[.]'").

Because the State Department's appropriation is limited to funding foreign affairs, and GEC is expressly prohibited from using funding for a purpose "other than countering ***foreign*** propaganda and misinformation," s*ee* NDAA for FY 2017, *supra* at p. 18, n.59, Defendants' funding of initiatives which targets, in whole or in part, Americans' speech or the American press, is also *ultra vires*, *see id.*, as well as otherwise illegal. *See* 31 U.S.C. §§ 1341(a), 1342 and 1517 (prohibiting federal agencies from obligating or expending federal funds outside of, in advance of, or in excess of an appropriation).

Defendants' *ultra vires* conduct and misappropriation of funds inflicts an injury-in-fact on Media Plaintiffs, which, at a minimum face blacklisting, demonetization, reduced circulation of publications and subscriber and advertiser loss caused by at least two of the more than 365 GEC supported CPD tools and technologies. That blacklisting and Defendants' further *ultra vires* efforts researching, assessing, testing, funding, developing, marketing, and/or promoting the 365-plus CPD censorship tools and technologies further chills Media Plaintiffs' speech, adding to their legal

19

injury: The First Amendment-protected speech of Media Plaintiffs has been chilled as a direct result of Defendants' *ultra vires* efforts.[60]

Defendants' unlawful censorship scheme and misappropriation of tax dollars also inflicts an injury-in-fact on Texas, by interfering with Texas's sovereign right to create and enforce a legal code, namely, HB 20, which requires social media companies with market power to act as common carriers. *See NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 445–46 (5th Cir. 2022), *cert. granted in part sub nom. Netchoice, LLC v. Paxton*, 216 L. Ed. 2d 1313 (Sept. 29, 2023) (explaining how HB 20 works); *see Biden v. Nebraska*, 143 S. Ct. 2355, 2366–67 (2023) (holding state had standing to challenge agency's action as exceeding Congressional authority where Department of Education's forgiveness of student loans harmed the state's "performance of its public function" which was "necessarily a direct injury"); *Va. ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 269 (4th Cir. 2011) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez*, 458 U.S. 592, 601 (1982)) ("[W]hen a federal law interferes with a state's exercise of its sovereign 'power to create *and enforce* a legal code' [] it inflict[s] on the state the requisite injury-in-fact.").

Because no statute provides a "colorable basis" for Defendants to assert the authority to engage in any efforts to reduce or lessen the reach of Americans' speech and the American press, or to use appropriated funds to further that scheme, Plaintiffs have a strong likelihood of prevailing on the merits of their *ultra vires* claims. *See City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) ("Any action that an agency takes outside the bounds of its statutory authority is *ultra vires*, *see City of Arlington*, 569 U.S. at 297, and violates the Administrative Procedure Act, *see* 5 U.S.C. §706(2)(c)); *see also Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 119

---

[60] *See* Exh. MM at App. 363, Declaration of Sean Davis, FDRLST Media, LLC; Exh. NN at App. 365, Declaration of John Bickley, The Daily Wire, LLC.

(2022) (quoting *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 505 (2010)) (OSHA vaccine mandate "extends beyond the agency's legitimate reach[]" evidenced by the "'lack of historical precedent,' coupled with the breadth of authority that the Secretary now claims[]"). And "[w]hen an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir.1988)).

> **B.**     **The State Department's Initiatives Abridge Media Plaintiffs' First Amendment Rights to Freedom of Speech and Freedom of Press.**

Not only have Defendants acted *ultra vires* and misappropriated funds restricted to combating foreign propaganda and misinformation, but Defendants have also violated Media Plaintiffs' First Amendment rights to freedom of speech and freedom of the press. The Media Plaintiffs have a substantial likelihood of success on the merits of their claims that Defendants abridged their right to freedom of speech and freedom of press (counts one and two).

