**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

THE DAILY WIRE, LLC *et al.*,

                Plaintiffs

      v.

UNITED STATES DEPARTMENT
OF STATE *et al.*,

              Defendants.

Civil Action No. 6:23-cv-00609 (JDK)

**DEFENDANTS' COMBINED OPPOSITION TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION AND MOTION TO DISMISS FOR LACK OF
JURISDICTION**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

JAMES J. GILLIGAN
Special Litigation Counsel
Federal Programs Branch

JOSHUA E. GARDNER
Special Counsel
Federal Programs Branch

DOROTHY M. CANEVARI
CRISTEN C. HANDLEY
CODY T. KNAPP
ARJUN MODY
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
Tel: (202) 451-7723
Email: arjun.a.mody@usdoj.gov

*Counsel for Defendants*

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................................1

STATEMENT OF ISSUES ...........................................................................................................3

BACKGROUND ...........................................................................................................................3

I.   Legal and Factual Background ............................................................................................3

    A.   Congress tasked the State Department's "Global Engagement Center" with exposing and countering foreign state and non-state propaganda and disinformation aimed at undermining or influencing the policies, security, or stability of the United States and its allies. ..................3

    B.   GEC carried out various initiatives through a grant to Park Advisors. ........................7

        1.   2020 subgrant to NewsGuard to understand the origins, content and spread of Russian and Chinese disinformation campaigns. ..............................................................8

        2.   2021 subgrant to Global Disinformation Index, Ltd. to add foreign language capabilities to its existing technology. ..................................................................................10

    C.   NewsGuard's and GDI's other business. ......................................................................12

        1.   NewsGuard's "Nutrition Labels" and "Misinformation Fingerprints" Products ........12

        2.   GDI's Dynamic Exclusion List ....................................................................................13

II.  This Litigation ....................................................................................................................14

LEGAL STANDARDS ..............................................................................................................15

ARGUMENT ..............................................................................................................................16

I.   The Court should dismiss this case for lack of jurisdiction. .............................................16

    A.   Texas lacks standing. ....................................................................................................17

    B.   Media Plaintiffs lack standing. .....................................................................................20

II.  Plaintiffs' Motion for Preliminary Injunction should be denied. ......................................28

    A.   Plaintiffs fail to demonstrate irreparable harm. ...........................................................28

    B.   Plaintiffs fail to demonstrate a likelihood of success on the merits of their claims. ...............30

        1.   Plaintiffs have not made a "clear showing" that they have standing. ...........................30

        2.   Media Plaintiffs are unlikely to succeed on their First Amendment claims. .................31

        3.   Plaintiffs are unlikely to succeed on their APA and *Ultra Vires* claims .........................41

    C.   The balance of equities and the public interest disfavor a preliminary injunction. ..................44

    D.   Plaintiffs' proposed injunction is improper. .................................................................46

        1.   The proposed injunction is imprecise. ..........................................................................46

        2.   The proposed injunction is overbroad. .........................................................................48

III. Claims against the official capacity Defendants should be dismissed. .............................49

CONCLUSION ...........................................................................................................................50

# TABLE OF AUTHORITIES

## Cases

*Ala. Rural Fire Ins. Co. v. Naylor,*
 530 F.2d 1221 (5th Cir. 1976) ................................................................................44

*Am. Mfrs. Mut. Ins. Co. v. Sullivan,*
 526 U.S. 40 (1999) .............................................................................................33

*Anyadike v. Vernon Coll.,*
 2015 WL 12964684 (N.D. Tex. Nov. 20, 2015) ...............................................29

*Ashcroft v. Iqbal,*
 556 U.S. 662 (2009) ...................................................................................... 20, 21

*Ass'n of Am. Physicians & Surgeons v. Schiff,*
 518 F. Supp. 3d 505 (D.D.C. 2021) ...............................................................27

*Bailey v. Mansfield Indep. Sch. Dist.,*
 425 F. Supp. 3d 696 (N.D. Tex. 2019),
 *appeal dismissed sub nom. Bailey v. Vaszauskas,* 2020 WL 3053942 (5th Cir. Feb. 28, 2020) ................38

*Barber v. Bryant,*
 860 F.3d 345 (5th Cir. 2017) ...........................................................................30

*Bd. of Regents of Univ. of Wis. Sys. v. Southworth,*
 529 U.S. 217, (2000) .......................................................................................39

*Benisek v. Lamone,*
 585 U.S. 155 (2018) .......................................................................................29

*Bennett v. Spear,*
 520 U.S. 154 (1997) ..................................................................................... 41, 42

*Blum v. Yaretsky,*
 457 U.S. 991 (1982) ...............................................................................passim

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,*
 531 U.S. 288 (2001) ...............................................................................31, 35, 36

*Burton v. Wilmington Parking Auth.,*
 365 U.S. 715 (1961) .......................................................................................36

*Califano v. Yamasaki,*
 442 U.S. 682 (1979) .......................................................................................48

*City of L.A. v. Lyons,*
 461 U.S. 95 (1983) ..................................................................................... 17, 20

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ........................................................................................ 18, 22, 31

*Ctr. for Biological Diversity v. U.S. EPA,*
   937 F.3d 533 (5th Cir. 2019) ...................................................................................... 18

*DaimlerChrysler Corp. v. Cuno,*
   547 U.S. 332 (2006) ...................................................................................................... 15

*Danos v. Jones,*
   652 F.3d 577 (5th Cir. 2011) ...................................................................................... 44

*Davis v. Pension Benefit Guar. Corp.,*
   571 F.3d 1288 (D.C. Cir. 2009) ................................................................................. 45

*Def. Distributed v. U.S. Dep't of State,*
   838 F.3d 451 (5th Cir. 2016) ...................................................................................... 46

*El Paso Cnty. v. Trump,*
   982 F.3d 332 (5th Cir. 2020) ...................................................................................... 30

*Frazier v. Bd. of Trs. of N.W. Miss. Reg. Med. Ctr.,*
   765 F.2d 1278 (5th Cir. 1985) .................................................................................... 36

*Geyen v. Marsh,*
   775 F.2d 1303 (5th Cir. 1985) .................................................................................... 44

*Google, Inc. v. Hood,*
   822 F.3d 212 (5th Cir. 2016) ...................................................................................... 28

*H.D. Vest, Inc. v. H.D. Vest Mgmt. & Servs., LLC,*
   2009 WL 1766095 (N.D. Tex. June 23, 2009) ......................................................... 29

*Harmon v. Dall. Cnty.,*
   927 F.3d 884 (5th Cir. 2019) ...................................................................................... 49

*Holland Am. Ins. Co. v. Succession of Roy,*
   777 F.2d 992 (5th Cir. 1985) ...................................................................................... 37

*Hotze v. Burwell,*
   784 F.3d 984 (5th Cir. 2015) ...................................................................................... 16

*Humana, Inc. v. Jacobson,*
   804 F.2d 1390 (5th Cir. 1987) .................................................................................... 28

*Inclusive Cmtys. Project, Inc. v. Dep't of Treasury,*
   946 F.3d 649 (5th Cir. 2019) ................................................................................ 22, 27

*Janvey v. Alguire,*
    647 F.3d 585 (5th Cir. 2011) ...................................................................................28

*Jordan v. Fisher,*
    823 F.3d 805 (5th Cir. 2016) ...................................................................................16

*Kennedy v. Warren,*
    66 F.4th 1199 (9th Cir. 2023).................................................................................38

*La. Div. Sons of Confederate Veterans v. City of Natchitoches,*
    821 F. App'x 317 (5th Cir. 2020) ..................................................................... 34, 35

*Leaf Trading Cards, LLC v. Upper Deck Co.,*
    2019 WL 7882552 (N.D. Tex. Sept. 18, 2019).......................................................29

*Leedom v. Kyne,*
    358 U.S. 184 (1958) .................................................................................................44

*Lugar v. Edmondson Oil Co.,*
    457 U.S. 922 (1982) .................................................................................................35

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ................................................................................. 15, 16, 22, 42

*Lujan v. Nat'l Wildlife Found.,*
    497 U.S. 871 (1990) .................................................................................................42

*Manhattan Cmty. Access Corp. v. Halleck,*
    587 U.S. 808 (2019) ........................................................................................... 31, 37

*Martinez v. Mathews,*
    544 F.2d 1233 (5th Cir. 1976).................................................................................16

*Mayo Found. for Med. Educ. & Rsch. v. BP Am. Prod. Co.,*
    447 F. Supp. 3d 522 (N.D. Tex. 2020)....................................................................45

*Millennium Funding, Inc. v. 1701 Mgmt. LLC,*
    2021 WL 3618227 (S.D. Fla. Aug. 16, 2021)........................................................29

*Missouri v. Biden,* 83 F.4th 350 (5th Cir. 2023),
    *cert. granted sub nom., Murthy v. Missouri,* 144 S. Ct. 7 (2023) ........................passim

*Mood v. Cnty. of Orange,*
    2019 WL 13036027 (C.D. Cal. July 25, 2019) ......................................................21

*Munaf v. Geren,*
    553 U.S. 674 (2008) .................................................................................................15

*Nat'l Endowment for the Arts v. Finley,*
   524 U.S. 569 (1998) ............................................................................................................38

*NCAA v. Tarkanian,*
   488 U.S. 179 (1988) .....................................................................................................35, 36

*NetChoice, LLC v. Paxton,*
   142 S. Ct. 1715 (2022) .......................................................................................................18

*NetChoice, LLC v. Paxton,*
   144 S. Ct. 477 (2023) .........................................................................................................18

*NetChoice, LLC v. Paxton,*
   2022 WL 1537249 (5th Cir. May 11, 2022) .....................................................................18

*NetChoice, LLC v. Paxton,*
   49 F.4th 439 (5th Cir. 2022) ..............................................................................................18

*NetChoice, LLC v. Paxton,*
   573 F. Supp. 3d 1092 (W.D. Tex. 2021) ...........................................................................18

*Nken v. Holder,*
   556 U.S. 418 (2009) ...........................................................................................................44

*Norton v. S. Utah Wilderness All.,*
   542 U.S. 55 (2004) .............................................................................................................42

*Nyunt v. Chairman, Broad. Bd. of Governors,*
   589 F.3d 445 (D.C. Cir. 2009) ..........................................................................................44

*O'Shea v. Littleton,*
   414 U.S. 488 (1973) .....................................................................................................17, 20

*Oestereich v. Selective Serv. Sys. Loc. Bd. No. 11,*
   393 U.S. 233 (1968) ...........................................................................................................44

*Pals Grp., Inc. v. Quiskeya Trading Corp.,*
   2017 WL 532299 (S.D. Fla. Feb. 9, 2017) .......................................................................29

*Paterson v. Weinberger,*
   644 F.2d 521 (5th Cir. 1981) .............................................................................................15

*Pennhurst State Sch. & Hosp. v. Halderman,*
   465 U.S. 89 (1984) .............................................................................................................44

*Penthouse Int'l, Ltd. v. Meese,*
   939 F.2d 1011 (D.C. Cir. 1991) ...................................................................................38, 39

*Polar Tankers, Inc. v. City of Valdez,*
    557 U.S. 1 (2009) ........................................................................................40

*Qureshi v. Holder,*
    663 F.3d 778 (5th Cir. 2011) ........................................................................41

*Rendell-Baker v. Kohn,*
    457 U.S. 830 (1982) ....................................................................................33

*Schmidt v. Lessard,*
    414 U.S. 473 (1974) ....................................................................................46

*Scott v. Schedler,*
    826 F.3d 207 (5th Cir. 2016) ................................................................ 46, 49

*Seiko Kabushiki Kaisha v. Swiss Watch Int'l, Inc.,*
    188 F. Supp. 2d 1350 (S.D. Fla. 2002) ........................................................29

*Shurtleff v. City of Bost.,*
    596 U.S. 243 (2022) ....................................................................................39

*Sierra Club v. Peterson,*
    228 F.3d 559 (5th Cir. 2000) ................................................................ 41, 42

*Simon v. E. Ky. Welfare Rights Org.,*
    426 U.S. 26 (1976) ......................................................................................22

*Soc'y of Separationists, Inc. v. Herman,*
    959 F.2d 1283 (5th Cir. 1992) ......................................................................30

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ....................................................................................16

*Superior MRI Servs., Inc. v. All. Healthcare Servs., Inc.,*
    778 F.3d 502 (5th Cir. 2015) ........................................................................15

*Telephone & Data Sys., Inc. v. FCC,*
    19 F.3d 42 (D.C. Cir. 1994) ........................................................................17

*Texas v. EEOC,*
    933 F.3d 433 (5th Cir. 2019) ........................................................................19

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ....................................................................................16

*Utah v. Evans,*
    536 U.S. 452 (2002) ....................................................................................27

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,*
    454 U.S. 464 (1982) ...........................................................................................16

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.,*
    576 U.S. 200 (2015) .................................................................................... 38, 40

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) .............................................................................16, 30, 45

*ZeptoLab UK Ltd. v. Commonwealth Toy & Novelty Co.,*
    2012 WL 4761501 (S.D.N.Y. Aug. 23, 2012) ................................................27

**Statutes**

22 U.S.C. § 2651 ................................................................................................ 4, 42

22 U.S.C. § 2656 ................................................................................................ 4, 42

22 U.S.C. § 2656 note (Global Engagement Center) .....................................4, 5, 42, 48

5 U.S.C. § 704 .........................................................................................................41

5 U.S.C. § 706 .................................................................................................. 41, 43

Act of Oct. 21, 1976, Pub. L. No. 94-574, § 1, 90 Stat. 2721 (codified at 5 U.S.C. § 702 (1982)) .......44

Tex. Civ. Prac. & Rem. Code Ann. § 143A ............................................................17

**Other Authorities**

Becera, https://perma.cc/5V8K-MKVJ ....................................................................8

Br. for the Petitioners, *Murthy v. Missouri*, No. 23-411 (2023) ...............................33

**Rules**

Fed R. Civ. P. 12(b)(1).............................................................................................15

Fed. R. Civ. P. 65(d)(1).................................................................................... 46, 47

**Constitutional Provisions**

U.S. Const. art. III, § 2 ...........................................................................................16

**Executive Materials**

Exec. Order 13721 (Mar. 14, 2016) ..........................................................................4

## INTRODUCTION

In this case, two press outlets, the Daily Wire and Federalist Media (Media Plaintiffs), as well as the state of Texas, allege that the State Department and one of its offices, the Global Engagement Center (GEC), have engaged in "one of the most egregious government operations to censor the American press in the history of the nation." Complaint at 1, ECF No 1. Plaintiffs' allegations of a widespread government censorship regime are laden with hyperbole and lack any factual support or basis in the law.

