**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

|  |  |
|---|---|
| THE DAILY WIRE, LLC *et al.*,<br><br>                Plaintiffs<br><br>        v.<br><br>UNITED STATES DEPARTMENT<br>OF STATE *et al.*,<br><br>                Defendants. | Civil Action No. 6:23-cv-00609 (JDK) |

## DEFENDANTS' MOTION TO DISMISS

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

JAMES J. GILLIGAN
Special Litigation Counsel
Federal Programs Branch

JOSHUA E. GARDNER
Special Counsel
Federal Programs Branch

DOROTHY M. CANEVARI
CRISTEN C. HANDLEY
CODY T. KNAPP
ARJUN MODY
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
Tel: (202) 616-8040
Email: Dorothy.M.Canevari@usdoj.gov

*Counsel for Defendants*

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................................... 1

STATEMENT OF ISSUES ............................................................................................................... 2

BACKGROUND ............................................................................................................................... 3

    I.    Legal and Factual Background ............................................................................................ 3

        A.    Congress tasked the State Department's "Global Engagement Center" with exposing and countering foreign state and non-state propaganda and disinformation aimed at undermining or influencing the policies, security, or stability of the United States and its allies. ............................................................... 3

        B.    GEC carried out various initiatives through a grant to Park Advisors. ............. 5

        C.    NewsGuard's and GDI's other business. .................................................................. 10

    II.    Plaintiffs' Allegations ......................................................................................................... 11

        A.    Media Plaintiffs .......................................................................................................... 12

        B.    State of Texas ............................................................................................................... 14

LEGAL STANDARD ...................................................................................................................... 14

ARGUMENT .................................................................................................................................... 15

    I.    The Court should dismiss this case for lack of jurisdiction. ........................................ 15

        A.    Texas lacks standing. .................................................................................................. 15

        B.    Media Plaintiffs lack standing .................................................................................. 18

    II.    Plaintiffs' APA claim should be dismissed for lack of jurisdiction. .......................... 26

    III.    Claims against the official capacity Defendants should be dismissed. ..................... 27

CONCLUSION ................................................................................................................................. 28

# TABLE OF AUTHORITIES

## CASES

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ...........................................................................................14, 19, 25

*Ass'n of Am. Physicians & Surgeons v. Schiff,*
  518 F. Supp. 3d 505 (D.D.C. 2021)........................................................................26

*Bennett v. Spear,*
  520 U.S. 154 (1997) ..........................................................................................26, 27

*City of L.A. v. Lyons,*
  461 U.S. 95 (1983)..............................................................................................15, 19

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ..........................................................................................16, 21

*Ctr. for Biological Diversity v. U.S. EPA,*
  937 F.3d 533 (5th Cir. 2019)....................................................................................17

*DaimlerChrysler Corp. v. Cuno,*
  547 U.S. 332 (2006) ..................................................................................................14

*Harmon v. Dall. Cnty.,*
  927 F.3d 884 (5th Cir. 2019)....................................................................................27

*Hotze v. Burwell,*
  784 F.3d 984 (5th Cir. 2015)....................................................................................15

*Inclusive Cmtys. Project, Inc. v. Dep't of Treasury,*
  946 F.3d 649 (5th Cir. 2019)..............................................................................20, 26

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ....................................................................................14, 15, 20, 26

*Lujan v. Nat'l Wildlife Found.,*
  497 U.S. 871 (1990) ..........................................................................................26, 27

*NetChoice, LLC v. Paxton,*
  49 F.4th 439 (5th Cir. 2022), *cert. granted in part sub nom.*, 144 S. Ct. 477 (2023)....................17

*NetChoice, LLC v. Paxton,*
  573 F. Supp. 3d 1092 (W.D. Tex. 2021) ............................................................16, 17

*NetChoice, LLC v. Paxton,*
    2022 WL 1537249 (5th Cir. May 11, 2022), *vacated sub nom.*, 142 S. Ct. 1715 (2022) ..........................17

*Norton v. S. Utah Wilderness All.,*
    542 U.S. 55 (2004) ...........................................................................................................27

*Onosode v. Equifax Info. Servs.,*
    2023 WL 2783263 (E.D. Tex. Mar. 29, 2023), *report and recommendation adopted,* 2023 WL
    3060790 (E.D. Tex. Apr. 22, 2023) .........................................................................................18

*O'Shea v. Littleton,*
    414 U.S. 488 (1973) ...................................................................................................15, 19

*Paterson v. Weinberger,*
    644 F.2d 521 (5th Cir. 1981) .........................................................................................14, 16

*Qureshi v. Holder,*
    663 F.3d 778 (5th Cir. 2011) ..........................................................................................2, 26

*Sierra Club v. Peterson,*
    228 F.3d 559 (5th Cir. 2000) .........................................................................................26, 27

*Simon v. E. Ky. Welfare Rights Org.,*
    426 U.S. 26 (1976) .......................................................................................................21

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) .....................................................................................................15

*Superior MRI Servs., Inc. v. All. Healthcare Servs., Inc.,*
    778 F.3d 502 (5th Cir. 2015) .........................................................................................14, 15

*Telephone & Data Sys., Inc. v. FCC,*
    19 F.3d 42 (D.C. Cir. 1994) .............................................................................................16

*Texas v. EEOC,*
    933 F.3d 433 (5th Cir. 2019) ............................................................................................18

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) .....................................................................................................15

*Utah v. Evans,*
    536 U.S. 452 (2002) .....................................................................................................26

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,*
    454 U.S. 464 (1982) .......................................................................................................1

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. III, § 2 ............................................................................................................1

## STATUTES

5 U.S.C. § 704 ....................................................................................................................26

22 U.S.C. § 2651 ..................................................................................................................3

22 U.S.C. § 2656 ...........................................................................................................3, 4, 5

## RULES

Fed. R. Civ. P. 5(b)(2) .........................................................................................................29

## EXECUTIVE MATERIALS

Exec. Order No. 13721,
    81 Fed. Reg. 14,685 (Mar. 14, 2016) ...........................................................................3

## OTHER AUTHORITIES

Becera, https://perma.cc/5V8K-MKVJ ...................................................................................6

Tex. Civ. Prac. & Rem. Code Ann. § 143A ...........................................................................16

## INTRODUCTION

Article III limits the judicial power to deciding "Cases" and "Controversies," U.S. Const. art. III, § 2, ensuring that federal courts do not become "forums for the ventilation of public grievances," *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 473 (1982). This case violates that foundational constitutional principle in textbook fashion. Two press outlets, the Daily Wire and Federalist Media (Media Plaintiffs), as well as the state of Texas, bring this suit against the State Department; one of its offices, the Global Engagement Center (GEC); and various federal officials in their official capacities. Plaintiffs allege that Defendants have censored the American press by funding and promoting private companies, which have created products that evaluate the veracity and reliability of information reported by news organizations, and that *other* unidentified third parties—businesses and social media companies—use those products to make decisions about where to spend advertising dollars or how to prioritize content on their online platforms. Plaintiffs claim these third parties use these products in a way that harms Media Plaintiffs' businesses and interferes with Texas's ability to enforce a currently enjoined state law that regulates content-moderation decisions by social media companies.

