# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | |
|---|---|
| **THE DAILY WIRE, LLC;**<br>**FDRLST MEDIA, LLC; and**<br>**THE STATE OF TEXAS, by and through its Attorney General, Ken Paxton,**<br>　　　　*Plaintiffs,*<br>　　v.<br>**DEPARTMENT OF STATE;**<br>**GLOBAL ENGAGEMENT CENTER;**<br>**ANTONY BLINKEN, in his official capacity as Secretary of State;**<br>**LEAH BRAY, in her official capacity as Deputy Coordinator of the State Department's Global Engagement Center;**<br>**JAMES P. RUBIN, in his official capacity as Coordinator for the Global Engagement Center of the State Department;**<br>**DANIEL KIMMAGE, in his official capacity as the Principal Deputy Coordinator for the Global Engagement Center at the State Department;**<br>**ALEXIS FRISBIE, in her official capacity as Senior Technical Advisor of the Technology Engagement Team for the Global Engagement Center at the State Department;**<br>**PATRICIA WATTS, in her official capacity as the Director of the Technology Engagement Team at the Global Engagement Center at the State Department,**<br>　　　　*Defendants.* | **Civil Action No.: 6:23-cv-00609**<br><br>**PLAINTIFFS' RESPONSE IN OPPOSITION TO MOTION TO DISMISS** |

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ........................................................................................................i

TABLE OF AUTHORITIES .................................................................................................ii

STATEMENT OF CASE ......................................................................................................1

INTRODUCTION .................................................................................................................1

STATEMENT OF ISSUES ...................................................................................................3

STANDARD ..........................................................................................................................4

ARGUMENT .........................................................................................................................5

    I.    DEFENDANTS' RULE 12(B)(1) MOTION TO DISMISS FOR LACK OF JURISDICTION SHOULD BE DENIED BECAUSE PLAINTIFFS HAVE DEMONSTRATED JURISDICTION IF THEIR ALLEGATIONS ARE TAKEN AS TRUE, AND THE FACTUAL ATTACK IS INEXTRICABLY INTERTWINED WITH THE MERITS OF PLAINTIFFS' CLAIMS. ...................................................... 5

    II.   THIS COURT HAS JURISDICTION OVER ALL OF PLAINTIFFS' CLAIMS ...................................... 6

        A.    This Court Has Subject Matter Jurisdiction Over Plaintiffs' APA Claims ....................7

        B.    A Final Agency Action Is Not Required for An *Ultra Vires* APA Claim ..............................9

        C.    Media Plaintiffs Have Standing. .................................................................................24

        D.    Texas Has Standing. ...................................................................................................24

    III.  ALTERNATIVELY, THIS COURT SHOULD ORDER DISCOVERY PRIOR TO RULING ON DEFENDANTS' MOTION TO DISMISS FOR LACK OF JURISDICTION....................................... 29

    IV.  THERE IS NO BASIS UNDER RULE 12(B)(1) TO DISMISS PLAINTIFFS' OFFICIAL CAPACITY CLAIMS AGAINST DEFENDANTS. ........................................................................................ 30

CONCLUSION.....................................................................................................................30

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Gardner,*
   387 U.S. 136 (1967) ........................................................................................................8

*Adams v. Bain,*
   697 F.2d 1213 (4th Cir. 1982) ....................................................................................5

*Apter v. Dep't of Health & Hum. Servs.,*
   80 F.4th 579 (5th Cir. 2023) ...........................................................................2, 3, 9

*Bennett v. Spear,*
   520 U.S. 154 (1997) .................................................................................................7, 27

*Califano v. Sanders,*
   430 U.S. 99 (1977).........................................................................................................8

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ..............................................................................................19, 26

*Consumer Data Indus. Ass'n v. Texas through Paxton,*
   No. 21-51038, 2023 WL 4744918 (5th Cir. July 25, 2023) .............................29

*Davis v. Fed. Election Comm'n,*
   554 U.S. 724 (2008) ..............................................................................................26, 28

*Dobbs v. Jackson Women's Health Org.,*
   597 U.S. 215 (2022) ....................................................................................................25

*Franklin v. Massachusetts,*
   505 U.S. 788 (1992) ......................................................................................................8

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,*
   528 U.S. 167 (2000) ....................................................................................................29

*GLO v. Biden,*
   71 F.4th 264 (5th Cir. 2023) ..................................................................................1, 28

*Inclusive Cmtys. Proj., Inc. v. Dep't of Treasury,*
   946 F.3d 649 (5th Cir. 2019) .................................................................................27, 29

*Irvin v. S. Snow Mfg., Inc.,*
   517 F.App'x 229 (5th Cir. 2013) ...........................................................................2, 10

*Jackson v. Biden,*
   No. 2:22-CV-241-Z, 2024 WL 406645 (N.D. Tex. Feb. 2, 2024) ......................26

*Jackson v. Wright,*
   82 F.4th 362 (5th Cir. 2023) ..................................................................................1, 12

*Larson v. Valente,*
   456 U.S. 228 (1982) ....................................................................................................20

*Laufer v. Mann Hospitality, L.L.C.,*
   996 F.3d 269 (5th Cir. 2021) ......................................................................................4

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
   567 U.S. 209 (2012) ......................................................................................................9

*Menchaca v. Chrysler Credit Corp.,*
   613 F.2d 507 (5th Cir. 1980) ......................................................................................4

*Mortensen v. First Federal Savings & Loan Ass'n,*
   549 F.2d 884 (3d Cir. 1977).......................................................................................4

*NetChoice, L.L.C. v. Paxton,*
   573 F. Supp. 3d 1092 (W.D. Tex. 2021) ........................................................25

*NetChoice, L.L.C. v. Paxton,*
   49 F.4th 439 (5th Cir. 2022) ...........................................................................25

*NetChoice, LLC v. Paxton,*
   144 S. Ct. 477 (Mem) (Sept. 29, 2023) ..................................................25, 26

*Paterson v. Weinberger,*
   644 F.2d 521 (5th Cir. 1981) ...................................................................... 1, 6

*People for the Ethical Treatment of Animals, Inc. v. Tabak,*
   622 F. Supp. 3d 581 (D. Md. 2023) ................................................................8

*Physician Hosps. of Am. v. Sebelius,*
   691 F.3d 649 (5th Cir. 2012) ...........................................................................4

*Pickett v. Texas Tech Univ. Health Sci. Ctr.,*
   37 F.4th 1013 (5th Cir. 2022) .................................................................... 4, 5

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott,*
   734 F.3d 406 (5th Cir. 2013) .........................................................................25

*Pluet v. Frasier,*
   355 F.3d 381(5th Cir. 2004) ........................................................................26

*Rumsfeld v. FAIR,*
   547 U.S. 47 (2006) ........................................................................................24

*Sanchez v. R.G.L.,*
   761 F.3d 495 (5th Cir. 2014) .........................................................................29

*Surpitski v. Hughes-Keenan Corp.,*
   362 F.2d 254 (1st Cir. 1966) ...........................................................................3

*Texas v. EEOC,*
   933 F.3d 433 (5th Cir. 2019) ..................................................................... 7, 8

*Texas v. Mayorkas,*
   No. 22-CV-094-Z, 2024 WL 455337 (N.D. Tex. Feb. 6, 2024) ..............26, 28

*Texas v. Nuclear Regul. Comm'n,*
   78 F.4th 827 (5th Cir. 2023) ..........................................................................24

*Texas v. United States,*
   40 F.4th 205 (5th Cir. 2022) ..........................................................................29

*Texas v. United States,*
   50 F.4th 498 (5th Cir. 2022) ...........................................................................9

*Texas v. United States,*
   809 F.3d 134 (5th Cir. 2015) .........................................................................24

*Texas Voters All. v. Dallas Cnty.,*
   495 F. Supp. 3d 441 (E.D. Tex. 2020) ..........................................................26

*United States ex. rel. Vuyyuru v. Jadhav,*
   555 F.3d 337 (4th Cir. 2009) ...........................................................................6

*Williamson v. Tucker,*
   645 F.2d 404 (5th Cir. 1981) .................................................................... 5, 30

**Statutes**

22 U.S.C. § 2656 note (i) ...................................................................................9, 10

5 U.S.C. § 706 .......................................................................................................8

H.B. 20, 87th Leg. (Tex. 2021) .....................................................................25, 27

Tex. Bus. & Com. Code Ann. § 120.001 ..........................................................................................25

**Rules**
Fed. R. Civ. P. 12 ............................................................................................................ 1, 3, 5
Fed. R. Civ. P. 56 ....................................................................................................................5

**Other Authorities**
CISA, Cyber Summit 2020: Day Four (Defending our Democracy),
    *Combating Misinformation and Disinformation*, YouTube,
    *available at*
    https://www.youtube.com/watch?v=WDtstiYHRNc.............................................17
Mad Scientist: Weaponized Information Virtual Conference, July 21, 2020,
    *2.09 MadSci Weaponized Information: Technology Engagement Team & Disinfo Cloud - Ms. Frisbie & Nemr*
    – YouTube..................................................................................................................17
U.S.-Paris Tech Challenge 2021,
    Sept. 30, 2021, *available at https://www.atlanticcouncil.org/event/u-s-paris-tech-challenge/* ....... 12, 16, 22, 24
Videos and Slides, Medialogue on Propaganda,
    *available at* https://www.medialogues.de/videos.................................................14

## PLAINTIFFS' RESPONSE IN OPPOSITION TO MOTION TO DISMISS

### STATEMENT OF THE CASE

The advent of the contemporary internet platform has forever changed how the press publishes and the public receives news. From a media market with only a few networks and wireservices providing the public access to our nation's press, the emergence of real-time, on-demand media has resulted in the proliferation of countless online media platforms, with a majority (56%) of U.S. adults reporting in 2023 that they often get "news from a smartphone, computer or tablet."[1]

As a result of these significant developments in the way consumers engage with media, online sources have garnered federal interest. However, to the detriment of a free press, the United States Department of State, ("State Department"), statutorily limited to matters of "foreign affairs," 22 U.S.C. § 2656, has now targeted media, through Defendants' funding and promotion of censorship technologies and private censorship enterprises. These federally funded and promoted censorship programs negatively impact media outlets' ability to circulate and distribute their publications and limit their revenue streams.

