IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| THE DAILY WIRE, LLC,  *ET AL.,*<br>     *Plaintiffs,*<br><br>v.<br><br>DEPARTMENT OF STATE, *ET AL.*,<br>     *Defendants.* | Civil Action No.: 6:23-cv-00609 |

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General of Texas

GRANT DORFMAN
Deputy First Assistant Attorney General of
Texas

RALPH MOLINA
Deputy Attorney General for Legal Strategy

RYAN D. WALTERS
Chief, Special Litigation Division

/s/ *Susanna Dokupil*
SUSANNA DOKUPIL, Special Counsel
Lead Attorney
Texas Bar No. 24032801

Office of the Attorney General of Texas
P.O. Box 12548 (MC 009)
Austin, TX 78711-2548
Phone: (512) 936-3754
 Susanna.Dokupil@oag.texas.gov
Amy.Hilton@oag.texas.gov
Johnathon.Stone@oag.texas.gov

*Attorneys for Plaintiff the State of Texas*

/s/ *Margaret A. Little*
Margaret A. Little
Lead Attorney
Senior Litigation Counsel
Connecticut Bar No. 303494
NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street NW, Suite 450
Washington, DC 20036
Telephone: (202) 869-5210
Facsimile: (202) 869-5238
Peggy.Little@ncla.legal

*Counsel for Plaintiffs The Daily Wire
Entertainment LLC and FDRLST Media LLC*

**Additional Counsel Listed Below**

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................ii

TABLE OF AUTHORITIES .......................................................................................iii

INTRODUCTION .........................................................................................................1

ARGUMENT ................................................................................................................2

    I.   DEFENDANTS' ACTIVITIES ARE NOT LIMITED TO "COUNTERING FOREIGN PROPAGANDA AND MISINFORMATION"..........................................................................................2

    II.   EVIDENCE OF OTHER PAST *ULTRA VIRES* ACTIVITIES ESTABLISHES A STRONG LIKELIHOOD OF A CONTINUING AND IMMINENT THREAT OF FUTURE *ULTRA VIRES*, APA, AND FIRST AMENDMENT VIOLATIONS AND HARM. ..............................................................6

        A.   Defendants' Declarations Do Not Negate Plaintiffs' Claims. ....................................9

        B.   Defendants' *Ultra Vires*, Illegal, and Unconstitutional Conduct Injures Plaintiffs... 10

        C.   Defendants Misrepresent the Traceability Standard....................................................11

        D.   An Injunction Will Also Redress the Harm Caused by Defendants...........................12

        E.   Plaintiffs' APA Claims Have a Strong Likelihood of Success...................................14

        F.   Plaintiffs' *Ultra Vires*' Claims Have a Strong Likelihood of Success .....................15

        G.   Media Plaintiffs' First Amendment Claims Have a Strong Likelihood of Success  156

        H.   The Government Speech Doctrine Does Not Save Defendants ...............................18

    III.   INJUNCTIVE RELIEF IS APPROPRIATE ............................................................18

CONCLUSION............................................................................................................20

CERTIFICATE OF SERVICE ...................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967) .................................................... 15

*Apter v. Dep't of Health & Human Servs.,* 80 F.4th 579, 588 (5th Cir. 2023) ................ 15, 16, 18

*Bates v. Little Rock*,
    361 U.S. 516 (1960) ................................................................................ 17

*Bennett v. Spear*,
    520 U.S. 154 (1997) ...................................................................... 11, 12, 15

*Biden v. Texas*,
    142 S. Ct. 2528 (2022) ........................................................................... 12

*California v. Texas*,
    141 S. Ct. 2104 (2021) ........................................................................... 12

*Clark v. Cmty for Creative Non-Violence*,
    468 U.S. 289 (1984) ............................................................................... 18

*Dep't of Commerce v. New York*,
    139 S. Ct. 2551 (2019) ........................................................................... 12

*Elrod v. Burns*,
    427 U.S. 347 (1976) ............................................................................... 19

*Graham v. Evangeline Parish Sch. Bd.*,
    484 F.2d 649 (5th Cir. 1973) ................................................................. 18

*Grosjean v. Am. Press Co.*,
    297 U.S. 233 (1936) ......................................................................... 16, 17

*Jackson v. Wright*,
    82 F.4th 362 (5th Cir. 2023) .................................................................... 4

*Larson v. Valente*,
    456 U.S. 228 (1982) ............................................................................... 14

*Lee v. Macon Cnty. Bd. of Educ.*,
    267 F. Supp. 458 (M.D. Ala. 1967) ...................................................... 17

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ............................................................................... 12

*Norwood v. Harrison*,
    413 U.S. 455 (1973) ......................................................................... 17, 18

*Pitt News v. Pappert*,
    379 F.3d 96 (3d Cir. 2004) .................................................................... 17

*Sierra Club v. U.S. Dep't of the Interior*,
    899 F.3d 260 (4th Cir. 2018) ................................................................. 11

*Texas v. Biden*,
  20 F.4th 928 (5th Cir. 2021) ...................................................................... 12

*Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 440–41 (5th Cir. 2019) ................... 15

*Voting for America, Inc. v. Steen*,
  732 F.3d 382 (5th Cir. 2013) ...................................................................... 18

**Statutes**

22 U.S.C. § 2656(i) note ......................................................................... 1, 20

5 U.S.C. § 706 ................................................................................... 14

**Other Authorities**

2 Cooley's Constitutional Limitations (8th ed.) ................................................. 17

CISA,
  Cyber Summit 2020: Day Four (Defending our Democracy),
  *Combating Misinformation and Disinformation*, YouTube,
  *available at* https://www.youtube.com/watch?v=WDtstiYHRNc .............................................. 9

Mad Scientist: Weaponized Information Virtual Conference,
  July 21, 2020 *2.09 MadSci Weaponized Information: Technology Engagement Team &
  Disinfo Cloud - Ms. Frisbie & Nemr* – YouTube,
  *available at* https://www.youtube.com/watch?v=YoeHq5gX0dA ........................................ 7, 9

U.S.-Paris Tech Challenge 2021, Sept. 30, 2021,
  *available at* https://www.atlanticcouncil.org/event/u-s-paris-tech-challenge/
  (last visited April 9, 2024) .............................................................. 4, 8, 10

Videos and Slides,
  Medialogue on Propaganda,
  *available at* https://www.medialogues.de/videos .................................................. 6, 8

## INTRODUCTION

"Limitation. – None of the funds authorized to be appropriated or otherwise made available to carry out this section shall be used for purposes other than countering foreign propaganda and misinformation that threatens United States national security." 22 U.S.C. § 2656(i) note.