The First Amendment provides: "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof; or *abridging* the freedom of speech, or of the press[.]" U.S. CONST. amend. I. (emphasis added). Courts are obliged to interpret the Constitution in accordance with its text, structure, and original understanding, informed by history and tradition. *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2128 (2002). Moreover, "[c]onstitutional analysis must begin with 'the language of the instrument[,]' … which offers a 'fixed standard' for ascertaining what our founding document means[.]" *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2244–45 (2022) (citation omitted) (first quotation quoting *Gibbons v. Ogden*, 22 U.S. 1, 186–89 (1824)) (second quotation quoting 1 J. Story, Commentaries on the Constitution of the United States § 399, p. 383 (1833)).

Beginning, then, with the text of the First Amendment: "abridging" is the "fixed standard" adopted at the Founding for evaluating whether the government has violated the constitutional

guarantees of freedom of speech and the press. Dictionaries published contemporaneously with the Constitution, such as Samuel Johnson's Dictionary, define "to abridge" first as "to 'make shorter' and, second, to 'contract' or 'diminish.'[] Its third meaning was to 'deprive of,' including to deprive one of a right or privilege.[]" *See* Philip Hamburger, *Courting Censorship*, 4 J. FREE SPEECH L. 195, Part III.B (forthcoming 2024) (manuscript) (footnotes omitted)[61] (quoting *Abridge*, JOHNSON'S DICTIONARY ONLINE (1755 ed.)).[62] Other dictionaries, as Hamburger details in *Courting Censorship*, likewise consistently defined "to abridge" as "reducing[]" and "secondarily, some add depriving.[]" *Id.* (footnote omitted). Additional texts published within this same time frame further indicate that "abridge" was considered synonymous with "restrain." *See id.* (quoting 2 THE OLD WHIG: OR, THE CONSISTENT PROTESTANT 225 (London 1739)). Such texts, include Federalist No. 84, penned by Alexander Hamilton, wherein he discussed the dangers of "an abridgement of the liberty of the press" and stressed how "the liberty of the press ought not to be restrained.[]" *Id.* (footnote omitted) (quoting THE FEDERALIST No. 84 (Alexander Hamilton) at 580, note (Jacob E. Cooke ed., 1961)); *id.* (footnote omitted) (citing THE FEDERALIST CONCORDANCE 4 (Thomas S. Engeman, Edward J. Erler, & Thomas B. Hofeller ed., 1980)) ("Indeed, the Federalist repeatedly used the word *abridging* and variations of it in ways that typically alluded to reducing.[]"). "Abridging," as used in the First Amendment thus signified the diminishing, reducing, restraining, or contracting freedom of speech or the press.

The historical record also makes clear that the word "abridge" was intentionally chosen in the speech context to create a lower bar for government action than that set for establishing unconstitutional government action vis-à-vis the practice of religion. While freedom of speech

---

[61] Exh. II at App. 249, Philip Hamburger, Courting Censorship, 4 J. FREE SPEECH L. 195, (forthcoming 2024), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4646028

[62] Exh. JJ at App. 341, "Abridge, v.a.1755." *A Dictionary of the English Language*, by Samuel Johnson. 1755, available at https://johnsonsdictionaryonline.com/1755/abridge_va (last visited Feb. 6, 2024).

and of the press may not be "abridged," free exercise of religion cannot be "prohibited," the latter term historically meaning "[t]o forbid; to interdict by authority." *Id.* (quoting SAMUEL JOHNSON'S DICTIONARY ONLINE, *prohibit* (1755 ed)). Thus, "[a] law prohibiting is prototypically one that comes with the force of law, perhaps its inward obligation and at least its outward coercion." Hamburger, *supra* p. 22 at 46. *See also Lyng v. Nw. Ind. Cemetery Prot. Ass'n*, 485 U.S. 439, 450–51 (1988) (explaining "[t]he crucial word in the constitutional text is 'prohibit'" and concluding the Free Exercise Clause protects against 'indirect coercion or penalties on the free exercise of religion, not just outright prohibitions[]'"). Accordingly, while some degree of governmental coercion is acceptable according to the plain text of the First Amendment in the free exercise context, in the free expression context, "not even a minor prohibition is required for abridging the freedom of speech." Hamburger, *supra* p. 22, Part III.B.