GEC is an office tasked by Congress with an essential foreign policy mission to respond to urgent, novel, and rapidly evolving threats from disinformation campaigns waged by America's foreign adversaries. As used here, "disinformation" is false or misleading information that is created and spread with the intent to deceive. Foreign state actors such as Russia, China, and their respective state media entities, and foreign non-state actors such as foreign terrorist organizations, utilize disinformation to destabilize societies and to strategically advance their policy goals, including, in some cases, military action. GEC carries out its mandate to combat such foreign state and non-state disinformation through a number of statutorily-defined activities, including by facilitating the federal government's use of technology. In short, Congress recognized that technology is critical to GEC's mission because the overwhelming majority of disinformation from foreign state and non-state actors is spread online. Countering such disinformation therefore requires understanding how technology can be harnessed to address the threat.

Plaintiffs allege that GEC and other entities on its behalf have, in the past, issued grants to and otherwise "promoted" two private companies. Those companies have created products that evaluated the veracity and reliability of information reported by Media Plaintiffs (among many other news organizations). Plaintiffs further allege that *other* unidentified third parties—businesses and social media companies—license those products and use them to make decisions about where to spend

1

advertising dollars or how to prioritize content on their websites in a way that harms Media Plaintiffs' businesses, causes them to self-censor, and interferes with Texas's ability to enforce a currently enjoined state law that regulates content-moderation decisions by social media companies.

Plaintiffs' claims suffer from a central Article III problem—they depend entirely on a sequence of independent actions by private third parties who are not before the Court. As a threshold matter, the complaint should be dismissed for lack of jurisdiction. Even accepting the complaint's allegations as true, the "speculative chain of possibilities" that they describe cannot establish any injury-in-fact that is "certainly impending" and traceable to Defendants' conduct or redressable by this Court. Plaintiffs' theory of standing also cannot survive a factual attack under Rule 12(b)(1), because multiple links in their alleged causal chain are conclusively contradicted by the record. Foremost, GEC's funding and support to the only two private entities that Plaintiffs identify—the Global Disinformation Index and NewsGuard—focused exclusively on developing technologies to combat foreign malign disinformation aimed at undermining the policies, security, or stability of the United States and its foreign allies and partners overseas. That funding did not support those entities' separate products that purportedly caused Plaintiffs' injuries. Texas independently lacks standing for multiple reasons. Plaintiffs fail to explain how Defendants' funding of technology aimed at countering foreign disinformation has interfered with Texas's ability to enforce a law that regulates the content on social media platforms. Nor have Defendants interfered with Texas's ability to enforce a statute that has never been in effect, because it has been enjoined.

Even if Plaintiffs could survive dismissal under Rule 12(b)(1), they cannot prevail on any of the preliminary injunction factors. *First*, Plaintiffs are not suffering any current or impending irreparable harm. Even if they were injured by any past actions by GEC (they were not), past injuries alone are not a basis for injunctive relief. Moreover, their significant delay in seeking this emergency relief weighs against a finding of imminent, irreparable harm. *Second*, Media Plaintiffs are unlikely to

succeed on their claims. Plaintiffs have not come close to the "clear showing" of Article III standing required for a preliminary injunction. They are unlikely to succeed on the merits of their First Amendment claims because they have failed to demonstrate that Defendants violated or imminently will violate Media Plaintiffs' First Amendment rights. GEC funded projects solely addressing foreign malign disinformation—projects that did not implicate either the First Amendment or any speech by Media Plaintiffs. Indeed, the evidence shows that Plaintiffs' challenges center on the actions of private actors and have nothing to do with the identified projects funded by GEC. Nor have they demonstrated the requisite connection between the government's conduct and the conduct of private parties sufficient to convert any private conduct into government action. Plaintiffs are also unlikely to succeed on their Administrative Procedure Act (APA) or *ultra vires* claims, because they have not challenged an identifiable final agency action or demonstrated that GEC has taken any action outside its statutory mandate. *Finally*, the balance of equities and public interest weigh heavily against emergency relief, as Plaintiffs' proposed injunction would chill a wide range of legitimate and essential government activity in the foreign affairs and national security arena.

## STATEMENT OF ISSUES

1. Should Plaintiffs' complaint be dismissed for lack of subject-matter jurisdiction?

2. Are Plaintiffs entitled to the extraordinary remedy of a preliminary injunction?

## BACKGROUND

## I.   Legal and Factual Background

### A.  Congress tasked the State Department's "Global Engagement Center" with exposing and countering foreign state and non-state propaganda and disinformation aimed at undermining or influencing the policies, security, or stability of the United States and its allies.

Disinformation is false or misleading information that is deliberately created or spread with the intent to deceive or mislead. Decl. of Daniel Kimmage, Principal Deputy Coordinator, Glob.

3

Engagement Ctr., U.S. Dep't of State ¶ 5 ("Kimmage Decl.") (Ex. 1). Disinformation and propaganda from foreign state and non-state actors—or "[f]oreign information manipulation"—is a quick and relatively cheap way for countries such as Russia and China to destabilize societies, including the United States and its allies. *Id.* ¶¶ 5-6; 22 U.S.C. § 2656 note (Global Engagement Center). It is thus a major national security concern to the United States. *See* Kimmage Decl. ¶ 5; 22 U.S.C. § 2656 note (Global Engagement Center). For example, disinformation is one of Russia's most important and far-reaching tools in support of its full-scale invasion of Ukraine. Kimmage Decl. ¶ 5. Russia's intelligence services are able to operate and influence websites that present themselves as news outlets to spread lies and sow discord. *Id.* ¶ 6. Similarly, China invests billions of dollars annually on its foreign information manipulation efforts. *Id.* ¶ 7.

Congress entrusted the State Department, led by the Secretary of State, with the management of foreign affairs. *See* 22 U.S.C. § 2651 (codifying the establishment of the State Department); *id.* § 2656. Recognizing the need for government action to counter disinformation from foreign state and non-state actors, Congress directed the Secretary of State to establish the "Global Engagement Center" within the Department.[1] *See* 22 U.S.C. § 2656 note (Global Engagement Center). GEC's mission is to "direct, lead, synchronize, integrate, and coordinate efforts of the Federal Government to recognize, understand, expose, and counter foreign state and non-state propaganda and disinformation efforts aimed at undermining or influencing the policies, security, or stability of the United States[, its] allies[,] and partner nations." *Id.*

GEC plays an essential role in coordinating U.S. government efforts and leading the global response to such foreign information manipulation. Kimmage Decl. ¶ 8. A central part of this effort

---

[1]Beforehand, in 2016, the President signed an executive order which developed the Global Engagement Center for a more limited focus. *See* Exec. Order 13721 (Mar. 14, 2016). Under that executive order, GEC supported government-wide counterterrorism communications activities directed abroad. *See id.*

is understanding the technologies that support the spread of foreign disinformation and propaganda and how technology can be harnessed to counter such spread. *Id.* GEC carries out its statutory mission to counter propaganda and disinformation from foreign state and non-state actors along five lines of effort: (1) analytics and research, (2) international partnerships, (3) programs and campaigns, (4) exposure, and (5) technology assessment and engagement. *Id.* ¶ 4. Through these means, GEC's Russia, China, Iran, and Counterterrorism teams seek to build societal and institutional resilience against foreign propaganda and disinformation abroad. *See id.*

One of the statutorily-defined functions of GEC is to "[f]acilitate the use of a wide range of technologies and techniques by sharing expertise among Federal departments and agencies, seeking expertise from external sources, and implementing best practices." *See* 22 U.S.C. § 2656 note (Global Engagement Center). In furtherance of this function, GEC's Technology Engagement Team (TET) identifies, assesses, tests, and implements technology to address the problem of foreign propaganda and disinformation. Kimmage Decl. ¶ 10. TET has historically carried out this mission through several initiatives. *Id.* ¶ 11. Its Tech Demo Series, for example, was a forum for private sector companies to present their technologies to an audience of U.S. government and foreign government officials, and explain how these technological tools could be used to counter foreign state and non-state information manipulation. *Id.* Invitations to present at a Demo were not endorsements of the company's technological tools, but rather an opportunity for government officials to discuss how the tools could be used to advance their missions. *Id.* For example, during one Demo, an academic institution presented an experimental artificial intelligence algorithm to analyze country-level censorship technology in places like China and Iran. *Id.* The Tech Demo Series ended in summer 2023 when GEC determined that it was no longer a critical effort, as it balanced limited resources and competing priorities. *Id.* ¶ 21.

Relatedly, GEC engages in short-term collaborations with other federal agencies through TET's "testbeds." *Id.* ¶ 11. In a testbed, GEC and another U.S. government entity work to identify a technological gap that exists for that entity in countering foreign information manipulation, and a potential technological solution to fill that gap. *Id.* Thereafter, those participants execute a statement of work outlining the objective of the testbed, the expectations of the participants, and stated deliverables for that test; and jointly evaluate the work performed. *Id.*

Similarly, TET hosts international tech challenges, which are typically one-or-two-day public events held abroad to develop partnerships with technology entities based outside the United States. *Id.* GEC, either directly or through a third-party implementer (such as a grantee or contractor), invites technologists from a specific country or region to submit applications to present innovative solutions to counter foreign information manipulation overseas to a panel of judges and an audience of government, civil society, private sector, and academic stakeholders. *Id.* Up to three awardees are selected to receive an award from GEC—such as a grant, contract, subgrant, or subcontract—to perform a short-term project in accordance with conditions outlined in a statement of work. *Id.*

GEC catalogued and compiled its assessments of these technologies in a grantee-maintained open-source, unclassified platform called Disinfo Cloud, a repository to catalog technologies to counter foreign propaganda and disinformation. *Id.* Specifically, testbed results were posted on the Disinfo Cloud platform primarily for use by U.S. government agencies and foreign partners. *Id.* ¶ 14.

Finally, GEC has a private sector engagement portfolio to facilitate collaboration between U.S. government and the tech sector, academia, and the research community, on the topic of foreign information manipulation overseas. *Id.* ¶ 11. Generally, the engagement focuses on trends, tactics, and techniques in foreign information manipulation. GEC's practice when sharing information with social media companies is not to request that the companies take any specific actions on the information. *Id.* The individual who led this effort from 2019 to 2022 worked from Silicon Valley. *Id.*

**B.  GEC carried out various initiatives through a grant to Park Advisors.**

Congress specifically vested GEC with the authority to provide grants or contracts of financial support to "civil society groups, media content providers, nongovernmental organizations, federally funded research and development centers, private companies, or academic institutions." 22 U.S.C. § 2656 note (Global Engagement Center). Such grants can be made, inter alia, "to support efforts by [GEC] to counter efforts by foreign entities to use disinformation and propaganda to undermine or influence the policies, security, and social and political stability of the United States and United States allies and partner nations." *Id.* § f(1)(D).

Thus, to further its mandate of recognizing and countering foreign state and non-state propaganda and disinformation, GEC awarded an approximately three million dollar grant to Park Capital Investment Group LLC (Park Advisors) in September 2018 "to test and engineer novel technological solutions—through combination, hybridization, or other applications of existing technologies—to the problems of foreign propaganda and disinformation, and rapidly make those technologies available for use by partners."[2] Kimmage Decl. ¶ 13. Park Advisors was a firm that managed public-private projects with a particular emphasis on combating violent extremism and disinformation. Decl. of Matthew Skibinski, General Manager, NewsGuard Technologies, Inc. ¶ 22 (Skibinski Decl.) (Ex. 2). GEC awarded additional funding to Park Advisors through various costs amendments. Kimmage Decl. ¶ 13. At the conclusion of the award's performance period, the award totaled approximately $6.5 million. *Id.*

---

[2] Contracts and grants are managed and monitored by GEC in accordance with applicable law, including applicable federal regulations, and Department policy. Kimmage Decl. ¶ 12. In implementing a GEC grant or contract, the recipient entity (prime recipient) may make subawards, by grant or contract as appropriate to other entities (subrecipients). *Id.* The prime recipient is responsible for monitoring the activities of the subrecipient, ensuring that such activities are carried out in a manner consistent with the relevant prime award, and providing relevant information concerning subrecipient compliance to GEC. *Id.*

Pursuant to its grant, Park Advisors administered the Testbed initiative and International Tech Challenges described above. *Id.* ¶¶ 14, 17. It also launched the now-retired Disinfo Cloud in August 2019. *Id.* By the end of 2021, Disinfo Cloud listed 366 tools and technologies relevant to countering foreign information manipulation. *Id.* ¶ 20. Additionally, in December 2020, Park Advisors established a weekly newsletter, Disinfo Cloud Digest, to provide the user community with updates related to Disinfo Cloud. *Id.* Park Advisors also created a Twitter account for Disinfo Cloud. *Id.* GEC's use of Disinfo Cloud ended in December 2021, and GEC no longer has access to it.[3] *Id.* ¶¶ 11, 14.

Park Advisors, in execution of the GEC grant, made subawards to two subrecipients.

### 1. 2020 subgrant to NewsGuard to understand the origins, content and spread of Russian and Chinese disinformation campaigns.

In 2020, the Department of Defense's National Security Innovation Network (NSIN) hosted the Countering Disinformation Challenge. *See* Skibinski Decl. ¶ 21. The challenge sought innovative tools to identify misinformation and disinformation online in near real time, in response to Russia's and China's efforts to promote COVID-19 disinformation. *Id.*

One of the participants in that challenge was NewsGuard Technologies, Inc. (NewsGuard). *Id.* NewsGuard is a for-profit organization that sells a browser extension that provides ratings and reviews of the reliability of different news sources next to links users encounter on social media sites or search engines. *Id.* ¶ 4. It was launched in 2018 with the aim of providing news consumers with detailed assessments of the reliability of news sources they might encounter on the Internet. *Id.* ¶ 3.