As explained in the Government's Response in Opposition to Plaintiffs' Motion for Preliminary Injunction, *see* ECF No. 32, Plaintiffs' claims of injury suffer from a central Article III problem—they depend entirely on a sequence of independent actions by private third parties that are not before the Court. Even accepting the complaint's allegations as true, the "speculative chain of possibilities" that Plaintiffs describe cannot establish any injury-in-fact that is "certainly impending" and traceable to Defendants' conduct or redressable by this Court. The Court should thus dismiss the complaint on its face for lack of jurisdiction. Plaintiffs' theory of standing also cannot survive a factual attack under Rule 12(b)(1), because multiple links in their alleged causal chain are conclusively contradicted by the record. Foremost, GEC's funding and support to the only two private entities that

Plaintiffs identify in their complaint—the Global Disinformation Index and NewsGuard—focused exclusively on developing technologies to combat foreign malign disinformation aimed at undermining the policies, security, or stability of the United States and its foreign allies and partners overseas. That funding did not support those entities' separate products that purportedly caused Plaintiffs' claimed injuries. Texas independently lacks standing for multiple reasons. Plaintiffs fail to explain how Defendants' funding of technology aimed at countering foreign disinformation has interfered with Texas's ability to enforce a law that regulates content-moderation on social media platforms. Nor have Defendants interfered with Texas's ability to enforce that law since it has never been in effect, because it is enjoined.

Even if Plaintiffs could establish standing, their Administrative Procedure Act (APA) claim should be dismissed because Plaintiffs have not identified any final agency action or actions that they challenge—a jurisdictional requirement in the Fifth Circuit. *See Qureshi v. Holder*, 663 F.3d 778, 781 (5th Cir. 2011). Furthermore, the Court should dismiss the claims against the official capacity Defendants because those claims merge with Plaintiffs' claims against the agency Defendants and are thus unnecessarily duplicative.

## STATEMENT OF ISSUES

1. Should Plaintiffs' complaint be dismissed *in toto* for lack of subject-matter jurisdiction?

2. Should Plaintiffs' APA claim be dismissed for lack of jurisdiction?

3. Should the claims against the official capacity Defendants be dismissed?

# BACKGROUND

I.   **Legal and Factual Background**

A.   **Congress tasked the State Department's "Global Engagement Center" with exposing and countering foreign state and non-state propaganda and disinformation aimed at undermining or influencing the policies, security, or stability of the United States and its allies.**

Disinformation is false or misleading information that is deliberately created or spread with the intent to deceive or mislead. Decl. of Daniel Kimmage, Principal Deputy Coordinator, Glob. Engagement Ctr., U.S. Dep't of State ¶ 5 ("Kimmage Decl.") (Ex. 1). Disinformation and propaganda from foreign state and non-state actors—or "[f]oreign information manipulation"—is a quick and relatively cheap way for countries such as Russia and China to destabilize societies, including the United States and its allies. *Id.* ¶¶ 5-6; 22 U.S.C. § 2656 note (Global Engagement Center). It is thus a major national security concern to the United States. *See* Kimmage Decl. ¶ 5; 22 U.S.C. § 2656 note (Global Engagement Center).

Congress entrusted the State Department, led by the Secretary of State, with the management of foreign affairs. *See* 22 U.S.C. § 2651 (codifying the establishment of the State Department); *id.* § 2656. Recognizing the need for government action to counter disinformation from foreign state and non-state actors, Congress directed the Secretary of State to establish the "Global Engagement Center" within the Department.[1] *See* 22 U.S.C. § 2656 note (Global Engagement Center). GEC's mission is to "direct, lead, synchronize, integrate, and coordinate efforts of the Federal Government to recognize, understand, expose, and counter foreign state and non-state propaganda and

---

[1] Beforehand, in 2016, the President signed an executive order which established the Global Engagement Center with a more limited focus. *See* Exec. Order 13721 (Mar. 14, 2016). Under that executive order, GEC supported government-wide counterterrorism communications activities directed abroad. *See id.*

disinformation efforts aimed at undermining or influencing the policies, security, or stability of the United States[, its] allies[,] and partner nations." *Id.*

One of the statutorily-defined functions of GEC is to "[f]acilitate the use of a wide range of technologies and techniques by sharing expertise among Federal departments and agencies, seeking expertise from external sources, and implementing best practices." *See* 22 U.S.C. § 2656 note (Global Engagement Center). In furtherance of this function, GEC's Technology Engagement Team (TET) identifies, assesses, tests, and implements technology to address the problem of foreign propaganda and disinformation. Kimmage Decl. ¶ 10. TET has historically carried out this mission through several initiatives. *Id.* ¶ 11. Its Tech Demo Series, for example, was a forum for private sector companies to present their technologies to an audience of U.S. government and foreign government officials, and explain how these technological tools could be used to counter foreign state and non-state information manipulation. *Id.* The Tech Demo Series ended in summer 2023 when GEC determined that it was no longer a critical effort, as it balanced limited resources and competing priorities. *Id.* ¶ 21.

Relatedly, GEC engages in short-term collaborations with other federal agencies through TET's "testbeds." *Id.* ¶ 11. In a testbed, GEC and another U.S. government entity work to identify a technological gap that exists for that entity in countering foreign information manipulation, and a potential technological solution to fill that gap. *Id.* Thereafter, those participants execute a statement of work outlining the objective of the testbed, the expectations of the participants, and stated deliverables for that test; and jointly evaluate the work performed. *Id.*

Similarly, TET hosts international tech challenges, which are typically one-or-two-day public events held abroad to develop partnerships with technology entities based outside the United States. *Id.* GEC, either directly or through a third-party implementer (such as a grantee or contractor), invites technologists from a specific country or region to submit applications to present innovative solutions to counter foreign information manipulation overseas to a panel of judges and an audience of

government, civil society, private sector, and academic stakeholders. *Id.* Up to three awardees are selected to receive an award from GEC—such as a grant, contract, subgrant, or subcontract—to perform a short-term project in accordance with conditions outlined in a statement of work. *Id.*

GEC catalogued and compiled its assessments of these technologies in a grantee-maintained open-source, unclassified platform called Disinfo Cloud, a repository to catalog technologies to counter foreign propaganda and disinformation. *Id.* Specifically, testbed results were posted on the Disinfo Cloud platform primarily for use by U.S. government agencies and foreign partners. *Id.* ¶ 14.

Finally, GEC has a private sector engagement portfolio to facilitate collaboration between the U.S. government and the tech sector, academia, and the research community, on the topic of foreign information manipulation overseas. *Id.* ¶ 11. Generally, the engagement focuses on trends, tactics, and techniques in foreign information manipulation. GEC's practice when sharing information with social media companies is not to request that the companies take any specific actions on the information. *Id.* The individual who led this effort from 2019 to 2022 worked from Silicon Valley. *Id.*

### B.  GEC carried out various initiatives through a grant to Park Advisors.

Congress specifically vested GEC with the authority to provide grants or contracts of financial support to "civil society groups, media content providers, nongovernmental organizations, federally funded research and development centers, private companies, or academic institutions." 22 U.S.C. § 2656 note (Global Engagement Center). Such grants can be made, *inter alia*, "to support efforts by [GEC] to counter efforts by foreign entities to use disinformation and propaganda to undermine or influence the policies, security, and social and political stability of the United States and United States allies and partner nations." *Id.* § f(1)(D).

Thus, to further its mandate of recognizing and countering foreign state and non-state propaganda and disinformation, GEC awarded an approximately three million dollar grant to Park Capital Investment Group LLC (Park Advisors) in September 2018 "to test and engineer novel

technological solutions—through combination, hybridization, or other applications of existing technologies—to the problems of foreign propaganda and disinformation, and rapidly make those technologies available for use by partners."[2] Kimmage Decl. ¶ 13. Park Advisors was a firm that managed public-private projects with a particular emphasis on combating violent extremism and disinformation. Decl. of Matthew Skibinski, General Manager, NewsGuard Technologies, Inc. ¶ 22 (Skibinski Decl.) (Ex. 2).