Plaintiffs The Daily Wire, LLC ("The Daily Wire"), FDRLST Media, LLC ("The Federalist"), (jointly "Media Plaintiffs"), and the State of Texas (collectively, "Plaintiffs"), filed the Complaint in this underlying action to halt this egregious government censorship scheme, raising Administrative Procedure Act and common law *ultra vires* claims. Media Plaintiffs also alleged First Amendment freedom of the press and freedom of speech claims. ECF1, Complaint at ¶ 272-313. Defendants now seek dismissal of Plaintiffs' Complaint under the guise that Plaintiffs' lack standing. For the reasons detailed below, that Motion should be DENIED.

### INTRODUCTION

Defendants have framed their Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(1) as an

---

[1] Jacob Liedke & Luxuan Wang, *News Platform Fact Sheets,* Pew Res. Ctr. (Nov. 15, 2023), *available at* https://www.pewresearch.org/journalism/fact-sheet/news-platform-fact-sheet/.

attack on jurisdiction, premising that argument on Plaintiffs' purported lack of Article III standing. Defendants have only challenged Texas's standing on its face, ECF33 at 21, but they have challenged Media Plaintiffs' standing in both a facial and factual attack.  A factual attack, which consists of a Rule 12(b)(1) motion accompanied by supporting evidence, differs from a facial attack in that it challenges the jurisdictional facts alleged in the complaint. *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). When ruling on a factual attack, a plaintiff must prove "through some evidentiary method . . . by a preponderance of the evidence that the court does have subject matter jurisdiction." *Id.* If, however, defendants challenge facts that go to the merits rather than jurisdiction, they raise a "factual merits defense"—not a factual attack on jurisdiction.  And a "factual merits defense" is "not a response cognizable on a motion to dismiss where allegations in [Plaintiff's] complaint must be taken as true." *GLO v. Biden*, 71 F.4th 264, 273 (5th Cir. 2023). Such is the case here. Accordingly, this Court should deny Defendants' Rule 12(b)(1) Motion to Dismiss.

Alternatively, this Court should **DENY** the Motion because Plaintiffs have demonstrated that this Court has subject matter jurisdiction by rebutting Defendants' factual attack through a preponderance of the evidence. Plaintiffs' extensive evidence establishes that Defendants' *ultra vires*, arbitrary, illegal, and unconstitutional censorship scheme inflicts both a past and an ongoing, prospective, and imminent injury on Plaintiffs. *See Jackson v. Wright*, 82 F.4th 362, 369 (5th Cir. 2023). The injury to Media Plaintiffs' circulation and revenue streams is both traceable to Defendants' *ultra vires* and illegal activities and is redressable by an order enjoining Defendants from continuing to fund the research, testing, development, and promotion of tools and technologies that target the domestic press and speech. Likewise, Defendants' *ultra vires* and illegal activities interfere in Texas's enforcement of H.B.20's transparency provisions, and more broadly, H.B.20's mandates against discrimination by common carriers, by concealing the government's involvement in viewpoint-based decisions made via

the adoption of the technology promoted by Defendants. Thus, Defendants' actions harm Texas's sovereign interest, with the injuries both traceable to Defendants' conduct and redressable by a Court order limiting Defendants to addressing foreign propaganda and speech.

Finally, Defendants have only moved to dismiss the APA claims based on the supposed lack of final agency action. ECF33 at 31-32. Plaintiffs maintain that Defendants' scheme is a final agency action. But even if not, Plaintiffs do not need a final agency action to maintain an *ultra vires* APA claim. *Apter v. Dep't of Health & Hum. Servs.*, 80 F.4th 579, 589 (5th Cir. 2023). Defendants do not independently challenge this Court's jurisdiction over Plaintiffs' common law *ultra vires* claims—that Defendants acted beyond statutory authority (Count III) and constitutional bounds (Count IV). ECF1 at 59-65 (Complaint ¶¶283-300, 307-313). Thus, they have waived any argument that those claims should be dismissed. *Irvin v. S. Snow Mfg.*, 517 F.App'x 229, 231 (5th Cir. 2013) (party waives argument by failing to raise it clearly and develop it adequately in opening brief). Even if these claims were properly raised, they would fail because Defendants have exceeded the bounds of their authority. Therefore, Defendants' Motion to Dismiss should be **DENIED**.[2]

## STATEMENT OF ISSUES

1. Should Plaintiffs' complaint be dismissed *in toto* for lack of subject-matter jurisdiction?

   No. Defendants' factual attack on jurisdiction is actually an attack on the merits and should be treated instead only as a facial attack. Plaintiffs have established Defendants' *ultra vires* and unconstitutional conduct has injured and continues to injure Plaintiffs. Alternatively, Plaintiffs have established by a preponderance of the evidence that they have standing, even in light of Defendants' factual attack.

2. Should Plaintiffs' APA claim be dismissed for lack of jurisdiction?

   No. Defendants' funding, adoption and deployment of specific programs that injure Plaintiffs constitutes a final agency action. Alternatively, Plaintiffs may maintain an *ultra vires* APA claim

---

[2] Should this Court instead conclude Plaintiffs have not met their burden of establishing standing, it should defer ruling on Defendants' Motion to Dismiss until Plaintiffs have had an opportunity for both discovery and an evidentiary hearing to allow Plaintiffs "a chance to discover the facts necessary to establish jurisdiction." *Williamson*, 645 F.2d at 414 (citing *Surpitski v. Hughes-Keenan Corp.*, 362 F.2d 254 (1st Cir. 1966)).

even if Defendants' actual implementation of the scheme was not a final agency action. *Apter v. Dep't of Health & Hum. Servs.*, 80 F.4th 579 (5th Cir. 2023).

3. Should the claims against the official capacity Defendants be dismissed?

No. Defendants present no basis for arguing this Court lacks jurisdiction over the official capacity claims against Defendants, further demonstrating Defendants' Motion is, in fact, an attack on the merits of the Complaint. Dismissal of the official capacity claims against the leaders of the Global Engagement Center and the Technology Engagement Team would be inappropriate in any event as those organizations are interagency organizations so an injunction against those groups is necessary to ensure injunctive relief is effective.

## STANDARD

Federal Rule of Civil Procedure 12(b)(1) governs motions to dismiss for lack of subject-matter jurisdiction. FED. R. CIV. P. 12(b)(1). "*A 'facial attack'* on the complaint requires the court merely to look and see if plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion." *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980) (citing *Mortensen v. First Federal Savings & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)) (emphasis added). "The burden of proof for a [Federal] Rule [of Civil Procedure] 12(b)(1) motion to dismiss is on the party asserting jurisdiction," and, at the pleading stage, the plaintiff's "'burden is to allege a plausible set of facts establishing jurisdiction.'" *Laufer v. Mann Hospitality, L.L.C.*, 996 F.3d 269, 271 (5th Cir. 2021) (quoting *Physician Hosps. of Am. v. Sebelius*, 691 F.3d 649, 652 (5th Cir. 2012)).

"*A 'factual attack*' . . . challenges the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered." *Menchaca* 613 F.2d at 511 (citing *Mortensen v. First Federal Savings & Loan Ass'n*, 549 F.2d 884, 891–92 (3d Cir.1977) (emphasis added). "[T]here are limits to a district court's ability to resolve fact disputes on a Rule 12(b)(1) motion." *Pickett v. Texas Tech Univ. Health Sci. Ctr.*, 37 F.4th 1013, 1019 (5th Cir. 2022). "[T]he question whether the trial court [can] resolve[] factual disputes . . . depends on

4

whether the subject-matter jurisdiction and merits questions are coterminous." *Id.* If it is not possible to extricate the jurisdictional question from the merits case, the district court should decline to resolve the disputed factual issues. *Id.*

## ARGUMENT

I. **DEFENDANTS' RULE 12(B)(1) MOTION TO DISMISS FOR LACK OF JURISDICTION SHOULD BE DENIED BECAUSE (1) PLAINTIFFS HAVE DEMONSTRATED JURISDICTION IF THEIR ALLEGATIONS ARE TAKEN AS TRUE; AND (2) THE FACTUAL ATTACK IS INEXTRICABLY INTERTWINED WITH THE MERITS OF PLAINTIFFS' CLAIMS.**

Defendants' Rule 12(b)(1) Motion to Dismiss, while framed as both a facial and factual challenge to jurisdiction, is neither. Instead, Defendants' Motion attacks the merits of Plaintiffs' APA claims and Media Plaintiffs' First Amendment claims, as demonstrated by its detailed, *albeit* faulty, discussion of the factual bases underlying both claims. If it is not possible to extricate the jurisdictional question from the merits case, the district court should decline to resolve the disputed factual issues. *Pickett*, 37 F.4th at 1019.

Where, as here, "the jurisdictional facts are intertwined with the facts central to the merits of the dispute … the entire factual dispute is appropriately resolved only by a proceeding on the merits." *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). As the Fifth Circuit stated in *Williamson v. Tucker*, 645 F.2d 404 (5th Cir. 1981), a contrary holding would deprive the Plaintiffs of the protections provided by both Rule 12(b)(6) and Rule 56.[3] *Id.* at 412–13.

The standard for a facial challenge to jurisdiction under Rule 12(b)(1) mirrors that governing a Rule 12(b)(6) motion to dismiss for failure to state a claim, as "the court must consider the allegations in the plaintiff's complaint as true." *Id.* at 412. But, when a Defendant presents a factual attack to jurisdiction, as Defendants do in this case, "no presumptive truthfulness attaches to plaintiff's

---

[3] Resolving factual, merits-based disputes at the Rule 12(b)(1) stage would likewise deny Plaintiffs their constitutional right to a jury trial, where such a right exists.

allegations." *Id.* at 413. Further, the Court may consider evidence outside the complaint proffered by Defendants. *Id.* Plaintiffs must then present their own admissible evidence to prove standing by a preponderance of the evidence, with the judge—and not the jury—sitting as the factfinder. *Paterson*, 644 F.2d at 523 (holding Plaintiff must prove "through some evidentiary method … by a preponderance of the evidence that the trial court does have subject matter jurisdiction").