Congress's command is clear: Global Engagement Center's *sole* purpose is countering ***foreign*** propaganda and misinformation. Yet, while Defendants' Response repetitively cites GEC's statutory authority to facilitate the use of "a wide range of technologies," *see* ECF32 at 13, 50, 56, Defendants do not even once acknowledge that Congress expressly and ***totally*** limited GEC's authority to fighting "foreign propaganda and misinformation." 22 U.S.C. § 2656(i) note. Thus, contrary to Defendants' position, there is nothing "mundane" about GEC promoting tools and technologies that target domestic speech and the domestic press to American tech and social media companies—and the public at large. ECF32 at 48 n.22. Likewise, funding seminars to instruct American teachers on combatting "misinformation" in their classrooms with technology that targets the domestic press and domestic speech is strictly forbidden. *See infra* at 4-6.

These are but two examples of Defendants' widespread illegal activities, which inflict ongoing harm on Plaintiffs. Defendants also funded grants and used both human and technological resources to identify, research, test, develop, and promote technology that (quite deliberately) negatively impacts the circulation and profitability of the domestic press and speech, and specifically Media Plaintiffs, which further establishes that GEC does not limit its activities to "countering foreign propaganda and misinformation." That this scheme has operated secretly for years, involved a dozen government agencies and scores of companies in the private sector and academia before the story broke last year means that these funds, tools, technologies, initiatives, and collaborative connections are now entrenched and threaten Plaintiffs with continuing, concrete

and future harm. Plaintiffs have thus established a strong likelihood of success on the merits of their *ultra vires* and Administrative Procedure Act "APA" claims. Further, because Defendants' unlawful activities continue to negatively impact Media Plaintiffs' circulation and revenue opportunities, Defendants' conduct unconstitutionally abridges their First Amendment rights—all that is needed to secure injunctive relief.

The other preliminary injunction factors also strongly support Plaintiffs' Motion: Every day, Defendants continue to operate their censorship scheme which targets domestic—not just foreign—speech, Media Plaintiffs suffer irreparable harm to their First Amendment rights. Further, where, as here, sovereign immunity prevents Plaintiffs from recovering damages for the government's violation of their constitutional rights, irreparable harm is presumed. Texas's sovereign interest in enforcing H.B. 20 also faces irreparable harm because the adoption of viewpoint-based technologies by common carriers will conceal violations of the Act from both Texas and its citizens. Additionally, the requested injunction will serve the public interest, as Americans—direct beneficiaries of free speech and freedom of the press—are not only harmed by Defendants' abridgement of their First Amendment rights but are also injured by Defendants' continued misappropriation of taxpayer funds. Conversely, Defendants, whose conduct was not only unauthorized, but expressly prohibited, will suffer no harm if enjoined.

## ARGUMENT

### I.  DEFENDANTS' ACTIVITIES ARE NOT LIMITED TO "COUNTERING FOREIGN PROPAGANDA AND MISINFORMATION."

Defendants used congressionally appropriated funds to research, test, develop, and promote tools, technology, and enterprises to the private sector, including technology and social media companies. ECF32-1 at 5-7 ¶¶10-11. Contrary to Defendants' claim that "GEC funded projects solely addressing foreign malign disinformation," ECF32 at 11, the evidence plainly

shows that Defendants' censorship scheme is not limited to "countering foreign propaganda and misinformation." Two examples prove the point—the grants to Park Advisors and Media Literacy Now.[1]

***Park Advisors Uses GEC Funds to Target Domestic Press and Speech.***

The $6.5 million that GEC paid Park Advisors funded the Disinfo Cloud platform, its management of a Twitter account, the publication of the Disinfo Cloud Digest, its management of GEC's testbed, and its running of tech challenges. ECF32 at 16. With those GEC funds, Park Advisors researched, tested, analyzed, and promoted what Defendants call Countering Propaganda and Disinformation, or "CPD," tools and technologies, ***including*** ones that target the ***domestic*** press and speech.[2] GEC directly promoted those "tools and technologies" to domestic tech companies, academia, and journalists, as exemplified in a still-available post on X stating that "[t]here are [a] number of databases to help journalists, technologists, academics, and others as they monitor and analyze #misinformation related to #COVID19."[3] The post then lists several databases, tagging the Twitter account for NewsGuard's rating technology.[4]

A still-available video of the U.S.-Paris Tech Challenge run by Disinfo Cloud establishes

---

[1] Defendants wrongly reduce Plaintiffs' lawsuit to a challenge to the State Department's funding of grants to NewsGuard and GDI, both of which received GEC awards and both of which rate Media Plaintiffs as unreliable. Plaintiffs' lawsuit, however, is ***not*** premised on Defendants providing grants to NewsGuard and GDI, but on the entirety of the State Department's censorship scheme, which entails Defendants funding grants and other initiatives and using GEC-funded human and technological resources to identify, research, test, develop, and promote technology that negatively impacts the circulation and profitability of the domestic press and speech. But because most of Defendants' *ultra vires* and unconstitutional activities are hidden from public view, by necessity, Plaintiffs focus on the currently provable aspects of the censorship scheme, which include Defendants' use of State Department funds and human resources to promote NewsGuard and GDI, as well as the more recently discovered promotion of Logically.AI, Media Literacy Now, and Ad Fontes. *See infra* at 3-5.

[2] *See e.g.,* ECF11-6 at 4-5 (GEC explains Disinfo Cloud helps technology providers "identify appropriate counter propaganda and disinformation tools and technologies to suit different groups' needs"); ECF11-17 at 2 (Disinfo Cloud post promoting Global Disinformation Index "GDI"); ECF11-19 at 3 (Disinfo Cloud Digest promoting NewsGuard's new tool "to help advertising companies avoid websites known to host or produce mis/disinformation"). *See also* ECF41-4–ECF41-14 (Disinfo Cloud posts promoting GDI, NewsGuard, and other tools and technologies that target domestic speech and the domestic press).

[3] *See* ECF41-12 (post by @DisinfoCloud highlighting databases for journalists, tech companies, and others).