The First Amendment's use of the term "abridging," rather than "infringing" or "prohibiting," in the context of freedom of speech and freedom of the press reflects the Framers' recognition that such rights could only truly be preserved in the absence of *any* governmental limitation on free speech or freedom of the press, including, especially, on matters of public interest, importance, or debate. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."). Indeed, "[t]he very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind. . . . In this field, every person must be his own watchman for truth, because the forefathers did not trust any government to separate the true from the false for us." *Thomas v. Collins*, 323 U.S. 516, 545 (1945) (Jackson, J., concurring).

Put otherwise, the government may play no role in limiting public discourse or restricting the free flow of ideas, opinions, debate, and association for "[t]he First Amendment embodies more than a commitment to free expression and communicative interchange for their own sakes; it has a *structural* role to play in securing and fostering our republican system of self-government." *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 587 (1980) (plurality opinion); *see also Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) (quoting *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 65 (1983)) ("'[G]overnment has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'"). Indeed, as Judge Learned Hand recognized, the rationale underlying the First Amendment is that "right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection." *United States v. Assoc. Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943).

As the Supreme Court in *United States v. Alvarez*, 567 U.S. 709, 728 (2012) explained:

The First Amendment itself ensures the right to respond to speech we do not like, and for good reason. Freedom of speech and thought flows not from the beneficence of the state but from the inalienable rights of the person. And suppression of speech by the government can make exposure of falsity more difficult, not less so. Society has the right and civic duty to engage in open, dynamic, rational discourse. These ends are not well-served when the government seeks to orchestrate public discussion through content-based mandates.

Our constitution's "profound" commitment to the principle of free speech is even more necessary when, as here, the debate may include critical or "unpleasantly sharp attacks" on the government or its policies. *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

The guarantee of freedom of the press is likewise protected from government "abridgement" by the First Amendment. The constitutional protection of freedom of the press is thus exceedingly broad and while it undoubtedly protects against prior restraints on publication, it is not limited to "any particular way of abridging" the right, for "[t]he evils to be prevented were

not the censorship of the press merely, but any action of the government by means of which it might prevent such free and general discussion of public matters as seems absolutely essential to prepare the people for an intelligent exercise of their rights as citizens." *Grosjean v. Am. Press Co.*, 297 U.S. 233, 249–50 (1936) (quoting 2 COOLEY'S CONSTITUTIONAL LIMITATIONS, 8th ed., p. 886). As such, the Supreme Court has long accorded constitutional protection to the press to disseminate the news, for "liberty of circulating" is essential to a free press, and "without the circulation, the publication would be of little value." *Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938) (quoting *Ex Parte Jackson*, 96 U.S. 727, 733 (1877)).

The government abridges freedom of the press by "penalizing the publishers and curtailing the circulation of a selected group of newspapers." *Grosjean*, 297 U.S. at 251. And the First Amendment's guarantee of a free press is infringed when government-supported and promoted third-parties rate media outlets in order to suppress and defund them for "freedom to publish means freedom for all and not for some." *Assoc. Press v. United States*, 326 U.S. 1, 20 (1945). Further, freedom of the press "rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public, that a free press is a condition of a free society." *Id.*

Defendants' own conduct, which, as detailed above, includes GEC's recruitment of social media and tech companies to join a platform owned and operated by the State Department, to identify, test, and then adopt tools and technologies that restrict, downgrade, and/or demonetize Americans' speech and the American press—diminishes, reduces, restrains, and contracts Media Plaintiffs' speech and circulation of publications. The breadth of the restraint on Media Plaintiffs' speech and circulation is, as yet, unknown. For instance, GEC may be assisting and encouraging web browsers and social media companies to adopt technology that hides The Daily Wire and The

25

Federalist's reporting, or GEC may provide technology, algorithms, or other proprietary information to assist in the blocking of Media Plaintiffs' speech, or it may provide key words or topics to technology companies to trigger the flagging of Media Plaintiffs' reporting as "misinformation." At a minimum, though, the evidence shows Defendants funded GDI's infrastructure, funded GDI and NewsGuard's testing on Disinfo Cloud, and otherwise assisted, tested, promoted, and marketed GDI and NewsGuard, whose ranking technologies direct the public and advertisers away from Media Plaintiffs. These facts more than suffice to establish Defendants are abridging The Daily Wire and The Federalist's speech and press rights.