As one of the winners of the Countering Disinformation Challenge, NewsGuard received a $25,000 subaward from Park Advisors to conduct a pilot in collaboration with GEC and in support

---

[3] After GEC's contract with Park Advisors ended, the Testbeds and International Tech Challenges initiatives continued, first through a subcontract with the consultancy company Becera, and now directly under GEC. Kimmage Decl. ¶ 21. According to its website, Becera is a consultancy that "bridges the public and private sectors to create innovative approaches that solve operational, governance, and administrative challenges through technology discovery and application." *See* Becera, https://perma.cc/5V8K-MKVJ.

of the Department of Defense's Cyber National Mission Force (CNMF) as part of the Testbed initiative. *See id.* ¶ 21; Kimmage Decl. ¶ 15. NewsGuard's work with GEC and CNMF was coordinated by Park Advisors, *see* Skibinski Decl. ¶ 22, and the funding allowed NewsGuard to help GEC and United States Cyber Command (USCYBERCOM), the unified combatant command for the cyberspace domain, to better understand the origins, content, and spread of Russian and Chinese disinformation campaigns, Kimmage Decl. ¶ 15. This project lasted four months and concluded in early 2021. *Id.*

Throughout the project, Park Advisors made clear that its focus was limited to monitoring foreign state-sponsored sources of disinformation—with no focus on domestic news sources. Skibinski Decl. ¶ 25. On October 6, 2020, NewsGuard received an initial draft scope document for the pilot that stated, "These tests will provide evaluation and visualization of trends in state sponsored information and will be a collaboration between three companies: PeakMetrics, Omelas, and NewsGuard. During the course of the tests, all three companies will take care to minimize data collection on U.S. Persons, focusing primarily on tracking foreign adversarial actors and narratives." *Id.* ¶ 26. Then, on October 30, 2020, after discussions with Park Advisors, NewsGuard agreed to a Statement of Work explaining the scope of the project:

> A series of reports that will help the GEC, USCYBERCOMMAND, and relevant partners better understand the origins, content, and spread of state-sponsored disinformation campaigns. . . . The focus of the reports will vary based on emerging events but will include insights on the following to the extent possible, tracking over time: 1) Which states are actively pushing certain narratives ahead of and after the 2020 U.S. elections with an aim to undermine the U.S.? (with an initial focus on examining Chinese and Russian state media) 2) What are these key narratives being amplified? 3) What broader disinformation themes and content are being pushed by China and Russia?

*Id.* ¶ 27. Even after the Statement of Work was signed, Park Advisors clarified that NewsGuard would be focused on monitoring Chinese state-sponsored media outlets and Russian outlets. *See id.* ¶¶ 28–30.

9

During the project, NewsGuard had approximately weekly calls with GEC, CNMF, and the other companies. *Id.* ¶ 31. The companies would send reports on their findings from monitoring Russian and Chinese state media ahead of the call. *Id.* The participants on these calls did not discuss domestic media sources in the context of mis- or disinformation, nor did any of NewsGuard's reports mention anything about the credibility or possible publication of misinformation by domestic media sources. *Id.* ¶ 32.

GEC does not have any ongoing grants, contracts, or subawards with NewsGuard and is not otherwise doing any work with it. Kimmage Decl. ¶ 19. [4]

### 2. 2021 subgrant to Global Disinformation Index, Ltd. to add foreign language capabilities to its existing technology.

In 2021, Park Advisors, through its grant from GEC, hosted the "U.S.-Paris Tech Challenge." Kimmage Decl. ¶ 17. This event, which took place in Paris, aimed to advance the development of promising and innovative technologies against foreign information manipulation. *Id.* To that end, Park

---

[4] Although not mentioned by Plaintiffs, NewsGuard received a second subaward after applying for a "call for submissions" from GEC's TET in December 2021 for projects focused exclusively on applying technology to countering foreign disinformation. Skibinski Decl. ¶ 33. NewsGuard's initial proposal was determined unlikely to yield results, and it did not complete the work to which it initially agreed. *Id.* But through that process, NewsGuard was connected to the State Department's Venezuela Affairs Unit, which was interested in whether NewsGuard's data could help trace Russian state-sponsored false narratives spreading in Latin America through Venezuelan media outlets. *Id.* Ultimately, NewsGuard monitored Venezuelan domains that regularly spread Kremlin-sponsored disinformation and 25 additional news and information websites with high readership throughout Latin America—including Spanish publications owned and operated by authoritarian governments such as Russia and Iran and websites operating from other Latin American countries. *Id.* The project did not involve any rating or monitoring of U.S.-based news outlets and was used for countering disinformation and propaganda overseas. *Id.* This work, and the $25,000 subaward in 2020 described above, represent the only work done by NewsGuard in connection with the Park Advisors grant. Kimmage Decl. ¶ 16.

Advisors awarded subgrants to companies addressing foreign-sourced disinformation circulating overseas; no subgrant was given to address disinformation in the United States. *Id.*

Park Advisors awarded one subgrant to the Disinformation Index, Ltd. (GDI). GDI is a United Kingdom-based non-profit company that provides independent, neutral disinformation risk data to digital advertisers around the world, enabling them to make more informed brand safety decisions regarding their open-web programmatic advertising purchases. Decl. of Dr. Daniel Rogers, Co-founder and Director, Disinformation Index, Ltd. ¶ 2 ("Rogers Decl.") (Ex. 3). GDI Ltd. is based in the United Kingdom. Its affiliate, Disinformation Index, Inc., (GDI Inc.) is based in the United States. *Id.* ¶ 6.

Park Advisors granted the London-based GDI Ltd. $100,000 to expand its disinformation risk measurement to a broader set of countries in East Asia and Europe—*i.e.*, countries within China's and Russia's spheres of influence—to enable advertisers in those markets to make informed brand safety decisions about where they were buying advertisements. *Id.* ¶ 4; Kimmage Decl. ¶ 18. GDI used the $100,000 subgrant to add language capabilities (Chinese, Japanese, Korean, Vietnamese, Russian, and Ukrainian) to its existing technology and to train GDI's artificial intelligence technology on culturally relevant adversarial narratives for use in risk measurement for locations outside of the United States. Rogers Decl. ¶ 5. GDI also used its subaward to train its program with specific disinformation content identified in those languages to help improve the model's performance in translating that type of content at scale. *Id.* GDI did not use any part of its funding to evaluate media entities in the United States. *Id.* ¶¶ 6–7.

This subgrant funded GDI's activities for just three months, and its activities concluded on December 31, 2021. Kimmage Decl. ¶ 18. It was the only grant that Park Advisors gave GDI under the GEC grant. *Id.*. GDI was never a part of the engagement initiative in Silicon Valley as part of this subgrant. Rogers Decl. ¶ 11. And beyond this subgrant, a single mention in the Disinfo Cloud Digest,

and a single retweet on the Disinfo Cloud Twitter account, GDI had no further connection to Disinfo Cloud. *Id.* ¶ 10. GEC does not have any ongoing grants, contracts, or subawards with GDI and is not otherwise doing any work with it. Kimmage Decl. ¶ 19.

### C.  NewsGuard's and GDI's other business.

Outside their work with GEC, NewsGuard and GDI each conduct other business.

### 1.  NewsGuard's "Nutrition Labels" and "Misinformation Fingerprints" Products

NewsGuard has developed several products to provide news consumers with detailed assessments of the reliability of news sources and to alert consumers to misinformation. Skibinski Decl. ¶¶ 5–20. These products act as alternatives to blocking or censoring content that may contain misinformation. *Id.* ¶ 41.

First, NewsGuard created "Nutrition Labels" which was first published in August 2018. *Id.* ¶ 14. Nutrition Labels use nine apolitical criteria to rate the reliability of news sources, giving sites a ranking on a scale of 0-100. *Id.* ¶¶ 5–6. Sites with scores over 60 are viewed as credible. *Id.* ¶ 10. These results are then shared with the publisher and made available to NewsGuard clients and through NewsGuard's browser extension to NewsGuard users. *Id.* ¶ 9. Some companies license this product to decide where to buy advertisement space. *Id.* ¶ 12. Different brands and advertisers have different brand-safety standards and have therefore reported using NewsGuard's ratings data in different ways, though many advertisers use a score of 60 as a threshold of when to advertise with a news site. *Id.*

The Daily Wire and The Federalist both have Nutrition Labels. *Id.* ¶ 14. Since 2021, the Daily Wire's score has been increasing. *Id.* ¶ 38. In 2023, the site achieved a score of 69.5. *Id.* This means NewsGuard rates the Daily Wire as a "credible" news source. *Id.* The Federalist's NewsGuard rating has stood at 12.5 points since 2018. *Id.* ¶ 39. Nobody from GEC, CNMF, or any other government agency was in any way involved in or funded these determinations. *Id.*

NewsGuard also launched a product called "Misinformation Fingerprints" in 2020. *Id.* ¶ 16. Misinformation Fingerprints is a catalog of significant false claims circulating online, with a focus on state-sponsored false narratives from Russia, China, and Iran. *Id.* NewsGuard provides a report of how it finds claims to be false and the evidence it considered, enabling users to make their own determinations as to the claim's veracity. *Id.* The Misinformation Fingerprints product does not rate the credibility of news publishers, nor does it direct the placement of advertisements. *Id.* Instead, NewsGuard licenses Misinformation Fingerprints to industries such as cyberdefense firms, reputation management firms, the defense and intelligence communities, and some social media platforms (to allow users to verify the veracity of content before publishing their own posts). *Id.* ¶ 18. Like Nutrition Labels, the Misinformation Fingerprints product was created independently by NewsGuard; neither GEC nor the CNMF nor any other government agency was involved in its development. *Id.* ¶ 17.

NewsGuard's revenue comes from Internet Service Providers, browsers, search engines, social platforms, education providers, advertising agencies, brand safety providers, researchers, and others paying to use NewsGuard's products. *Id.* ¶ 4. NewsGuard did not use its grant funding from GEC, or any other government funding, to rate news sources or debunk any specific narratives. *Id.* ¶ 37.

### 2. GDI's Dynamic Exclusion List

GDI provided disinformation risk data to digital advertisers around the world through several projects. *See* Rogers Decl. ¶ 2. For example, GDI's United States affiliate, Disinformation Index, Inc., runs a "Dynamic Exclusion List." *Id.* ¶ 7. The Dynamic Exclusion List is a non-public source that identifies publications with a risk of spreading disinformation. *Id.* ¶ 8. It is updated monthly. *Id.* GDI Inc. does not have the ability to "blacklist" organizations through the list. *Id.* ¶ 6. Rather, it provides data to advertising buyers, who make their purchasing decisions. *Id.* The Dynamic Exclusion List is not funded by the State Department or GEC, nor were any of the funds from the U.S.-Paris Tech

Challenge (which were awarded to the London-based GDI Ltd.) put towards the Dynamic Exclusion List. *Id.* ¶ 7.

In November 2022, GDI also published a Disinformation Risk Assessment Report for the United States. *Id.* ¶ 8. In that report, GDI included a list of the ten least risky and the ten most risky of sixty-nine news sites manually reviewed for the purposes of that report. *Id.* Plaintiffs were identified among the ten most risky. *Id.* The report is completely independent of the Dynamic Exclusion List. *Id.* There is no correlation between risk as identified in the report and any site's inclusion in or exclusion from the Dynamic Exclusion List. *Id.* GDI funded its 2022 Assessment Report with private funds. *Id.* ¶. And GDI covers all of its infrastructure costs through private sources of funding. *Id.* ¶ 7.

## II.    This Litigation

Plaintiffs are two media organizations, The Daily Wire and The Federalist, and the State of Texas. Compl. ¶¶ 13, 39, 41. They filed their complaint on December 6, 2023 against the State Department; GEC; and a number of State Department officials in their official capacities (collectively, "Defendants"). *Id.* ¶¶ 15–22. Plaintiffs allege that Defendants encouraged the development of "Countering Propaganda and Disinformation" (CPD) technologies by private third parties, which advertisers and social media companies in turn purportedly used to restrict the Media Plaintiffs' speech. *See id.* ¶¶ 3, 65. Texas argues separately that Defendants' alleged actions interfere with its enforcement of a (presently enjoined) state law that regulates social media companies' content-moderation decisions. *See id.* ¶¶ 234–35.

Two months after filing their complaint, and upon receiving notice of Defendants' intent to file a motion to transfer venue, *see* Defs.' Mot. to Stay Deadlines to Respond to the Compl. & Pls.' Forthcoming Mots. for Prelim. Inj. & Expedited Disc., ECF No. 8,[5] Plaintiffs filed a Motion for

---

[5] The Court granted in part and denied in part Defendants' motion to stay their deadlines. *See* Order Granting-in-Part & Denying-in-Part Mot. to Stay at 1, ECF No. 15. It denied the motion with respect

Preliminary Injunction (Plaintiffs' Motion) on February 6, 2024. *See* Mot. for Prelim. Inj., ECF No. 11 (PI Mot.). The next day, Plaintiffs filed their Motion to Expedite Discovery. *See* Mot. for Expedited Prelim.-Inj.-Related Disc., ECF No. 13. That motion is now fully briefed. *See* Defs.' Opp'n to Mot. for Expedited Prelim.-Inj.-Related Disc., ECF No. 20; Pls.' Reply in Supp. of Mot. for Expedited Prelim.-Inj.-Related Disc., ECF No. 23. On February 9, 2024, Defendants filed a motion to transfer venue. *See* Defs.' Mot. to Transfer Venue, ECF No. 14. Plaintiffs filed their response on March 14, 2024. *See* Pls.' Resp. to Defs' Mot. to Transfer Venue, ECF No. 25.