Pursuant to its grant, Park Advisors administered the Testbed initiative and International Tech Challenges described above. *Id.* ¶¶ 14, 17. It also launched the now-retired Disinfo Cloud in August 2019. *Id.* Additionally, in December 2020, Park Advisors established a weekly newsletter, Disinfo Cloud Digest, to provide the user community with updates related to Disinfo Cloud. *Id.* ¶ 20. Park Advisors also created a Twitter account for Disinfo Cloud. *Id.* GEC's use of Disinfo Cloud ended in December 2021, and GEC no longer has access to it.[3] *Id.* ¶¶ 11, 14.

Park Advisors, in execution of the GEC grant, made subawards to subrecipients, including NewsGuard and the Disinformation Index, Ltd.

---

[2] Contracts and grants are managed and monitored by GEC in accordance with applicable law, including applicable federal regulations, and Department policy. Kimmage Decl. ¶ 12. In implementing a GEC grant or contract, the recipient entity (prime recipient) may make subawards, by grant or contract as appropriate to other entities (subrecipients). *Id.* The prime recipient is responsible for monitoring the activities of the subrecipient, ensuring that such activities are carried out in a manner consistent with the relevant prime award, and providing relevant information concerning subrecipient compliance to GEC. *Id.*

[3] After GEC's contract with Park Advisors ended, the Testbeds and International Tech Challenges initiatives continued, first through a subcontract with the consultancy company Becera, and now directly under GEC. Kimmage Decl. ¶ 21. According to its website, Becera is a consultancy that "bridges the public and private sectors to create innovative approaches that solve operational, governance, and administrative challenges through technology discovery and application." *See* Becera, https://perma.cc/5V8K-MKVJ.

1.  **2020 subgrant to NewsGuard to understand the origins, content, and spread of Russian and Chinese disinformation campaigns.**

In 2020, the Department of Defense's National Security Innovation Network (NSIN) hosted the Countering Disinformation Challenge. *See* Skibinski Decl. ¶ 21. The challenge sought innovative tools to identify misinformation and disinformation online in near real time, in response to Russia's and China's efforts to promote COVID-19 disinformation. *Id.*

One of the participants in that challenge was NewsGuard Technologies, Inc. (NewsGuard). *Id.* NewsGuard is a for-profit organization that sells a browser extension that provides ratings and reviews of the reliability of different news sources next to links users encounter on social media sites or search engines. *Id.* ¶ 4. It was launched in 2018 with the aim of providing news consumers with detailed assessments of the reliability of news sources they might encounter on the Internet. *Id.* ¶ 3.

As one of the winners of the Countering Disinformation Challenge, NewsGuard received a $25,000 subaward from Park Advisors to conduct a pilot in collaboration with GEC and in support of the Department of Defense's Cyber National Mission Force (CNMF) as part of the Testbed initiative. *See id.* ¶ 21; Kimmage Decl. ¶ 15. NewsGuard's work with GEC and CNMF was coordinated by Park Advisors, *see* Skibinski Decl. ¶ 22, and the funding allowed NewsGuard to help GEC and United States Cyber Command (USCYBERCOM), the unified combatant command for the cyberspace domain, to better understand the origins, content, and spread of Russian and Chinese disinformation campaigns, Kimmage Decl. ¶ 15. This project lasted four months and concluded in early 2021. *Id.*

Throughout the project, Park Advisors made clear that its focus was limited to monitoring foreign state-sponsored sources of disinformation—with no focus on domestic news sources. Skibinski Decl. ¶¶ 25–30. During the project, NewsGuard had approximately weekly calls with GEC, CNMF, and the other companies. *Id.* ¶ 31. The companies would send reports on their findings from monitoring Russian and Chinese state media ahead of the call. *Id.* The participants on these calls did

not discuss domestic media sources in the context of mis- or disinformation, nor did any of NewsGuard's reports mention anything about the credibility or possible publication of misinformation by domestic media sources. *Id.* ¶ 32. GEC does not have any ongoing grants, contracts, or subawards with NewsGuard and is not otherwise doing any work with it. Kimmage Decl. ¶ 19.[4]

### 2. 2021 subgrant to Global Disinformation Index, Ltd. to add foreign language capabilities to its existing technology.

In 2021, Park Advisors, through its grant from GEC, hosted the "U.S.-Paris Tech Challenge." Kimmage Decl. ¶ 17. This event, which took place in Paris, aimed to advance the development of promising and innovative technologies against foreign information manipulation. *Id.* To that end, Park Advisors awarded subgrants to companies addressing foreign-sourced disinformation circulating overseas; no subgrant was given to address disinformation in the United States. *Id.*

Park Advisors awarded one subgrant to the Disinformation Index, Ltd. (GDI). GDI is a United Kingdom-based non-profit company that provides independent, neutral disinformation risk data to digital advertisers around the world, enabling them to make more informed brand safety decisions regarding their open-web programmatic advertising purchases. Decl. of Dr. Daniel Rogers,

---

[4] Although not mentioned by Plaintiffs, NewsGuard received a second subaward after applying for a "call for submissions" from GEC's TET in December 2021 for projects focused exclusively on applying technology to countering foreign disinformation. Skibinski Decl. ¶ 33. NewsGuard's initial proposal was determined unlikely to yield results, and it did not complete the work to which it initially agreed. *Id.* But through that process, NewsGuard was connected to the State Department's Venezuela Affairs Unit, which was interested in whether NewsGuard's data could help trace Russian state-sponsored false narratives spreading in Latin America through Venezuelan media outlets. *Id.* Ultimately, NewsGuard monitored Venezuelan domains that regularly spread Kremlin-sponsored disinformation and 25 additional news and information websites with high readership throughout Latin America—including Spanish publications owned and operated by authoritarian governments such as Russia and Iran and websites operating from other Latin American countries. *Id.* The project did not involve any rating or monitoring of U.S.-based news outlets and was used for countering disinformation and propaganda overseas. *Id.* This work, and the $25,000 subaward in 2020 described above, represent the only work done by NewsGuard in connection with the Park Advisors grant. Kimmage Decl. ¶ 16.

Co-founder and Director, Disinformation Index, Ltd. ¶ 2 ("Rogers Decl.") (Ex. 3). GDI Ltd. is based in the United Kingdom. Its affiliate, Disinformation Index, Inc., (GDI Inc.) is based in the United States. *Id.* ¶ 6.

Park Advisors granted the London-based GDI Ltd. $100,000 to expand its disinformation risk measurement to a broader set of countries in East Asia and Europe—*i.e.*, countries within China's and Russia's spheres of influence—to enable advertisers in those markets to make informed brand safety decisions about where they were buying advertisements. *Id.* ¶ 4; Kimmage Decl. ¶ 18. GDI used the $100,000 subgrant to add language capabilities (Chinese, Japanese, Korean, Vietnamese, Russian, and Ukrainian) to its existing technology and to train GDI's artificial intelligence technology on culturally relevant adversarial narratives for use in risk measurement for locations outside of the United States. Rogers Decl. ¶ 5. GDI also used its subaward to train its program with specific disinformation content identified in those languages to help improve the model's performance in translating that type of content at scale. *Id.* GDI did not use any part of its funding to evaluate media entities in the United States. *Id.* ¶¶ 6–7.

This subgrant funded GDI's activities for just three months, and its activities concluded on December 31, 2021. Kimmage Decl. ¶ 18. It was the only subgrant that Park Advisors gave GDI under the GEC grant. *Id.* GDI was never a part of the engagement initiative in Silicon Valley as part of this subgrant. Rogers Decl. ¶ 11. And beyond this subgrant, a single mention in the Disinfo Cloud Digest, and a single retweet on the Disinfo Cloud Twitter account, GDI had no further connection to Disinfo Cloud. *Id.* ¶ 10. GEC does not have any ongoing grants, contracts, or subawards with GDI and is not otherwise doing any work with it. Kimmage Decl. ¶ 19.