Here, the so-called jurisdictional facts Defendants cite in support of their Rule 12(b)(1) Motion to Dismiss are merits-based—not jurisdictional. *See, e.g., United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 350, 354 (4th Cir. 2009) (explaining jurisdictional facts are wholly distinct from the substantive elements of a plaintiff's claims). For instance, Defendants maintain (incorrectly) that, as a factual matter: (1) Media Plaintiffs' injury was solely in the past; (2) Defendants' conduct does not interfere in Texas's enforcement of H.B.20; (3) State Department grants and initiatives solely reach foreign propaganda and disinformation; (4) Defendants are not responsible for third parties' actions; and (5) the State Department did not issue a final action. These disputed facts all concern the underlying merits of Plaintiffs' ADA, common law *ultra vires*, and constitutional claims. None implicates jurisdiction. Or, to the extent Defendants' factual arguments implicate jurisdiction by attacking standing, those arguments are inextricably entwined with the merits of Plaintiffs' claims.

Accordingly, this Court should deny Defendants' factual attack on jurisdiction as their challenge is to the merits and not jurisdiction under Rule 12(b)(1). And as a facial attack, taking all allegations pleaded as true, Plaintiffs have met their burden. Even Defendants seem to agree, as their Motion relies almost entirely on pleading their factual attack.

## II.   THIS COURT HAS JURISDICTION OVER ALL OF PLAINTIFFS' CLAIMS.

Alternatively, should this Court believe Defendants have attacked jurisdictional facts that do not implicate the merits, the Court should nonetheless deny Defendants' Rule 12(b)(1) Motion to

Dismiss because this Court has jurisdiction over all of Plaintiffs' claims.

### A.  This Court Has Subject Matter Jurisdiction Over Plaintiffs' APA Claims.

Defendants initially assert this Court lacks subject matter jurisdiction over Plaintiffs' APA claims, arguing that the alleged censorship scheme was not a "final agency action." Typically, an agency action is "final" for the purposes of judicial review if two conditions are met: "First, the action must mark the 'consummation' of the agency's decisionmaking process … it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up) (citations omitted). Notably, "[t]he Supreme Court has long taken a pragmatic approach to finality, viewing the APA's finality requirement as 'flexible." *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019) (internal quotations omitted).

Here, Defendants' secretive scheme to suppress, defame, defund, discredit, and reduce the circulation of a segment of the press by, among other things, funding, marketing, and/or promoting censorship tools, technology and censorship enterprises operating in the United States—specifically the censorship-by-risk-rating technology and entities—constitutes final agency action under the APA. The censorship scheme consists of specific, concrete, and well-defined programs Defendants adopted, funded, staffed, and deployed, as clearly identified on their government webpage.[4] The adoption and deployment of those programs "mark[ed] the consummation of the agency's decisionmaking process." *Bennett*, 520 U.S. at 178 (internal quotations omitted). Further, Defendants issued numerous grants to implement and deploy the various challenged initiatives. *See* ECF33-1, Declaration of Daniel Kimmage at 5-10, ¶¶11-20. An agency's "decision to approve [a] grant is the 'consummation of the agency's

---

[4] ECF11-25 (official webpage identifying programs adopted by GEC's Technology Engagement Division); ECF11-5 (official State Department webpage announcing end of Disinfo Cloud program and informing public to watch webpage for new programs).

decisionmaking process' that is of sufficient 'legal consequence[ ]' to make the action 'final' under the APA." *People for the Ethical Treatment of Animals, Inc. v. Tabak*, 662 F. Supp. 3d 581, 591 (D. Md. 2023).

GEC's deliberative adoption, funding, and deployment of the challenged initiatives satisfies the APA's "'flexible'" and "'pragmatic'" finality requirement. *Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 440–41 (5th Cir. 2019) (internal citations omitted) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149-50 (1967)). Further, legal consequences flow to Plaintiffs from Defendants' decision to adopt programs that reach the domestic press and domestic speech: Defendants' deployment of the challenged initiatives negatively abridges Media Plaintiffs' press and speech rights and harms Texas's sovereign interest. Plaintiffs need only show they are "direct[ly] and immediate[ly]" impacted by Defendants' decision in the form of "direct effect on [their] day-to-day business." *Abbott Labs v. Gardner*, 387 U.S. 136, 152 (1967) *abrogated by Califano v. Sanders*, 430 U.S. 99 (1977). Plaintiffs easily meet that standard.

There is no dispute that the challenged agency action did not go through notice and comment rulemaking, nor have Defendants asserted an exception to the notice and comment requirement. *See* 5 U.S.C. § 553. Even if they had, this effort would fail because Defendants created a binding norm with substantial impact. "While mindful but suspicious of the agency's own characterization, [courts] . . . focus[] primarily on whether the rule has binding effect on agency discretion or severely restricts it." *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 382 (D.C. Cir. 2002) (quoting *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1320 (D.C. Cir. 1988). Thus, the agency action is binding once the program has been adopted—the agency has committed itself to a particular position. *See also Texas v. EEOC*, 933 F.3d at 441. The final agency action here is also substantive because it does not give the agency any discretion to change the initiatives and grants funded and deployed. *See, e.g., Texas v. U.S.*, 809 F.3d 134, 171 (5th Cir. 2015) (cleaned up).

"[A]n agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding." *Gen. Elec.,* 290 F.3d at 383 (citation omitted). *See also Texas v. EEOC,* 827 F.3d 372, 385–86 (5th Cir. 2016), *opinion withdrawn on reh'g,* 838 F.3d 511 (5th Cir. 2016) ("[T]he Guidance does not simply repeat the relevant provisions" of a statute. "Instead, the Guidance purports to interpret authoritatively. This court has always considered such a distinction important when deciding whether agency action is 'final' under the APA."). The final agency action here is substantive because it does not give the agency any discretion to change the initiatives and grants funded and put into action. *See e.g. Texas v. U.S.,* 809 F.3d. 134, 171 (5th Cir. 2015) (cleaned up).

As a final agency action, Defendants' program is arbitrary and capricious because it failed to consider the relevant costs, did not give a sufficient reasoned analysis for awarding grants that target the domestic press and domestic speech, did not consider any more limited options, and failed to take into account the reliance interests. *See* 5 U.S.C. 702(2)(A). Therefore, this Court has jurisdiction over Plaintiffs' APA claims.[5]

## B.  A Final Agency Action Is Not Required for An *Ultra Vires* APA Claim.

Further, even if Defendants' adoption of the challenged initiatives was not a final agency action—it was—as the Fifth Circuit recently held in *Apter,* 80 F.4th at 589, "when a plaintiff uses the APA to assert a 'non-statutory cause of action'—such as an *ultra vires* claim," the agency action need not be final. Plaintiffs need only identify "some agency action affecting him in a specific way" and that "he has been adversely affected or aggrieved by that action." *Id.* (cleaned up). "To satisfy this second

---

[5] In their Motion to Dismiss, Defendants do not otherwise challenge Plaintiffs' APA claims that allege Defendants' actions were "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "(B) contrary to constitutional right, power, privilege, or immunity" of Plaintiffs, 5 U.S.C. § 706(2)(B), "(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C) , and that Defendants failed to observe the "procedure required by law" 5 U.S.C. § 706(2)(D) . ECF1 at 63 (Complaint at ¶¶301-06).

requirement, the plaintiff must establish that the injury he complains of falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint. *Id.* at 589-90 (cleaned up). "The test is satisfied if the claims are '*arguably* within the zone of interests to be protected or regulated by the statute.' … The Supreme Court has 'always conspicuously included the word "*arguably*" in the test to indicate that the benefit of *any doubt goes to the plaintiff*." *Texas v. United States*, 50 F.4th 498, 521 (5th Cir. 2022) (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224-25 (2012)) (emphasis added).

Defendants' various initiatives, including tech challenges, private-sector engagement, Disinfo Cloud, the testbed, granting programs, and engagement in various promotional efforts, "adversely affect" Plaintiffs "in a specific way," by rating domestic media by its content. *See Apter*, 80 F.4th at 589 (citation omitted). Thus, at a minimum Defendants engaged in an "agency action." Further, Plaintiffs claim that the agency exceeded its authority to regulate foreign affairs and Congress's express limitation on that authority, to wit, [n]one of the funds authorized to be appropriated or otherwise made available to carry out this section shall be used for purposes other than countering foreign propaganda and misinformation that threatens United States national security." 22 U.S.C. § 2656 note (i).

Media Plaintiffs are domestic press organizations and Texas's sovereign interest in enforcing H.R.20's protection of its citizens' rights to free speech both falls easily within the "zone" Congress sought to protect by limiting GEC to only countering foreign speech. At the very least, then, Plaintiffs meet the low threshold of being ***arguably*** within the "zone of interest" Congress sought to protect in limiting GEC to countering foreign propaganda and misinformation. Thus, even if Defendants' censorship programs are not "final agency action," this Court has subject matter jurisdiction over

10

Plaintiffs' *ultra vires* APA claims.[6]

### C. Media Plaintiffs Have Standing.

*Media Plaintiffs Established an Injury-in-Fact.*

Defendants nonetheless argue Media Plaintiffs have failed to establish an "injury-in-fact" for standing purposes because "Media Plaintiffs' claimed injuries occurred in the past," and "Plaintiffs do not plausibly allege any current activity that causes them ongoing or imminent harm." ECF33 at 24.

Not so. As more fully detailed in Plaintiffs' Preliminary Injunction briefing, Plaintiffs alleged and presented substantial evidence showing Defendants use Congressionally appropriated funds to research, test, develop, and promote tools and technologies to the private sector (hereinafter, "censorship scheme"), including to domestic tech and social media companies, injuring Media Plaintiffs' circulation and revenue opportunities. Such use of GEC funding violates Congress's command that "[n]one of the funds authorized to be appropriated or otherwise made available to carry out this section shall be used for purposes other than countering foreign propaganda and misinformation that threatens United States national security." 22 U.S.C. § 2656 note (i). Further, and contrary to Defendants' argument that their conduct ended long ago, the evidence establishes the harm remains ongoing.