[4] *Id.*

3

that GEC-funded initiatives are not limited to foreign propaganda and disinformation.[5] That tech challenge featured GDI, which ranks media companies for supposed disinformation, including the American press.[6] A video of GDI's presentation includes a summary of the organization's technology, marketed as "allow[ing] advertisers to steer their spend away from disinformation and toward quality journalism"—with a link to GDI's webpage.[7] The still-available video also includes a GEC-paid Director encouraging listeners to engage with GDI, claiming its counter-disinformation work "benefits us all in building a better information environment."[8] GDI ranks both The Daily Wire and The Federalist as among the top-ten riskiest online American outlets, with the admitted purpose of causing advertisers to avoid them. ECF11-12 at 3 (GDI report identifying The Daily Wire and The Federalist as among top-ten riskiest American online outlets).

While GEC's grant to Park Advisors has allegedly ended and the Disinfo Cloud platform has been shuttered, the above GEC-funded promotion of censorship technology that targets Media Plaintiffs remains public and thus the injury is ongoing. That ongoing injury suffices to establish injury-in-fact. *See Jackson v. Wright*, 82 F.4th 362, 369 (5th Cir. 2023) (holding Plaintiff established injury-in-fact by alleging "a continuing (*i.e.*, ongoing) or 'imminent' future injury").

**State Department Funds Media Literacy Now, Inc. to Target Domestic Press and Speech**

The State Department's $30,000 grant to Media Literacy Now, Inc., a Massachusetts-based corporation "devoted to advancing media literacy in the United States,"[9] also funded the promotion of tools and technologies that target the American press and Americans' speech. The grant

---

[5] U.S.-Paris Tech Challenge 2021, Sept. 30, 2021, *available at* https://www.atlanticcouncil.org/event/u-s-paris-tech-challenge/, at 1:09:30 (last visited April 9, 2024) (video of U.S.-Paris State-Department funded event).
[6] *Id.* (GEC event with video featuring GDI).
[7] ECF41-15, U.S.-Paris Tech Challenge 2021, (screengrab of GDI slide promoting its technology).
[8] U.S.-Paris Tech Challenge 2021, *supra* at 5 n.3 at 1:26:10 (video capturing director of Technology Engagement Team promoting featured technology companies, including GDI).
[9] ECF41-16, Final Report, Medialogue on Propaganda at 29 (detailing use of grant to Media Literacy Now which describes that entity as a non-profit seeking to advance "media literacy in the United States").

document framed the award as funding a German seminar,[10] but the final report from Media Literacy Now shows the seminar provided virtual training to American teachers on so-called media literacy.[11] Not only were State Department funds used to "educate" American teachers, but the still-available recordings of the media literacy sessions also establish that the seminars pushed tools and technology that target the domestic press, including The Daily Wire and The Federalist.

For instance, the still-available recording of the event shows Vanessa Otero, who serves on the National Advisory Council for the grant recipient Media Literacy Now and who is the Founder and CEO of Ad Fontes Media, presenting an entire session on Ad Fontes's "Media Bias Chart" at the State Department-funded training session.[12] The Media Bias Chart focuses almost exclusively on the American press and brands The Federalist as "Hyper-Partisan Right" and "Unreliable, Problematic,"[13] and The Daily Wire as "Strong Right" and with a variation in reliability.[14] Another session focused on the "Data Detox Kit," which, among other things, instructs teachers to install NewsGuard.[15] Once installed, NewsGuard's numeric reliability ratings are automatically super-imposed on search results and social media posts, telling students whether to believe the source or not—essentially compelling government-assisted incriminating speech on Plaintiffs' own articles. ECF11-38 (screengrabs illustrating NewsGuard superimposes its rating on search results). Videos of these State Department-funded seminars remain available online to this day, including the sessions that promote Ad Fontes's Media Bias Chart and the Data Detox Kit.[16] Here, too, then, the harm is ongoing.

---

[10] ECF41-17, Media Literacy Now Grant Summary, USASpending at 3 (describing purpose of grant).
[11] ECF41-16, Final Report, Medialogue on Propaganda, *in passim* (summarizing participation of American teachers).
[12] ECF41-18, Staff, Media Literacy Now at 2 (identifying Otero as a member of Media Literacy Now's National Advisory Council); ECF41-23 (screengrab of Otero's video presentation on Ad Fontes's Media Bias Chart).
[13] ECF41-19–ECF41-20 (Ad Fontes's rating of The Federalist).
[14] ECF41-21–ECF41-22 (Ad Fontes's rating of The Daily Wire).
[15] ECF41-24 at 7 (Data Detox Kit recommending NewsGuard as a "plug-in" to fact check articles).
[16] Videos and Slides, Medialogue on Propaganda, *available at* https://www.medialogues.de/videos (videos of State-Department funded training sessions for American teachers).

*GEC Webpage Promotes Resources That Target Domestic Press and Speech.*

Aside from funding outside projects that reach domestic speech, GEC currently also highlights on its taxpayer-funded webpage an array of what it calls "significant counter-disinfo resources." ECF11-34 at 2. GEC's featured resources target the American press and speech, including some which promote NewsGuard and GDI—both of which directly target Media Plaintiffs. ECF11-26 at 6 (article from GEC's recommended resource, Harvard Kennedy School Misinformation Review, which used NewsGuard ratings to assess reliability of media outlets); ECF11-28 at 2 (promotion of GDI, which is identified as rating news "based on the 'probability of disinformation on a specific media outlet'").[17]

The above evidence disproves Defendants' claim that "GEC funded projects solely addressing foreign malign disinformation," ECF32 at 11, and that "Plaintiffs have failed to adduce any evidence that Defendants continue to fund or promote any specific so-called 'censorship technologies.'" *Id.* at 38.

## II.   EVIDENCE OF OTHER PAST *ULTRA VIRES* ACTIVITIES ESTABLISHES A STRONG LIKELIHOOD OF A CONTINUING AND IMMINENT THREAT OF FUTURE *ULTRA VIRES*, APA, AND FIRST AMENDMENT VIOLATIONS AND HARM.