This abridgement is especially egregious as the blacklisting of The Daily Wire and The Federalist's speech and circulation constitutes viewpoint-based discrimination. *See Hill v. Colorado*, 530 U.S. 703, 723 (2000) (citing *Consolidated Edison Co. of N.Y. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 530, 538 (1980)) ("viewpoint-based" regulation is especially "obnoxious" to the First Amendment). In fact, Defendants' censorship scheme in this case brings to life the "rationale of the general prohibition" against content- and/or viewpoint-based regulation, namely that "content discrimination raises the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 387 (1992) (emphasis added) (quoting *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991)) (quotation marks omitted). *See also Int'l Women's Day March Planning Comm. v. City of San Antonio*, 619 F.3d 346, 359 (5th Cir. 2010) (citing *Pleasant Grove City v. Summum*, 129 S. Ct. 1125, 1132 (2009)) ("[C]ontent-based burdens on speech in a public forum are subject to strict scrutiny, while viewpoint-based burdens are [absolutely] unconstitutional."). Driving those deemed by the government purveyors of misinformation from

26

the information superhighway of the digital age is precisely the goal of the State Department's censorship scheme—and as such, it is clearly unconstitutional.

This scheme is profoundly dangerous, especially where, as here, the government decides what qualifies as misinformation or disinformation. As the Supreme Court has observed:

> "Speech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people. . . . Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints. . . . Prohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others. . . . As instruments to censors, these categories are interrelated: Speech restrictions based on the identity of the speaker are all too often simply a means to control content."

*Citizens United v. FEC*, 558 U.S. 310, 339–40 (2010) (internal citations omitted).

The government is "constitutionally disqualified from dictating the subjects about which persons may speak and the speakers who may address a public issue." *First Nat'l Bank of Bos. v. Bellati*, 435 U.S. 765, 784–85 (1978) (citing *Police Dep't of Chicago v. Mosley*, 409 U.S. 92, 96 (1972)). The Court's reasoning that "[s]uch power in government to channel the expression of views is unacceptable under the First Amendment[]" and that that is "[e]specially" true when the attempted "suppression of speech suggests an attempt to give one side of a debatable public question an advantage.[]" *Id.* at 785 (footnotes omitted) (citation omitted).

That the object of the State Department's scheme is suppression further renders it an unconstitutional *de facto* prior restraint. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67, 70 (1963) (holding decision by governmental officials to "list particular publications as objectionable" constitute an unconstitutional "system of prior administrative restraints" without judicial oversight, where Defendants "deliberately set out to achieve the suppression of publications" through "informal sanctions," including "the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation[]"). *See also Near v. Minnesota ex rel.*

*Olson*, 283 U.S. 697, 703, 711–12 (1931) (concluding statute constituted a prior restraint because its object was "not punishment, in the ordinary sense, but suppression of the offending newspaper or periodical"). Prior restraints are the most offensive of all First Amendment violations, with "[a]ny system of prior restraint coming to the courts bearing a heavy presumption against its constitutional validity." *Bantam Books*, 372 U.S. at 70.