## LEGAL STANDARDS

A plaintiff's failure to establish jurisdiction, including its standing, warrants dismissal under Rule 12(b)(1). *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). It is "presume[d] that federal courts lack jurisdiction unless the contrary appears affirmatively from the record." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006). "A motion to dismiss for lack of standing may be either 'facial' or 'factual.'" *Superior MRI Servs., Inc. v. All. Healthcare Servs., Inc.*, 778 F.3d 502, 504 (5th Cir. 2015).[6] Under a facial attack, the court assesses whether the plaintiff has sufficiently alleged standing, accepting the complaint's allegations as true. *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). On the other hand, an attack is "factual . . . if the defendant submits affidavits, testimony, or other evidentiary materials" to challenge the truth of those allegations. *Superior MRI Servs.*, 778 F.3d at 504. "To defeat a factual attack, a plaintiff must prove the existence of subject-matter jurisdiction by a preponderance of the evidence" through evidence of its own. *Id.*

"A preliminary injunction is an extraordinary and drastic remedy" that is "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008). A plaintiff may obtain this "extraordinary remedy"

---

to staying Defendants' deadlines in response to Plaintiffs' motion for a preliminary injunction and motion for expedited preliminary-injunction discovery. *Id.* But it granted a forty-five-day extension of Defendants' deadline to respond to Plaintiffs' complaint. *Id.*

[6] Internal quotation marks and citations are omitted throughout this brief, unless noted.

only "upon a clear showing" that it is "entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The plaintiff must show (1) "a substantial threat of irreparable injury," (2) "a substantial likelihood of success on the merits," (3) "that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted," and (4) "that the grant of an injunction will not disserve the public interest." *Jordan v. Fisher*, 823 F.3d 805, 809 (5th Cir. 2016). The plaintiff must "clearly carr[y] the burden of persuasion on all four requirements." *Id.* A plaintiff's burden is even higher where, as here, it seeks a preliminary injunction that would alter the status quo. *See, e.g.*, *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976) (such injunctions are "particularly disfavored").

## ARGUMENT

### I.   The Court should dismiss this case for lack of jurisdiction.

Article III limits the judicial power to deciding "Cases" and "Controversies," U.S. Const. art. III, § 2, which ensures that federal courts do not become "forums for the ventilation of public grievances," *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 473 (1982). As part of that limitation, a plaintiff must demonstrate three elements to meet the "irreducible constitutional minimum of standing," *Lujan*, 504 U.S. at 560–61: (1) "injury in fact," (2) "that is fairly traceable to the challenged conduct of the defendant," and (3) "likely to be redressed by a favorable judicial decision," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

"[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press" and "for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 432 (2021). And where, as here, "the plaintiff is not [it]self the object of the government action or inaction [it] challenges," the Supreme Court has recognized that "standing is . . . substantially more difficult to establish." *Lujan*, 504 U.S. at 562; *accord Hotze v. Burwell*, 784 F.3d 984, 995 (5th Cir. 2015). Finally, to obtain prospective relief, it is not enough to allege past injury. *City of L.A. v. Lyons*,

461 U.S. 95, 102 (1983); *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1973). Rather, a plaintiff must face a "real and immediate threat" of ongoing or future harm. *Lyons*, 461 U.S. at 102.

Plaintiffs' complaint cannot survive either a facial or factual motion to dismiss for lack of jurisdiction. They have not alleged facts that, even if true, would support Article III standing as required for injunctive relief. Moreover, those allegations are contradicted by the evidence Defendants have submitted with this motion.

### A.  Texas lacks standing.

Texas's sole basis for standing is its theory that Defendants are "interfering with Texas's sovereign right to create and enforce a legal code"—that is, HB 20, a presently enjoined state law that regulates social media companies' content-moderation decisions. *See* PI Mot. at 20; Compl. ¶¶ 234–239. Relevant here, HB 20's content-moderation provisions restrict social media companies' choices about whether and how to present content to the public. *See* Tex. Civ. Prac. & Rem. Code Ann. § 143A. Texas alleges that, by working with GDI and NewsGuard, which market technology to social media companies, which in turn decide whether to use that so-called "censorship" technology, Defendants "induce social media companies to violate HB 20." Compl. ¶ 237. This "inducement" theory is incomplete, because it does not explain why any of the alleged conduct here would prevent a social media company from complying with HB 20's content-moderation restrictions. That is, if HB 20 prohibits a social media company from using a particular technology in a particular way, then the company can simply choose not to use that technology as such. Texas's theory of standing fails for that simple reason. Moreover, if the theory depends on the premise that third-party social media companies will use technology created by other third parties to violate state law, that "unadorned speculation" plainly does not satisfy Article III traceability. *Telephone & Data Sys., Inc. v. FCC*, 19 F.3d 42, 48 (D.C. Cir. 1994) (rejecting a theory of standing that "invite[d] [the court] 'to presume illegal activities' on the part of actors not before the court"); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414

n.5 (2013) ("Plaintiffs cannot rely on speculation about the unfettered choices made by independent actors not before the court" to establish causation).

This circuitous theory also lacks merit for the numerous reasons explained in the government's Motion to Transfer Venue (ECF No. 14) at 5–9. Texas has not suffered any injury-in-fact because HB 20 has never gone into effect, and Texas has therefore never been able to enforce it, nor does Texas allege that enforcement is imminent. The law was scheduled to take effect on December 2, 2021, but on December 1, 2021, its enforcement was preliminary enjoined. *NetChoice, LLC v. Paxton*, 573 F. Supp. 3d 1092 (W.D. Tex. 2021).[7] Texas's conclusory allegation that the "injury to [its] sovereign interest is continuing and ongoing," Compl. ¶ 238, without more cannot support injury-in-fact. *Ctr. for Biological Diversity v. U.S. EPA*, 937 F.3d 533, 545 (5th Cir. 2019) ("Article III demands more than . . . conclusory assertions."). Nor are Texas's injuries redressable, because no order from this Court could overturn the Western District of Texas's current injunction preventing HB 20 from going into effect. Finally, even if Plaintiffs had plausibly alleged standing, the record demonstrates that GEC has made no efforts to block either public or private enforcement of HB 20, or otherwise interfere with compliance with the law, defeating Plaintiffs' assertions otherwise. Kimmage Decl. ¶ 22.

Plaintiffs offer several responses in their Reply in Support of Motion for Expedited Discovery at 2–3, ECF No. 23, but none is persuasive. First, Plaintiffs note that the Fifth Circuit upheld HB 20's constitutionality and complain that it is Defendants that ask this Court to "inappropriately speculate" as to whether the Supreme Court will reverse that decision. But the Fifth Circuit stayed the mandate in that case; its judgment has no current legal effect and is therefore immaterial as to whether Plaintiffs are injured, whether that injury is traceable to Defendants, or whether that injury is redressable by this

---

[7] The Fifth Circuit stayed the injunction, *NetChoice, LLC v. Paxton*, 2022 WL 1537249 (5th Cir. May 11, 2022), but the Supreme Court vacated that stay, 142 S. Ct. 1715 (2022), leaving the district court's injunction in place. The Fifth Circuit subsequently decided to vacate the injunction, *NetChoice, LLC v. Paxton*, 49 F.4th 439 (5th Cir. 2022), but stayed its mandate (thus again leaving the injunction in place), and the Supreme Court granted certiorari, 144 S. Ct. 477 (2023).

Court. It is beyond dispute that Texas has never enforced and cannot currently enforce HB 20. And it is Plaintiffs, not Defendants, who ask this Court to speculate because Plaintiffs' argument rests on the assumption that it could be injured in the future if the Supreme Court ultimately permits HB 20 to go into effect (or that social media companies would choose to violate state law). In any event, Plaintiffs' accusation is a non sequitur that ignores the basic principle that Plaintiffs must clearly establish standing; it is not Defendants' burden to disprove the opposite.

Second, Plaintiffs make the unadorned assertion that HB 20's private enforcement provisions have never been enjoined. *Id.* Assuming this is true, Plaintiffs do not explain how Defendants are interfering with private parties' ability to sue social media companies for violations of HB 20 (or have ever done so in the past). In any event, Plaintiffs also do not allege that any private parties have ever attempted to enforce HB 20 or been dissuaded as a result of Defendants' actions from doing so. If this argument depends on the same assumptions that underlie the "inducement" theory described above, this Court should summarily reject it for the reasons already explained. Finally, Plaintiffs contend that Texas's sovereign interests encompass "compliance with its laws," not merely enforcement. But the caselaw that Texas cites does not support such a compliance-enforcement distinction.[8] Even if it did, Texas has neither alleged nor demonstrated, other than through the complaint's flawed and incomplete inducement theory, that Defendants are interfering with private parties' "compliance" with HB 20.[9]

---

[8] Texas's citation to *Texas v. EEOC*, 933 F.3d 433 (5th Cir. 2019), *see* ECF No. 23 at 3, does not support any such distinction because the state law at issue there was plainly in effect and not enjoined. Moreover, the federal guidance challenged there threatened civil liability for private parties if they did not take action in direct violation of state law—a far cry from the speculative causal chain underlying Texas's inducement theory in this case.

[9] In their most recent filing, Plaintiffs offer a third theory. They assert, without any explanation, that the State Department "interferes" with HB 20's "transparency" provisions, which require social media companies to publicly report instances in which they remove or deprioritize content. Pls.' Resp. to Defs.' Mot. to Transfer Venue at 5, ECF No. 25. It is entirely unclear how any of the alleged conduct in this case would prevent any social media company from complying with that provision of HB 20.

### B.  Media Plaintiffs lack standing.

Likewise, Media Plaintiffs fall far short of alleging facts that would support Article III standing, and in any event, the record firmly contradicts those allegations. Media Plaintiffs assert two purported injuries allegedly attributable to Defendants: (i) the loss of advertiser and subscriber revenue and readership, and (ii) a First Amendment harm from self-censorship. PI Mot. at 19–20; Compl. ¶¶ 4–5. Neither injury is ongoing so as to support prospective injunctive relief, traceable to Defendants' conduct, or redressable by the proposed preliminary injunction.

*Injury-in-fact.* As an initial matter, Media Plaintiffs' claimed injuries occurred in the past, and "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief." *O'Shea*, 414 U.S. at 495–96; *see Lyons*, 461 U.S. at 102. Rather, a plaintiff must establish a "real and immediate threat of repeated injury." *O'Shea*, 414 U.S. at 496. The key activities alleged in the Complaint ended years ago, and Plaintiffs do not plausibly allege any current activity that causes them ongoing or imminent harm. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In fact, many of the complaint's allegations indicate that any harm was exclusively in the past. *See* Compl. ¶¶ 142–44 (one-time grants to GDI and NewsGuard from several years ago); *id.* ¶¶ 160–61, 167 (alleging Disinfo Cloud's website is no longer publicly accessible); *id.* ¶ 165 (Park Advisors, which operated Disinfo Cloud, has closed). To be sure, they offer a laundry list of vague and generalized grievances to support assertions of ongoing harm. For example, they allege that two years-old Twitter posts from the Disinfo Cloud account remain online, *id.* ¶ 161; that Defendants "continue to use" the "research and reports" on Disinfo Cloud, *id.* ¶ 162, without further explanation of how that "research" injures them; that Defendants moved "information" from Disinfo Cloud's website to an unnamed new "platform," *id.* ¶ 165; that Defendants "continue" to fund "censorship enterprises" (a legal conclusion), *id.* ¶ 170; and that Defendants are performing unspecified work with a new consulting company, Becera, again without explaining what that work is or how it harms them, *id.* ¶¶ 176–78.

These allegations, many of which are mere "labels and conclusions," *Iqbal*, 556 U.S. at 678, fail to coherently articulate any theory of concrete, actual, and ongoing or imminent harm as Article III requires for prospective relief.

Indeed, the record confirms that Plaintiffs suffer no ongoing injury from Defendants' conduct.[10] GEC does not have any ongoing grants, contracts, or subawards with GDI or NewsGuard and is not otherwise doing any work with those entities. Kimmage Decl. ¶ 19. GEC's use of Disinfo Cloud ended in December 2021, the related Digest was retired at the same time, and the Twitter account has remained inactive since then. *Id.* ¶¶ 11, 20.[11] As a result of shifting priorities and evolving disinformation threats, GEC has ended many of the initiatives that Plaintiffs speculate are harming them here, such as the Tech Demo Series or the presence of a GEC employee in Silicon Valley. *Id.* ¶ 21.

Undeterred, Plaintiffs have in recent submissions continued to press their conclusory and unsupported claims that "Defendants' still-ongoing censorship scheme . . . suppresses disfavored domestic speech" by funding the development of unspecified "censorship technology and private censorship enterprises." ECF No. 23 at 1. Plaintiffs further speculate, without citation or evidence, that the "Silicon Valley office remains in operation" (without explaining why that injures them) and that Defendants "use a different platform and contractors" to carry out so-called "blacklisting." *Id.* at 2. These unsupported assertions are contradicted by the evidence cited above.

Finally, Plaintiffs' assertions of self-censorship do not support a finding of injury-in-fact. If they have not otherwise clearly shown an ongoing or imminently threatened injury, Plaintiffs "cannot

---

[10] Plaintiffs heavily rely on hearsay within news articles as evidence for their allegations. *E.g.*, PI Mot. Exs. F, H–J, U, HH. The Court should give those articles minimal weight in light of Defendants' sworn declarations that contradict the unsupported assertions in those articles. *Cf. Mood v. Cnty. of Orange*, 2019 WL 13036027, at *2–5, 7–8 (C.D. Cal. July 25, 2019) (news article containing hearsay less reliable than sworn testimony).

[11] The Tweets that Plaintiffs reference are years old and do not even mention Media Plaintiffs; they are patently insufficient to provide the basis for any ongoing injury to them.

manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416. "[A]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Id.* at 418.[12] That principle squarely forecloses Plaintiffs' self-censorship theory of harm, which depends on speculation about future actions by Defendants, future unnamed grantees, advertisers, and social media companies.