9

### C.  NewsGuard's and GDI's other business.

Outside their work with GEC, NewsGuard and GDI each conduct other business.

### 1.  NewsGuard's "Nutrition Labels" and "Misinformation Fingerprints" Products

NewsGuard has developed several products to provide news consumers with detailed assessments of the reliability of news sources and to alert consumers to misinformation. Skibinski Decl. ¶¶ 5–20. These products, such as "Nutrition Labels" and "Misinformation Fingerprints," act as alternatives to blocking or censoring content that may contain misinformation. *Id.* ¶ 41. Nutrition Labels[5] and Misinformation Fingerprints were created independently by NewsGuard; neither GEC nor the CNMF nor any other government agency was involved in their development. *Id.* ¶¶ 14, 17.

NewsGuard's revenue comes from Internet Service Providers, browsers, search engines, social platforms, education providers, advertising agencies, brand safety providers, researchers, and others paying to use NewsGuard's products. *Id.* ¶ 4. NewsGuard did not use its grant funding from GEC, or any other government funding, to rate news sources or debunk any specific narratives. *Id.* ¶ 37.

### 2.  GDI's Dynamic Exclusion List

GDI provided disinformation risk data to digital advertisers around the world through several projects. *See* Rogers Decl. ¶ 2. For example, GDI's United States affiliate, Disinformation Index, Inc., runs a "Dynamic Exclusion List." *Id.* ¶ 7. The Dynamic Exclusion List is a non-public source that identifies publications with a risk of spreading disinformation. *Id.* ¶ 8. It is updated monthly. *Id.* GDI Inc. does not have the ability to "blacklist" organizations through the list. *Id.* ¶ 6. Rather, it provides data to advertising buyers, who make their purchasing decisions. *Id.* The Dynamic Exclusion List is

---

[5] The Daily Wire and The Federalist both have Nutrition Labels. Skibinski Decl. ¶ 14. Since 2021, the Daily Wire's score has been increasing. *Id.* ¶ 38. In 2023, the site achieved a score of 69.5. *Id.* This means NewsGuard rates the Daily Wire as a "credible" news source. *Id.* The Federalist's NewsGuard rating has stood at 12.5 points since 2018. *Id.* ¶ 39. Nobody from GEC, CNMF, or any other government agency was in any way involved in or funded these determinations. *Id.*

not funded by the State Department or GEC, nor were any of the funds from the U.S.-Paris Tech Challenge (which were awarded to the London-based GDI Ltd.) put towards the Dynamic Exclusion List. *Id.* ¶ 7.

In November 2022, GDI also published a Disinformation Risk Assessment Report for the United States. *Id.* ¶ 8. In that report, GDI included a list of the ten least risky and the ten most risky of sixty-nine news sites manually reviewed for the purposes of that report. *Id.* Media Plaintiffs were identified among the ten most risky. *Id.* The report is completely independent of the Dynamic Exclusion List. *Id.* There is no correlation between risk as identified in the report and any site's inclusion in or exclusion from the Dynamic Exclusion List. *Id.* GDI funded its 2022 Assessment Report with private funds. *Id.* And GDI covers all of its infrastructure costs through private sources of funding. *Id.* ¶ 7.

## II.    Plaintiffs' Allegations

Plaintiffs filed this lawsuit in December 2023, alleging that GEC is "intervening in the news-media market to render disfavored press outlets unprofitable by funding the infrastructure, development, and marketing and promotion of censorship technology and private censorship enterprises to covertly suppress speech of a segment of the American press." Compl. ¶ 1, ECF No. 1. Through this purported course of "recommending censorship technology to the private sector, which then targets the American press and/or American[] speech," Media Plaintiffs allege that Defendants have violated their First Amendment rights. *See id.* ¶¶ 164, 272–82 (Counts I and II). Plaintiffs also allege this supposed course of conduct exceeded Defendants' statutory authority, violated the APA,

and exceeded "constitutional bounds." *Id.* ¶¶ 283–313 (Counts III–V). Plaintiffs seek declaratory and injunctive relief. *Id.* at 65–66 (Prayer for Relief).[6]

Media Plaintiffs and the State of Texas each allege different ways that they are injured by Defendants' purported conduct as follows.

### A.    Media Plaintiffs

Media Plaintiffs claim that they suffer ongoing harm through the following sequence of events. First, they allege that GEC funded "Park Advisors or Disinfo Cloud" to "funnel money to, and serve as a sales representative for, censorship technologies and private censorship enterprises." *Id.* ¶¶ 55-56. They then allege that GEC "funded GDI in 2021 through its U.S.-Paris Tech Challenge." *Id.* ¶ 125. Although Media Plaintiffs acknowledge that the tech challenges "were international," they claim that the "U.S.-Paris Challenge awarded cash prizes to GDI which blacklisted Media Plaintiffs." *Id.* ¶ 126. Media Plaintiffs allege that GDI runs the Dynamic Exclusion List which "blacklists media outlets" by naming outlets with a "high risk for disinformation" and attempting to "disrupt[] the ad-funded disinformation business model." *Id.* ¶¶ 105–09. Based solely upon information and belief, Media Plaintiffs allege that they are included on that List. *Id.* ¶ 108. They further allege that the Dynamic Exclusion List was "funded and promoted by" Defendants to "defund, deplatform, and discredit" them. *Id.* ¶ 114. Media Plaintiffs also allege that "GDI published a separate report" in 2020, the "Disinformation Risk Assessment," which included them in a list of the top ten "riskiest" news outlets.

---

[6] Plaintiffs seek to "enjoin Defendants, their officers, officials, agents, servants, employees, attorneys, and all persons acting in concert or participation with them . . . from developing, funding, testing, maintaining, storing, highlighting, promoting, using, or encouraging, urging, pressuring, or otherwise inducing others to use, technology to track, rate, rank, silence, assess, counter, amplify, de-amplify, deplatform, de-boost, demonetize, suspend, shadow ban, de-boost, restrict, limit, reduce access to, or otherwise abridge the lawful speech of the American press and Americans" and from "further engaging in the unlawful conduct" alleged in the complaint. Compl. at 66 (Prayer for Relief).

*Id.* ¶¶ 115–16. Additionally, Media Plaintiffs claim that the State Department, "through its alter ego Disinfo Cloud, promoted GDI on its Twitter feed." *Id.* ¶ 133.

Second, Media Plaintiffs claim that "the State Department co-sponsored a 'COVID-19 misinformation and disinformation' tech challenge" in 2020 and awarded $25,000 to NewsGuard— an "American compan[y] which offer[s] censorship technologies that target Americans' speech broadcast to Americans." *Id.* ¶¶ 142–43. Media Plaintiffs allege that this award was paid by the State Department "through its alter ego, Disinfo Cloud." *Id.* ¶ 144. They also allege that NewsGuard "compiles a list of American press outlets it characterizes as 'unreliable'" and that they are labeled as "unreliable." *Id.* ¶¶ 117, 22. Media Plaintiffs claim that NewsGuard "refine[d] their technology" on Disinfo Cloud's testbed. *Id.* ¶¶ 144–45. Media Plaintiffs further allege that "Disinfo Cloud also promoted NewsGuard on its Twitter feed" and "featured NewsGuard in at least one Disinfo Cloud Digest." *Id.* ¶¶ 155–56.