Two examples prove the point—Defendants' grants to Park Advisors and Media Literacy Now.[7]

---

[6] Again, as noted above, Defendants do not challenge this Court's jurisdiction over Plaintiffs' common law *ultra vires* claims, waiving any argument those claims should be dismissed for lack of jurisdiction. *Irvin,* 517 F.App'x at 231.

[7] Defendants wrongly reduce Plaintiffs' lawsuit to a challenge to the State Department's funding of grants to NewsGuard and GDI, both of which received GEC awards and both of which sell supposed media-credibility ratings. However, Plaintiffs' lawsuit is **not** premised on Defendants providing grants to NewsGuard and GDI, but on the entirety of the State Department's censorship scheme, which entails Defendants funding grants and other initiatives and using GEC-funded human and technological resources to identify, research, test, develop, and promote technology that negatively impacts the circulation and profitability of the domestic press. But because most of Defendants' *ultra vires* and unconstitutional activities are hidden from public view, by necessity—and to establish standing—Plaintiffs focus on the currently provable aspects of the censorship scheme that confirm Defendants' illegal conduct injures Plaintiffs, namely Defendants' use of State Department funds and human resources to promote NewsGuard and GDI, as well as the more

*Park Advisors Uses GEC Funds to Target Domestic Press and Speech.*

The $6.5 million GEC paid Park Advisors funded the Disinfo Cloud platform, management of a Twitter (now X.com) account, the publication of the Disinfo Cloud Digest, its management of GEC's testbed, and its running of tech challenges. ECF32 at 12-16 (Defendants' Response). With those GEC funds, Park Advisors researched, tested, analyzed, and promoted what Defendants call Countering Propaganda and Disinformation or "CPD" tools and technologies, ECF11-18, which targeted the domestic press and speech. *See, e.g.,* ECF11-6 at 4-5 (GEC explains Disinfo Cloud helps technology providers "identify appropriate counter propaganda and disinformation tools and technologies to suit different groups' needs"); ECF11-17 at 2 (Twitter post promoting GDI); 11-19 at 3 (Disinfo Cloud Digest promoting NewsGuard's new tool "to help advertising companies avoid websites known to host or produce mis/disinformation"). *See also,* Exhs. A–K (Disinfo Cloud Twitter posts promoting GDI, NewsGuard, and other tools and technology targeting domestic speech and the domestic press).[8] Further, GEC directly promoted those "tools and technologies" to domestic tech companies, academia, and journalists, as exemplified in a still-available post on X stating "[t]here are [a] number of databases to help journalists, technologists, academics, and others as they monitor and analyze #misinformation related to #COVID19." *See,* Exh. I (Twitter post by @DisinfoCloud highlighting databases for journalists, tech companies, and others). The post then listed several databases including NewsGuard's rating technology, tagging the company's Twitter handle @NewsGuardRating. *Id.* (Twitter post by @DisinfoCloud Tweet tagging @NewsGuardRating, which is NewsGuard's Nutrition Ratings social media account).

---

recently discovered funding of the promotion of Logically.AI, Media Literacy Now, and Ad Fontes. *See infra* at 11-16.
[8] Exh. A, @DisinfoCloud Tweet, Dec. 20, 2021; Exh. B, @DisinfoCloud Tweet, Dec. 20, 2021; Exh. C, @DisinfoCloud Tweet, Nov. 2, 2020; Exh. D, @publiceditor_io Tweet, Sept. 2, 2021; Exh. E, @Brrrigham Tweet, Nov. 5, 2021; Exh. F, @DisinfoCloud Tweet, Nov. 3, 2021; Exh. G, @publiceditor_io Tweet, Dec. 20, 2021; Exh. H, @publiceditor_io Tweet, July 15, 2021; Exh. I, @DisinfoCloud Tweet, Apr. 15, 2020; Exh. J, @NewsGuardRating Twitter; Exh. K, @DisinfoCloud Tweet, Mar. 25, 2020.

A still-available video of the U.S.-Paris Tech Challenge run by Disinfo Cloud further establishes GEC-funded initiatives are not limited to foreign propaganda and disinformation.[9] That tech challenge featured the Global Disinformation Index ("GDI,") which ranks media companies for supposed disinformation, including the American press.[10] A video of GDI's presentation includes a summary of the organization's technology, marketed as "allow[ing] advertisers to steer their spend away from disinformation and toward quality journalism," with a link to GDI's webpage.[11] The online video also includes a GEC-paid Director encouraging listeners to engage with GDI, claiming its counter-disinformation work "benefits us all in building a better information environment."[12] GDI ranks both The Daily Wire and The Federalist as among the top-ten riskiest online American outlets, with the admitted purpose of causing advertisers to avoid them. ECF11-12 at 3 (GDI report with table identifying The Daily Wire and The Federalist as among top ten riskiest American outlets).

While GEC's grant to Park Advisors has allegedly ended and the Disinfo Cloud platform has been shuttered, the above GEC-funded promotion of censorship technology that targets Media Plaintiffs remains public to this day, and thus the injury is ongoing. That ongoing injury suffices to establish injury-in-fact. *See Jackson*, 82 F.4th at 369 (holding Plaintiff established injury-in-fact for standing purposes by alleging "a continuing (*i.e.*, ongoing) or 'imminent' future injury").

**State Department Funds Media Literacy Now, Inc. to Target Domestic Press and Speech.**

The State Department's $30,000 grant to Media Literacy Now, Inc., a Massachusetts-based corporation "devoted to advancing media literacy in the United States,"[13] also funded the promotion

---

[9] U.S.-Paris Tech Challenge 2021, Sept. 30, 2021, *available at https://www.atlanticcouncil.org/event/u-s-paris-tech-challenge/*, at 1:09:30 (last visited April 9, 2024) (video of U.S.-Paris State-Department funded event featuring GDI).
[10] *Id.* (video featuring GDI).
[11] Exh. L, U.S.-Paris Tech Challenge 2021, Sept. 30, 2021 (screengrab of video showing slide GDI used to promote its technology).
[12] U.S.-Paris Tech Challenge 2021, *supra* at 12 n.11 at 1:26:10 (video capturing director of Technology Engagement Team promoting featured technology companies, including GDI) .
[13] Exh. M, *Final Report*, Medialogue on Propaganda at 27 (report detailing use of grant to Media Literacy Now which describes that entity as a non-profit seeking to advance "media literacy in the United States").

13

of tools and technologies that target the American press and Americans' speech. While the grant document framed the award as funding a German seminar,[14] the final report from Media Literacy Now established the seminar provided virtual training to American teachers on so-called media literacy.[15] Not only were State Department funds used to "educate" American teachers, but recordings of the so-called media literacy sessions also establish that the seminars pushed tools and technology that target the domestic press, including The Daily Wire and The Federalist.

For instance, Vanessa Otero, who serves on the National Advisory Council for the grant recipient, Media Literacy Now and who is the Founder and CEO of Ad Fontes Media, presented an entire session on Ad Fontes's "Media Bias Chart" at the State Department-funded training session.[16] The Media Literacy Bias tool focuses almost exclusively on the American press and brands The Federalist as "Hyper-Partisan Right" and "Unreliable, Problematic"[17] and The Daily Wire as "Strong Right" and with a variation in reliability.[18] Another session focused on what organizers called a "Data Detox Kit," which among other things instructs teachers to install NewsGuard.[19] Once installed, NewsGuard's numeric reliability ratings are automatically super-imposed on search results and social media posts, telling students whether to believe the source or not—essentially compelling government-assisted incriminating speech on the Plaintiffs' own articles. ECF11-38 (screengrabs illustrating NewsGuard superimposes its rating on search results). Videos of these State Department-

---

[14] Exh. N, *Media Literacy Now Grant Summary*, USASpending at 2 (describing purpose of grant).
[15] Exh. M, *Final Report*, Medialogue on Propaganda, *in passim* (summarizing grant program and participation of American teachers).
[16] Exh. O, *Staff*, Media Literacy Now  (identifying Otero as a member of Media Literacy Now's National Advisory Council); Exh. T, Vanessa Otero, The Media Bias Chart, Medialogues  (screengrab of Otero's video presentation on Ad Fontes's Media Bias Chart).
[17] Exh. P, *The Federalist Bias and Reliability*, Ad Fontes Media at 2-3 (Ad Fontes's ranking of The Federalist as "Hyper-Partisan Right" and "Unreliable" and "Problematic"); Exh. Q, *Search result: "The Federalist"*, Ad Fontes Media Interactive Media Bias Chart (Ad Fontes's chart showing The Federalist's visual rating).
[18] Exh. R, *Daily Wire Bias and Reliability*, Ad Fontes Media; (Ad Fontes's ranking of The Daily Wire as "Strong Right" and with a variation in reliability); Exh. S, *Search result: "Daily Wire,"* Ad Fontes Media Interactive Media Bias Chart (Ad Fontes's chart showing The Daily Wire's visual rating).
[19] Exh. U, *6 Tips to Steer Clear of Misinformation Online*, Data Detox Kit at 6 (recommending NewsGuard as a "plug-in" to fact check articles).

funded seminars remain available online to this day, including the sessions promoting Ad Fontes and the Data Detox Kit.[20] Here, too, then, the harm is ongoing.