In addition to the above examples where Defendants have clearly exceeded their congressional mandate to manage foreign affairs and where the harm is continuing, the breadth and reach of Defendants' other past *ultra vires* conduct establishes a strong likelihood that the illegal conduct remains ongoing, threatening Plaintiffs with imminent harm. Specifically, overwhelming evidence establishes that GEC used Congressionally appropriated funds for

---

[17] Even the GEC-promoted technologies that purportedly focus on foreign disinformation, such as the Alliance for Secur[ing] Democracy, also target Americans' speech and the American press. *See* ECF41-25, Matt Taibbi, *New Knowledge, The Global Engagement Center, and State-Sponsored Blacklists*, The Twitter Files Substack at 16-17 (internal Twitter communications establish Alliance for Securing Democracy's "Hamilton Dashboard" falsely branded Americans' speech as Russian disinformation).

purposes other than "countering foreign propaganda and misinformation," by:

- Funding Park Advisors, which used GEC funds to market 360-plus tools and technologies—beyond NewsGuard and GDI—to tech companies,[18] including ones that target the American press and Americans' speech;[19]
- Using GEC funds to coordinate with technology and social media companies, including by encouraging the use of tools that target domestic speech and the domestic press;[20]
- Funding the testbed platform to experiment and develop technology that reaches both foreign and domestic speech and making the testbed and test results available to American tech and social media companies;
- Funding companies to test technology that impacts and abridges domestic speech;
- Providing a grant that funded the infrastructure of an organization which demonetizes American media outlets.

Defendants seek to obscure this reality by *ipse dixit*, framing GEC-funded initiatives as limited to foreign propaganda and disinformation. For instance, in discussing GEC's Silicon Valley outreach, Defendants claim, "Plaintiffs utterly fail to explain how Defendants 'targeted' American speech by engaging in dialogue with some of the world's most significant internet companies to share information on combating foreign disinformation and propaganda overseas." ECF32 at 35. It is not Defendants' "dialogue" about "combating foreign disinformation" that is at issue, however, but that GEC also collaborates with social medial companies about combating domestic "disinformation," and used the Disinfo Cloud platform and GEC-funded technology and human resources to help domestic tech companies assess and adopt technology that targets

---

[18] GEC claims its use of Disinfo Cloud ended in December 2021, and that it no longer has access to that platform. If this assertion is true, injunctive relief directing GEC to obtain control of the GEC-funded platform to prevent a third party from relaunching the GEC-funded webpage to the detriment of Plaintiffs is imperative.

[19] *See e.g.,* ECF11-6 at 4-5 (GEC explains Disinfo Cloud helps technology providers "identify appropriate counter propaganda and disinformation tools and technologies to suit different groups' needs"); ECF11-17 at 2 (Disinfo Cloud post promoting GDI); ECF11-19 at 3 (Disinfo Cloud post promoting NewsGuard's new tool designed "to help advertising companies avoid websites known to host or produce mis/disinformation"). *See also* ECF41-4–ECF41-14 (Disinfo Cloud posts promoting GDI, NewsGuard, and other tools and technology targeting domestic speech and the domestic press).

[20] Mad Scientist: Weaponized Information Virtual Conference, July 21, 2020, at 33:58, 34:10, *2.09 MadSci Weaponized Information: Technology Engagement Team & Disinfo Cloud - Ms. Frisbie & Nemr* – YouTube, *available at* https://www.youtube.com/watch?v=YoeHq5gX0dA (video of GEC presentation in which GEC representatives explain how they use outreach to address domestic speech that "mirrors" foreign disinformation); ECF41-26, @ArmyMadSci Tweets, July 21, 2020 (Tweets highlighting GEC presentation and noting GEC seeks to bridge gap between foreign misinformation and the domestic mirroring of content with a "wide variety of reps to engage with partners in industry").

domestic speech.[21]

Evidence that GEC has funded a censorship scheme, as well as the above *ultra vires* activities, targeting domestic speech and the domestic press is extensive, as detailed at length in Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss. *See* ECF41 at 20-23. In short, that evidence establishes: Defendants funded the promotion of tools and technologies that impact and abridge domestic speech, including Logically.AI,[22] Public Editor,[23] The Critical Mass,[24] GDI,[25] Ad Fontes, [26] and NewsGuard;[27] the GEC-funded testbed tested technologies that continue to impact and abridge domestic speech;[28] and GEC's public-sector outreach to tech companies and academia included the targeting of domestic speech.[29]

---

[21] *Id.*

[22] ECF11-19 at 2 (evidence confirming GEC's promotion of Logically.AI); ECF41-27 – ECF 41-35 (evidence establishing Logially.AI reaches domestic speech and limits circulation of Media Plaintiffs' reporting).

[23] ECF41-53 at 6, ECF41-35 (evidence confirming Public Editor reaches domestic speech); ECF41-8 (evidence confirming GEC's promotion of Public Editor).

[24] ECF41-39 (evidence confirming The Critical Mass collaborated with GEC); ECF41-33, ECF41-37–ECF41-40 (evidence The Critical Mass's technology reaches the domestic media and Americans' speech).

[25] U.S.-Paris Tech Challenge 2021, *supra* at 5 n.3 at 1:26:10 (video capturing director of Technology Engagement Team promoting featured technology companies, including GDI); *supra* at 5 n.3 at 1:25:50 (video of GDI's CEO Clare Melford declared GEC grant would help support organization's infrastructure); ECF11-8 at 2 (GDI webpage detailing its "core output" as the Dynamic Exclusion List).

[26] ECF41-16, Final Report, Medialogue on Propaganda (report detailing use of grant to training Media Literacy Now to training American teachers including on Ad Fontes); Videos and Slides, Medialogue on Propaganda, *available at* https://www.medialogues.de/videos (videos of State-Department funded training sessions for American teachers); ECF41-23 (screengrab of Otero's video presentation on Ad Fontes's Media Bias Chart).

[27] ECF11-19 at 3; ECF41-12 (evidence of Defendants promoting NewsGuard).

[28] ECF32-2 at 10 ¶26; ECF11-6 at 5 (evidence GEC shared testbed results with all Disinfo Cloud users, including domestic tech and social media companies); ECF11-24 at 3; ECF41-53 at 6; ECF41-35 (evidence confirming testbed tests were conducted on tools and technologies that reached domestic speech).