Further, to prevail on their freedom of speech and press claims, Media Plaintiffs need not establish that Defendants succeeded in reducing speech or circulation of their respective publications. Rather, it is sufficient to show that the government's funding, support, and collusion with private parties "cast disapproval on particular viewpoints" and "risk[ed] the suppression of free speech and creative inquiry[.]" *Rosenberger v. Rectors and Visitors of Univ. of Va.*, 515 U.S. 819, 836 (1995). The State Department's censorship scheme alleged in this case functions in precisely such a way. Moreover, not only has Defendants' unconstitutional conduct *risked* the suppression of Media Plaintiffs' First Amendment rights, but it also results in the chilling of Media Plaintiffs' speech. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 332 (5th Cir. 2020) ("'[C]onstitutional violations may arise from the deterrent, or "chilling," effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights.'") (quoting *Laird v. Tatum*, 408 U.S. 1, 11 (1972)).

While the chill from the State Department's censorship scheme is a sufficient constitutional injury for Media Plaintiffs to prevail on their First Amendment claims, *see id.*, in this case, in seeking funding from the State Department, GDI bragged that its technology caused a monetary harm to those outlets it branded as "disinformation peddlers." ECF1 at ¶ 129 (citation omitted). Specifically, Danny Rogers, the American partner in GDI, confirmed that "over a dozen ad-tech companies," covering "20 different media markets," used GDI's technology and that its

technology succeeded in "cutting the number of ad options" by over half, "redirecting millions of dollars away from disinformation peddlers toward quality journalism." *Id.* at ¶ 129.[63] Clare Melford, Rogers's business partner and CEO of GDI, similarly stated in a March 2022 podcast that the blacklist "had a significant impact on the advertising revenue that has gone to those sites." *Id.* at ¶ 130.[64]

Similarly, NewsGuard, which ranks both The Daily Wire and The Federalist as "unreliable," attests that its goal is to deprive disfavored news sites of revenue, stating that it licenses its so-called "White List of legitimate news sites to advertisers, which will cut off revenues to fake news sites." *Id.* at ¶ 120.[65] NewsGuard also confirms that its "licensees include search engines and platforms, internet service providers, advertising companies, health and medical institutions, educational organizations, cybersecurity companies, governments, researchers and more." *Id.* at ¶ 121.[66]

As detailed in the complaint, open-source evidence also establishes Defendants engaged in multiple *ultra vires* activities designed to induce third parties to adopt GDI and NewsGuard technology that inflicts this monetary harm on the American press. *See, e.g., id.* at ¶ 132 (Defendant Watts, the Director of TET at GEC, championed GDI and encouraged individuals to "engage" with the company "to determine if there are opportunities to support their counter-disinformation work[,]" stating "[t]heir work benefits us all in building a better information environment, so please do reach out to them or to us.");[67] *id.* at ¶ 87 (Disinfo Cloud Twitter feed promoting NewsGuard's claim it would "ensure websites deemed 'disinformation websites' would be unable

---

[63] Exh. T at App. 128, *supra* n.38
[64] Exh. U at App. 132, *supra* n.39
[65] Exh. N at App. 86, *supra* n.25
[66] *Id.*
[67] *See* Exh. T at App. 128, *supra* n.38

to profit from digital ads"[68]); *id.* at ¶ 89 ("Disinfo Cloud Digest featured censorship tools and technologies that reached American outlets, such as NewsGuard's 'Responsible Advertising for News Segment (RANS)' tool which Disinfo Cloud promoted in its April 6, 2021 Digest, stating that such technology 'help[s] advertising companies avoid websites known to host or produce mis/disinformation.'"[69]). These facts thus create a reasonable inference that Defendants' *ultra vires* conduct actually reduced Media Plaintiffs' circulation of their publications and negatively impacted subscriber and advertising support—even though proof of neither would be required for Media Plaintiffs to prevail on their First Amendment claims.