*Traceability.* Article III also requires "a causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560. "Causation" is not established if Plaintiffs' alleged "injuries" are "the result of the independent action[s] of . . . third party" companies that are "not before the court." *Inclusive Cmtys. Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019). Plaintiffs' various theories of traceability ignore this fundamental principle several times over.

(1) Consider the grant to GDI. Plaintiffs maintain: (a) GEC, through its grantee Park Advisors, gave a one-time $100,000 grant to GDI in a 2021 international technology challenge; (b) GDI used that money to develop the Dynamic Exclusion List; (c) Media Plaintiffs are on that List; and (d) corporations who subscribe to that List may choose not to advertise based on Media Plaintiffs' (unconfirmed) presence on that List as a result. PI Mot. at 7–9, 13. Even if all these allegations were true, this theory of standing fails as a matter of law because it depends on exactly the kind of "speculation about the decisions of independent actors" that the Supreme Court has repeatedly rejected. *Clapper*, 568 U.S. at 413–14; *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976) (standing cannot be premised upon "injury that results from the independent action of some third party not before the court").

---

[12] Plaintiffs' declarations assert, with no explanation, that "[t]he State Department's promotion of technology that blacklists [The Daily Wire/The Federalist] has a chilling effect on the organization." *See* PI Mot. Exs. MM ¶ 5, NN ¶ 5. This sort of conclusory allegation is patently insufficient to serve as evidence of self-censorship.

In any event, the record contradicts Plaintiffs' version of events. Foremost, no part of the challenged 2021 grant was used in any way for activities aimed at U.S. media outlets or even in the United States at all. Rogers Decl. ¶¶ 4, 6–7; Kimmage Decl. ¶ 18. "GDI" is in fact two distinct legal entities: London-based GDI Ltd., and U.S.-based GDI Inc. Rogers Decl. ¶¶ 2, 6. As part of the U.S.-Paris Tech Challenge, an overseas competition aimed at advancing technologies to combat foreign disinformation and propaganda, London-based GDI Ltd. applied for funding to expand its already-existing disinformation risk measurement technology to six foreign languages—Chinese, Japanese, Korean, Vietnamese, Russian, and Ukrainian. *Id.* ¶¶ 4–5. Based on that pitch, GDI Ltd. won the $100,000 award and used the money accordingly, that is, to advance its technology to recognize those languages and in turn train its artificial intelligence technology on local and culturally relevant adversarial narratives in East Asia and Europe. *Id.* ¶ 5. The project was successful and, as a result, GDI Ltd.'s technology is now more effective at identifying dangerous disinformation narratives originating in those foreign languages, for the benefit of U.S. interests and public and private entities based overseas. *Id.* Again, that grant was simply not used in any way for the purpose of expanding disinformation risk measurement in the United States. *Id.* The Dynamic Exclusion List—the purported source of Media Plaintiffs' injuries—was created by and is wholly maintained by the U.S.-based entity, which was not the recipient of the Paris Tech Challenge funds. *Id.* ¶ 7. The List was not funded by the State Department or any State-Department affiliated entity, and GDI's infrastructure costs are borne out of private sources of funding. *Id.*

The rest of Media Plaintiffs' purported causal chain similarly either depends primarily on the unrelated actions of third parties (and therefore the allegations fail as a matter of law) or is contradicted by the record. Plaintiffs heavily emphasize their inclusion in a one-time report that U.S.-based GDI Inc. published in 2022, titled "Disinformation Risk Assessment," about the domestic online news market. Based on their inclusion in that report, they speculate that GDI Inc. included them on the

non-public Dynamic Exclusion List, PI Mot. at 8, Compl. ¶¶ 115–16, but Article III demands more than guesswork. Indeed, Plaintiffs have failed to allege that a single advertiser or social media company has ever made a single decision that harmed them on the basis of this report. For this reason alone, Plaintiffs have failed to allege any cognizable injury traceable to Defendants, much less an imminent one.

The record also shows that there is no relationship between the report and the Dynamic Exclusion List. Rogers Decl. ¶ 8. Even if the report from U.S.-based GDI Inc. were relevant, Defendants had nothing to do with that report, which was supported entirely by private funding. *Id.* And on top of that, Plaintiffs' theory of resulting economic harm and self-censorship depends on the further actions of advertisers and social media companies, some of world's largest corporations whose decisions are governed by market forces and economic incentives wholly unrelated to a grant that GEC made to a UK-based company in 2021, which was in turn unrelated in any way to the 2022 GDI Inc. report.

(2) Media Plaintiffs' theory regarding NewsGuard suffers from the same defects. They maintain that: (a) NewsGuard won a $25,000 award during a technology challenge organized by the NSIN and GEC; (b) as part of that award, NewsGuard piloted one of its technologies on a GEC testbed; (c) NewsGuard maintains a database of ratings of domestic news outlets, in which Media Plaintiffs score poorly; and (d) advertisers withhold revenue from them and social media companies deprioritize them as a result. Even accepting this narrative on its own terms, Plaintiffs' fail to explain how, in their view, the 2020 NSIN award for a challenge focused on foreign disinformation narratives relates to NewsGuard's domestic news ratings database. And even if that connection were clearly explained, this overall theory once again depends entirely on the actions of third parties—advertisers and social media companies—that make independent decisions, not at the behest of NewsGuard and certainly not as a direct result of anything Defendants have done.

At any rate, the record again contradicts Media Plaintiffs' narrative, primarily because there is no connection between NewsGuard's Nutrition Labels media-rating product and any funding that NewsGuard has ever received from Defendants (or any other federal agency). Skibinski Decl. ¶ 22–24. The facts are this: NewsGuard received a $25,000 subaward from Park Advisors under its GEC grant in 2020 in connection with the NSIN-organized foreign disinformation challenge. *Id.* ¶ 21.[13] NewsGuard's project pursuant to the NSIN challenge focused exclusively on identifying rapidly-evolving, false narratives being spread by foreign state and state-sponsored actors, with a particular emphasis on China and Russia, and did not involve monitoring of domestic news sources. *Id.* ¶¶ 21–32; Kimmage Decl. ¶ 15. And the testing of NewsGuard technology as part of that award was exclusively designed for those national security and foreign affairs purposes. Skibinski Decl. ¶ 25. Put simply, NewsGuard did not use any resources from Defendants to create, improve, or implement NewsGuard's Nutrition Labels ratings database. *Id.* ¶ 24. Finally, NewsGuard first published its ratings database in August 2018, years before any of the events alleged in this lawsuit. *Id.* ¶ 14.[14] These facts highlight that Plaintiffs' theory of harm attributable to Defendants' interactions with NewsGuard lacks any evidentiary support.

(3) Plaintiffs' remaining attempts to establish some connection between Defendants and their purported injuries are even more attenuated, vague, and speculative than those described above.

---

[13] NewsGuard also worked on a project with the State Department's Venezuela Affairs Unit to trace Russian state-sponsored false narratives spreading in Latin America through Venezuelan media outlets. Skibinski Decl. ¶ 33. The project did not involve any rating or monitoring of U.S.-based news outlets and was used for countering disinformation and propaganda overseas. *Id.* This work, and the $25,000 subaward in 2020 described above, represent the only work done by NewsGuard in connection with the Park Advisors grant. Kimmage Decl. ¶ 16. Plaintiffs do not make any allegations regarding this project.

[14] During the period of the grant projects, Daily Wire's NewsGuard score actually increased by 7.5 rating points, and from August 2021 to November 2023, the site achieved a score of 69.5. NewsGuard describes outlets achieving a score above 60 as "credible," and 60 is the threshold that many advertisers use in deciding whether to advertise on a given news site, although, again, those decisions are made entirely by advertisers and not by NewsGuard. Skibinski Decl. ¶ 38. These facts further undermine any claimed injury to the Daily Wire traceable to Defendants' conduct.

Plaintiffs allege that Defendants "promoted" GDI, NewsGuard, and other unspecified technologies through other means such as the Disinfo Cloud platform and its related Twitter account and News Digest, PI Mot. at 6–7, 12; GEC's engagement with companies based in Silicon Valley, *id.* at 15; and State Department website links to various third-party resources and webpages, some of which in turn include GDI and NewsGuard among long lists of other resources, *id.* at 15–16.

These allegations are facially inadequate to support Article III traceability, and moreover, the evidence contradicts them. As for Disinfo Cloud, GDI's technology was never included on that platform. Rogers Decl. ¶ 9. The fact that the Disinfo Cloud Twitter account and Digest each on one occasion referenced GDI's work in the foreign disinformation space does not remotely connect Defendants to Plaintiffs' purported injuries from domestic advertisers or social media companies. The theory that Defendants "promoted" NewsGuard's domestic news ratings database through either the Disinfo Cloud platform, Twitter account, or Digest lacks merit for all the same reasons. As for GEC's interactions with domestic technology companies, Plaintiffs utterly fail to explain how Defendants "targeted" American speech by engaging in dialogue with some of the world's most significant internet companies to share information on combating foreign disinformation and propaganda overseas.[15] Finally, the notion that Defendants have caused Plaintiffs injury by posting links on a State Department website to compilations of disinformation technologies created by private entities, some of which include links to GDI's and NewsGuard's website, is based on an attenuated causal chain that

---

[15] Plaintiffs' allegations are laden with insinuation and conclusory statements that simply do not support a plausible claim. For example, the Complaint alleges that American companies were "encouraged to join Disinfo Cloud" to identify technological solutions to "counter propaganda and disinformation" but does not allege that the companies sought to use, or used, those technologies to target U.S. media outlets (let alone Media Plaintiffs). Compl. ¶ 76. Similarly, Plaintiffs allege that GEC maintained a Senior Advisor, Samaruddin Stewart, as a Silicon Valley liaison, but, again, do not claim that Mr. Stewart ever spoke to American companies about domestic news sources rather than foreign malign influence operations. *Id.* ¶ 78; *see also id.* ¶¶ 80–82, 85 (no reference to American media).

cannot support causation.[16]

      ***Redressability.*** For similar reasons, Plaintiffs' purported injuries are not redressable by the injunction they seek, or indeed by any equitable relief directed at Defendants. Plaintiffs ask this Court to enjoin Defendants from "continuing to research, assess, fund, test, market, promote, host on its government platform, and/or otherwise assist with the development of, or encourage the use of, technology" that targets American speech. PI Mot. at 36. But even if Defendants were taking any action aimed at suppressing, or even affecting, American speech (they are not), granting that injunction would not redress the supposed source of Plaintiffs' injuries, that is, GDI Inc.'s (purported) and NewsGuard's ratings of Media Plaintiffs, and in turn the decisions of advertisers and social media companies that allegedly impact Plaintiffs' audience sizes and revenues. Simply put, those are "unfettered choices made by independent actors not before the court[], and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *Lujan*, 504 U.S. at 562. It is "pure speculation that any order directed at [Defendants] would affect the behavior of the third-party technology companies" such as GDI Inc., NewsGuard, and social media platforms, or of blue-chip advertisers, and Article III demands far more.[17] *Ass'n of Am. Physicians & Surgeons v. Schiff*, 518 F. Supp. 3d 505, 516 (D.D.C. 2021); *see Inclusive Cmtys.*, 946 F.3d at 655; *Utah v. Evans*, 536 U.S. 452, 464 (2002).

      Thus, the Court should dismiss Plaintiffs' complaint for lack of subject matter jurisdiction.

---

[16] Plaintiffs also argue that the State Department funded a seminar in Germany to train American teachers and "instruct[ed] teachers to install NewsGuard." PI Mot. at 16. These allegations do not appear in the complaint and therefore cannot form the basis for a preliminary injunction. *ZeptoLab UK Ltd. v. Commonwealth Toy & Novelty Co.*, 2012 WL 4761501, at *7 (S.D.N.Y. Aug. 23, 2012). These new allegations also fail to establish traceability because any resulting harm depends entirely on the actions of independent third parties.

[17] In Plaintiffs' own words, "once [GDI's and NewsGuard's] technologies are adopted by third parties, . . . fashioning injunctive relief to limit the continuing harm will become increasingly challenging." PI Mot. at 34. This concedes that Plaintiffs' entire theory of harm turns on the actions of third parties and that relief from this Court cannot affect, let alone prohibit, those third parties' future choices.

## II.     Plaintiffs' Motion for Preliminary Injunction should be denied.

### A.  Plaintiffs fail to demonstrate irreparable harm.

To establish irreparable injury, a plaintiff must demonstrate "a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1987). "[A] showing of speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). For the same reasons that Plaintiffs have failed to establish an ongoing or certainly impending future injury-in-fact for purposes of Article III standing, they fail to establish non-speculative, imminent irreparable injury.

Plaintiffs' arguments otherwise lack merit. First, they contend that if they establish a likelihood of success on the merits of their First Amendment claim, they *ipso facto* satisfy the irreparable harm prong for emergency relief. PI Mot. at 34. That is incorrect, because irreparable injury must be "imminent"; a past injury, even a constitutional one, does not qualify. As the Fifth Circuit has explained, "invocation of the First Amendment cannot substitute for the presence of an imminent, non-speculative irreparable injury." *Google, Inc. v. Hood*, 822 F.3d 212, 227–28 (5th Cir. 2016). Thus, even if Plaintiffs had established a likelihood that Defendants violated their First Amendment rights at some point in the past, that still would not relieve them of their burden to demonstrate that they either currently, or will in the immediate future, suffer some constitutional injury.

Second, Plaintiffs claim that "if Defendants are not promptly enjoined, their unconstitutional conduct will continue to reduce the Media Plaintiffs' reach, rendering it all the more difficult, if not impossible, to undo the harm flowing from the *continued* funding and promotion of censorship technologies which abridge their First Amendment rights." PI Mot. at 34 (emphasis added). But Plaintiffs have failed to adduce any evidence that Defendants are continuing to fund or promote any

specific "censorship technologies," or that such funding has resulted or is imminently likely to result in harm to them.

Third, Plaintiffs rehash their arguments in a handful of sentences that Media Plaintiffs suffer some unspecified irreparable injury from Defendants' so-called "censorship scheme" and that Texas suffers irreparable harm to its sovereign interests from its inability to enforce an already-enjoined state law. *Id.* at 35. These undeveloped arguments fail for the same reasons Plaintiffs lack standing.