Finally, Media Plaintiffs allege that, having been deemed "unreliable" or "risky" by GDI and NewsGuard, Defendants have injured them "by starving them of advertising revenue and reducing the circulation of their reporting and speech[.]" *Id.* ¶ 4. Media Plaintiffs acknowledge that "DisinfoCloud.com is no longer publicly accessible" and that Park Advisors has closed. *Id.* ¶¶ 160, 161–62, 165. But they claim that three Twitter posts from 2021 from the Disinfo Cloud account remain online and that Defendants "continue[] to use" unspecified "research and reports" on Disinfo Cloud. *Id.* ¶¶ 161–62. Plaintiffs further allege that Defendants moved "information" from Disinfo Cloud's website to an unnamed new "platform," and that Defendants are performing unspecified work with a new consulting company, Becera. *Id.* ¶¶ 165, 176–78. And they claim that "GEC also highlights on its .gov webpage several organizations and resources that the State Department represents as 'counter-disinfo resources' . . . including some which promote NewsGuard and GDI." *Id.* ¶ 174. Further, Media Plaintiffs allege that GEC maintains a "Silicon Valley location" that

"continues to promote and market censorship tools and technology that target segments of the American press and Americans' speech to the tech industry, the private sector, and academia." *Id.* ¶ 175.

### B.  State of Texas

Texas alleges that Defendants have interfered with its sovereign interest in creating and enforcing its legal code. *Id.* ¶¶ 5, 234–39. According to the complaint, on December 2, 2021, HB 20— "a Texas statute that regulates social media companies as common carriers and prohibits them from censoring speech and press on their platforms"—became effective. *Id.* ¶¶ 234–35. That statute is presently enjoined by the Western District of Texas. *Id.* ¶ 234. Nevertheless, Plaintiffs allege that Defendants "interfere with Texas's enforcement" of HB 20 by "induc[ing] social media companies to violate [it]." *Id.* ¶¶ 235, 237. Texas claims that Defendants' "unlawful censorship" constitutes an "injury-in-fact" to Texas's sovereign interest, which Texas alleges is "continuing and ongoing and 'necessarily' irreparable." *Id.* ¶ 238.

### LEGAL STANDARD

A plaintiff's failure to establish jurisdiction, including its standing, warrants dismissal under Rule 12(b)(1). *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). It is "presume[d] that federal courts lack jurisdiction unless the contrary appears affirmatively from the record." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006). "A motion to dismiss for lack of standing may be either 'facial' or 'factual.'" *Superior MRI Servs., Inc. v. All. Healthcare Servs., Inc.*, 778 F.3d 502, 504 (5th Cir. 2015).[7] Under a facial attack, the court assesses whether the plaintiff has sufficiently alleged standing, accepting the complaint's well-pled, non-conclusory factual allegations as true, *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981), though the court need not accept as true legal conclusions, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). On the other hand, an attack on the court's jurisdiction is "factual . . . if the

---

[7] Internal quotation marks and citations are omitted throughout this brief, unless noted.

defendant submits affidavits, testimony, or other evidentiary materials" to challenge the truth of those allegations. *Superior MRI Servs.*, 778 F.3d at 504. "To defeat a factual attack, a plaintiff must prove the existence of subject-matter jurisdiction by a preponderance of the evidence" through evidence of its own. *Id.*

## ARGUMENT

### I.   The Court should dismiss this case for lack of jurisdiction.

A plaintiff must demonstrate three elements to meet the "irreducible constitutional minimum of standing," *Lujan*, 504 U.S. at 560–61: (1) "injury in fact," (2) "that is fairly traceable to the challenged conduct of the defendant," and (3) "likely to be redressed by a favorable judicial decision," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)."[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press" and "for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 432 (2021). And where, as here, "the plaintiff is not [it]self the object of the government action or inaction [it] challenges," the Supreme Court has recognized that "standing is . . . substantially more difficult to establish." *Lujan*, 504 U.S. at 562; *accord Hotze v. Burwell*, 784 F.3d 984, 995 (5th Cir. 2015). Finally, to obtain prospective relief, it is not enough to allege past injury. *City of L.A. v. Lyons*, 461 U.S. 95, 102 (1983); *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1973). Rather, a plaintiff must face a "real and immediate threat" of ongoing or future harm. *Lyons*, 461 U.S. at 102.

Plaintiffs' complaint cannot survive either a facial or factual motion to dismiss for lack of jurisdiction. They have not alleged facts that, even if true, would support Article III standing as required for injunctive relief. Moreover, those allegations are contradicted by the evidence Defendants have submitted with this motion.

### A.  Texas lacks standing.

Texas's sole basis for standing is its theory that Defendants are "interfering with Texas's

sovereign right to create and enforce a legal code"—that is, HB 20, a presently enjoined state law that regulates social media companies' content-moderation decisions. *See* Compl. ¶¶ 234–39. This theory of standing fails on its face. *See Paterson*, 644 F.2d at 523. Relevant here, HB 20's content-moderation provisions restrict social media companies' choices about whether and how to present content to the public. *See* Tex. Civ. Prac. & Rem. Code Ann. § 143A. Texas alleges that, by working with GDI and NewsGuard, which market technology to social media companies, which in turn decide whether to use that so-called "censorship" technology, Defendants "induce social media companies to violate HB 20." Compl. ¶ 237. This "inducement" theory is illogical, because it fails to explain why any of the alleged conduct here would prevent a social media company from complying with HB 20's content-moderation restrictions. That is, if HB 20 prohibits a social media company from using a particular technology in a particular way, then the company can simply choose not to use that technology as such. Texas's theory of standing fails for that simple reason. Moreover, if the theory depends on the premise that third-party social media companies will use technology created by other third parties to violate state law, that "unadorned speculation" plainly does not satisfy Article III traceability. *Telephone & Data Sys., Inc. v. FCC*, 19 F.3d 42, 48 (D.C. Cir. 1994) (rejecting a theory of standing that "invite[d] [the court] 'to presume illegal activities' on the part of actors not before the court"); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) ("Plaintiffs cannot rely on speculation about the unfettered choices made by independent actors not before the court" to establish causation).

This circuitous theory also lacks merit for the numerous reasons explained in Defendants' Motion to Transfer Venue at 5–9, ECF No. 14. That is, even if social media companies are somehow violating HB 20, Texas has not suffered any injury-in-fact because HB 20 has never gone into effect, and Texas has therefore never been able to enforce it, nor does Texas allege that enforcement is imminent. The law was scheduled to take effect on December 2, 2021, but on December 1, 2021, its enforcement was preliminarily enjoined. *NetChoice, LLC v. Paxton*, 573 F. Supp. 3d 1092 (W.D. Tex.

2021).[8] Texas's conclusory allegation that the "injury to [its] sovereign interest is continuing and ongoing," Compl. ¶ 238, without more cannot support injury-in-fact. *Ctr. for Biological Diversity v. U.S. EPA*, 937 F.3d 533, 545 (5th Cir. 2019) ("Article III demands more than . . . conclusory assertions."). Nor are Texas's injuries redressable, because no order from this Court could overturn the Western District of Texas's current injunction preventing HB 20 from going into effect. Finally, even if Texas had plausibly alleged standing, the complaint cannot survive a factual attack because the evidence submitted with this motion demonstrates that GEC has made no efforts to block either public or private enforcement of HB 20, or otherwise interfere with compliance with the law, defeating Plaintiffs' assertions otherwise. Kimmage Decl. ¶ 22.

Texas offers several responses in Plaintiffs' Reply in Support of Motion for Expedited Discovery at 2–3, ECF No. 23, but they are unpersuasive. First, Texas notes that the Fifth Circuit upheld HB 20's constitutionality and complains that Defendants ask this Court to "inappropriately speculate" as to whether the Supreme Court will reverse that decision. But the Fifth Circuit stayed the mandate in that case; its judgment has no current legal effect and is therefore immaterial as to whether Texas is injured, whether that injury is traceable to Defendants, or whether that injury is redressable by this Court. Texas has never enforced and cannot currently enforce HB 20. And it is Texas, not Defendants, that asks this Court to speculate because Texas's argument rests on the assumption that it could be injured in the future if the Supreme Court ultimately permits HB 20 to go into effect (or that social media companies would choose to violate state law). In any event, Texas's accusation ignores the basic principle that Texas must clearly establish standing; it is not Defendants' burden to disprove the opposite.