### GEC Webpage Promotes Resources That Target Domestic Press and Speech.

Aside from funding outside projects that reach domestic speech, GEC's Technology Engagement Team currently also highlights on its taxpayer-funded webpage an array of what it calls "significant counter-disinfo resources." ECF11-34 (State Department webpage listing "significant counter-disinfo resources" available online). Clicking the GEC-provided links confirms the featured resources target the American press and speech, including some which promote NewsGuard and GDI—both of which directly target Media Plaintiffs. ECF11-26 at 6 (article from State Department's recommended resource, Harvard Kennedy School Misinformation Review, which used NewsGuard ratings to assess reliability of media outlets); ECF11-28 at 2 (promotion of GDI, which is identified as rating news "based on the 'probability of disinformation on a specific media outlet'").[21]

### Past Conduct Shows There Is a Strong Likelihood Harm Is Ongoing and Imminent.

In addition to the above examples where Defendants exceeded their Congressional mandate to manage foreign affairs and where the harm is continuing, the breadth and reach of Defendants' other past *ultra vires* conduct establish a strong likelihood the illegal conduct remains ongoing, threatening Plaintiffs with imminent harm. Specifically, the following evidence shows GEC funded a censorship scheme and engaged in *ultra vires* activities that targeted domestic speech and the domestic press:

- The GEC-funded Disinfo Cloud promoted Logically.AI in its "spotlight series" on or about

---

[20] Videos and Slides, Medialogue on Propaganda, *available at* https://www.medialogues.de/videos (videos of State-Department funded training sessions for American teachers).

[21] Even the GEC-promoted technologies that purportedly focus on foreign disinformation, such as the Alliance for Secur[ing] Democracy, also target Americans' speech and the American press. *See* Exh. V, Matt Taibbi, *New Knowledge, The Global Engagement Center, and State-Sponsored Blacklists*, The Twitter Files Substack at 15-16 (reporting based on internal Twitter communications that ASD's "Hamilton Dashboard" falsely branded Americans' speech as Russian disinformation).

April 1, 2021. ECF11-19 at 2 (Disinfo Cloud Digest noting its blog showcased Logically.AI's capabilities, which at-scale allow for "analysis, classification, and detection to help their partners monitor the online media landscape for the spread of damaging activities and narratives"). Three months later, Facebook contracted with Logically's "fact-checking team" to "review and rate the accuracy of content on Facebook including text, images, videos and articles."[22] Logically.AI explained when it "rates a piece of content as false, Facebook will significantly reduce its distribution so that fewer people see it, apply a warning label to let people know that the content has been rated false, and notify people who try to share it."[23] Logically, which currently provides fact checking for Meta and TikTok,[24] does not focus solely on foreign speech and includes multiple negative assessments of The Daily Wire's and The Federalist's reporting.[25] Logically.AI also claims that in 2020 and 2022 it "worked with both state and federal agencies to safeguard US elections, as well as several NGOs and academics, and presently claims "[t]his election year, Logically.AI continues efforts to ensure election integrity in the US and around the world."[26]

- The GEC-funded testbed developed a trial for "Public Editor," a company with a self-described function of reviewing the "most-shared news articles" and identifying and labeling "specific misinformation appearing in the online news articles which constitute the foundation of our public discourse."[27] Following its "successful test" on GEC's testbed, Public Editor boasted it was now "ready to move forward to label and corrent [*sic*] #misinformation at scale," with next steps including working with "news aggregators" and Facebook & Twitter users to counter so-called misinformation.[28] Public Editor is not limited to foreign propaganda and disinformation.[29]

- Defendants' declaration confirms GEC's $25,000 grant to NewsGuard to test NewsGuard's "Misinformation Fingerprints" reached domestic speech: NewsGuard was told to "take care to minimize data collection on U.S. Persons." ECF32-2 at 10, ¶26. GEC shared the testbed results with all Disinfo Cloud users, including American tech and social media companies. ECF11-6 at 5 (official State Department webpage stating users of Disinfo Cloud and testbed

---

[22] Exh. X, Stephen Farrell, *Logically Enters UK Fact-Checking Partnership with Facebook*, Insider Media, July 16, 2021 (summarizing Logically's new partnership with Facebook).

[23] *Id.*

[24] Exh. Y, *Logically Facts Launched to Build Safer Spaces for Online Users*, Logically Media (explaining Logically Facts provides fact checking for Meta and TikTok).

[25] *See* Exh. Z, *False: The World Economic Forum plans to block the sun physically using 'space bubbles' to stop climate change*, Logically Facts (review of The Daily Wire article); Exh. AA, Ankita Kulkarni, *Misleading: Biden has "functionally and effectively" dismantled ICE by telling the agents to stand down*, Logically Facts, Dec. 20, 2021 (review of The Daily Wire article); Exh. BB, Ganashree N A, *Misleading: Biden "plans to force schools to allow males to use female bathrooms,"* Logically Facts, Jan. 14, 2021 at 1 (review of article by The Federalist calling it "a far-right news site that has repeatedly published misinformation and articles diminishing trans rights"); Exh. CC, Madhukar PB, *Misleading: Kamala Harris supports late-term abortion*, Logically Facts, Oct. 26, 2021 (review of article by The Federalist); Exh. EE, @sagared Tweet, Apr. 1, 2021(Tweet by Logically.AI representative noting platform was featured in Disinfo Cloud's spotlight series).

[26] Exh. FF, *Elections*, Logically at 2 (noting Logically.AI helps "[e]lection officials, agencies, and supporting organizations" by protecting "local and national elections against interference, both foreign and domestic").

[27] Exh. XX, *The Inevitable Evolution of Communication Technologies*, Public Editor at 5 (explaining "Public Editor has built a collective intelligence system that labels over 40 types of misinformation in the most-shared news articles on the internet within 30 minutes of their publication").

[28] Exh. E (Tweet by Public Editor representative announcing successful test with GEC testbed and detailing next steps, which include working with Facebook and Twitter users).

[29] Exh. GG, *Newsreader*, Public Editor (Public Editor review of domestic media outlets including Fox News, Blaze Media, and Breitbart News Network).

16

include those in "academia, private sector, and tech vendors").

- GEC collaborated with The Critical Mass LLC[30] whose technology, Node XL, reaches both domestic and foreign speech, as shown by the company's report on research conducted to assess whether China was spreading misinformation about biolabs and Ukraine. That report concluded posts of the "highest visibility & interest on Twitter originated" in China,[31] but also identified "ggreenwald" as the individual with the third "highest visibility and interest."[32] Glenn Greenwald is an American journalist who, during the relevant time of the research, had posted a C-Span video of then-Undersecretary of State Victoria Nuland, testifying to Sen. Rubio that Ukraine has "biological research facilities."[33]

- GEC funded the infrastructure of GDI.[34] GDI's "core output" is its "Dynamic Exclusion List (DEL) of global news publications rated high risk for disinformation." ECF11-8 (GDI webpage detailing its "core output," the "Dynamic Exclusion List").

- GEC's private-sector engagement was not limited to foreign disinformation but addressed domestic speech that "mirrored" foreign speech by "engag[ing] with partners in industry" and "regularly look[ing] to engage beyond the government to make sure that discussion is on a wider societal level."[35]

- GEC collaborated with the Election Integrity Partnership ("EIP") in 2020 to report supposed misinformation to EIP which in turn requested social media companies remove the posts. EIP provided GEC direct access to its database to create tickets to flag purported disinformation; GEC was the only federal agency with the ability to submit tickets directly to EIP.[36] GEC flagged posts and narratives on social and digital media that it viewed as being "amplified by, or likely to be amplified by, foreign malign influence actors"—not merely foreign posts.[37] In fact, EIP's leader Alex Stamos admitted that the speech targeted "is all domestic …. The vast, vast majority … is domestic."[38] GEC also flagged "a YouTube channel run by Americans falsely claiming" that a certain State Department special envoy was "Patient Zero" for Covid-

---

[30] Exh. JJ, @TCM_LLC Tweet, June 9, 2022 (Tweet by The Critical Mass noting it had worked with GEC).

[31] Exh. HH, @TCM_LLC Tweet, Mar. 23, 2022 (Tweet by The Critical Mass highlighting its research into origins of posts using the hashtags #biolabs and #Ukraine).

[32] Exh. DD, *#Biolabs #Ukraine: A Social Media Analysis*, The Critical Mass at 1 (summary of research by The Critical Mass); Exh. II, ariellemattes (graphic from The Critical Mass identifying ggreenwald as having third highest visibility and interest on Twitter with hashtags #biolabs and #Ukraine).

[33] Exh. KK, @ggreenwald Tweet, Aug. 15, 2023 (Tweet by American journalist Glenn Greenwald of video showing Sen. Marco Rubio questioning then-Undersecretary of State Victoria Nuland about Ukraine's biological research facilities).

[34] U.S.-Paris Tech Challenge 2021, *supra* at 12 n.11 at 1:25:50 (video of GDI's CEO Clare Melford declared GEC grant would help support organization's infrastructure) .

[35] Mad Scientist: Weaponized Information Virtual Conference, July 21, 2020, at 33:58, 34:10, *2.09 MadSci Weaponized Information: Technology Engagement Team & Disinfo Cloud - Ms. Frisbie & Nemr* – YouTube, *available at* https://www.youtube.com/watch?v=YoeHq5gX0dA (video of GEC presentation in which GEC representatives explain how they use outreach to address domestic speech that "mirrors" foreign disinformation); Exh. W, @ArmyMadSci Tweets, July 21, 2020 (Tweets highlighting GEC presentation and noting GEC seeks to bridge gap between foreign misinformation and domestic mirroring that content with "wide variety of reps to engage with partners in industry).

[36] Exh. ZZ, *Transcript of Interview of Alexander Stamos Before the H. Comm. on the Judiciary*, 118th Cong. at 98 (June 23, 2023) (testifying only GEC had direct access to EIP platform to create tickets of supposed disinformation).

[37] Exh. SS, Declaration of Leah Bray at 7, ¶18, Exhibit, *Missouri v. Biden*, 22-cv-01213, ECF 266-6, Apr. 27, 2023 (explaining categories of material GEC flagged for EIP).

[38] CISA, Cyber Summit 2020: Day Four (Defending our Democracy), *Combating Misinformation and Disinformation*, YouTube, at 3:24:17, *available at* https://www.youtube.com/watch?v=WDtstiYHRNc (interview of Stamos who summarized EIP's then-ongoing work in 2020, stressing it is nearly all domestic information the group saw related to the election).