[29] Evidence establishing GEC's "public-sector outreach" targeted domestic speech includes: ECF41-55, *Transcript of Interview of Alexander Stamos Before the H. Comm. on the Judiciary*, 118th Cong. at 99 (June 23, 2023) (testimony establishing only GEC had direct access to EIP platform to create tickets of supposed disinformation); CISA, Cyber Summit 2020: Day Four (Defending our Democracy), *Combating Misinformation and Disinformation*, YouTube, at 3:24:17, *available at* https://www.youtube.com/watch?v=WDtstiYHRNc (interview of Stamos who summarized EIP's then-ongoing work in 2020, stressing it is nearly all domestic information the group saw related to the election); ECF41-48, Declaration of Leah Bray at 8, ¶18, Exhibit, *Missouri v. Biden*, No. 22-cv-01213, ECF266-6, Apr. 27, 2023 (explaining categories of material GEC flagged for EIP); ECF41-49 at 3 (exhibit in *Missouri v. Biden*, No. 22-cv-01213 showing GEC targeting domestic post); ECF41-25 at 8-10 (Matt Taibbi's reporting based on internal Twitter communications including spreadsheet GEC sent Twitter of names of thousands of users it claimed represented

Defendants admit that they continue to provide grants and run the testbed, tech challenges, and GEC's "private sector" engagement portfolio,[30] ECF32-1 at 11 ¶21, the latter of which "facilitate[s] collaboration between U.S. government and the tech sector, academia, and the research community." ECF32 at 14–15. Those continuing initiatives, coupled with Defendants' years-long and far-reaching scheme of illegally using those initiatives to target domestic speech and the domestic press, establish a real and substantial threat of ongoing and future harm to Plaintiffs.

### A.  Defendants' Declarations Do Not Negate Plaintiffs' Claims.

Defendants attempt to obscure the reality that GEC funds and uses both its human and technological resources to defund and blacklist the domestic press and speech by presenting the Court with carefully wordsmithed declarations. However, as Plaintiffs explain in detail in their Response in Opposition to Defendant's Motion to Dismiss, ECF41 at 25–29, none of Defendants' proffered Declarations contradict Plaintiffs' evidence: The Declarations do not deny that GEC's various initiatives impacted domestic speech, in addition to foreign speech; the Declarations also do not dispute that the tools and technologies that GEC identifies, funds, develops, and promotes serve to abridge domestic speech. In sum, Defendants' Declarations fail to overcome the evidence presented by Plaintiffs, and that evidence establishes that Defendants' censorship scheme continues, including its ongoing promotion of NewsGuard, Ad Fontes, and GDI, which, as

---

Chinese accounts; they were not, but instead included ordinary Americans and several CNN reporters); Mad Scientist: Weaponized Information Virtual Conference, July 21, 2020, at 33:58, 34:10, *2.09 MadSci Weaponized Information: Technology Engagement Team & Disinfo Cloud - Ms. Frisbie & Nemr* – YouTube, *available at* https://www.youtube.com/watch?v=YoeHq5gX0dA (video of GEC presentation in which GEC representatives explain how they use outreach to address domestic speech that "mirrors" foreign disinformation); ECF41-26, @ArmyMadSci Tweets, July 21, 2020 (Tweets highlighting GEC presentation and noting GEC seeks to bridge gap between foreign misinformation and the domestic mirroring of content with "wide variety of reps to engage with partners in industry").

[30] That GEC's current private-sector engagement liaison does not work from Silicon Valley changes nothing: *Ultra vires* outreach from D.C. remains equally illegal.

discussed *infra* at 10–12, injures Plaintiffs.

**B.     Defendants' *Ultra Vires*, Illegal, and Unconstitutional Conduct Injures Plaintiffs.**

Both Disinfo Cloud and Media Literacy Now's promotion of supposed CPD tools and technologies injures Media Plaintiffs and their continuing injury is imminent. NewsGuard, Ad Fontes, and GDI all negatively impact The Daily Wire's and The Federalist's circulation and/or revenue streams. All three entities rate Media Plaintiffs as unreliable. As NewsGuard brags, negative ratings reduce web traffic to the outlets ranked unreliable, and a majority of users surveyed report they would be less likely to share articles NewsGuard rates unreliable.[31] NewsGuard and GDI also steer advertising dollars away from publications rated unreliable. *See* U.S.-Paris Tech Challenge (video of GDI boasting "over a dozen ad-tech companies" used GDI's technology, "redirecting millions of dollars away from disinformation peddlers toward quality journalism");[32] NewsGuard Presentation (stating it licenses a "White List of legitimate news sites to advertisers, which will cut off revenues to fake news sites").[33]

Further, the adoption of these tools and technologies by social media outlets harms Texas's sovereign interest by interfering with the transparency mandates of H.B.20, hiding viewpoint-based discrimination from Texans. The Supreme Court has held that an agency action that harms the state's "performance of its public function" is "necessarily a direct injury." *Biden v. Nebraska*, 143 S. Ct. 2355, 2366-67 (2023) (holding state had standing to challenge the Department of Education's loan forgiveness program as exceeding Congressional authority). "When a federal law interferes with a state's exercise of its sovereign 'power to create *and enforce* a legal code' [] it

---

[31] *See* ECF41-47 (NewsGuard press release summarizing studies showing NewsGuard's "unreliable" rating decreases readership of outlets and reduces circulation by causing individuals not to share articles).
[32] U.S.-Paris Tech Challenge 2021, *supra* at 5 n.3 at 1:10:25 (GDI's presentation to GEC).
[33] ECF41-52 (slides from NewsGuard presentation summarizing its product and explaining its reliability ratings serve to "cut off revenues to fake news sites").

inflict[s] on the state the requisite injury-in-fact." *Id.*.

Finally, whether Texas's law H.B. 20 is presently enjoined is not dispositive.  First, the Court must presume statutes constitutional until proven otherwise. *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 301 (2022) (statutes entitled to "strong presumption of validity"). The Supreme Court has not ruled that any parts of H.B. 20 are unconstitutional. *See NetChoice, LLC v. Paxton*, 144 S. Ct. 477 (Mem.) (Sept. 29, 2023) (granting *certiorari* in part). Second, regardless of the Supreme Court's decision in *NetChoice*, parts of H.B. 20 will remain in force. Third, Texas need only show a "substantial risk" of an "identifiable trifle" of injury. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (a "substantial risk" of future injury suffices); *United States v. SCRAP*, 412 U.S. 669, 689 n.14 (1973) (an "identifiable trifle" is enough). Texas has standing.