That Defendants curtail Media Plaintiffs' circulation of their publications indirectly through a multi-step scheme is of no moment. Whether the government abridges freedom of speech or freedom of the press directly or indirectly is irrelevant, as it is "axiomatic" that the Government may not "induce, encourage, or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973) (quoting *Lee v. Macon Cnty. Bd. of Educ.*, 267 F. Supp. 458, 475–76 (M.D. Ala. 1967)). The nearly two-hundred year old principle that "a state … cannot [do] indirectly[] what it is prohibited from doing directly[,]" *Briscoe v. Bank of Commonwealth of Ky.*, 36 U.S. 257, 316 (1837), confirms that Media Plaintiffs have a strong likelihood of success on the merits of their freedom of speech and freedom of press claims. *See also Smith v. Turner*, 48 U.S. 283, 458 (1849) ("It is a just and well-settled doctrine established by this [C]ourt, that a State cannot do that indirectly which she is forbidden by the Constitution to do directly."). This doctrine is a logical necessity if the Constitution is to be more than a dead letter. Put otherwise, if the government can simply outsource constitutional violations

---

[68] Exh. P at App. 105, *supra* n.34.
[69] Exh. R at App. 116, *supra* n.36.

to third parties—whether or not those parties are willing participants—the Constitution is meaningless.

Consistent with this doctrine, in *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462–63 (1958), the Supreme Court held that the First Amendment's guarantee of Americans' right to freedom of speech prohibited the state from forcing the NAACP to disclose its membership list. Although the government's interference with NAACP members' associational rights was indirect, the Court concluded that it nonetheless unconstitutionally abridged their associational rights. *Id.* at 462. The Supreme Court reaffirmed that point in *Healy v. James*, 408 U.S. 169, 183 (1972), stressing "the Constitution's protection is not limited to direct interference with fundamental rights." *See also Bates v. City of Little Rock*, 361 U.S. 516, 523 (1960) (citing *Grosjean v. Am. Press Co.*, 297 U.S. 233 (1936)) ("Freedoms such as these are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle government interference."); *Sailors v. Bd. of Educ. of Kent Cnty.*, 387 U.S. 105, 108 n.5 (1967) (citations omitted) ("Nor can the restraints imposed by the Constitution on the States be circumvented by local bodies to whom the State delegates authority."); *Cooper v. Aaron*, 358 U.S. 1, 17 (1958) ("The constitutional rights of children not to be discriminated against in school admission on grounds of race or color declared by this Court in the *Brown* case can neither be nullified openly and directly by state legislators or state executive or judicial officers, *nor nullified indirectly by them through evasive schemes* for segregation whether attempted ingeniously or ingenuously.") (emphasis added) (internal quotation and citation omitted).

Further, as the Supreme Court recognized in *Bantam Books*, Courts "look through forms to the substance and recognize that informal censorship may sufficiently inhibit the circulation of publications to warrant injunctive relief.[]" *See Bantam Books*, 372 U.S. at 67 (footnote omitted).

31

In *Bantam Books*, as in this case, the government "deliberately set about to achieve the suppression of publications deemed 'objectionable' and succeeded in its aim.[]" *Id.* (footnote omitted). In other words, the "substance" and not the form of the government's conduct proved dispositive to the question of abridgement. As the Supreme Court stressed in *Near v. State of Minnesota ex rel. Olson*, 283 U.S. 697, 708 (1931), "it is enough to say that in passing upon constitutional questions the court has regard to substance and not to mere matters of form, and that, in accordance with familiar principles, the state must be tested by its operation and effect." (citations omitted). Media Plaintiffs' allegations overwhelmingly show Defendants' "operation and effect" was to abridge their freedom of speech and the press, with the government acting to "suppress" speech.

While the "abridging" standard of the First Amendment controls, rendering Defendants' censorship scheme unconstitutional, *see supra* at 19–30, the Media Plaintiffs also have a strong likelihood of prevailing on their freedom of speech and freedom of the press claims under the varied other standards courts have applied in the context of the First Amendment. For instance, the evidence indicates GEC significantly encouraged the use of the censorship technology, which renders the third-party conduct state action under *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). Additionally, the regular coordination between tech companies and the Silicon Valley Engagement employee embedded there establishes that the private actors operated as willful participants in joint activity with the government. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982); *Dennis v. Sparks*, 449 U.S. 24 (1980). Similarly, through Silicon Valley Engagement, Disinfo Cloud, testbed, and the various tech challenge initiatives, Defendants "so far insinuated" themselves into the private affairs of the tech companies—both the developers and the users of the CPD tools and technology—that the line between public and private action is blurred, rendering the government liable for the constitutional abridgement of Media Plaintiffs' speech and press rights. *Jackson v.*