In addition, Plaintiffs' delay in seeking preliminary relief weighs heavily against any argument that they might suffer imminent, irreparable injury absent emergency relief. A party seeking a preliminary injunction "must generally show reasonable diligence," *Benisek v. Lamone*, 585 U.S. 155, 159 (2018), and accordingly numerous courts in the Fifth Circuit have held that "[d]elay in seeking a remedy is an important factor bearing on the need for a preliminary injunction. Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief." *Anyadike v. Vernon Coll.*, 2015 WL 12964684, at *3 (N.D. Tex. Nov. 20, 2015). "[A]nywhere from a three-month delay to a six-month delay [is] enough to militate against issuing injunctive relief." *Leaf Trading Cards, LLC v. Upper Deck Co.*, 2019 WL 7882552, at *2 (N.D. Tex. Sept. 18, 2019) (collecting cases).[18] Plaintiffs delayed twice in this case: first, in waiting years after many of the relevant events, which largely occurred between 2020 and 2022, to file this lawsuit; and second, in waiting two months after filing this lawsuit to seek a preliminary injunction. Plaintiffs' Motion makes no attempt to justify these delays,

---

[18] *See also*, *e.g.*, *Anyadike*, 2016 WL 12964684, at *3 ("several-month delay in filing . . . militates against a finding of irreparable harm"); *H.D. Vest, Inc. v. H.D. Vest Mgmt. & Servs., LLC,* , 2009 WL 1766095, at *4 (N.D. Tex. June 23, 2009) (delay of almost five months undercut assertion of irreparable harm); *Pals Grp., Inc. v. Quiskeya Trading Corp.*, 2017 WL 532299, at *6 (S.D. Fla. Feb. 9, 2017) (three-month delay "is by itself sufficient grounds to deny its request for an injunction"); *Seiko Kabushiki Kaisha v. Swiss Watch Int'l, Inc.*, 188 F. Supp. 2d 1350, 1356 (S.D. Fla. 2002) (finding that a "three-month delay . . . undercuts any sense of urgency"); *Millennium Funding, Inc. v. 1701 Mgmt. LLC*, 2021 WL 3618227, at *10 (S.D. Fla. Aug. 16, 2021) ("it is not uncommon for courts to deny a preliminary injunction in the face of unexplained delays of more than two months") (collecting cases).

or to explain why they now require this Court's intervention on an expedited basis, when they were in no particular rush in the preceding months and years.

### B. Plaintiffs fail to demonstrate a likelihood of success on the merits of their claims.

#### 1. Plaintiffs have not made a "clear showing" that they have standing.

Standing is "an indispensable part of the plaintiff's case," and therefore "each element must be supported [] with the manner and degree of evidence required at the successive stages of the litigation." *El Paso Cnty. v. Trump*, 982 F.3d 332, 338 (5th Cir. 2020). For a preliminary injunction, "plaintiffs must make a 'clear showing' that they have standing." *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017) (quoting *Winter*, 555 U.S. at 22). This is a higher standard than the "preponderance of evidence" standard that Plaintiffs must meet to survive a Rule 12(b)(1) factual attack. Plaintiffs' cursory, one-page discussion of standing in their Motion does not meet the "clear showing" standard. *See* PI Mot. at 19–20.

Plaintiffs assert in their Motion that Media Plaintiffs "face blacklisting, demonetization, reduced circulation of publications and subscriber and advertiser loss" caused by two "GEC supported" technologies, *i.e.*, GDI Inc.'s Dynamic Exclusion List and NewsGuard's Nutrition Labels product. PI Mot. at 19. These conclusory, factually unsupported statements fall short of the "clear" showing of concrete injury required for standing and for preliminary relief. *See Soc'y of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1287 (5th Cir. 1992) (en banc) ("Especially where governmental action is involved, courts should not intervene unless the need for equitable relief is clear, not remote or speculative.").[19] For the numerous reasons already explained, *supra* Argument I.B, the record

---

[19] In support of their request for expedited discovery, which this Court should reject for independent reasons, Plaintiffs have also implicitly conceded that they lack any specific knowledge regarding current or future injury as a result of Defendants' conduct. *E.g.*, ECF No. 13 at 1 (discovery necessary "to determine the breadth of the still ongoing harm to Plaintiffs"); *see also* PI Mot. at 25 ("breadth of the restraint on Media Plaintiffs' speech and circulation is . . . unknown"); Compl. ¶ 3 (same). The fact that Plaintiffs do not know how or if they are suffering or facing injury strongly supports the

demonstrates that these allegations are factually false and legally insufficient to establish any ongoing injury traceable to Defendants' conduct. Plaintiffs also reiterate, in a sentence, their theory of injury to Texas based on HB 20. PI Mot. at 20. That incomplete theory fails as well, *supra* Argument I.A.

The Court should therefore deny Plaintiffs' preliminary injunction motion for the independent reason that they have not clearly shown standing.

### 2.   Media Plaintiffs are unlikely to succeed on their First Amendment claims.

Even if Media Plaintiffs had standing to seek injunctive relief and had shown imminent irreparable harm, they are unlikely to succeed on the merits of their First Amendment claims for the simple reason that the claimed censorship of their speech is not attributable to state action. Media Plaintiffs' arguments to the contrary are both factually incorrect and unsupported by First Amendment caselaw.

The Free Speech Clause of the First Amendment applies only to "*governmental* abridgment of speech"; it "does not prohibit *private* abridgment of speech." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 808 (2019). Private action is attributable to the Government, and subject to constitutional restraints, in only limited circumstances. *See, e.g.*, *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) ("Our precedents indicate that a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State."); *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001) (holding that private party is deemed a state actor when it "operates as a 'willful participant in joint activity with the State or its agents.'"). Under the proper legal analysis and a correct view of the facts, it is plain that Defendants have not violated the First Amendment.

---

conclusion that they are not confronted by an actual or imminent injury at all. *Cf. Clapper*, 568 U.S. at 409 (injury must be "*certainly* impending").

a.  **Media Plaintiffs are unlikely to show that Defendants "exercised coercive power" over private parties or provided "such significant encouragement" as to convert private conduct into government action.**

Media Plaintiffs cannot show that Defendants are engaged in "coercion" or providing such "significant encouragement" to private parties as to convert private actions to ones of the government. Media Plaintiffs gesture to *Blum v. Yaretsky*, 457 U.S. 991 (1982), and baldly assert that "the evidence indicates GEC significantly encouraged the use of the censorship technology, which renders the third-party conduct state action." PI Mot. at 32. But Media Plaintiffs fail to demonstrate that GEC had the type of control over GDI or NewsGuard—much less that use GDI or NewsGuard's products—to meet *Blum*'s high bar (let alone that any GEC funding targeted domestic speech that would implicate Media Plaintiffs).

At the outset, Media Plaintiffs do not expressly argue that Defendants engaged in coercion. *See id.* at 21–33. Nor could they. To amount to coercion, the government must have "compelled [a] decision by, through threats or otherwise, intimating that some form of punishment will follow a failure to comply." *Missouri v. Biden*, 83 F.4th 350, 380 (5th Cir. 2023), *cert. granted sub nom.*, *Murthy v. Missouri*, 144 S. Ct. 7 (2023); *see Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 62–63 (1963) (holding that a state entity's threat to refer a book distributor to the state Attorney General, among other things, if the distributor did not take certain books off the shelf, was coercive). Any such argument would fail at the jump because Media Plaintiffs allege no threat or intimidation from GEC to GDI or NewsGuard (or any threat or intimidation from GDI and NewsGuard to social media companies and advertisers) that would suggest that Defendants previously have or are now compelling such third-party companies to "downgrade" Media Plaintiffs' content or stop advertising on Media Plaintiffs' platforms. *See supra* Background I.C; Argument I.B; Skibinski Decl. ¶ 39 ("While the plaintiffs claim that these supposedly government-directed determinations led to them losing advertising revenue, if they did indeed lose such revenue, it is due not to the government's actions but to their own

[choices]."). With no government request or instruction—let alone any intimation that punishment would follow from a failure to comply—Media Plaintiffs cannot prevail on a theory that Defendants are engaged in coercion. *See Missouri*, 83 F.4th at 377–78.

Nor can Media Plaintiffs demonstrate "significant encouragement." The Fifth Circuit has held that "[t]o constitute 'significant encouragement,' there must be such a 'close nexus' between the parties that the government is practically 'responsible' for the challenged decision." *Id.* at 374 (quoting *Blum*, 457 U.S. at 1004). The Government does not significantly encourage a private party through "[m]ere approval of or acquiescence in the initiatives." *Blum*, 457 U.S. at 1004–05*; Rendell-Baker v. Kohn*, 457 U.S. 830, 841 (1982) ("Acts of such private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contract."); *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 54 (1999) ("[P]ermission of a private choice cannot support a finding of state action."). Rather, the Fifth Circuit has held that the "the government must exercise some active, meaningful control over the private party's decision" for the choice to be considered that of the state. *Missouri*, 83 F.4th at 374.[20]

Media Plaintiffs cannot make such a showing because GEC does not exert any sort of "meaningful, active control," *see id.* at 376, over the development or use of the so-called "censorship technologies" of which Media Plaintiffs complain, or any ensuing decisions regarding Media Plaintiffs made by the companies that decided to use these technologies. First take GDI. Media Plaintiffs assert that they were harmed by GDI's Dynamic Exclusion List because corporations that subscribe to that List have chosen not to advertise with Media Plaintiffs based on their (unconfirmed) presence on it. But as discussed above, GEC did not then and does not now have any control over the U.S.-based

---

[20] The United States argued before the Supreme Court that the Fifth Circuit misinterpreted the "significant encouragement" standard in *Missouri v. Biden*. *See* Br. for the Petitioners, *Murthy v. Missouri*, No. 23-411 (2023). Nevertheless, Media Plaintiffs cannot meet the Fifth Circuit's interpretation of this standard.

GDI Inc's decision to create the Dynamic Exclusion List, nor such control over the corporations choosing to purchase the list, or those opting not to advertise with Media Plaintiffs—as to make these independent decisions ones of the federal government. *See* Rogers Decl. ¶ 7; *La. Div. Sons of Confederate Veterans v. City of Natchitoches*, 821 F. App'x 317, 319–20 (5th Cir. 2020) (business association's decision to deny the Sons of Confederate Veterans from marching in a parade after considering a letter from a Mayor that asked the association to "prohibit the display of the Confederate battle flag in that year's parade" did not amount to "sufficiently strong 'encouragement'" under *Blum*). Thus, Media Plaintiffs cannot even show "[m]ere approval of or acquiescence" in these decisions—which itself is *insufficient* for a showing of state action. *Blum*, 457 U.S. at 1004–05. With no indication that Defendants had any involvement (let alone active, meaningful control) over the decisions surrounding U.S.-based GDI Inc.'s Dynamic Exclusion List—and much less the companies that purportedly choose not to advertise with those on the Dynamic Exclusion List—the actions of these entities cannot be deemed ones of the federal government. *See Missouri*, 83 F.4th at 374–75.

The same holds true for NewsGuard. Media Plaintiffs maintain they were harmed by NewsGuard's Nutrition Labels database (which rates domestic news outlets), because advertisers withhold revenue from them, and social media companies deprioritize them, as a result of their ratings. But there is no connection between the GEC subgrant to NewsGuard and NewsGuard's ratings of domestic media outlets. *See, e.g.*, Skibinski Decl. ¶ 36 ("During the course of the project, however, nobody at Park Advisors, NSIN, GEC, the United States Cyber Command, CNMF, PeakMetrics, or Omelas aided, assisted, helped, or otherwise took any action to improve or develop NewsGuard's website ratings."). And with no nexus between the government and the challenged private action, NewsGuard's choice, or the choice of any potential advertiser or social media company which looks at NewsGuard's products, cannot be attributed to Defendants. *Id.* ¶ 39 ("Nobody from the GEC,

CNMF, or any other government agency was in any way involved in these determinations."); *City of Natchitoches*, 821 F. App'x at 319–20.

Without any evidence that Defendants are exercising any control over GDI, NewsGuard, or third-party advertising companies, Media Plaintiffs have no likelihood of succeeding on their claim that Defendants "coerce" or "so significant[ly] encourage" social media companies or advertisers to restrict, downgrade, or demonetize of any Americans' speech or any American press, such that the actions taken by any third-party companies "must in law be deemed to be [those] of the [government]." *Blum*, 457 U.S. at 1004.

## b. Media Plaintiffs cannot show "joint action" between GEC, tech companies, and undefined "users" of tech companies' products.

For similar reasons, Media Plaintiffs cannot make a showing that GEC engages in "joint action" with private parties. *See* PI Mot. at 32. Under the joint action doctrine, private parties can be deemed to be state actors when their conduct is vested with governmental authority or otherwise closely intertwined with action by government officials. *See, e.g.*, *Brentwood Acad.*, 531 U.S. at 296. There are a few types of cases in which the Supreme Court found joint action.

In the first category, courts have held that an action by a private party that harms the plaintiff constitutes state action if "the State provided a mantle of authority that enhanced the power of the harm-causing individual actor," *NCAA v. Tarkanian*, 488 U.S. 179, 192 (1988). In *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982), for example, the Supreme Court held that a corporation was a state actor when, exercising authority conferred on it by state law and in conjunction with state officials, it obtained a prejudgment attachment of property to satisfy what it claimed was a debt. *Id.* at 941–42. Although Plaintiffs rely on *Lugar*, they make no effort to show that the government conferred any

authority onto GDI and NewsGuard, much less onto far-removed third parties such as the advertisers that decline to patronize Media Plaintiffs, so as to transform private conduct into state action.