---

[8] The Fifth Circuit stayed the injunction, *NetChoice, LLC v. Paxton*, 2022 WL 1537249 (5th Cir. May 11, 2022), but the Supreme Court vacated that stay, 142 S. Ct. 1715 (2022), leaving the district court's injunction in place. The Fifth Circuit subsequently decided to vacate the injunction, *NetChoice, LLC v. Paxton*, 49 F.4th 439 (5th Cir. 2022), but stayed its mandate (thus again leaving the injunction in place), and the Supreme Court granted certiorari, 144 S. Ct. 477 (2023).

Second, Texas makes the unadorned assertion that HB 20's private enforcement provisions have never been enjoined. *Id.* This theory does not appear in the complaint, and the Court should not consider it. *Onosode v. Equifax Info. Servs.*, 2023 WL 2783263, at *10 (E.D. Tex. Mar. 29, 2023) (concluding that a plaintiff could not amend her complaint through briefing in opposition to a motion for summary judgment), *report and recommendation adopted,* 2023 WL 3060790 (E.D. Tex. Apr. 22, 2023). But even if the Court does consider it, Texas does not explain how Defendants are interfering with private parties' ability to sue social media companies for violations of HB 20 (or have ever done so in the past). Nor does Texas allege that any private parties have ever attempted to enforce HB 20 or been dissuaded as a result of Defendants' actions from doing so. *See generally* Compl. If this argument depends on the same assumptions that underlie the "inducement" theory described above, this Court should summarily reject it for the reasons already explained. Finally, Texas contends—not in the complaint but in its opposition to Defendants' motion to transfer—that its sovereign interests encompass "compliance with its laws," not merely enforcement. But the caselaw that Texas cites does not support such a compliance-enforcement distinction.[9] Even if it did, Texas has not alleged, other than through the complaint's flawed and illogical inducement theory, that Defendants are interfering with private parties' "compliance" with HB 20. For these reasons, Texas cannot establish Article III standing, and its claims should be dismissed for lack of subject matter jurisdiction.

### B. Media Plaintiffs lack standing.

Likewise, Media Plaintiffs fall far short of alleging facts that would support Article III standing, and in any event, the evidence submitted with this motion firmly contradicts those allegations. Media Plaintiffs assert two purported injuries allegedly attributable to Defendants: (i) the loss of advertiser

---

[9] Texas's citation to *Texas v. EEOC*, 933 F.3d 433 (5th Cir. 2019), *see* ECF No. 23 at 3, does not support any such distinction because the state law at issue there was plainly in effect and not enjoined. Moreover, the federal guidance challenged there threatened civil liability for private parties if they did not take action in direct violation of state law—a far cry from the speculative causal chain underlying Texas's inducement theory in this case.

and subscriber revenue, and (ii) a First Amendment harm from reduced circulation of their reporting and speech. Compl. ¶ 4. Neither injury is ongoing so as to support prospective injunctive relief, traceable to Defendants' conduct, or redressable by the Court.

*Injury-in-fact.* As an initial matter, Media Plaintiffs' claimed injuries occurred in the past, and "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief." *O'Shea*, 414 U.S. at 495–96; *see Lyons*, 461 U.S. at 102. Rather, a plaintiff must establish a "real and immediate threat of repeated injury." *O'Shea*, 414 U.S. at 496. The key activities alleged in the complaint ended years ago, and Plaintiffs do not plausibly allege any current activity that causes them ongoing or imminent harm. *See Iqbal*, 556 U.S. at 678. In fact, many of the complaint's allegations indicate that any harm was exclusively in the past. *See* Compl. ¶¶ 142–44 (one-time grants to GDI and NewsGuard from several years ago); *id.* ¶¶ 160–61, 167 (alleging Disinfo Cloud's website is no longer publicly accessible); *id.* ¶ 165 (Park Advisors, which operated Disinfo Cloud, has closed). To be sure, Media Plaintiffs offer a laundry list of vague and generalized grievances to support assertions of ongoing harm. For example, they allege that two years-old Twitter posts from the Disinfo Cloud account remain online, *id.* ¶ 161; that Defendants "continue to use" the "research and reports" on Disinfo Cloud, *id.* ¶ 162, without further explanation of how that "research" injures them; that Defendants moved "information" from Disinfo Cloud's website to an unnamed new "platform," *id.* ¶ 165; that Defendants "continue" to fund "censorship enterprises" (a legal conclusion), *id.* ¶ 170; and that Defendants are performing unspecified work with a new consulting company, Becera, again without explaining what that work is or how it harms them, *id.* ¶¶ 176–78. These allegations, many of which are mere "labels and conclusions," *Iqbal*, 556 U.S. at 678, fail to coherently articulate any theory of concrete, actual, and ongoing or imminent harm as Article III requires for prospective relief. Because the complaint on its face fails to allege any plausible ongoing or imminent harm, dismissal is warranted.

Moreover, the record confirms that Plaintiffs suffer no ongoing injury from Defendants' conduct, and thus the complaint cannot withstand a factual challenge. GEC does not have any ongoing grants, contracts, or subawards with GDI or NewsGuard and is not otherwise doing any work with those entities. Kimmage Decl. ¶ 19. GEC's use of Disinfo Cloud ended in December 2021, the related Digest was retired at the same time, and the Twitter account has remained inactive since then. *Id.* ¶¶ 11, 20.[10] As a result of shifting priorities and evolving disinformation threats, GEC has ended many of the initiatives that Plaintiffs speculate are harming them here, such as the Tech Demo Series or the presence of a GEC employee in Silicon Valley. *Id.* ¶ 21.

Undeterred, Plaintiffs have in recent submissions continued to press their conclusory and unsupported claims that "Defendants' still-ongoing censorship scheme . . . suppresses disfavored domestic speech" by funding the development of unspecified "censorship technology and private censorship enterprises." ECF No. 23 at 1; *see also* Compl. ¶ 1. Plaintiffs further speculate, without citation or evidence, that the "Silicon Valley office remains in operation" (without explaining why that injures them). ECF No. 23 at 2; Compl. ¶ 175. These unsupported assertions are contradicted by the evidence cited above.

***Traceability.*** Article III also requires "a causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560. "Causation" is not established if Plaintiffs' alleged "injuries" are "the result of the independent action[s] of . . . third party" companies that are "not before the court." *Inclusive Cmtys. Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019). Plaintiffs' various theories of traceability ignore this fundamental principle several times over.

(1) Consider the grant to GDI. Plaintiffs maintain: (a) GEC, through its grantee Park Advisors, gave a one-time $100,000 grant to GDI in a 2021 international technology challenge; (b) GDI used

---

[10] The Tweets that Plaintiffs reference are years old and do not even mention Media Plaintiffs; they are patently insufficient to provide the basis for any ongoing injury to them.

that money to develop the Dynamic Exclusion List; (c) Media Plaintiffs are on that List; and (d) corporations that subscribe to that List may choose not to advertise based on Media Plaintiffs' (unconfirmed) presence on that List as a result. *See* Compl. ¶¶ 59, 105–13. Even if all these allegations were true, this theory of standing fails as a matter of law because it depends on exactly the kind of "speculation about the decisions of independent actors" that the Supreme Court has repeatedly rejected. *Clapper*, 568 U.S. at 413–14; *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976) (standing cannot be premised upon "injury that results from the independent action of some third party not before the court").