19.[39]

- GEC sent Twitter a list of some 5,500 accounts for investigation, claiming they were "Chinese" accounts engaged in "state-backed coordinated manipulation." That list included "multiple Western government accounts and at least three CNN employees based abroad," as well as many ordinary Americans.[40]

Defendants admit they continue to provide grants and run the testbed, tech challenges, and GEC's "private sector engagement portfolio,"[41] ECF32-1 at 11 ¶21, the latter of which "facilitate[s] collaboration between U.S. government and the tech sector, academia, and the research community." ECF32 at 14-15. Those continuing initiatives, coupled with Defendants' years-long and far-reaching scheme of illegally using those initiatives to target domestic speech and the domestic press, establish a real and substantial threat of future harm to Media Plaintiffs.

### Media Plaintiffs Established Traceability.

Defendants next argue Media Plaintiffs cannot establish traceability, which requires "a causal connection between the injury and the conduct complained of." *Lujan v. Nat'l Wildlife Found.*, 504 U.S. 555, 560 (1992). Defendants maintain Media Plaintiffs cannot establish causation because their alleged injuries are the result of the independent actions of third parties not before the Court. ECF33 at 25. Contrary to Defendants' portrayal of the traceability standard, however, "the causation element of standing does not require the challenged action to be the sole or even immediate cause of the injury." *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018). Further, that the causal relationship between the challenged action and injury depends on the conduct of a third party does not preclude a finding of traceability. *California v. Texas*, 141 S. Ct. 2104, 2117 (2021). Rather, a Plaintiff satisfies the traceability requirement by "showing that third parties will likely react in predictable ways

---

[39] Exh. TT at 2, Brian Scully Deposition Exhibit, *Missouri v. Biden*, No. 22-cv-01213, ECF No. 209-15, Mar. 4, 2023.
[40] Exh. V at 7-8 (Matt Taibbi's reporting based review of internal Twitter communications including spreadsheet GEC sent Twitter of names of thousands of users it claimed represented Chinese accounts—***they were not***).
[41] That GEC's current private-sector engagement liaison does not work from Silicon Valley changes nothing: *Ultra vires* outreach from D.C. remains equally illegal.

to the [defendant's actions]." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019). And traceability is satisfied when "common sense" shows an "inference to be a reasonable prediction rather than 'mere speculation." *Id.*

In this case, Plaintiffs' injuries are the predictable result of Defendants' deliberate efforts to market and promote the CPD tools and technologies. Common sense tells us that promoting tools and technologies will result in third parties adopting those tools and technologies—precisely the reason Defendants promoted them. Contrary to Defendants' spin, there is no "speculative chain of possibilities" necessary to injure Plaintiffs. Rather, as in *Texas v. Biden*, 20 F.4th 928, 974 (5th Cir. 2021) *rev'd on other grounds*, 142 S. Ct. 2528 (2022), only one relevant third-party choice remains: an organization adopting the tool or technology promoted by Defendants to limit Media Plaintiffs' circulation and revenue opportunities. *Id.* at 973 (holding plaintiff established traceability because "the only relevant third-party choice that remains, then, is the alien's choice to apply for a license once in Texas"). Further, the causal chain in this case is even more straightforward than in *Massachusetts v. EPA*, 549 U.S. 497 (2007), wherein the Supreme Court found the Plaintiff had established traceability where the EPA's challenged action may cause people to drive less fuel-efficient cars, that may contribute to a prospective rise in sea levels, and in turn may cause the erosion of Massachusetts' shoreline. *Id.* at 523. In sum, Supreme Court and Fifth Circuit precedent confirm Plaintiffs have satisfied traceability.[42]

### *Media Plaintiffs Established Redressability.*

Defendants submit that Media Plaintiffs' injuries are not redressable because granting the relief sought, namely prohibiting Defendants from funding the censorship scheme, "would not redress the

---

[42] Defendants' reliance on *Clapper* is misplaced. In that case, respondents' argument rested on their highly speculative fear that required five independent steps and a "highly attenuated chain of possibilities." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). In contrast, like *Texas v. Biden*, wherein the Fifth Circuit found traceability, only one step remains, making "the causal chain" in this case "easy to see." *Texas v. Biden*, 20 F.4th at 972.

supposed source of Plaintiffs' injuries," which Defendants frame as GDI and NewsGuard's negative ratings of the Media Plaintiffs, which in turn reduces Media Plaintiffs' circulation and revenue opportunities. ECF33 at 25-30.

This argument misses the point: The injunctive relief sought does not seek to control the behavior of third parties, but rather to enjoin Defendants from engaging in *ultra vires* testing, funding, developing, and promotion of CPD tools and technologies that target the domestic press and speech. There is nothing "attenuated, vague, and speculative," ECF32 at 34, about the harm Plaintiffs seek to halt: The injury to Media Plaintiffs is the logical, foreseeable, and intended consequence of Defendants' *ultra vires* actions, namely inducing third parties to adopt the tools and technologies GEC promotes, such as NewsGuard, GDI, Ad Fontes, and Logically to negatively impact Media Plaintiffs' reach and revenue. An injunction prohibiting Defendants' conduct will redress the harm **caused** by Defendants; that other third parties may independently discover, research, evaluate, and adopt the tools and technologies does not alter that conclusion. *See Larson v. Valente*, 456 U.S. 228, 244 n.15 (1982) ("[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself.").

### *Defendants' Declarations Do Not Negate Media Plaintiffs' Standing.*

In attempting to challenge Media Plaintiffs' standing, Defendants present three declarations, but none of those declarations alters the above analysis. For instance, while in his declaration Daniel Kimmage, the Principal Deputy Coordinator of GEC, frames all of GEC's activities as related to countering foreign propaganda and disinformation,[43] not once does he deny that GEC's various

---

[43] *See, e.g.,* Kimmage Declaration at 2, ¶4 (stating GEC "identifies innovative solutions to foreign disinformation and propaganda"); *id.* at 4, ¶10 (noting "through its Technology Engagement Team (TET), has worked to identify, assess, test, and implement technologies to address the problems of foreign propaganda and disinformation in cooperation with foreign partners, private industry, and academia"); *id.* at 4, 7-8 ¶¶10, 14 (GEC uses its testbed "to identify a technological gap that exists for the U.S. government entity in countering foreign information manipulation" and to "test[] how existing technologies can be used to provide solutions to foreign information manipulation challenges); *id.* at 6, ¶11 (GEC invites companies in tech challenges "to submit applications to present innovative solutions to counter foreign information

initiatives likewise reached domestic press and speech. Nor does Kimmage's declaration dispute that the tools and technologies GEC identifies, funds, develops, and promotes also counter domestic press and speech. His declaration also does not contradict ***any*** of Plaintiffs' evidence detailed above.

NewsGuard's declaration is likewise unhelpful to Defendants. While NewsGuard stresses that none of the money it received from the State Department funded its "Nutrition Ratings" of The Federalist and The Daily Wire, ECF32-2 at 14, ¶37, that does not change the fact that GEC financed the promotion of NewsGuard on the Disinfo Cloud platform and that GEC-funded and still-available videos and posts promote not just NewsGuard but specifically NewsGuard's "Nutrition Ratings."[44]

Further, NewsGuard carefully crafted its declaration concerning the $25,000 grant it received from Disinfo Cloud to create the inaccurate impression that its testbed work with GEC did not reach the domestic press or domestic speech. However, Defendants acknowledge NewsGuard was told to "minimize" the collection of U.S. data, which confirms the test gathered at least some domestic information. When not drafting a statement for litigation, NewsGuard was also much more forthcoming, stating in its press release that to "help the State Department and DoD 'evaluate disinformation narrative themes in near real time' by identifying online sources spreading COVID-19 disinformation or misinformation narratives," "NewsGuard offered a 'human intelligence' solution with two key components." ECF11-24. What were those two key components? NewsGuard's press release identified them as: "Access to NewsGuard's constantly updated database of journalist-produced ratings and 'Nutrition Labels' for thousands of news and information websites in the U.S.

---

manipulation overseas" and uses private-sector engagement "to facilitate knowledge-sharing between the U.S. government and the tech sector, academia, and the research community on the topic of foreign information manipulation overseas"); *id.* at 9, ¶20 ("[b]y the end of 2021, Disinfo Cloud listed 366 tools and technologies relevant to countering foreign information manipulation"); *id.* at 7, ¶13 (GEC granted Park Advisors approximately $3 million "to test and engineer novel technological solutions. . . to the problems of foreign propaganda and disinformation, . . .").

[44] Defendants also suggest that The Daily Wire was not injured by NewsGuard's rating because advertisers typically use a 60-point cut-off before pulling ads from companies and during the "relevant" time period The Daily Wire's rating was 69.5. NewsGuard currently rates The Daily Wire at only 49.5, however, *see* ECF11-41, establishing Defendants' ongoing promotion of NewsGuard currently harms The Daily Wire.

and Europe," and "NewsGuard's growing database of Misinformation Fingerprints™, a catalogue of known hoaxes, falsehoods and misinformation narratives that are spreading online."[45] *Id.*

While NewsGuard's General Manager Matthew Skibinski further attests that "Misinformation Fingerprints is a human- and machine-readable catalog of the significant false claims circulating online, with a focus on state-sponsored false narratives from Russia, China, and Iran," ECF32-2 at 7, ¶16, the sample "Misinformation Fingerprint" NewsGuard highlights on its webpage in promoting that product highlights a story by American reporter Jim Hoft at Gateway Pundit about election fraud in 2020 in Michigan.[46]

NewsGuard's excerpt from its Statement of Work and "Deliverables" also does not establish that its testbed project targeted only foreign propaganda and disinformation. First, NewsGuard only excerpted portions of the Statement of Work and in doing so, used ellipses, leaving unknown the full breadth of the project. ECF32-2 at 10, ¶27. Further, when NewsGuard collaborated with the Air Force for a different test, it gave the government a license to both its credibility ratings and Misinformation Fingerprints, making it reasonable to infer NewsGuard's testbed trial followed a similar approach.[47]

The final declaration from GDI's American founder, Danny Rogers, also does not alter the reality that GEC funds were used to promote GDI and its technology, which demonetizes domestic speech, including of Media Plaintiffs. Rogers's denial that GEC funds supported GDI's infrastructure, ECF32-3 at 4, ¶7, should be given little weight because contemporaneous to learning GDI had "won" the U.S.-Paris tech challenge, GDI's CEO Clare Melford declared the funds would help fund the

---

[45] In contrast, NewsGuard's Declaration claims the technology it provided for the GEC-funded project did not rely on its "ratings of news websites, including of American media outlets, . . ." ECF32-2, Declaration of Skibinski at 10, ¶25.
[46] Exh. LL, *Misinformation Fingerprints*, NewsGuard at 2 (NewsGuard's webpage summary of its Misinformation Fingerprints product with a sample highlighting Gateway Pundit's reporting).
[47] Exh. MM, NewsGuard's Work Plan for Air Force Contract (showing NewsGuard provided Air Force full access to Misinformation Fingerprints); Exh. NN, NewsGuard and Air Force's Licensing Agreement at 1 (NewsGuard licenses to the Air Force its "website credibility ratings" and data related to specific misinformation narratives).

organization's infrastructure.[48] Melford's contemporaneous statement holds more force than Rogers's litigation-supplied declaration. By funding GDI's infrastructure, GEC funds made GDI's operations possible, including what it describes as its "core output": the "Dynamic Exclusion List (DEL) of global news publications rated high risk for disinformation."