### C.     Defendants Misrepresent the Traceability Standard.

Defendants respond that Plaintiffs cannot prevail on the merits of their claims because "any resulting harm depends entirely on the actions of independent third parties." ECF32 at 35, n.15. However, contrary to Defendants' portrayal of the traceability standard, "the causation element of standing does not require the challenged action to be the sole or even immediate cause of the injury." *Sierra Club v. U.S. Dep't of Interior*, 899 F.3d 260, 284 (4th Cir. 2018). While there must be "a causal connection between the plaintiff's injury and the defendant's challenged conduct, [traceability] doesn't require a showing of proximate cause or that 'the defendant's actions are the very last step in the chain of causation.'" *Inclusive Cmtys. Proj. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019) (quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997)). Rather, a plaintiff can satisfy traceability by showing the challenged action "produce[s] a 'determinative or coercive effect upon the action of someone else,' resulting in injury." *Id.* (quoting *Bennett*, 520 U.S. at 169).

Further, a causal relationship between the challenged action and injury that depends on the

conduct of a third party does not preclude a finding of traceability. *California v. Texas*, 141 S. Ct. 2104, 2117 (2021). Rather, a Plaintiff satisfies the traceability requirement by "showing that third parties will likely react in predictable ways to the [defendant's actions]." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019). And "traceability is satisfied" when based on "the predictable effect of Government action on the decisions of third parties" rather than "mere speculation." *Id.*

In this case, Plaintiffs' injuries are the predictable result of Defendants' deliberate efforts to market and promote the CPD tools and technologies.[34] Common sense tells us that promoting tools and technologies will result in third parties adopting those tools and technologies—precisely the reason Defendants promoted them. Contrary to Defendants' spin, there is no "speculative chain of possibilities" necessary to injure Plaintiffs. Rather, as in *Texas v. Biden*, 20 F.4th 928, 974 (5th Cir. 2021) *rev'd on other grounds sub nom. Biden v. Texas*, 142 S. Ct. 2528 (2022), only one relevant third-party choice remains: an organization adopting the tool or technology promoted by Defendants. *Id.* at 973 (holding plaintiff established traceability because "the only relevant third-party choice that remains, then, is the alien's choice to apply for a license once in Texas"). Further, the causal chain in this case is even more straightforward than in *Massachusetts v. EPA*, 549 U.S. 497 (2007), wherein the Supreme Court found the Plaintiff established traceability where the EPA's challenged action may cause people to drive less fuel-efficient cars, that may contribute to a prospective rise in sea levels, and in turn an erosion of Massachusetts' shoreline. *Id.* at 523. In sum, Supreme Court and Fifth Circuit precedent confirm Plaintiffs have satisfied traceability.[35]

**D.    An Injunction Will Also Redress the Harm Caused by Defendants.**

---

[34] Defendants argue Plaintiffs "haven't established [Park Advisors'] actions are attributable to GEC," ECF32 at 47 n.21, but GEC funded and authorized Park Advisors to act on GEC's behalf rendering GEC responsible for its actions.
[35] Defendants' reliance on *Clapper* is misplaced. In that case, respondents' argument rested on their highly speculative fear that required five independent steps and a "highly attenuated chain of possibilities" for a harm. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). In contrast, here, as in *Texas v. Biden*, wherein the Fifth Circuit found traceability, only one step remains, making "the causal chain" in this case "easy to see." *Texas v. Biden*, 20 F.4th at 972.

Defendants also attempt to challenge redressability by arguing "[t]his Court cannot affect, let alone prohibit, those third parties' future choices." ECF32 at 36, n.17. This argument misses the point: The injunctive relief sought does not seek to control the behavior of third parties, but rather to enjoin Defendants from engaging in *ultra vires* testing, funding, developing, and promotion of CPD tools and technologies that target the domestic press and speech. And there is nothing "attenuated, vague, and speculative," ECF32 at 34, about the harm Plaintiffs seek to halt: The injury to Media Plaintiffs is the logical, foreseeable, and intended consequence of Defendants' *ultra vires* actions, namely inducing third parties to adopt tools and technologies GEC promotes, such as NewsGuard, GDI, Ad Fontes, and Logically to reduce Media Plaintiffs' circulation and revenue streams. Similarly, State Department's *ultra vires* censorship scheme interferes with the functioning of H.B.20, at a minimum, by violating H.B.20's transparency requirements that remain good law, and additionally by promoting blacklisting and other censorship technologies that limit the reach of media outlets on various platforms, in direct violation of H.B.20. *See* ECF25 at 8–12 (Plaintiffs' Response in Opposition of Motion to Transfer Venue establishing Texas's standing to sue).

Moreover, "[w]hen establishing redressability, a plaintiff need only show that a favorable ruling could potentially lessen its injury; it need not definitively demonstrate that a victory would completely remedy the harm." *Texas*, 2023 WL 6281319, at *4 (quoting *Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014)). Here, a favorable ruling would absolutely lessen Texas's and Media Plaintiffs' injury at the hands of the government entities. That an injunction might not provide a complete remedy from similar harm at the hands of private entities is immaterial—Plaintiffs need only show a favorable ruling will help.  *See Larson v. Valente*, 456 U.S. 228, 244 n.15 (1982) ("[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will

relieve a discrete injury to himself.").[36] They have done so: An injunction prohibiting Defendants' conduct will redress the harm **caused by Defendants**; that third parties may independently discover, evaluate, and adopt similar tools and technologies does not alter that conclusion. *Id.*

### E.    Plaintiffs' APA Claims Have a Strong Likelihood of Success.

Under the APA, courts have authority to "hold unlawful and set aside agency action[]" that, among other things, is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C. § 706(2)(C). As detailed above, Defendants' actions in establishing initiatives, including tech challenges, private-sector engagement, Disinfo Cloud, the testbed, granting programs, and the various promotional efforts were "in excess of statutory authority" and "statutory limitation" because Defendants' actions were not limited to "countering foreign propaganda and misinformation that threatens United States national security," as Congress mandated. Thus, Plaintiffs have a strong likelihood of success on their APA claims.