32

*Metro. Edison Co.*, 419 U.S. 345, 357 (1974); *Evans v. Newton*, 382 U.S. 296, 299 (1966). GEC also "knowingly accept[ed] the benefits derived from unconstitutional behavior[]" by reaping the reward of the censorship of disfavored American media outlets through their joint efforts with social media companies and tech companies providing web browsing services. *Kirtley v. Rainey*, 326 F.3d 1088, 1093 (9th Cir. 2003) (quoting *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1486 (9th Cir. 1995). For this added reason, GEC is liable for the abridgement prompted by its joint engagement with Silicon Valley tech companies. *Id. See also Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1453 (10th Cir. 1995) (joint action may also be proven by showing that government officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights).

In sum, Media Plaintiffs have been deprived of their First Amendment rights to free speech and freedom of the press because of the "substance" of the State Department Defendants' censorship scheme. That alone is enough to establish a strong likelihood of success on the merits of Media Plaintiffs' First Amendment claims.[70] *See Bantam Books*, 372 U.S. at 70–71. Media Plaintiffs, however, also have a strong likelihood of success on these claims given Defendants' significant encouragement to third parties to use CPD tools and technologies, given the extent of joint censorship activities with social media and Big Tech companies, and given the excessive entanglement between Defendants, organizations developing CPD tools and technologies, and groups using the CPD tools and technologies targeting Media Plaintiffs' speech and circulation of publications.

---

[70] Defendants' constitutional violation also renders its conduct *ultra vires* and illegal under the APA.

33

II.       **PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION.**

To satisfy the irreparable harm requirement, a plaintiff need only demonstrate that absent a preliminary injunction, he is "likely to suffer irreparable harm before a decision on the merits can be rendered." *Winter v. NRDC*, 555 U.S. 7, 22 (2008) (citation omitted). The deprivation of a constitutional right, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Thus, if a plaintiff establishes a sufficient likelihood of success on the merits of a First Amendment claim, he also establishes irreparable harm. *See Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 295 (5th Cir. 2012) ("Opulent Life has satisfied the irreparable-harm requirement because it has alleged violations of its First Amendment" rights.).

As detailed above, Media Plaintiffs have established a strong likelihood of success on the merits of their First Amendment claims and thus have also established irreparable harm. The irreparable harm is particularly acute because, if Defendants are not promptly enjoined, their unconstitutional conduct will continue to reduce the Media Plaintiffs' reach, rendering it all the more difficult, if not impossible, to undo the harm flowing from the continued funding and promotion of censorship technologies which abridge their First Amendment rights. Indeed, once such technologies are adopted by third parties, the censorship-by-technology will be in place, and fashioning injunctive relief to limit the continuing harm will become increasingly challenging.

Nor can money make the Media Plaintiffs whole again, for the Defendants enjoy sovereign immunity from monetary damages. So, while the State Department intentionally enlisted and promoted blacklisting companies which bragged about "systemically defund[ing]" disfavored members of the press and "redirecting millions of dollars away from disinformation peddlers toward quality journalism," the Media Plaintiffs have no recompense from the

government for the State Department's violation of their First Amendment rights. ECF1 ¶¶ 119–20, 129.[71] Where costs are not recoverable because the government-defendant enjoys sovereign immunity from monetary damages, irreparable harm is generally satisfied. *Wages & White Lion Invs., LLC*, 16 F.4th 1130, 1142 (5th Cir. 2021). That is because the only possible relief is for the Court to order an end to the unconstitutional conduct—which is precisely what the Media Plaintiffs seek.