In a handful of other cases, courts have found that private parties engaged in state actions—even absent a governmental "enhance[ment]" of their power, *Tarkanian*, 488 U.S. at 192—on the theory that the government had "so far insinuated itself into a position of interdependence with" the private party "that it must be recognized as a joint participant in the challenged activity," *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961). In *Burton*, the Supreme Court held that "a restaurant's refusal to serve [Black customers] constituted state action since, among other things, the restaurant was located on the premises of a public parking garage and the garage profited from the discriminatory conduct of the restaurant." *Frazier v. Bd. of Trs. of N.W. Miss. Reg. Med. Ctr.*, 765 F.2d 1278, 1285 (5th Cir. 1985). Plaintiffs make the broad, conclusory, and factually unsupported assertion that "Defendants 'so far insinuated' themselves into the private affairs of the tech companies—both the developers and the users of the CPD tools and technology—that the line between public and private action is blurred." PI Mot. at 32. But there is nothing like the sort of "interdependence" that *Burton* requires to show state action—GEC has had no control over GDI and NewsGuard's technologies which Media Plaintiffs allege have caused them harm, nor control over the decisions made by users of those technologies. *See supra* Background I.

Finally, a private entity may also be deemed a state actor when it "operates as a 'willful participant in joint activity with the State or its agents.'" *Brentwood Acad.*, 531 U.S. at 296. There must be such a level of intertwinement that "any act of the private entity will be fairly attributable to the state even if it cannot be shown that the government played a direct role in the particular action challenged." *Frazier*, 765 F.2d at 1288 n.22. The Fifth Circuit recognized that this test is an exceedingly high bar. *Missouri*, 83 F.4th at 375 n.11 Thus, the joint action doctrine is even harder to satisfy than the "significant encouragement" or "coercion" tests and requires a plaintiff to plead and prove

"substantial integration between the two entities *in toto.*" *Id.* For the reasons discussed above, Media

Plaintiffs cannot demonstrate significant government involvement in a particular challenged action.

*See supra* Argument II.B.1.a. And they are even less likely to prevail on the argument that there is

"pervasive entwinement" between Defendants and such far-removed third parties as the advertisers

that decline to patronize Media Plaintiffs such that *every decision* of those parties becomes one of the

federal government. *Missouri*, 83 F.4th at 375 n.11. To find that GEC engages in "joint action" with

every named and unnamed company that develops or uses tools and technology for countering foreign

disinformation and propaganda would eliminate the distinction between public and private action.

Media Plaintiffs' argument should be rejected. *Manhattan Comm. Access Corp.*, 587 U.S. at 808–09.

### c.  Defendants did not directly violate the First Amendment.

In apparent acknowledgment that they cannot meet the demands of the state-action doctrine,

Media Plaintiffs claim the only relevant inquiry is whether Defendants' actions have the consequence

of abridging First Amendment rights. PI Mot. at 30; Compl. ¶ 201 ("[W]hat matters . . . is whether the

government's actions have had the consequence of *abridging* Freedom of Speech or Freedom of the

Press, not whether it has acted directly, not whether a private partner has become a government actor,

and not whether government has acted coercively or with undue pressure."). Thus, they assert that

Defendants directly engage in viewpoint-based discrimination and impose a de facto prior restraint

on speech because they have "funded GDI's infrastructure, funded GDI and NewsGuard's testing on

Disinfo Cloud, and otherwise assisted, tested, promoted, and marketed GDI and NewsGuard, whose

ranking technologies direct the public and advertisers away from Media Plaintiffs." PI Mot. at 26–27.[21]

---

[21] Media Plaintiffs also conjecture that GEC, among other activities, "may be assisting and encouraging web browsers and social media companies to adopt technology that hides The Daily Wire and the Federalist's reporting." PI Mot. at 25-26. Such speculation is insufficient to warrant a preliminary injunction or to even maintain a complaint. *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985) (concluding that "there must be more than an unfounded fear on the part of the applicant" to issue a preliminary injunction); *Bailey v. Mansfield Indep. Sch. Dist.*, 425 F. Supp. 3d 696,

But Media Plaintiffs cite no case which supports their theory that the government can violate the First Amendment based upon third parties' reactions to government speech or funding.

In fact, case law confirms just the opposite. The crux of Media Plaintiffs' argument is that GEC's speech and funding dissuaded private persons and companies from giving their business to, supporting, or reading the Daily Wire and the Federalist, thereby limiting Media Plaintiffs' speech and circulation. *Id.* at 25-27. But "urging, encouraging, pressuring or even inducing action does not violate the Constitution unless and until such conduct crosses the line into coercion or significant encouragement." *Missouri*, 83 F.4th at 395. Moreover, "[w]hen government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.,* 576 U.S. 200, 207-08 (2015); *Kennedy v. Warren*, 66 F.4th 1199 (9th Cir. 2023) (affirming the denial of a preliminary injunction after a United States Senator sent a letter to Amazon requesting that it stop selling a "false or misleading" book because such a First Amendment claim was unlikely to succeed on the merits); *Penthouse Int'l, Ltd. v. Meese*, 939 F.2d 1011, 1015 (D.C. Cir. 1991) (concluding that statements made by the Attorney General's Commission on Pornography, which led the owners of 7-Eleven to stop selling Penthouse magazine, did not abridge Penthouse's First Amendment rights); *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 572, 583 (1998) (so long as the Government's funding decisions do "not silence speakers by expressly threaten[ing] censorship of ideas," or "introduce considerations that, in practice, would effectively preclude or punish the expression of particular views," they do not compromise First Amendment principles).

In any event, Media Plaintiffs' argument lacks a factual basis. Media Plaintiffs claim that Defendants "funded GDI's infrastructure, funded GDI and NewsGuard's testing on Disinfo Cloud, and otherwise assisted, tested, promoted, and marketed GDI and NewsGuard, whose ranking

---

712 (N.D. Tex. 2019) (even on a motion to dismiss, "a court is not to strain to find inferences favorable to the plaintiff and is not to accept conclusory allegations, unwarranted deductions, or legal conclusions."), *appeal dismissed sub nom. Bailey v. Vaszauskas*, 2020 WL 3053942 (5th Cir. Feb. 28, 2020).

technologies direct the public and advertisers away from Media Plaintiffs." PI Mot. at 26–27. But GEC did not fund GDI's infrastructure, Rogers Decl. ¶ 7 ("GDI's infrastructure costs were borne entirely out of other, private sources of funding"), nor did it fund any testing of GDI or NewsGuard's technologies that rank American news sources or "direct the public and advertisers away from Media Plaintiffs," *see* PI Mot. at 26; Rogers Decl. ¶ 4 (explaining that GEC's subaward to GDI was to "expand GDI's disinformation risk measurement to a broader set of countries in East Asia and Europe"); Skibinski Decl. ¶ 25 (attesting that its 2020 subaward under the GEC grant "was limited to monitoring foreign state-sponsored sources of disinformation—with no focus on domestic news sources").

Media Plaintiffs are thus left to argue that Defendants violated the First Amendment by promoting and marketing GDI and NewsGuard. PI Mot. at 26–27, 29–30. Media Plaintiffs point to a statement of the Director of TET about GDI, a "tweet" from NewsGuard that was "retweeted" on the Disinfo Cloud's Twitter Account, and a statement in the Disinfo Cloud Digest. *Id.* at 29–30. But even assuming that these were the government's own speech,[22] government officials could not do their jobs without expressing views—often on controversial topics—for themselves and their agencies, and the First Amendment does not place a viewpoint-neutrality requirement on the Government's own speech. *See Missouri*, 83 F.4th at 374 (noting that "'the government can speak for itself,' which includes the right to 'advocate and defend its own policies.'" (quoting *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 229 (2000)); *Shurtleff v. City of Bost.*, 596 U.S. 243, 251–52 (2022). In fact, Government officials may go as far as to "vigorously criticize a publication" or speaker "for any reason they wish." *Penthouse*, 939 F.2d at 1015.[23] As such, these statements are nothing more than permissible speech.

---

[22] As stated above, Park Advisors ran the Disinfo Cloud Digest and Disinfo Cloud Twitter account, Kimmage Decl. ¶ 20, and Media Plaintiffs have not established that its actions are attributable to GEC.
[23] Although government officials may criticize publications and speakers, *see id.*, the speech alleged here comes nowhere close to criticizing Media Plaintiffs or encouraging others away from their

To be sure, the government may not "do that indirectly which [it] is forbidden . . . to do directly." *Polar Tankers, Inc. v. City of Valdez*, 557 U.S. 1, 8 (2009). Because the government could go so far as "vigorously criticizing" Media Plaintiffs themselves, however, it would not be constitutionally improper for Defendants to fund private entities that might do so. *Penthouse*, 939 F.2d at 1015. And regardless, this is not the story that the facts bear out. *See supra* Background I. Media Plaintiffs are thus unlikely to prevail on their claim the Defendants are directly violating the First Amendment.

* * *

At bottom, Media Plaintiffs ask this Court to hold that Defendants' permissible speech and discrete grants of money for legitimate purposes (which are unrelated to Media Plaintiffs' complaints) transformed the actions of private entities—and the actions of other private individuals reacting to those private entities—into ones of the government. That surprising suggestion runs counter to longstanding Supreme Court precedent. *See, e.g.*, *Blum*, 457 U.S. at 1004. Not only that, it would constitutionalize a wide range of legitimate, First Amendment-protected private activity, thereby turning bedrock free speech principles on their head. Media Plaintiffs' attempt at rewriting First Amendment precedent should be roundly rejected.

---

platform. Indeed, Plaintiffs do not claim that this speech even mentioned Media Plaintiffs in any statement or publication. Rather, Media Plaintiffs allege that Patricia Watts, the Director of TET stated, "we encourage [those listening] to engage with all eight companies featured during the tech challenge to determine if there are opportunities to support their counter-disinformation work. Their work benefits us all in building a better information environment, so please do reach out to them or to us." Compl. ¶ 132. NewsGuard's tweet—which was retweeted by Disinfo Cloud's Account—states that NewsGuard was releasing a paper that "independent research show[ed] that human-curated news reliability ratings help mitigate false news." PI Mot. Ex. P at 107, ECF No. 11-17. And the statement in the Disinfo Cloud Digest merely references a NewsGuard product. *See* PI Mot. Ex. R at 117, ECF No. 11-19 ("NewsGuard launched a new tool, Responsible Advertising for News Segments (RANS), to help advertising companies avoid websites known to host or produce mis/disinformation."). Such mundane speech, which does not even reference Media Plaintiffs, does not violate Media Plaintiffs' First Amendment rights. *Walker*, 576 U.S. at 207–08.

### 3.   Plaintiffs are unlikely to succeed on their APA and *Ultra Vires* claims.

Plaintiffs are also unlikely to succeed on their APA or *ultra vires* claims that Defendants are exceeding their statutory authority.[24] *See* PI Mot. at 17 (discussing 5 U.S.C. § 706(2)(C)); Compl. ¶¶ 283–300 (Count Three), *id.* ¶¶ 301–05 (Count Four). As a threshold jurisdictional matter, Plaintiffs' APA claim fails because they have not identified a discrete final agency action that they challenge. On the merits of both claims, Plaintiffs have not demonstrated that any of Defendants' conduct has in the past or is now exceeding their clear statutory authority to identify and combat foreign malign disinformation campaigns.

### a.   Plaintiffs have not identified any final agency action.

The APA limits judicial review to "final agency action," 5 U.S.C. § 704, which is a jurisdictional requirement in the Fifth Circuit, *Qureshi v. Holder*, 663 F.3d 778, 781 (5th Cir. 2011). Agency action is final if it is one: "(1) [that] 'mark[s] the consummation of the agency's decisionmaking process,' and (2) 'by which rights or obligations have been determined, or from which legal consequences will flow.'" *Sierra Club v. Peterson*, 228 F.3d 559, 565 (5th Cir. 2000) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)). Plaintiffs' APA claim fails as a matter of law because they have not identified the final agency action or actions that they challenge.

The relevant paragraph in the complaint alleges that the "final agency action" here is "Defendants' secretive scheme to suppress, defame, defund, discredit, and reduce the circulation of a segment of the press" by "funding, marketing, and/or promoting censorship tools, technology and censorship enterprises" in the United States. Compl. ¶ 260. Even assuming that Defendants were doing anything of the sort (they are not), this generalized and inchoate attack on an ill-defined ongoing course of conduct constitutes the kind of challenge to "the continuing (and thus constantly changing)

---

[24] Plaintiffs' contention that Defendants violate the APA by exceeding their constitutional authority (Count Five), *see* PI Mot. at 17, is duplicative of their standalone First Amendment claims and fails for the same reasons that those do. *See supra* Argument II.B.2.

operations" of a federal agency that the Supreme Court and the Fifth Circuit have rejected for failing to identify a specific and discrete final agency action. *Sierra Club*, 228 F.3d at 566; *see Lujan v. Nat'l Wildlife Found.*, 497 U.S. 871, 899 (1990) (final action must be "an identifiable action or event"); *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004) (APA limits judicial review to "circumscribed, discrete agency actions"). In other words, Plaintiffs' wholesale challenge to an undefined "secretive scheme," Compl. ¶ 260, "is not a justiciable challenge because the program [to which Plaintiffs] object does not 'mark the consummation of the agency's decisionmaking process,' or constitute 'an identifiable action or event.'" *Sierra Club*, 228 F.3d at 566 (quoting *Bennett*, 520 U.S. at 178, and *Lujan*, 497 U.S. at 899). "Instead, as in *Lujan*, [Plaintiffs] have impermissibly attempted to 'demand a general judicial review of the [State Department's] day-to-day operations.'" *Id.* (quoting *Lujan*, 497 at 899). The APA does not grant federal courts that power. Nor is Plaintiffs' "programmatic challenge made justiciable by the fact that [they have] identified some specific" actions that Defendants took several years ago, such as those in connection with the subawards to GDI Ltd. or to NewsGuard, "that they [might] argue are final agency actions." *Id.* at 567. This Court should reject these invitations to ignore the "institutional limits on courts which constrain [their] review to narrow and concrete actual controversies," *id.* at 566, and dismiss Plaintiffs' APA claim for lack of jurisdiction.