In any event, the record contradicts Plaintiffs' version of events. Foremost, no part of the challenged 2021 grant was used in any way for activities aimed at U.S. media outlets or even in the United States at all. Rogers Decl. ¶¶ 4, 6–7; Kimmage Decl. ¶ 18. "GDI" is in fact two distinct legal entities: London-based GDI Ltd., and U.S.-based GDI Inc. Rogers Decl. ¶¶ 2, 6. As part of the U.S.-Paris Tech Challenge, an overseas competition aimed at advancing technologies to combat foreign disinformation and propaganda, London-based GDI Ltd. applied for funding to expand its already-existing disinformation risk measurement technology to six foreign languages—Chinese, Japanese, Korean, Vietnamese, Russian, and Ukrainian. *Id.* ¶¶ 4–5. Based on that pitch, GDI Ltd. won the $100,000 award and used the money accordingly, that is, to advance its technology to recognize those languages and in turn train its artificial intelligence technology on local and culturally relevant adversarial narratives in East Asia and Europe. *Id.* ¶ 5. The project was successful and, as a result, GDI Ltd.'s technology is now more effective at identifying dangerous disinformation narratives originating in those foreign languages, for the benefit of U.S. interests and public and private entities based overseas. *Id.* Again, that grant was simply not used in any way for the purpose of expanding disinformation risk measurement in the United States. *Id.* The Dynamic Exclusion List—the purported source of Media Plaintiffs' injuries—was created by and is wholly maintained by the U.S.-

based Disinformation Index, Inc., which was not the recipient of the Paris Tech Challenge funds. *Id.* ¶ 7. The List was not funded by the State Department or any State-Department affiliated entity, and GDI's infrastructure costs are borne out of private sources of funding. *Id.*

The rest of Media Plaintiffs' purported causal chain similarly either depends primarily on the unrelated actions of third parties (and therefore the allegations fail as a matter of law) or is contradicted by the record. Media Plaintiffs heavily emphasize their inclusion in a one-time report that U.S.-based GDI Inc. published in 2022, titled "Disinformation Risk Assessment," about the domestic online news market, that they acknowledge was "separate" from the List. Compl. ¶ 115. Nevertheless, based on their inclusion in that report, they speculate that GDI Inc. included them on the non-public Dynamic Exclusion List, *id.* ¶¶ 115–16, but Article III demands more than guesswork. Indeed, Plaintiffs have failed to allege that a single advertiser or social media company has ever made a single decision that harmed them on the basis of this report. For this reason alone, Plaintiffs have failed to allege any cognizable injury traceable to Defendants, much less an imminent one.

The record also shows that there is no relationship between the report and the Dynamic Exclusion List. Rogers Decl. ¶ 8. Even if the report from U.S.-based GDI Inc. were relevant, Defendants had nothing to do with that report, which was supported entirely by private funding. *Id.* And on top of that, Plaintiffs' theory of resulting economic harm depends on the further actions of advertisers and social media companies—some of the world's largest corporations whose decisions are governed by market forces and economic incentives wholly unrelated to a GEC subgrant to a UK-based company in 2021—which was in turn unrelated in any way to the 2022 GDI Inc. report.[11]

(2) Media Plaintiffs' theory regarding NewsGuard suffers from the same defects. They

---

[11] Plaintiffs' allegations regarding grants from the "State-Department-funded National Endowment for Democracy" (NED) to NewsGuard suffer from the same traceability problems as the theory regarding the Park Advisors grant. *See* Compl. ¶¶ 134–40. The record also confirms that GDI used the NED grant to perform media market analysis abroad and for its foreign language translation capabilities. Rogers Decl. ¶ 12. In other words, this grant had no effect on Plaintiffs.

maintain that: (a) NewsGuard won a $25,000 award during a technology challenge organized by the NSIN and GEC; (b) as part of that award, NewsGuard piloted one of its technologies on a GEC testbed; (c) NewsGuard maintains a database of ratings of domestic news outlets, in which Media Plaintiffs score poorly; and (d) advertisers withhold revenue from them and social media companies deprioritize them as a result. Compl. ¶¶ 117–22, 142–47, 164. Even accepting this narrative on its own terms, Plaintiffs fail to explain how, in their view, the 2020 NSIN award for a challenge focused on foreign disinformation narratives relates to NewsGuard's domestic news ratings database. And even if that connection were clearly explained, this overall theory once again depends entirely on the actions of third parties—advertisers and social media companies—that make independent decisions, not at the behest of NewsGuard and certainly not as a direct result of anything Defendants have done.

At any rate, the record again contradicts Media Plaintiffs' narrative, primarily because there is no connection between NewsGuard's Nutrition Labels media-rating product and any funding that NewsGuard has ever received from Defendants (or any other federal agency). Skibinski Decl. ¶¶ 22–24. The facts are this: NewsGuard received a $25,000 subaward from Park Advisors under its GEC grant in 2020 in connection with the NSIN-organized foreign disinformation challenge. Id. ¶ 21.[12] NewsGuard's project pursuant to the NSIN challenge focused exclusively on identifying rapidly-evolving, false narratives being spread by foreign state and state-sponsored actors, with a particular emphasis on China and Russia, and did not involve monitoring of domestic news sources. Id. ¶¶ 21–32; Kimmage Decl. ¶ 15. And the testing of NewsGuard technology as part of that award was exclusively designed for those national security and foreign affairs purposes. Skibinski Decl. ¶ 25. Put

---

[12] As mentioned above, see supra at n.4, NewsGuard also worked on a project with the State Department's Venezuela Affairs Unit to trace Russian state-sponsored false narratives spreading in Latin America through Venezuelan media outlets. Skibinski Decl. ¶ 33. The project did not involve any rating or monitoring of U.S.-based news outlets and was used for countering disinformation and propaganda overseas. Id. This work, and the $25,000 subaward in 2020 described above, represent the only work done by NewsGuard in connection with the Park Advisors grant. Kimmage Decl. ¶ 16. Plaintiffs do not make any allegations regarding this project.

simply, NewsGuard did not use any resources from Defendants to create, improve, or implement NewsGuard's Nutrition Labels ratings database. *Id.* ¶ 24. Finally, NewsGuard first published its ratings database in August 2018, years before any of the events alleged in this lawsuit.  *Id.* ¶ 14.[13] These facts highlight that Plaintiffs' theory of harm attributable to Defendants' interactions with NewsGuard lacks any evidentiary support.

(3) Plaintiffs' remaining attempts to establish some connection between Defendants and their purported injuries are even more attenuated, vague, and speculative than those described above. Plaintiffs allege that Defendants "promoted" GDI, NewsGuard, and other unspecified technologies through other means such as the Disinfo Cloud platform and its related Twitter account and News Digest, *see, e.g.*, Compl. ¶¶ 4, 89, 133, 161; GEC's engagement with companies based in Silicon Valley, *id.* ¶ 175; and State Department website links to various third-party resources and webpages, some of which in turn include GDI and NewsGuard among long lists of other resources, *id.* ¶ 174.

These allegations are facially inadequate to support Article III traceability,  and moreover, the evidence contradicts them. As for Disinfo Cloud, GDI's technology was never included on that platform. Rogers Decl. ¶ 9. The fact that the Disinfo Cloud Twitter account and Digest each on one occasion referenced GDI's work in the foreign disinformation space does not remotely connect Defendants to Plaintiffs' purported injuries from domestic advertisers or social media companies. The theory that Defendants "promoted" NewsGuard's domestic news ratings database through either the Disinfo Cloud platform, Twitter account, or Digest lacks merit for all the same reasons. As for GEC's interactions with domestic technology companies, Plaintiffs utterly  fail to explain how Defendants

---

[13] During the period of the grant projects, Daily Wire's NewsGuard score actually increased by 7.5 rating points, and from August 2021 to November 2023, the site achieved a score of 69.5. NewsGuard describes outlets achieving a score above 60 as "credible," and 60 is the threshold that many advertisers use in deciding whether to advertise on a given news site, although, again, those decisions are made entirely by advertisers and not by NewsGuard. Skibinski Decl. ¶ 38. These facts further undermine any claimed injury to the Daily Wire traceable to Defendants' conduct.