Rogers's declaration does not deny GDI also targets Americans' speech. Further Rogers's efforts to decouple the funding of the British corporate entity, Disinformation Index, Ltd., which received the grant, and the American corporate entity, Disinformation Index, Inc., which he claims produces the Dynamic Exclusion List, are likewise unconvincing. The webpage GDI linked in the U.S.-Paris Challenge presentation directs users to the exact same webpage as identified in the American entity's IRS filings.[49] And that webpage highlights the Dynamic Exclusion List—the source of Media Plaintiffs' injuries—as GDI's core output.

Finally, Rogers's claim that "there is no correlation between risk as identified in the [2022 Disinformation Risk Assessment] report and any site's inclusion in or exclusion from the Dynamic Exclusion List," ECF32-3 at 5, ¶8, is implausible, as GDI's contract with the University of Texas, signed by CEO Melford on behalf of the American entity, Disinformation Index, Inc., shows students used GDI's methodology to compile the report that ranked The Federalist and The Daily Wire as among the top-ten riskiest American online outlets.[50]

In sum, then, Defendants' Declarations fail to overcome the evidence presented by Plaintiffs which establishes Defendants' censorship scheme continues, including its ongoing promotion of

---

[48] U.S.-Paris Tech Challenge 2021, *supra* at 12 n.11 at 1:25:50 (video of GDI's CEO Clare Melford declared GEC grant would help support organization's infrastructure) .

[49] *See* Exh. L, U.S.-Paris Tech Challenge 2021, Sept. 30, 2021 (screengrab of slide used by GDI during its presentation to GEC showing webpage); Exh. VV, Form 990: Return of Organization Exempt from Income Tax, Disinformation Index Inc. at 1 (IRS filing for Disinformation Index Inc. showing webpage directing to same GDI webpage as British entity).

[50] Exh. OO, *GDI Letter of Agreement with University of Texas at Austin* at 4 (contract between GDI and Texas describing GDI's methodology for assessing the disinformation risk of news domains and GDI's "mission to catalyze industry and government to defund disinformation").

NewsGuard, Ad Fontes, and GDI. All three entities rate the Media Plaintiffs as unreliable. As NewsGuard brags, negative ratings reduce web traffic to outlets ranked unreliable, and a majority of users surveyed report they would be less likely to share articles NewsGuard rates unreliable.[51] NewsGuard and GDI also steer advertising dollars away from publications rated unreliable. *See* U.S.-Paris Tech Challenge (capturing GDI boasting "over a dozen ad-tech companies" used GDI's technology, "redirecting millions of dollars away from disinformation peddlers toward quality journalism");[52] NewsGuard, Library Partnership Initiative (stating NewsGuard licenses a "White List of legitimate news sites to advertisers, which will cut off revenues to fake news sites").[53] This evidence satisfies Media Plaintiffs' burden to establish standing.

### D. Texas Has Standing.

Defendants also challenge Texas's standing to sue. Because "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement," *Texas v. Nuclear Regul. Comm'n*, 78 F.4th 827, 835 (5th Cir. 2023) (quoting *Rumsfeld v. FAIR*, 547 U.S. 47, 52, n.2 (2006)), Media Plaintiffs' standing is sufficient to avoid a Rule 12(b)(1) dismissal, and this Court need not consider whether Texas has an independent basis for standing. In any event, and as Texas further demonstrated in its Response in Opposition to Motion to Transfer Venue, Texas has standing to bring its APA and common law *ultra vires* claims.[54]

Texas has standing to bring this case based on its interest in enforcing its sovereign laws. The Fifth Circuit has held that "States have a sovereign interest in 'the power to create and enforce a legal

---

[51] *See* Exh. RR, *New Research from NYU Shows NewsGuard Helps Those Most Exposed to Misinformation*, NewsGuard, May 6, 2022, at 4-5 (NewsGuard press release summarizing studies showing NewsGuard's "unreliable" rating decreases readership of outlets and reduces circulation by causing individuals not to share articles).

[52] U.S.-Paris Tech Challenge 2021, *supra* at 12 n.11 at 1:10:25 (GDI's presentation to GEC).

[53] Exh. WW, NewsGuard Library Partnership Initiative at 12 (summary of NewsGuard and explaining its reliability ratings serve to "cut off revenues to fake news sites").

[54] Texas also has standing to assert a procedural injury because it has been deprived of the APA's notice-and-comment requirement, to protect its concrete interests. *Texas v. EEOC*, 933 F.3d at 447.

code.' Pursuant to that interest, states may have standing based on (1) federal assertions of authority

to regulate matters they believe they control; (2) federal preemption of state law; and (3) federal

interference with the enforcement of state law, at least where the state statute at issue regulates

behavior or provides for the administration of a state program . . . ." *Texas v. United States*, 809 F.3d

134, 153 (5th Cir. 2015) (cleaned up); *cf. Planned Parenthood v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013)

(citation omitted) ("When a statute is enjoined, the State necessarily suffers the irreparable harm of

denying the interest in the enforcement of its laws.").

      In this case, Defendants' censorship scheme interferes with Texas's enforcement of H.B.20, a

statute that codifies the State's "fundamental interest in protecting the free exchange of ideas and

information in this state." H.B.20, 87th Leg. (Tex. 2021) § 1(2). Defendants' censorship scheme

undermines Texas's interest in enforcing this law, which requires social media companies with market

power to act as common carriers. *See* Tex. Bus. & Com. Code Ann. §§ 120.001 *et seq.*; ECF1 at ¶ 6.

Texas has standing where the State Department's actions have both regulated (at least implicitly)

matters Texas believes it controls and, in the process, federally preempted the state law codified at

H.B.20. *See* ECF1 at ¶ 237.

      Texas's interest in enforcing H.B.20 is not lessened for standing purposes by the legal

challenge pending before the United States Supreme Court in *NetChoice, LLC v. Paxton*. 144 S. Ct. 477

(Mem.) (Sept. 29, 2023) (granting *certiorari* in part). First, a duly enacted state statute is entitled to a

"strong presumption of validity." *See, e.g., Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 301 (2022).

Thus, Defendants are incorrect to suggest that Texas's standing "rest[s] on pure speculation

concerning the Supreme Court's forthcoming ruling." ECF14 at 12. Rather, this Court must presume

the validity of H.B.20 until proven otherwise.

      Second, parts of H.B.20 remain law, regardless of the Supreme Court's decision. So, while

Defendants claim H.B.20 is currently enjoined, ECF14 at 8, the story is more complicated. After the Fifth Circuit overturned the district court's ruling enjoining H.B.20, *see NetChoice, L.L.C. v. Paxton*, 49 F.4th 439 (5th Cir. 2022) (vacating and remanding 573 F. Supp. 3d 1092 (W.D. Tex. 2021)), the parties agreed to a stay of the Fifth Circuit's mandate pending review by the Supreme Court.[55] The grant of *certiorari*, however, was more limited than the Fifth Circuit's mandate, and covered only the narrow questions raised in the Solicitor General's amicus brief. *See NetChoice, L.L.C. v. Paxton*, 144 S. Ct. 477 (Mem) (Sept. 29, 2023).[56] Therefore, any part of H.B.20 upheld by the Fifth Circuit but not part of the grant of *certiorari* stands, regardless of the Supreme Court's decision. Texas thus maintains, at a minimum, an interest in enforcing the sections of H.B.20 the Fifth Circuit upheld that are not implicated in the Supreme Court's appellate review.

Although Defendants argue that Texas's injuries are merely speculative, the relevant inquiry remains "whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Texas v. Mayorkas*, No. 22-CV-094-Z, 2024 WL 455337, at *2 (N.D. Tex. Feb. 6, 2024) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)); *Jackson v. Biden*, No. 2:22-CV-241-Z, 2024 WL 406645, at *4 (N.D. Tex. Feb. 2, 2024) (citing *Pluet v. Frasier*, 355 F.3d 381, 386 (5th Cir. 2004) ("A party must have standing at the time the complaint is filed.")). "What *is* relevant to the standing inquiry is whether Plaintiff pled a sufficient prospective injury." *Mayorkas*, No. 22-CV-094-Z, 2024 WL 455337, at *2 (citing *Davis*, 554 U.S. at 734 n.5). And "[t]he Supreme Court has noted that a plaintiff need not 'demonstrate that it is literally certain that the harms they identify will come

---

[55] *See,* Appellees' Unopposed Motion to Stay the Mandate Pending Petition for Writ of Certiorari, Doc. No. 00516489553, *NetChoice, L.L.C. v. Paxton*, No. 21-51178 (5th Cir. Sept. 29, 2022).