First, there is a final agency action, and that action did not comply with the standards of the APA. An agency's "decision to approve [a] grant is the 'consummation of the agency's decisionmaking process' that is of sufficient 'legal consequence[]' to make the action 'final' under the APA." *People for the Ethical Treatment of Animals, Inc. v. Tabak*, 662 F. Supp. 3d 581, 591 (D. Md. 2023). The action here was arbitrary and capricious and exceeded the bounds of statutory authority. 5 U.S.C. § 706(2)(A), (C). As Plaintiffs detailed in their Response in Opposition to Motion to Dismiss, *see* ECF41, Defendants' censorship scheme consisted of specific, well-defined programs Defendants adopted, funded, staffed, deployed, and clearly identified on their government webpage.[37] The adoption of those programs "mark[ed] the consummation of the

---

[36] Defendants are correct, however, that "this Court cannot affect, let alone prohibit, those third parties' future choices," ECF32 at 36, n.17, which is precisely why a preliminary injunction is necessary—because once third parties adopt technology promoted by Defendants to censor speech, the Court cannot undo the third-parties' decision.
[37] ECF11-25 (official webpage identifying programs adopted by GEC's Technology Engagement Division).

agency's decisionmaking process," *Bennett*, 520 U.S. at 178 (internal quotations omitted), as no further action was necessary to establish them as agency policy for how to best achieve the State Department's mission. *See* ECF33-1, Declaration of Daniel Kimmage at 5–7 ¶11 (detailing programs, also called initiatives, historically adopted to carry out agency's mission).

Further, legal consequences flow to Plaintiffs from Defendants' decision to adopt programs that reach the domestic press and domestic speech: Defendants' adoption of the challenged initiatives negatively impacts Media Plaintiffs' press and speech rights and Texas's sovereign interest. GEC's deliberative adoption of the challenged initiatives that impact Plaintiffs' rights satisfies the APA's "'flexible'" and "'pragmatic'" finality requirement. *Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 440–41 (5th Cir. 2019) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)).

Even in the absence of a final action, Plaintiffs have an *ultra vires* APA claim. *Apter v. Dep't of Health & Human Servs.,* 80 F.4th 579, 588 (5th Cir. 2023). Plaintiffs need only identify "some agency action affecting him in a specific way" and that "he has been adversely affected or aggrieved by that action." *Id.* (cleaned up). Plaintiffs have shown that they are arguably within the zone of interests protected by Congress's limitation on GEC to combatting only foreign misinformation. At a minimum, then, Plaintiffs have a strong likelihood of success on their *ultra vires* APA claim. *Id.*

### F.    Plaintiffs' *Ultra Vires'* Claims Have a Strong Likelihood of Success.

Plaintiffs likewise have a strong likelihood of success on their common law *ultra vires* claims alleged in Counts Three and Five.[38] At common law, actions by a defendant beyond his

---

[38] This Court need only reach the question of whether Plaintiffs have a strong likelihood of success on their common law *ultra vires* claims if it declines to find a likelihood of success on the APA *ultra vires* claims. *Apter*, 80 F.4th at 593. *See also id.* (noting other circuits have held common law *ultra vires* claims are only available when APA *ultra vires* claims are not).

authority are "*ultra vires*" and "therefore may be made the object of specific relief." *Apter*, 80 F.4th at 587. As detailed above, Defendants acted "without any authority whatever" in researching, testing, developing, and promoting tools and technology that reach the domestic press and domestic speech. *Id.* (internal quotation omitted). That Defendants' conduct was totally lacking in any authority is clear because Congress expressly limited GEC's use of funds to countering ***foreign*** propaganda and disinformation. Accordingly, Plaintiffs have a strong likelihood of success on their common law *ultra vires* claim premised on Defendants exceeding their statutory authority. Further, as detailed below, Defendants exceeded their constitutional authority, and, as such, Plaintiffs are also entitled to relief on their common law *ultra vires* claim in the form of an injunction to restrain Defendants to the constitutional limits of their authority.

> **G.    Media Plaintiffs' First Amendment Claims Have a Strong Likelihood of Success.**

Media Plaintiffs also have a strong likelihood of success on their freedom of press claims, as it is axiomatic that the government abridges freedom of the press by penalizing publishers or curtailing the circulation of a selected group of newspapers. *Grosjean v. Am. Press Co.*, 297 U.S. 233, 251 (1936). At a minimum, Defendants' promotion of Logically.AI, NewsGuard, and Ad Fontes curtail the circulation of The Daily Wire and The Federalist, and GEC's promotion of NewsGuard and GDI negatively impacts their revenue streams. *See supra* at 10–12. While Defendants' funding of the broader censorship scheme likely includes many more examples of Media Plaintiffs' circulation being curtailed and diminution of their revenue streams, these few examples suffice to establish a violation of freedom of the press. *See also Pitt News v. Pappert*, 379 F.3d 96, 111-12 (3d Cir. 2004) ("The threat to the First Amendment arises from the imposition of financial burdens that may have the effect of influencing or suppressing speech, and whether those burdens take the form of taxes or some other form is unimportant.").

Defendants erroneously argue that to prevail on their freedom of the press claim, Media Plaintiffs must prove Defendants coerced third parties to adopt various censorship technologies. Not so. The right to freedom of the press is "protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference." *Bates v. Little Rock*, 361 U.S. 516, 523 (1960) (citing *Grosjean*). Further, among the "evils to be prevented," by the First Amendment press guarantee, is "not the censorship of the press merely, but any action of the government by means of which it might prevent such free and general discussion of public matters as seems absolutely essential to prepare the people for an intelligent exercise of their rights as citizens." *Grosjean*, 297 U.S. at 249–50 (citing 2 Cooley's Constitutional Limitations 886 (8th ed.)). Defendants' censorship scheme easily crosses the line, stifling Media Plaintiffs' circulation and revenue opportunities, thereby violating their right to freedom of the press.

Media Plaintiffs also have a strong likelihood of success on their free speech claims, as Defendants' conduct abridges or lessens their rights to free speech. As both the Supreme Court and the Fifth Circuit have stressed, "[i]t is axiomatic that a state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973) (quoting *Lee v. Macon Cnty. Bd. of Educ.*, 267 F. Supp. 458, 475-76 (M.D. Ala. 1967)); *Graham v. Evangeline Parish Sch. Bd.*, 484 F.2d 649, 650 (5th Cir. 1973) (quoting *Norwood*).

Defendants counter that "abridgement" is not the standard for holding them liable for third parties' conduct. But in making that argument, Defendants misapprehend Media Plaintiffs' First Amendment Claims. Media Plaintiffs do not seek to hold Defendants responsible for the conduct of others. Media Plaintiffs' Complaint is not that private third parties are censoring their speech. Rather, Media Plaintiffs' Complaint centers on State Department Defendants' *ultra vires* actions

in promoting technology (and testing and developing such technology) to lessen Media Plaintiffs' speech. Further, even under the various other standards, such as "significant encouragement," collaboration, or coercion, Plaintiffs have a significant likelihood of success on the merits. *See* ECF11 at 45 (Plaintiffs' Motion for Preliminary Injunction).