Similarly, Defendants' *ultra vires* censorship scheme and its concomitant misappropriation of funds for domestic efforts to combat so-called misinformation, irreparably harm Plaintiffs, as once such technology is funded, developed, and adopted, it will prove difficult if not impossible to undo the harm to Plaintiffs. Texas suffers irreparable harm from Defendants' *ultra vires* censorship scheme which interferes in Texas' sovereign right to create and enforce its own laws, namely, HB 20. *Cf. Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013) (citations omitted) (the State's ability to enforce its laws "necessarily suffers [] irreparable harm" when denied the ability to enforce its laws). Accordingly, Plaintiffs have established the irreparable harm requirement necessary to obtain a preliminary injunction.

### III.  THE BALANCE OF EQUITIES (INCLUDING THE PUBLIC INTEREST) WEIGHS HEAVILY IN PLAINTIFFS' FAVOR.

A preliminary injunction is proper when "the balance of equities tips in [the movant's] favor, and [when] an injunction is in the public interest." *Winter*, 555 U.S. at 20. A preliminary injunction will always be in the public interest, and the equities will always favor the movant, when Plaintiff establishes the likelihood of success on a First Amendment claim. *Nken v. Holder*,

---

[71] Exh. M at App. 81, *supra* n.24; Exh. N at App. 86, *supra* n.25

556 U.S. 418, 435–36 (2009). That is because "any interest … in enforcing an unlawful (and likely unconstitutional) [law] is illegitimate." *BST Holdings, L.L.C. v. Occupational Safety & Health Admin., U.S. Dep't of Lab.*, 17 F.4th 604, 618 (5th Cir. 2021). Conversely, "[i]njunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) (quoting *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006)). Thus, because Plaintiffs have established a likelihood of success on the merits, the remaining preliminary injunction "factors are presumed and weigh in favor of an injunction." *Ass'n of Club Executives of Dallas, Inc. v. City of Dallas*, 604 F. Supp. 3d 414, 419 (N.D. Tex. 2022), *vacated and remanded by* 83 F.4th 958, 970 (5th Cir. 2023). *See also Texans for Free Enter.*, 732 F.3d at 539.

## CONCLUSION

For the reasons detailed above, Plaintiffs respectfully request this Court grant Plaintiffs' Motion for a Preliminary Injunction, enjoining Defendants and any individuals and entities acting on their behalf from continuing to research, assess, fund, test, market, promote, host on its government platform, and/or otherwise assist with the development of, or encourage the use of, technology that targets in whole, or in part, Americans' speech or the American press.

<div style="margin-left:40%">

Respectfully submitted,

/s/ *Margaret A. Little*

Margaret A. Little
Lead Attorney
Senior Litigation Counsel
Connecticut Bar # 303494
NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street NW, Suite 450
Washington, DC 20036
Telephone: (202) 869-5210
Facsimile: (202) 869-5238
Peggy.Little@ncla.legal

</div>

/s/ *Margot J. Cleveland*

Margot J. Cleveland,
Of Counsel
Michigan Bar #P83564
NEW CIVIL LIBERTIES ALLIANCE
Margot.Cleveland@ncla.legal

/s/ *Casey Norman*

Casey Norman*
*Pro hac vice forthcoming*
Litigation Counsel
New York Bar #5772199
Casey.Norman@ncla.legal

*Attorneys for Plaintiffs the Daily Wire Entertainment LLC and FDRLST Media LLC*

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General of Texas

GRANT DORFMAN
Deputy First Assistant Attorney General of Texas

RALPH MOLINA
Deputy Attorney General for Legal Strategy

RYAN D. WALTERS
Chief, Special Litigation Division

/s/ *Susanna Dokupil*

SUSANNA DOKUPIL
Lead Attorney
Special Counsel
Texas State Bar No. 24034419

AMY S. HILTON
Special Counsel
Texas State Bar No. 24097834

37

JOHNATHAN STONE
Special Counsel
Texas State Bar No. 24071779

*Attorneys for the State of Texas*

## CERTIFICATE OF SERVICE

I hereby certify that, on February 6, 2024, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ Margot J. Cleveland*

Margot J. Cleveland