### b. Defendants have not exceeded their statutory authority.

On the merits, Plaintiffs have failed to demonstrate that Defendants have previously or are now exceeding their statutory authority. The State Department is responsible for the management of foreign affairs. 22 U.S.C. §§ 2651, 2656. In line with that mandate, GEC is statutorily charged with leading and coordinating the federal government's efforts to recognize, expose, and counter "foreign state and non-state propaganda and disinformation efforts aimed at undermining or influencing the policies, security, or stability" of the United States and its allies, including through the use of "a wide range of technologies." *Id.* § 2656 note (Global Engagement Center). GEC has explicit grant-making

authority to carry out its mission. *Id.* § (f). As explained at length, all of GEC's activities at issue in this lawsuit—the awards to GDI Ltd. and to NewsGuard in connection with its Testbed and Tech Challenges initiatives; its tech demos; the Disinfo Cloud platform; and its engagement with private-sector technology companies whose websites can be potent vectors for the spread of foreign disinformation narratives overseas—were consistent with and furthered that critical national security mission.

The same misstatements of fact that plague Plaintiffs' theories of standing and state action for First Amendment purposes doom their contentions that Defendants are in any way exceeding their broad statutory mandates. In particular, Plaintiffs' claims all rest on the profoundly incorrect premise that Defendants have targeted, or are targeting, either directly or indirectly, their speech or press freedom. *See generally* PI Mot. at 18–20 (asserting that Defendants "research, assess, test, market, or promote tools and technologies that target Americans' speech or the American press"; help develop technology to do the same; "discuss with [Silicon Valley] tech companies concerns about" American speech; or generally "reduce or lessen the reach" of American speech). But Plaintiffs' evidence does not support even the barest inference that Defendants have done or continue to do any such thing, let alone establish a substantial likelihood of success on the merits.

Finally, as an alternative to challenging final agency action under the APA, Plaintiffs' Motion makes a passing reference to their non-statutory *ultra vires* claim, which is based on the same theory that Defendants acted beyond their statutory authority. *See* PI Mot. at 17 (referencing "count[] three" without further analysis). Plaintiffs' Motion does not discuss this claim but instead appears to use the phrase "*ultra vires*" as shorthand for an ordinary APA claim arising under 5 U.S.C. § 706(2)(C), challenging agency action in excess of statutory authority. In any event, assuming they can bring a

non-statutory *ultra vires* claim,[25] it is duplicative of the APA claim and fails for the reasons just explained. Moreover, *ultra vires* claims are subject to an even more demanding standard that Plaintiffs do not come close to meeting. To state an *ultra vires* claim, "a plaintiff must 'do more than simply allege that the actions of the officer are illegal or unauthorized.'" *Danos v. Jones*, 652 F.3d 577, 583 (5th Cir. 2011) (quoting *Ala. Rural Fire Ins. Co. v. Naylor*, 530 F.2d 1221, 1226 (5th Cir. 1976)). Rather, a plaintiff "must allege facts sufficient to establish that the officer was acting 'without any authority what[so]ever,' or without any 'colorable basis for the exercise of authority.'" *Id.* (quoting *Pennhurst*, 465 U.S. at 101 n.11). This is an extraordinarily difficult standard to meet; *ultra vires* review is available only for the most blatant violations of law. *Oestereich v. Selective Serv. Sys. Loc. Bd. No. 11*, 393 U.S. 233, 238 (1968) (challenged action must be "blatantly lawless" or a "clear departure" from agency's statutory mandate).[26] Nothing in the record establishes a likelihood that any of Defendants' conduct meets this exacting standard.

### C. The balance of equities and the public interest disfavor a preliminary injunction.

The remaining two preliminary injunction factors—the balance of the equities and the public interest—"merge when the Government is the opposing party" and weigh sharply in Defendants' favor. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). As an initial matter, because Plaintiffs cannot establish the first two factors necessary to obtain an injunction, "it is clear they cannot make the

---

[25] The Fifth Circuit and the Supreme Court have both historically expressed doubts about whether non-statutory *ultra vires* review remains available in light of the 1976 amendments to the APA. *See Geyen v. Marsh*, 775 F.2d 1303, 1307 (5th Cir. 1985) (recognizing that the "principal purpose" of the 1976 Amendments—which "waived sovereign immunity for suits seeking nonmonetary relief through nonstatutory judicial review of agency action"—"was to do away with the *ultra vires* doctrine and other fictions surrounding sovereign immunity" (citing Act of Oct. 21, 1976, Pub. L. No. 94-574, § 1, 90 Stat. 2721, 2721 (codified at 5 U.S.C. § 702 (1982)))); *see also Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 116 (1984) (noting that "the *ultra vires* doctrine [is] a narrow and questionable exception" to sovereign immunity).

[26] *See also Leedom v. Kyne*, 358 U.S. 184, 188 (1958); *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (Kavanaugh, J.) (an *ultra vires* claim is "essentially a Hail Mary pass" that "rarely succeeds"; the agency's error must be "so extreme" that it is "jurisdictional or nearly so").

corresponding strong showings [on the second two factors] required to tip the balance in their favor." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009); *Mayo Found. for Med. Educ. & Rsch. v. BP Am. Prod. Co.*, 447 F. Supp. 3d 522, 535 (N.D. Tex. 2020) (declining to address the final two *Winter* factors because the plaintiff could not establish the first two factors).

But even if Plaintiffs could satisfy one or both of those factors, the remaining factors tip decisively in Defendants' favor. Although First Amendment rights when they are genuinely at risk are in the public interest, the speculative risk of harm to Plaintiffs' asserted interests must be weighed against the obstruction of legitimate government functions that could result if the Court entered Plaintiffs' proposed injunction. *See Winter*, 555 U.S. at 24 ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." (citations omitted)).

As also shown in the discussion of the proposed injunction's overbreadth, *infra* Argument II.D, Plaintiffs' proposed injunction could significantly hinder GEC's ability to combat foreign state and non-state propaganda and disinformation overseas. Kimmage Decl. ¶ 25. ("If the proposed preliminary injunction prohibited GEC from taking any action to test or use technology to counter disinformation and propaganda overseas" that could, through "events outside of the GEC's control, someday be used by third parties in the United States, it would severely constrain GEC's ability to carry out its statutorily mandated mission."). For example, under a broad reading of the proposed preliminary injunction, GEC's efforts to identify technology to counter the misuse of artificial intelligence by foreign adversaries could be considered "encourag[ing] the development or use of technology" targeting American speech to the extent such technology could also be used in a domestic context, even if that was not the purpose or effect of GEC's effort. *Id.* ¶ 24.

Countering foreign state and non-state disinformation and propaganda is of critical concern to the United States, *id.* ¶ 5, and GEC's work in this regard helps to ensure that foreign actors do not

undermine the "policies, security, or stability of the United States and United States allies and partner nations," 22 U.S.C. § 2656 note (Global Engagement Center). These government activities help protect the nation's welfare and safety and outweigh Plaintiffs' speculative First Amendment harms. Kimmage Decl. ¶¶ 24–25; *Def. Distributed v. U.S. Dep't of State*, 838 F.3d 451, 459 (5th Cir. 2016) (holding that any First Amendment interest by plaintiffs was outweighed by national security interests). Accordingly, the balance of the equities and the public interest weigh heavily against granting the relief Plaintiffs seek.

### D. Plaintiffs' proposed injunction is improper.

Plaintiffs' proposed injunction is not only contrary to the public interest but also improper for two reasons. First, the proposed injunction lacks the specificity required by Federal Rule of Civil Procedure 65(d)(1). Second, the proposed injunction is substantially overbroad because it would needlessly interfere with the performance of lawful Executive Branch activities that protect national security.

#### 1. The proposed injunction is imprecise.

Rule 65(d)(1) requires "[e]very order granting an injunction" to "state its terms specifically," and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." As the Supreme Court has explained, these are "no mere technical requirements"; they serve the vital purpose of giving proper notice to those subject to court orders so that they may act without fear of being found in contempt. *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974); *see also Scott v. Schedler*, 826 F.3d 207, 213–14 (5th Cir. 2016) (an injunction "must describe in reasonable detail the acts restrained or required" and identify what specific policies are enjoined).

Plaintiffs' requested injunction falls far short of Rule 65(d)'s requirements. Before all else, it is unclear what broad array of activity Plaintiffs seek to enjoin. Plaintiffs' Motion requests that the Court enjoin Defendants "from continuing to research, assess, fund, test, market, promote, host on [their]

46

government platform, and/or otherwise assist with or encourage the development or use of technology that targets in whole, or in part, Americans' speech or the American press." PI Mot. at 3. But Plaintiffs' proposed order requests that the Court enjoin Defendants from "developing, funding, testing, maintaining, storing, highlighting, promoting, using, or encouraging, urging, pressuring, or otherwise inducing others to use, technology to track, rate, rank, silence, assess, counter, amplify, de-amplify, deplatform, de-boost, demonetize, suspend, shadow ban, de-boost, restrict, limit, reduce access to, or otherwise abridge the lawful speech of the American press and Americans." Proposed Order ¶ 2, ECF No. 11-42.

Plaintiffs compound this problem by using undefined, vague terms. If Defendants are to understand these undefined terms, such as "promote," "assist with," "encourage" or "induce," by reference to the immense swath of conduct that, in Plaintiffs' view, violates the First Amendment, those terms could encompass any form of government expression. The injunction thus risks enjoining permissible government action and speech, *see supra* Argument II.B.2.c, and it is "axiomatic that an injunction is overboard if it enjoins a defendant from engaging in legal conduct." *Missouri*, 83 F.4th at 395. Plaintiffs further seek to enjoin Defendants from "assist[ing]" or "encourag[ing]" conduct, PI Mot. at 3, but assisting or encouraging action "does not violate the Constitution unless and until such conduct crosses the line into coercion or significant encouragement." *Missouri*, 83 F.4th at 395.

Further, by failing to define terms such as "assist," "encourage," or "promote," Plaintiffs fail to put the Defendants on reasonable notice of what conduct is proscribed and might improperly place Defendants at risk of contempt. Nor do Plaintiffs define the terms "de-amplify," "deplatform," "de-boost," "demonetize," "suspend," "shadow ban," "de-boost," or "restrict." And the fact the Plaintiffs' proposed preliminary injunction fails to identify a single, concrete instance of ongoing government action, a current government policy, or imminent policy decision to be enjoined underscores its impermissibility. Plaintiffs' proposed injunction thus fails to meet the requirements of Rule 65(d)(1).

### 2.  The proposed injunction is overbroad.

Even if Plaintiffs' proposed injunction were sufficiently precise, it would still be overbroad. Although GEC does not engage in activities that restrict American speech or press, the proposed injunction threatens to prevent GEC from performing functions essential to public safety and national security. Thus, the injunction would defy established principles barring equitable relief that is "more burdensome to the defendant[s] than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

The proposed injunction could interfere with key functions statutorily assigned to GEC. Congress tasked GEC with "recogniz[ing], understand[ing], expos[ing], and counter[ing] foreign state and non-state propaganda and disinformation efforts aimed at undermining or influencing the policies, security, or stability of the United States and United States allies and partner nations." 22 U.S.C. §2656 note (Global Engagement Center). More specifically, one of the statutorily-defined functions assigned to GEC is to "[f]acilitate the use of a wide range of technologies and techniques by sharing expertise among Federal departments and agencies, seeking expertise from external sources, and implementing best practices." 22 U.S.C. § 2656 note (Global Engagement Center). GEC's ability to meet its functions therefore "requires a cutting-edge understanding of the technologies our adversaries are using and the technologies under development" required to respond. Kimmage Decl. ¶ 25. But the proposed preliminary injunction threatens to prevent GEC from performing these activities because it could "prohibit[] GEC from taking any action to test or use technology to counter disinformation and propaganda overseas" that could, through "events outside of the GEC's control, someday be used by third parties in the United States." *Id.*

GEC, for example, is working to identify technology to counter the misuse of artificial intelligence by foreign adversaries. Kimmage Decl. ¶ 24. Under a broad reading of the proposed preliminary injunction, such activity could be considered "encourag[ing] the development or use of

technology" targeting American speech to the extent such technology could also be used in a domestic context, even though that was not the purpose or effect of GEC's effort. *Id.* Such a restriction does not remedy the harm Plaintiffs claim, *see supra* Argument I, and is unnecessarily overboard. *Scott*, 826 F.3d at 211 (concluding that an injunction must be "narrowly tailor[ed] . . . to remedy the specific action which gives rise to the order as determined by the substantive law at issue").

## III.   Claims against the official capacity Defendants should be dismissed.

Finally, this Court should at the very least dismiss Plaintiffs' claims against the official capacity Defendants. As the Fifth Circuit has recognized, an official capacity claim is essentially a claim against the agency and the official capacity claims therefore merge with those against the agencies. *Harmon v. Dall. Cnty.*, 927 F.3d 884, 891 (5th Cir. 2019) (observing that when "a defendant government official is sued in his individual and official capacity, and the city or state is also sued," those sets of claims "merge"). Along similar lines, Plaintiffs fail to explain why an injunction against federal employees sued in their official capacity is necessary when they also seek to enjoin the agency where these individuals are employed. There is nothing added by seeking to enjoin individuals sued in their official capacity where the agency also would be subject to the proposed injunction.

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' motion for a preliminary injunction and grant Defendants' motion to dismiss.

Dated: March 15, 2024                    Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

JAMES J. GILLIGAN
Special Litigation Counsel
Federal Programs Branch

JOSHUA E. GARDNER
Special Counsel
Federal Programs Branch

*/s/  Arjun Mody*
DOROTHY M. CANEVARI (NY # 5989694)
CRISTEN C. HANDLEY (MO # 69114)
CODY T. KNAPP (NY # 5715438)
ARJUN MODY (DC #90013383)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel: (202) 451-7723
Email: arjun.a.mody@usdoj.gov

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

On March 15, 2024, I electronically submitted this document to the clerk of the court of the

U.S. District Court for the Eastern District of Texas using the court's electronic case filing system. I

certify that I have served all parties electronically or by another manner authorized by Federal Rule

of Civil Procedure 5(b)(2).

/s/ Arjun Mody
ARJUN MODY