"targeted" American speech by engaging in dialogue with some of the world's most significant internet companies to share information on combating foreign disinformation and propaganda overseas.[14] Finally, the notion that Defendants have injured Plaintiffs by posting links on a State Department website to compilations of disinformation technologies created by private entities, some of which include links to GDI's and NewsGuard's website, is based on an attenuated causal chain that cannot support Article III standing.

*Redressability.* For similar reasons, Plaintiffs' purported injuries are not redressable by the relief they seek, or indeed by any equitable relief directed at Defendants. Plaintiffs ask this Court to enjoin Defendants "from developing, funding, testing, maintaining, storing, highlighting, promoting, using, or encouraging, urging, pressuring, or otherwise inducing others to use, technology to track, rate, rank, silence, assess, counter, amplify, de-amplify, deplatform, de-boost, demonetize, suspend, shadow ban, de-boost, restrict, limit, reduce access to, or otherwise abridge the lawful speech of the American press and Americans." Compl. at 66 (Prayer for Relief). But even if Defendants were taking any action aimed at suppressing, or even affecting, American speech (they are not), granting that relief sought in the complaint would not redress the supposed source of Plaintiffs' injuries, that is, GDI Inc.'s (purported) and NewsGuard's ratings of Media Plaintiffs, and in turn the decisions of advertisers and social media companies that allegedly impact Media Plaintiffs' audience sizes and revenues. Simply put, those are "unfettered choices made by independent actors not before the court[], and whose

---

[14] Plaintiffs' allegations are laden with insinuation and conclusory statements that simply do not support a plausible claim. For example, the complaint alleges that American companies were "encouraged to join Disinfo Cloud" to identify technological solutions to "counter propaganda and disinformation" but does not allege that the companies sought to use, or used, those technologies to target U.S. media outlets (let alone Media Plaintiffs). Compl. ¶ 76. Similarly, Plaintiffs allege that GEC maintained a Senior Advisor, Samaruddin Stewart, as a Silicon Valley liaison, but, again, do not claim that Mr. Stewart ever spoke to American companies about domestic news sources rather than foreign malign influence operations. *Id.* ¶ 78; *see also id.* ¶¶ 80–82, 85 (no reference to American media). These allegations cannot rescue Plaintiffs' complaint from dismissal. *See Iqbal*, 556 U.S. at 678 (at the motion to dismiss stage, "mere conclusory statements[] do not suffice").

exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *Lujan*, 504 U.S. at 562. It is "pure speculation that any order directed at [Defendants] would affect the behavior of the third-party technology companies" such as GDI Inc., NewsGuard, and social media platforms, or of blue-chip advertisers, and Article III demands far more. *Ass'n of Am. Physicians & Surgeons v. Schiff*, 518 F. Supp. 3d 505, 516 (D.D.C. 2021); *see Inclusive Cmtys.*, 946 F.3d at 655; *Utah v. Evans*, 536 U.S. 452, 464 (2002).

***

Thus, the Court should dismiss Plaintiffs' complaint for lack of subject matter jurisdiction.

## II.    Plaintiffs' APA claim should be dismissed for lack of jurisdiction.

The APA limits judicial review to "final agency action," 5 U.S.C. § 704, which is a jurisdictional requirement in the Fifth Circuit, *Qureshi*, 663 F.3d at 781. Agency action is final if it is one: "(1) [that] 'mark[s] the consummation of the agency's decisionmaking process,' and (2) 'by which rights or obligations have been determined, or from which legal consequences will flow.'" *Sierra Club v. Peterson*, 228 F.3d 559, 565 (5th Cir. 2000) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)). The Court lacks jurisdiction over Plaintiffs' APA claim because Plaintiffs have not identified the final agency action or actions that they challenge.

The relevant paragraph in the complaint alleges that the "final agency action" here is "Defendants' secretive scheme to suppress, defame, defund, discredit, and reduce the circulation of a segment of the press" by "funding, marketing, and/or promoting censorship tools, technology and censorship enterprises" in the United States. Compl. ¶ 260. Even assuming that Defendants were doing anything of the sort (they are not), this generalized and inchoate attack on an ill-defined ongoing course of conduct constitutes the kind of challenge to "the continuing (and thus constantly changing) operations" of a federal agency that the Supreme Court and the Fifth Circuit have rejected for failing to identify a specific and discrete final agency action. *Sierra Club*, 228 F.3d at 566; *see Lujan v. Nat'l*

26

*Wildlife Found.*, 497 U.S. 871, 899 (1990) (final action must be "an identifiable action or event"); *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004) (APA limits judicial review to "circumscribed, discrete agency actions"). In other words, Plaintiffs' wholesale challenge to an undefined "secretive scheme," Compl. ¶ 260, "is not a justiciable challenge because the program [to which Plaintiffs] object does not 'mark the consummation of the agency's decisionmaking process,' or constitute 'an identifiable action or event.'" *Sierra Club*, 228 F.3d at 566 (quoting *Bennett*, 520 U.S. at 178, and *Lujan*, 497 U.S. at 899). "Instead, as in *Lujan*, [Plaintiffs] have impermissibly attempted to 'demand a general judicial review of the [State Department's] day-to-day operations.'" *Id.* (quoting *Lujan*, 497 U.S. at 899). The APA does not grant federal courts that power. Nor is Plaintiffs' "programmatic challenge made justiciable by the fact that [they have] identified some specific" actions that Defendants took several years ago, such as those in connection with the subawards to GDI Ltd. or to NewsGuard, "that they [might] argue are final agency actions." *Id.* at 567. This Court should reject these invitations to ignore the "institutional limits on courts which constrain [their] review to narrow and concrete actual controversies," *id.* at 566, and dismiss Plaintiffs' APA claim for lack of jurisdiction.

## III.   Claims against the official capacity Defendants should be dismissed.

Finally, this Court should dismiss Plaintiffs' claims against the official capacity Defendants. As the Fifth Circuit has recognized, an official capacity claim is essentially a claim against the agency and the official capacity claims therefore merge with those against the agencies. *Harmon v. Dall. Cnty.*, 927 F.3d 884, 891 (5th Cir. 2019) (observing that when "a defendant government official is sued in his individual and official capacity, and the city or state is also sued," those sets of claims "merge"). Because Plaintiffs fail to explain why an injunction against these officials is necessary when they also seek to enjoin the agency where these individuals are employed, the Court should dismiss the claims against the official capacity Defendants.

## CONCLUSION

For these reasons, the Court should grant Defendants' motion to dismiss.

Dated: March 25, 2024                            Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

JAMES J. GILLIGAN
Special Litigation Counsel
Federal Programs Branch

JOSHUA E. GARDNER
Special Counsel
Federal Programs Branch

*/s/ Dorothy M. Canevari*
DOROTHY M. CANEVARI (NY # 5989694)
CRISTEN C. HANDLEY (MO # 69114)
CODY T. KNAPP (NY # 5715438)
ARJUN MODY (DC #90013383)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel: (202) 616-8040
Email: Dorothy.M.Canevari@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

On March 25, 2024, I electronically submitted this document to the clerk of the court of the U.S. District Court for the Eastern District of Texas using the court's electronic case filing system. I certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ Dorothy M. Canevari
DOROTHY M. CANEVARI