[56] The Solicitor General's brief presented two questions: "1. Whether the laws' content-moderation restrictions comply with the First Amendment;" and "2. Whether the laws' individualized-explanation requirements comply with the First Amendment." Br. of the United States as Amicus Curiae in Support of Respondents in No. 22-277 and No. 22-555, *NetChoice*, 2023 WL 8600432, at *i (Dec. 7, 2023).

about.'" *Texas Voters All. v. Dallas Cnty.*, 495 F. Supp. 3d 441, 454 (E.D. Tex. 2020) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)).

The fact that there has been an appeal to the U.S. Supreme Court in a separate action does not affect the standing inquiry, particularly because portions of H.B. 20 remain in force. Texas had standing at filing (and still does). H.B.20's transparency requirements, for example, remain in force regardless of the Supreme Court's decision. *See* H.B.20 at § 120.053. H.B.20 requires covered social media platforms to report biannually on the instances in which content was removed, deprioritized, or demonetized. *See, id.* Such a policy protects Texans from unseen censorship schemes, such as the one challenged here, by informing consumers not only about the number of times the platform acted against illegal or policy-violating content, but also the source of the alert. *See, id.* Specifically, the social media platforms must disclose if the alert came from "a government" or "an internal automated detection tool." *Id.* at (b)(2)(A), (C). The State Department's illegal and *ultra vires* censorship scheme interferes with Texas's consumer protection statute and, thus, Texas's sovereign interest in enforcing its laws. Texas has standing.

Texas can also show traceability. Defendants assert Texas has not shown that media companies were induced to violate H.B. 20 by the challenged agency action.  ECF33 at 16.  But this is not the standard. While there must be "a causal connection between the plaintiff's injury and the defendant's challenged conduct, [traceability] doesn't require a showing of proximate cause or that 'the defendant's actions are the very last step in the chain of causation.'" *Inclusive Cmtys. Proj. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019) (quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997)). Rather, a plaintiff can satisfy traceability when the challenged act "does not rest on mere speculation about the decisions of third parties" but instead "on the predictable effect of [g]overnment action on the decisions of third parties." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019). Moreover "[i]t bears

repeating: Plaintiff, at this stage, is under no obligation to prove its injury actualized *or to define and eliminate all possible factors contributing to it*." *Mayorkas*, No. 22-CV-094-Z, 2024 WL 455337, at *3 (emphasis added). That is because, "the injury required for standing need not be actualized." *Davis*, 554 U.S. at 734. At this stage, since the allegations are taken as true because the alleged factual attack is intertwined with the merits, Texas is not required "to produce specific evidence to counter" the argument raised by Defendants on the merits. *Gen. Land Off. v. Biden*, 71 F.4th 264, 273 (5th Cir. 2023). And even if the factual attack were not intertwined with the merits, Plaintiffs have rebutted the factual attack by a preponderance of evidence. *See supra* Part II.A and II.B.

Ultimately, Texas challenges the State Department's actions in funding a domestic censorship scheme—the known and unlawful breadth and scope of which is detailed in the 69-page Complaint. Specifically, the State Department's censorship scheme interferes with the functioning of H.B.20 "by funding the infrastructure, development, and marketing and promotion of censorship technology and private censorship enterprises," at a minimum, by violating H.B.20's transparency requirements that remain good law. ECF1 at ¶1; *see also, id.* at ¶234. At a maximum, the over 360 domestic blacklisting and other censorship technologies funded, developed, and still promoted by the GEC with State Department funds and State Department-funded resources limit the reach of media outlets on various platforms, in direct violation of H.B.20. *See id.* at ¶235. At this stage of the litigation, which tools and technologies discriminate against Texans' speech on technology platforms deemed common carriers under H.B.20 is not fully known, but the evidence summarized establishes some of the tools and technologies promoted by Defendants impact Texans' speech and thus Texas's sovereign interest. Discovery will likely reveal additional injuries to Texas's sovereign interests. But at this point, the evidence is sufficient to show that the State Department's activities interfere in Texas's enforcement of H.B.20's transparency provisions, and more broadly H.B.20's mandates against discrimination by

common carriers. The harm caused here by the actions of social media companies is a "predictable effect of [g]overnment action on the decisions of third parties." *Dep't of Com.*, 139 S. Ct. at 2566. Thus, Defendants' actions harm Texas's sovereign interest, and Texas has established traceability.

Texas can also show redressability. Redressability requires a plaintiff to show that a favorable decision "is *likely*, as opposed to merely *speculative*," to redress its injury. *Inclusive Cmtys. Proj.*, 946 F.3d at 655 (emphasis in original) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)). A plaintiff demonstrates redressability if "the desired relief would lessen" the injury—a "complete[] cure" is unnecessary. *Id.*

That is, the injunction need not alleviate all harms. *See, Texas v. United States*, 40 F.4th 205, 219 (5th Cir. 2022). It must only "potentially lessen its injury." *Consumer Data Indus. Ass'n v. Texas through Paxton*, No. 21-51038, 2023 WL 4744918, at *6 (5th Cir. July 25, 2023) (citing *Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014)). Here, Plaintiffs have indicated that the injuries to Texas would be "eased" and thus demonstrates that the relief requested in this suit "would naturally redress Texas's harm to a meaningful degree." *Texas*, 40 F.4th at 219. An injunction would put an end to Defendants' actions and therefore redress the harm to Texas's sovereign interests in enforcing H.B.20's transparency mandate.

In sum, then, because Texas has established (1) Defendants' actions interfere with Texas's sovereign interest in enforcing H.B.20; (2) that sovereign interest encompasses preventing Defendants from aiding common carriers in violating H.B.20 and the interests it intends to protect; and (3) an injunction against Defendants' actions would redress that injury, Texas has standing to sue.

III. **ALTERNATIVELY, THIS COURT SHOULD ORDER DISCOVERY PRIOR TO RULING ON DEFENDANTS' MOTION TO DISMISS FOR LACK OF JURISDICTION.**

Should this Court conclude that Defendants have properly raised a factual attack on jurisdiction and that Plaintiffs have not rebutted that attack with the proffered evidence, the proper

course of action is to "give the plaintiff an opportunity for discovery and for a hearing." *Williamson*, 645 F.2d at. 414. Accordingly, Plaintiffs seek, in the alternative, an opportunity for jurisdictional discovery before this Court consider Defendants' Motion to Dismiss.

## IV. THERE IS NO BASIS UNDER RULE 12(b)(1) TO DISMISS PLAINTIFFS' OFFICIAL CAPACITY CLAIMS AGAINST DEFENDANTS.

Defendants maintain this Court should dismiss the official capacity claims against the individual Defendants, but they present no basis for arguing this Court lacks jurisdiction over those claims. Accordingly, dismissal under 12(b)(1) is inappropriate. Dismissal of the official capacity claims against the individual leaders of the Global Engagement Center and the Technology Engagement Team would also be inappropriate because those organizations are interagency and thus act on behalf of other agencies.[57] Further, while the GEC and the TET are currently housed in the State Department, they could be shifted to another federal agency. Accordingly, to ensure the injunctive relief sought binds both the GEC and the TET, this Court should deny Defendants' Motion to Dismiss the official capacity claims against the leaders of those groups.

## CONCLUSION

Defendants' Motion to Dismiss for lack of jurisdiction is a challenge to the merits of Plaintiffs' claims, and as such should be denied. Alternatively, should this Court consider Defendants' motion under Fed. R. Civ. P. 12(b)(1), the Court should **DENY** the Motion because both Media Plaintiffs and Texas have standing to sue. The Court should further reject Defendants' request to dismiss the official capacity suits against the individual defendants to ensure the injunctive relief is effective to halt the *ultra vires* and unconstitutional conduct by the GEC and TET, in addition to the State Department. Accordingly, for these and the foregoing reasons, this Court should **DENY** Plaintiffs' Motion.

---

[57] Exh. YY, *U.S. Mission Geneva, Fact Sheet: The Global Engagement Center, U.S. Mission to International Organizations in Geneva*, July 7, 2016 at 1 (official government webpage noting GEC is an "interagency entity").

DATED: April 10, 2024

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

/s/ Margaret A. Little

BRENT WEBSTER
First Assistant Attorney General of Texas

Margaret A. Little
Lead Attorney
Senior Litigation Counsel
Connecticut Bar No. 303494
NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street NW, Suite 450
Washington, DC 20036
Telephone: (202) 869-5210
Facsimile: (202) 869-5238
Peggy.Little@ncla.legal

GRANT DORFMAN
Deputy First Assistant Attorney General of
Texas

RALPH MOLINA
Deputy Attorney General for Legal Strategy

RYAN D. WALTERS
Chief, Special Litigation Division

/s/ Margot J. Cleveland

Margot J. Cleveland,
Of Counsel
Michigan Bar No. 83564
NEW CIVIL LIBERTIES ALLIANCE
Margot.Cleveland@ncla.legal

/s/ Susanna Dokupil

SUSANNA DOKUPIL
Lead Attorney
Special Counsel
Texas State Bar No. 24032801

/s/ Casey Norman

Casey Norman
Litigation Counsel
New York Bar No. 5772199
NEW CIVIL LIBERTIES ALLIANCE
Casey.Norman@ncla.legal

AMY S. HILTON
Special Counsel
Texas State Bar No. 24097834

JOHNATHAN STONE
Special Counsel
Texas State Bar No. 24071779

*Counsel for Plaintiffs The Daily Wire
Entertainment LLC and FDRLST Media LLC*

JACOB E. PRZADA
Special Counsel
Texas State Bar No. 24125371

Office of the Attorney General of Texas
P.O. Box 12548 (MC 009)
Austin, TX 78711-2548
Phone: (512) 936-3754
FAX: (512) 457-4410
Susanna.Dokupil@oag.texas.gov
Amy.Hilton@oag.texas.gov
Johnathon.Stone@oag.texas.gov

*Attorneys for Plaintiff the State of Texas*

## CERTIFICATE OF SERVICE

I hereby certify that, on April 10, 2024, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.


*/s/ Margot J. Cleveland*
Margot J. Cleveland

32