### H. The Government Speech Doctrine Does Not Save Defendants

Defendants' efforts to defend their *ultra vires* abridgement of speech and the press based on the government speech doctrine likewise fails. First, and dispositively, the government speech doctrine has no bearing on Plaintiffs' *ultra vires* or APA claims, as that doctrine does not expand Defendants' authority to speak when Congress expressly limited their authority to foreign affairs. *See Apter*, 80 F.4th at 595 (holding Plaintiffs stated an *ultra vires* APA claim against the FDA for speaking about its view regarding the use of ivermectin for treatment of Covid-19). Second, as the Supreme Court has repeatedly stressed in the context of freedom of speech guaranteed under the First Amendment, "non-expressive conduct does not acquire First Amendment protection whenever it is combined with another activity that involves protected speech." *Voting for America, Inc. v. Steen*, 732 F.3d 382, 389 (5th Cir. 2013) (quoting *Clark v. Cmty for Creative Non-Violence*, 468 U.S. 289, 297–98 (1984). Likewise, the government speech doctrine does not enshrine Defendants with a right to engage in initiatives that reduce Media Plaintiffs' speech and press circulation under the guise that they are engaging in government speech.

### III. INJUNCTIVE RELIEF IS APPROPRIATE

The above analysis establishes Plaintiffs have a substantial likelihood of success on the merits. The remaining factors also support injunctive relief. Further, Defendants' argument that Plaintiffs engaged in "significant delay in seeking … relief" that "weighs against a finding of imminent, irreparable harm," ECF32 at 11, is both factually and legally flawed. Factually,

Defendants' stealth censorship scheme prevented Plaintiffs from discovering the injury until recently, and as soon as practicable they filed their claim and then promptly turned to drafting the motion for a preliminary injunction. This argument also contradicts black-letter law. Ongoing First Amendment violations constitute irreparable injury, regardless of how long the injuries have been occurring: "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

The balance of the equities and public interest also favors injunctive relief.  "[A]ny interest in enforcing an unlawful (and likely unconstitutional) [law] is illegitimate."  *BST Holdings, L.L.C. v. Occupational Safety & Health Admin.*, 17 F.4th 604, 618 (5th Cir. 2021). Conversely, "[i]njunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) (quoting *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006)).

Further, contrary to Defendants claim that the injunction requested lacks the specificity required by Federal Rule of Civil Procedure 65(d)(1), ECF32 at 54, the injunction is appropriately precise. In fact, Defendants' very argument lists no less than twelve different verbs describing actions one could take with technology, and another eighteen actions that the technology should be prohibited from doing to abridge speech. *See id.* Even if it is "axiomatic that an injunction is overbroad if it enjoins a Defendant from engaging in legal conduct," *Missouri*, 83 F.4th at 395, Plaintiffs' requested injunction clarifies that it only applies to actions that would "abridge the lawful speech of the American press and Americans."  The Court should reject this argument.

Finally, Defendants argue the injunction sought is overbroad because it would "'prohibit[] GEC from taking any action to test or use technology to counter disinformation and propaganda overseas,' [if] that [technology] could, through 'events outside of the GEC's control, someday be

used by third parties in the United States, . . .'" ECF32 at 53 (quoting ECF32-1 at 12, ¶25). Not so. The proposed injunction would only bar GEC from testing, using, developing, or promoting CPD tools or technology that ***currently*** reach the domestic press or domestic speech. Under the terms of the proposed injunction, the State Department would remain free to counter foreign propaganda and disinformation by developing and using CPD tools and technologies limited in reach to foreign actors, even if a third party in the future might modify the foreign-reaching technology so that it also reaches domestic speech. In short, it is not the injunction that is overbroad, but Defendants' initiatives and technologies that reach both domestic and foreign speech—in clear violation of Congress's spending limitation.

## CONCLUSION

Congress did not direct the State Department to "generally" focus on "foreign information manipulation" or to "minimize" the collection of data on U.S. Persons: It told GEC in no uncertain terms that funding must be used *exclusively* to "counter[] foreign propaganda and misinformation that threatens United States national security." 22 U.S.C. § 2656(i) note. Overwhelming evidence shows Defendants ignored Congress's mandate, and their *ultra vires* conduct has already harmed and threatens further imminent and irreparable harm to Plaintiffs, including abridging Media Plaintiffs' rights to freedom of the press and freedom of speech. Accordingly, for these and the foregoing reasons, this Court should **GRANT** Plaintiffs' Motion for Preliminary Injunction.

Dated:  April 12, 2024                    Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General of Texas

GRANT DORFMAN
Deputy First Assistant Attorney General of
Texas

RALPH MOLINA
Deputy Attorney General for Legal Strategy

RYAN D. WALTERS
Chief, Special Litigation Division

/s/ Susanna Dokupil
SUSANNA DOKUPIL
Lead Attorney
Special Counsel
Texas Bar No. 24032801

JONATHAN STONE
Special Counsel
Texas Bar No. 24071779

AMY HILTON
Special Counsel
Texas Bar No. 24097834

JACOB E. PRZADA
Special Counsel
Texas Bar No. 24125371

Office of the Attorney General of Texas
P.O. Box 12548 (MC 009)
Austin, TX 78711-2548
Phone: (512) 936-3754

*Attorneys for Plaintiff the State of Texas*

/s/ *Margaret A. Little*
Margaret A. Little
Lead Attorney
Senior Litigation Counsel
Connecticut Bar No. 303494
NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street NW, Suite 450
Washington, DC 20036
Telephone: (202) 869-5210
Facsimile: (202) 869-5238

/s/ *Margot J. Cleveland*
Margot J. Cleveland
Of Counsel
Michigan Bar No. 83564
NEW CIVIL LIBERTIES ALLIANCE
Margot.Cleveland@ncla.legal

/s/ *Casey Norman*
Casey Norman
Litigation Counsel
New York Bar No. 5772199
NEW CIVIL LIBERTIES ALLIANCE
Casey.Norman@ncla.legal

*Counsel for Plaintiffs The Daily Wire*
*Entertainment LLC and FDRLST Media LLC*

21

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically

(via CM/ECF) on April 12, 2024 and that all counsel of record were served by CM/ECF.

_/s/ Margot J. Cleveland_
Margot J. Cleveland