1     IN THE UNITED STATES DISTRICT COURT
      FOR THE EASTERN DISTRICT OF TEXAS
2                 TYLER DIVISION

3

4   THE DAILY WIRE, LLC, ET AL    )
                                          CASE NO. 6:23cv609
5        -vs-                     )
                                  Tyler, Texas
6   UNITED STATES DEPARTMENT OF   )  1:32 p.m.
    STATE, ET AL                      April 23, 2024
7

8
                  TRANSCRIPT OF MOTIONS HEARING
9        BEFORE THE HONORABLE JEREMY D. KERNODLE,
               UNITED STATES DISTRICT JUDGE
10

11
                   A P P E A R A N C E S
12

13

14   FOR THE PLAINTIFFS:

15   MS. SUSANNA DOKUPIL
     MR. JACOB E. PRZADA
16   MS. MUNERA AL-FUHAID
     OFFICE OF THE ATTORNEY GENERAL
17   OF TEXAS
     P.O. Box 12548
18   Austin, TX 78711-2548

19
     MS. MARGARET LITTLE
20   MS. CASEY NORMAN
     NEW CIVIL LIBERTIES ALLIANCE
21   1225 19th Street NW, Suite 450
     Washington, DC 20036
22

23

24

25

```
 1    FOR THE DEFENDANTS:

 2    MS. DONNA M. CANEVARI
      MS. CRISTEN C. HANDLEY
 3    MR. ARJUN MODY
      UNITED STATES DEPARTMENT OF JUSTICE
 4    CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
      1100 L Street, NW
 5    Washington, DC 20005

 6

 7    MR. JAMES GILLINGHAM
      ASSISTANT U.S. ATTORNEY
 8    110 North College, Suite 700
      Tyler, TX 75702
 9

10

11

12    COURT REPORTER:          MS. SHEA SLOAN, CSR, RPR
                               FEDERAL OFFICIAL COURT REPORTER
13                             211 W. Ferguson
                               Tyler, TX 75702
14

15

16    Proceedings taken by Machine Stenotype; transcript was
      produced by a Computer.
17

18

19

20

21

22

23

24

25
```

1              P R O C E E D I N G S

2              (CALL TO ORDER OF THE COURT.)

3              THE COURT:  Thank you.  Please be seated.

4              Okay.  This is Civil Action 6:23cv609, The Daily

5    Wire vs. United States Department of State.

6              Let me take appearances beginning with Plaintiffs'

7    counsel.

8              MS. DOKUPIL:  I'm Susanna Dokupil representing the

9    State of Texas.

10             THE COURT:  Okay.

11             MS. DOKUPIL:  And with me are Jacob Przada and

12   Munera Al-Fuhaid.

13             MS. LITTLE:  And Margaret Little representing Daily

14   Wire and the Federalist.  And with me today is Casey Norman.

15             THE COURT:  Okay.

16             Okay.

17             MR. MODY:  Arjun Mody from the Justice Department

18   representing Defendants, joined by my colleagues Dorothy

19   Canevari, Cristen Handley, and James Gillingham from the U.S.

20   Attorney's Office.

21             THE COURT:  Okay.  Well, I want to start with

22   primarily the Defendants' two motions, the motion to transfer

23   and the motion to dismiss.

24             So are you going to be arguing on behalf of the

25   Defendants, Mr. Mody?

1          MR. MODY:  So I am prepared to address the

2    issues -- the standing and venue issues, so -- in the motion

3    to dismiss and motion for transfer.

4          THE COURT:  Okay.  Why don't you start there.  And

5    one of the questions that I have is just the order of

6    proceedings.  What do I need to decide first?

7          MR. MODY:  Sure.  Would you like me to --

8          THE COURT:  If you would go to the podium.

9          MR. MODY:  Certainly.  So we think that it makes

10   most sense to start with jurisdiction.  We think that the

11   Court should confirm its jurisdiction, so address the Article

12   III standing issues first before proceeding to venue,

13   deciding whether this is the correct forum.  And then we

14   think that if the Court has jurisdiction and venue is proper

15   here, then we would proceed -- we would propose proceeding to

16   Plaintiffs' motions.

17         THE COURT:  Okay.

18         MR. MODY:  So -- happy to start with standing.

19         Congress tasked the State Department Global

20   Engagement Center with coordinating the Federal Government's

21   response to foreign disinformation aimed at harming U.S.

22   interests and U.S. allies abroad.

23         And based primarily on several events from years

24   ago, Plaintiffs have brought this lawsuit asserting that the

25   GEC is engaged in a wide-ranging enterprise to censor

1   American speech by -- we think there is a fundamental

2   disconnect between the specific allegations in the complaint

3   and Plaintiffs' rhetoric, meaning that the claims fail for

4   structural reasons.  And I wanted to just emphasize two key

5   points with regard to standing to start.

6          The first is, this case is really about Plaintiffs'

7   concerns with products that private companies created and

8   then how other companies such as advertisers or social media

9   platforms use those products.  But none of that is connected

10  to Defendants, and so we think there is a serious

11  traceability problem.

12         And the second reason that Plaintiffs lack standing

13  is related to timing.

14         The lawsuit focuses on events that took place many

15  years ago primarily, and we think this means that there is no

16  ongoing or imminent injury-in-fact as required for injunctive

17  relief, or that Plaintiffs have really identified any

18  specific ongoing conduct that this Court could enjoin that

19  would redress those injuries.

20         And we think these two issues -- that none of the

21  conduct here is connected to Defendants and the timing issues

22  play out slightly different ways with respect to Texas and

23  the Media Plaintiffs.  But I guess we propose starting with

24  Texas.

25         We think that the facts there are more

1    straightforward and arguments about Texas's standing are also

2    relevant to the venue analysis because that is the basis for

3    venue that Plaintiffs alleged in the complaint.

4         So Texas's theory is that Texas has a state law, HB

5    20, that regulates content moderation decisions by social

6    media platforms, so it restricts the decisions that the

7    platforms can make with respect to whether to present certain

8    kinds of content on their websites or how to prioritize that

9    content.

10        And the complaint has a handful of allegations.  I

11   think it is four or five paragraphs of the complaint that say

12   that Defendants' conduct is interfering with Texas

13   enforcement of HB 20 by inducing the platforms to violate HB

14   20.

15        And so we think that there are several problems

16   with this theory.  The first is, just kind of as a logical

17   matter, I don't think Plaintiffs have explained what the

18   inducement is, whether there are sort of positive incentives

19   or negative incentives or coercion or anything like that that

20   is happening with respect to conduct that Defendants -- or

21   with respect to Defendants' conduct that is actually causing

22   the platforms to violate HB 20.

23        Most of the allegations in the complaint, again,

24   focus on these products.  You know, NewsGuard and GDI are the

25   two primary companies that appear in the complaint.  And

1   those products, you know, to the extent that they are used by

2   the social media platforms, the platforms can use those

3   products in whatever way they'd like.  And to the extent that

4   a particular use of one of those products would violate HB

5   20, the platforms are free to use -- to not use the products

6   in that way.

7         THE COURT:  But their allegations -- and we are

8   here on a motion to dismiss the pleading -- are that

9   Defendants have encouraged, have funded, have made all of

10   these technologies available and invited the social media

11   companies to use them.  So what do you do about those

12   allegations?

13         MR. MODY:  So a couple of responses to that,

14   Your Honor.  I don't think that Plaintiffs have alleged that

15   the Defendants are actually asking the platforms to use these

16   products in any particular way.

17         And just to focus on what the actual two grants to

18   GDI and NewsGuard are -- and this gets into our sort of

19   factual attack on Plaintiffs' standing here, but none of the

20   conduct -- Defendants -- none of the conduct here is actually

21   related to the products that Plaintiffs claim in turn are

22   then used by other third parties to violate HB 20.

23         So, again, I guess there are two levels to our

24   argument.

25         First is that any violation of HB 20 depends on the

1    independent actions of third parties, and we think cases like

2    Lujan and Clapper sort of categorically say that where there

3    is that independent conduct, several chains and sort of a

4    causal link, that can't form the basis for Article III

5    standing.  It is not traceable to anything Defendants have

6    done.

7                 THE COURT:  What if the Defendants have required

8    social media companies to use these technologies, would Texas

9    then be able to assert standing?

10               MR. MODY:  So we think if there was a specific

11   allegation that the Defendants coerced a platform to use this

12   technology in a way that violated HB 20, we think that there

13   would be standing under those circumstances.

14               And I think one of the cases that Defendants cite

15   in their briefing is the Texas vs. EEOC case, which the Fifth

16   Circuit found standing based on a sovereign injury to the

17   State of Texas based on a federal regulation.

18               And, there, the regulation -- it was an EEOC

19   regulation -- or I believe it was guidance.  The guidance at

20   issue in that case essentially required Texas to either

21   change its -- change its policies with respect to how it

22   hired employees as a state employer or they would be subject

23   to civil liability under the guidance.

24               And so we think, for instance, if the social media

25   platforms were exposed to civil liability, if they didn't use

1    the products in a way that violated HB 20, we think that

2    might show standing for Texas.  We think that if there were

3    sort of strong, positive inducements to the platforms to use

4    these products in ways that clearly violated HB 20, I think

5    Texas might allege standing under those facts.

6           I think there is a separate issue here, which is

7    that Texas has not attempted to enforce HB 20 --

8           THE COURT:  Well, stay on the other issue first.

9           MR. MODY:  Sure.  Sure.

10          THE COURT:  So where would you draw that line?

11   Clearly, requiring social media companies to use the

12   technologies would create standing, and just notifying social

13   media companies that there are these technologies would not.

14   Okay?

15          MR. MODY:  Correct.

16          THE COURT:  But what about somewhere in between,

17   which is where I read the Plaintiffs' allegations is it was a

18   lot more than here are some technologies.

19          But here are some technologies.  We invite you to

20   use them.  We have tested them.  Come try them out

21   yourselves.  We have a State Department employee in Silicon

22   Valley to answer any questions.  The world was on fire during

23   COVID.  We need you to help us control misinformation and

24   disinformation.

25          Why does that not start to look more like a

1    requirement?

2         MR. MODY:  So, again, I think even under those

3    facts, Your Honor, it is not a requirement that the platforms

4    are using the technologies in any particular way.  I think we

5    think that even under Plaintiffs' allegation, which is that

6    there is inducement, there needs to be some sort of, let's

7    say, benefit that is inuring to the platforms or some sort of

8    negative consequence that would befall the platforms if they

9    didn't use the platforms -- they didn't use the products in a

10   particular way.

11        We also think that this lawsuit and with respect to

12   the GEC generally -- I appreciate that Your Honor referenced

13   the sort of more general issues around COVID and sort of

14   talking to the -- talking to the social media companies.

15   GEC's focus is on foreign disinformation overseas.

16        And so when you look at the actual grants, for

17   instance, that GEC gave to GDI and NewsGuard, those were

18   discrete grants that were in the context of, for instance,

19   for GDI it was for the purpose of GDI being able to expand

20   its language capabilities to East Asian languages or Eastern

21   European languages.

22        It was in the context of an international

23   technology challenge hosted in Paris where, you know, GDI's

24   technology -- you know, the State Department is essentially

25   saying GDI has a product, and our partners in Europe and our

1   partners in Asia, East Asia, or Southeast Asia can use those

2   products to counter Russian or Chinese disinformation.

3          And it's very similar for NewsGuard.  The grant

4   that went to NewsGuard was for a -- for a -- excuse me -- for

5   a challenge that was hosted by the Department of Defense and

6   the State Department, and it was all geared towards Russian

7   and Chinese disinformation.

8          I wanted to address the point that you raised about

9   actually talking to the platforms because that is obviously

10  something that Plaintiffs do bring up in their complaint.

11         And, again, there are -- I mean, we don't read the

12  complaint to make any specific allegations about Defendants

13  sort of telling a platform that you have to use GDI or

14  NewsGuard or any other technology in this particular way, let

15  alone in a way that would actually violate a state law.

16         And so, you know, we don't -- we think we are very,

17  very far from the line in terms of is there specific conduct

18  that is alleged in the complaint whereby, you know, GEC or

19  the State Department is telling Facebook or some other social

20  media platform, here is a product, you should use it in this

21  way, and, you know, we know that this is going to interfere

22  with Texas's -- with HB 20.

23         THE COURT:  Well, are you familiar with the Texas

24  vs. NRC?  I think it is -- I don't know what NRC stands for

25  at the moment -- Nuclear Regulatory Commission, decided in

1    2023 -- I hated it when judges would ask about cases.  I

2    don't think anybody has cited this one.  So if you tell me

3    no, that is fine.

4            But this is a Fifth Circuit case where the federal

5    agency had issued a license permitting the storage of nuclear

6    waste in Texas, potentially in Texas, which would have

7    violated a Texas law, HB 7, which made it illegal to dispose

8    of or store high-level radioactive waste in Texas.

9            So the State of Texas sues, challenges the agency

10   issuance of these licenses before anybody had actually stored

11   any nuclear waste in Texas, from what I can tell from reading

12   the case.

13           And the Fifth Circuit says Texas can allege injury,

14   can allege standing because the agency's action is

15   encouraging others to violate state law.

16           MR. MODY:  Uh-huh.

17           THE COURT:  That seems pretty on point to what the

18   Plaintiffs have alleged here.

19           MR. MODY:  So I am not -- as you have probably

20   noted, I am not familiar with that case.  I guess it seems a

21   little bit like in that case, and, again, without having read

22   it or being familiar with the facts, that there might have

23   been some kind of incentive that was given to companies to

24   store their nuclear waste under those circumstances.  I don't

25   know if the Federal Government was subsidizing it in some way

1  or the Federal Government was --

2          THE COURT:  Well, none of those facts -- that may

3  be true, but none of those facts entered into the discussion

4  or the analysis by the Fifth Circuit.

5          Well, that is my question -- one of the questions I

6  have on Texas's standing.  And if you want to look at the

7  case later, I am not going to make you stand there and

8  answer --

9          MR. MODY:  Sure.

10         THE COURT:  -- distinguish a case you have never

11  read.  But I am happy to hear you later after you have had an

12  opportunity to review it.

13         MR. MODY:  Understood, Your Honor.

14         I guess I just wanted to emphasize one more time

15  with respect to Texas's standing that, yeah, I mean, we think

16  that the kind of promotion -- what Plaintiffs are calling

17  promotion of these technologies or whatnot was really sort of

18  limited to the foreign context for GEC and for the State

19  Department.  And so --

20         THE COURT:  Well, that gets into the factual

21  attack.

22         MR. MODY:  Right.

23         THE COURT:  And I don't know what to do with that.

24  Because, you know, this is a 12(b) motion.  There's not been

25  any discovery.  They filed a complaint.  And I interpret

1  their complaint to be alleging much more than just the

2  funding of technologies to censor foreign propaganda.  It

3  went much further, according to Plaintiffs' allegations.

4          They may be completely wrong.  And at summary

5  judgment you may come in, or trial, and introduce all sorts

6  of evidence to establish they are wrong, but at this stage

7  shouldn't I just be looking at the complaint and kind of put

8  off for another day all of the evidence that you've

9  submitted?

10          MR. MODY:  Well, I think for -- I don't think the

11  Court needs to look at the factual attack, but, of course, to

12  the extent that you are inclined to disagree with us on the

13  facial challenge to Plaintiffs' standing, we think that there

14  is case law that supports that, you know, Defendants are

15  entitled to bring a factual challenge to jurisdiction, and

16  the Court can resolve even contested facts --

17          THE COURT:  Well, I've been looking at those

18  cases --

19          MR. MODY:  -- under the 12(b)(1) motion.

20          THE COURT:  -- and, I mean, I understand that if

21  there is a dispute about an amount in controversy, for

22  example, or the citizenship of a party, that makes sense that

23  you would conduct a small summary judgment proceeding on that

24  disputed fact question.  It doesn't make sense that you would

25  require the parties to stay in federal court when the Court

1  lacks jurisdiction, for months --

2        MR. MODY:  Right.

3        THE COURT:  -- only to disprove it later when it

4  could have been handled first.

5        But what you have done is challenged the truth of

6  virtually all of the allegations.  And I don't know that I

7  have ever seen that before where a party -- a Defendant comes

8  in and says there is no standing because there is no injury

9  because none of this ever happened.

10        MR. MODY:  Right.

11        THE COURT:  Can you cite me a case where a court

12  has essentially allowed a defendant sort of a preliminary

13  summary judgment motion on the merits at this early stage?

14        MR. MODY:  I mean, I think that I would just

15  distinguish between -- we are not claiming that the factual

16  attack is -- says that their claims are foreclosed on the

17  merits.

18        I mean, we think that Plaintiffs do bear the burden

19  of establishing Article III standing, and part of that is

20  alleging concrete injury.

21        And I think that the complaint has a handful of

22  specific allegations about these grants that went to

23  NewsGuard and GDI, but sort of I think more broadly the sort

24  of overall rhetoric of the complaint gets into allegations

25  that there is this much broader censorship scheme going on,

1    and I think that is how Plaintiffs are attempting to

2    establish their ongoing injury.

3         Because Plaintiffs agree that most of the specific

4    allegations of the complaint did -- do relate to conduct from

5    several years ago, and I think couldn't really be -- there is

6    nothing to enjoin, for instance, with respect to the grants,

7    there is nothing to enjoin with respect to the platform

8    Disinfo Cloud.

9         So I guess my reaction would be that part of that

10   is -- to just clarify some of that for the Court, and we

11   think that because standing here when they brought a

12   constitutional challenge, some of the facts are related to

13   the merits in some sense, but I guess concrete injury,

14   traceability, redressability we see those as core sort of

15   jurisdictional issues that Plaintiffs are required to plead,

16   understood that it is different --

17        THE COURT:  I don't think they would disagree with

18   that.

19        MR. MODY:  Yeah.

20        THE COURT:  And I have had many cases where

21   Defendants challenged the allegations as failing to allege

22   injury, failing to allege redressability along the lines of

23   what you have done.  But it doesn't get into the -- I mean,

24   we don't start looking at evidence at this stage.  I mean, it

25   would be entirely unfair to require the Plaintiffs to counter

1   your affidavits that you have submitted when they haven't

2   even had any discovery, right?

3           MR. MODY:  Your point is well taken, Your Honor.  I

4   think we understand your position on this.  We feel that the

5   declarations do go to jurisdictional issues that this Court

6   has the ability to resolve at this time.

7           And we also think that, to the extent, for

8   instance, that Plaintiffs have the burden to establish

9   concrete actual ongoing injuries to them, our position is

10  that those should be facts that are within their

11  position -- within their possession, and so we don't think --

12  we don't think that the fact that we have submitted

13  declarations necessarily means that Plaintiffs --

14          THE COURT:  I mean, another alternative would be

15  allow the parties to engage in jurisdictional discovery,

16  which, as you have teed it up, would essentially be discovery

17  on the merits.  I am assuming that is not what Defendants

18  would want at this point.

19          MR. MODY:  No, that is not, Your Honor.  I mean, we

20  think it makes most sense to just resolve the motion to

21  dismiss and motion to transfer first on the papers.

22          And, of course, if Your Honor is inclined to

23  disagree with us or deny both of those motions, then I think

24  we would just be past the Rule 12 stage at that point, and

25  then be going into sort of normal order of civil litigation.

1          THE COURT:  Okay.

2          Did you want to address the issue with Texas having

3     not enforced the state law?

4          MR. MODY:  Certainly, Your Honor.  Thank you.

5          I think that is part of a piece with the rest of

6     our argument, but we think that that goes most directly to

7     injury-in-fact, that there is no sort of ongoing --

8     Plaintiffs -- or, excuse me, Texas hasn't alleged that they

9     have attempted to enforce HB 20 or are imminently going to

10    enforce HB 20.  And so we think that that sort of means

11    facially that there is no injury-in-fact to Texas.

12         They also haven't alleged that there is any

13    particular platform that is currently violating HB 20.  And

14    so, again, there is the separate traceability issue, but we

15    think that that means that there is no -- there is no ongoing

16    violation of HB 20 that Defendants are causing because, in

17    our view, there is no ongoing violation of HB 20 that Texas

18    has alleged.

19         THE COURT:  Well, what about the EMTALA case that

20    Judge Hendrix had, I think it was Texas vs. Becerra?

21         MR. MODY:  Uh-huh.

22         THE COURT:  Are you familiar with that case?  I

23    think it is discussed in the papers.  This is the case where

24    Texas obviously has antiabortion statutes, federal agency

25    issues guidance that would require emergency room doctors to

1    perform abortions in Texas and everywhere under certain

2    emergency conditions.

3           MR. MODY:  Right.

4           THE COURT:  Texas challenges it using the same

5    theory that they have alleged here, that the agency's

6    guidance would harm the State's sovereign interest in the

7    enforcement of its own laws.

8           There is no allegation anywhere in the district

9    court opinion or statement that anybody had actually

10   confronted the situation that would have required Texas to

11   enforce its antiabortion statutes.  But the district court

12   found that Texas had asserted an injury.

13          What is your response to that?  That seems pretty

14   similar to this scenario.

15          MR. MODY:  Yeah.  I appreciate that, Your Honor.  I

16   guess two responses.

17          One is that, to the extent that case law in that

18   case is not enjoined, then we think -- we think that creates

19   a sort of separate redressability problem here for Texas.

20   Because to the extent that a statute is enjoined, then it is

21   not going to be able to enforce the statute regardless of

22   what happens in this litigation.

23          But maybe the more important point is, again, there

24   it seems there was a direct conflict between the federal --

25   Texas was alleging that there was a direct conflict between

1    the federal law and the state law, and I guess we just don't

2    understand what the conflict would be between any of the

3    conduct that is alleged in the complaint and HB 20.

4            It sounds like they are -- private parties would be

5    forced to make a choice between -- or could be forced to make

6    a choice between --

7            THE COURT:  Well, now you are going to back to the

8    first issue we talked about --

9            MR. MODY:  Right.  I think that sort of goes to the

10   first issue more perhaps --

11           THE COURT:  Okay.

12           MR. MODY:  Yeah.

13           THE COURT:  What do you do with the fact that HB 20

14   has a private citizen enforcement mechanism?  So even if the

15   State can't bring any kind of action to enforce it, the

16   citizens throughout Texas, as I understand it, can.  They are

17   not enjoined from doing that.  And that is the way the Texas

18   Legislature crafted the statute --

19           MR. MODY:  Certainly.

20           THE COURT:  -- it was enacted by the people, and

21   signed into law by the Governor.  Why wouldn't that still be

22   affected by what -- at least what the Plaintiffs are claiming

23   that the Defendants are doing here?

24           MR. MODY:  So, again, I am not sure how any of

25   Defendants' conduct is interfering with a private party's

1    ability to bring an enforcement suit.  We haven't --

2    Plaintiffs haven't provided any examples of a Plaintiff

3    attempting to bring an enforcement suit.

4         THE COURT:  Well, then what -- I don't think there

5    is anywhere in the case law that says that is the kind of

6    conflict that has to exist.  I mean, as I understand it, if

7    the Defendants, if the State Department were requiring social

8    media companies --

9         MR. MODY:  Understood.

10        THE COURT:  -- to employ these technologies --

11        MR. MODY:  Uh-huh.

12        THE COURT:  -- they are requiring them to violate

13   state law, and the fact that the State of Texas can't bring

14   any kind of enforcement action at the moment doesn't prohibit

15   citizens from bringing those actions, as I understand the

16   state law.  And why wouldn't Texas's sovereign interests in

17   the enforcement of its own laws still be an injury or harm

18   that they could allege here?

19        MR. MODY:  Understood, Your Honor.  So I guess my

20   response to that is very similar to my prior responses, which

21   is that the traceability issue that we discussed at the

22   outset and then I think with the private enforcement

23   provision and the transparency provision, which is something

24   that they have raised again, those were not -- those are not

25   in the complaint.

1          I think on the transparency provision, there is

2     sort of the separate point, which is that none of Defendants'

3     conduct -- I believe that provision requires platforms to

4     report, I think it might be once a year or twice a year, on

5     the decisions that they've made with respect to content on

6     their platforms.  And I don't think any of the allegations or

7     any of the products that are discussed here would prevent a

8     social media platform --

9          THE COURT:  Well, I have a question about that for

10    Plaintiffs when they get up.

11         MR. MODY:  Understood.

12         THE COURT:  Okay.  Do you want to move on to --

13    anything else about Texas's standing that you want to

14    address?

15         MR. MODY:  Unless, Your Honor has further

16    questions, I am happy to move to Media Plaintiffs' standing

17    or anywhere else.

18         THE COURT:  Okay.

19         MR. MODY:  Yeah.

20         So I think some of these points we have covered

21    with respect to Texas's standing, but I think, you know, with

22    respect to injury-in-fact, I just want to focus maybe on the

23    ongoing harm because that is I think a key point and

24    something that they have to allege both for the purposes of

25    injury-in-fact and also for redressability.  There needs to

1   be some ongoing conduct that the Court could enjoin in terms

2   of standing.

3           And so, I mean, I think this gets into the timing

4   issues.  The vast majority of the allegations in the

5   complaint were from years ago, and so even if -- setting

6   aside our factual attack, even if you were to accept that

7   there was some conduct that injured Plaintiffs in the past,

8   Plaintiffs haven't identified specific, ongoing conduct that

9   is harming them in a concrete way that could be enjoined.

10          Just to take the example of discussions with social

11  media platforms or what they call the Silicon Valley

12  initiative, I think, gee, our clients at the State Department

13  just sort of part of their mandate to understand the ways in

14  which technology is used by foreign actors to spread

15  disinformation, part of that -- part and parcel of that is

16  talking to private sector companies and understanding the way

17  that technology works and the way that they are maybe seeing

18  certain disinformation narratives kind of spread on their

19  platforms.  Plaintiffs haven't identified -- haven't

20  identified examples of the State Department sort of telling

21  any platform to take down content --

22          THE COURT:  But do they have to identify specific

23  examples?  I mean, they have identified past examples, and

24  then they repeatedly say, you know -- and they have -- I

25  can't remember where it is, but there are allegations that

1    Defendants have said, you know, we are discontinuing Disinfo

2    Cloud but stay tuned for more.  We are going to have further

3    platforms available.

4              MR. MODY:  That's right, Your Honor.

5              THE COURT:  Why isn't that enough?  I mean, under

6    the federal rules they don't have to allege every single

7    current violation or future violation, right?

8              MR. MODY:  Absolutely, Your Honor.  I mean, we

9    still think that a statement from the State Department --

10   that statement I think was in 2022, tying that to a concrete

11   injury to The Daily Wire and FDRLST Media in 2024, we just

12   think that Article III requires more.

13             The requirement is that there needs to be an actual

14   concrete and particularized injury to them that is ongoing or

15   imminent.  And we think a statement from Defendants from two

16   years ago that there is a platform that they no longer are

17   using but that stay tuned for another platform, and then

18   there is no allegation about what that platform is, what that

19   platform is used for, how that platform is injuring

20   Plaintiffs in 2024, and we just think that all of the

21   standard requirements for injury-in-fact are not met by

22   allegations.

23             I think that is actually a good example that, in

24   our view, of an allegation that Plaintiffs are attempting to

25   use to tie it to ongoing injury-in-fact but falls short of

1    the actual concrete, particularized requirements.

2                    THE COURT:  Okay.

3                    MR. MODY:  Yeah.

4                    So I guess I would say the same thing about

5    allegations regarding the private sector engagement work.

6    Even if they don't have to identify that there was a

7    specific, for instance, action taken, there is no allegation

8    even that any of those conversations are about The Daily Wire

9    and FDRLST Media.

10                   And to the extent, at least that is -- I don't see

11   that specific allegation in the complaint.  And that, at the

12   very least, seems like it would be required to show some type

13   of particularized harm to them.

14                   Again, they point to I think there are three

15   Twitter posts on the Disinfo Cloud Twitter.  Those are

16   referenced in the complaint and also referenced in their

17   motion to dismiss opposition.  Those are all from three or

18   four years ago.  They are also on a Twitter account that is

19   inactive and that is not even controlled by the State

20   Department or GEC.  The same is true for the Digest articles

21   that they point to.

22                   So I think a lot of this -- a lot of Plaintiffs'

23   theory about ongoing injury to them is tied to a handful of

24   things that are sort of still on the Internet.  Most of it is

25   on third-party websites.  Couldn't really be enjoined --

1           THE COURT:  Well, what is the GEC doing right now?

2    I mean, if they are not doing any of this, what is their

3    function?  What are they doing on a daily basis?  They are

4    still open for business, correct?

5           MR. MODY:  Correct, Your Honor.

6           THE COURT:  Okay.

7           MR. MODY:  So, I mean, the GEC's mission is foreign

8    disinformation, and they are still hosting international tech

9    challenges.  So I believe the recent one was in the Ivory

10   Coast or something like that.

11          They are still hosting tech challenges for

12   companies to, you know, show products and then how those

13   products can be used to counter foreign disinformation.  I

14   think there is a lot of, for instance, Russian disinformation

15   that is being spread in Europe related to the war in Ukraine.

16   That is a key focus or the GEC.  There is still a lot of --

17          THE COURT:  And what do they do to ensure that that

18   stuff doesn't filter back and censor Americans?

19          MR. MODY:  So, I mean, their focus is all on -- a

20   couple of responses, Your Honor, and I am probably not going

21   to be able to explain the exact technology in terms of how --

22          THE COURT:  I probably wouldn't understand it

23   anyway.

24          MR. MODY:  -- they do this.

25          But, you know, our understanding is GEC has kind of

1   mechanisms for identifying whether, you know, someone is a

2   non-U.S. person in terms of a Twitter account or something

3   like that.

4         GEC also does more just sort of straightforward

5   things, such as they might publish a report in a foreign

6   language that is clearly targeted at -- you know, they might

7   publish a report in an Eastern European language or in French

8   or something like that.

9         And that is clearly just targeted at places in

10   Europe, places overseas, and countering narratives that are

11   being pushed by adversaries.

12         And so I think there is just a lot of checks and

13   balances in terms of what GEC --

14         THE COURT:  But when they are funding tech

15   challenges to invite private entities and people to create

16   tools to counter foreign propaganda, how do they ensure that

17   that is not used in the United States to censor Americans and

18   the press?

19         MR. MODY:  So, I mean, I am not sure I am prepared

20   to give a much more fulsome answer to that question.  I think

21   we have obviously been focused on the allegations in this

22   specific case and -- I mean, with respect to Media Plaintiffs

23   and with respect to The Daily Wire and Federalist, so I think

24   I am not going to be able to give a more fulsome answer to

25   that question.

1          THE COURT:  Okay.

2          MR. MODY:  But, yeah.

3          So just moving from injury-in-fact to traceability

4     for a minute, and I just want to focus on the facial attack.

5          Again, we think this is all kind of about private

6     conduct.  This is all about Plaintiffs' concerns about how

7     GDI and NewsGuard, which have described The Federalist and

8     Daily Wire in contexts that are separate from the Defendants

9     and then kind of market those products to other companies.

10         I think one point I wanted to emphasize that gets a

11    little bit lost in the briefing perhaps is that Plaintiffs

12    describe a lot of these tools and technologies as censorship

13    tools and technologies, but the declarations from -- from --

14    I guess the products are not censorship technologies, and

15    they don't -- you know, NewsGuard, GDI, and similar

16    companies, they don't have the power to kind of censor or

17    blacklist entities.  They create products that -- that --

18    essentially, their opinions of the credibility of news

19    organizations, and according to kind of free market

20    principles, other advertisers or platforms or whatnot are

21    free to adopt those policies.

22         I think with respect to NewsGuard and Plaintiffs

23    focus a lot on the -- their ratings of -- their ratings

24    product essentially, the nutrition labels of products.

25         If you are a -- if you are just a normal Internet

1   user, such as yourself or myself, and we were to install

2   this, it would just provide a little box that provides more

3   content in our browser.  And then as a reader, you are sort

4   of free to interpret that however you would like.

5           And we think that this is like -- we think this is

6   an alternative essentially to censorship, or that is how

7   NewsGuard and GDI have described their products.

8           THE COURT:  But you don't think the State

9   Department or the Federal Government could create that kind

10  of technology and target domestic speech, do you, American

11  media companies?  And, you know, require social media

12  companies to provide these sort of explanations for certain

13  speech.  You are not making that argument, are you?

14          MR. MODY:  We are not making the argument that the

15  State Department has the power to compel the platforms to,

16  you know, say certain things --

17          THE COURT:  Well, I don't mean the power to.  I

18  mean, assuming there is --

19          MR. MODY:  Consistent with the --

20          THE COURT:  Yeah, consistent the First Amendment.

21  Okay.

22          MR. MODY:  Yeah.  But we also don't think that's

23  necessarily what this case is about.  Because, again, just

24  focusing on Daily Wire and Federalist, you know, we don't

25  think there is an allegation in this case that the Defendants

1    are compelling anyone to speak, at least I don't think there

2    is a compelled speech argument that Plaintiffs have made

3    here.

4                THE COURT:  Okay.

5                MR. MODY:  Unless Your Honor has more questions

6    about traceability, I am happy to do redressability quickly.

7                THE COURT:  Okay.

8                MR. MODY:  I think this is -- I think I have sort

9    of said some of this already, but we think the kind of

10   breadth of the injunctive relief that Plaintiffs are seeking

11   here is kind of indicative of the fact that they haven't

12   identified specific actions that would be enjoined or

13   specific conduct that would be enjoined that would redress

14   their injuries.  And so I just wanted to -- yeah, I just

15   wanted to say that before --

16               THE COURT:  Okay.

17               MR. MODY:  -- kind of closing on standing.

18               THE COURT:  Do you want to talk about the APA

19   claim?

20               MR. MODY:  Sure, Your Honor, I'm happy to address

21   the APA claim.

22               I mean, in the Fifth Circuit, identifying a final

23   agency action is a jurisdictional requirement for the APA

24   claim.  And, you know, Plaintiffs haven't identified a

25   discrete final agency action.

```
1              In the complaint, their identification of the final
2    agency action is essentially a broad, secretive scheme that
3    they say needs to be enjoined, and we think that just doesn't
4    meet the discrete final agency action requirement under the
5    APA.
6              THE COURT:  Are you aware of any cases -- maybe you
7    have cited them -- where courts have decided this question at
8    the motion to dismiss stage, or would it be better to decide
9    it later?
10             MR. MODY:  I mean, we -- I am not sure if the Lujan
11   vs. the Defend -- it is not Defenders of Wildlife -- the
12   National Wildlife case is -- I'm not sure if that is a motion
13   to dismiss stage, Your Honor, but we think that is part of
14   their pleading requirement to establish jurisdiction.
15             THE COURT:  Okay.
16             MR. MODY:  Well, unless you have a specific
17   question about the APA claim --
18             THE COURT:  That was it.
19             MR. MODY:  Okay.  Thank you, Your Honor.
20             Any other questions about standing, or would it be
21   better if I moved to venue?
22             THE COURT:  You can move to venue.
23             MR. MODY:  Okay.  Just briefly, Your Honor.  I
24   think there are two parts to -- two main parts to our venue
25   argument.
```

1          The first is that, in our view, because Texas lacks

2     standing, then you can't be premised on Texas's presence in

3     this lawsuit, and the complaint -- the basis for venue that

4     is pled in the complaint, I think it is paragraph 9, is

5     focused on Texas.

6          In their -- I think in their briefing and their

7     opposition, Plaintiffs have raised the sort of second basis

8     for venue, which is whether a substantial number of events

9     that led to -- that gave rise to the claims occurred in this

10    district.

11         We don't think that is well pled.  It is not in the

12    complaint.  But even if -- even if Your Honor looks at that,

13    we don't think -- we don't think they meet that standard

14    because none of Defendants' conduct took place in this

15    district, and Media Plaintiffs don't reside in this district

16    and are not sort of present in this district --

17         THE COURT:  But if I find that Texas has standing,

18    are you still arguing that Texas can't sue in the Eastern

19    District of Texas?

20         MR. MODY:  We have made that Honor Your -- we have

21    made that argument, Your Honor.  We are certainly aware that

22    the weight of authority in the Fifth Circuit cuts against us

23    on that argument.  But we would say that that is a separate

24    basis for denying venue even if Texas has standing.

25         THE COURT:  Okay.

1          MR. MODY:  And so just in terms of the substantial

2   part of the events prong, we think that the focus needs to be

3   on where Defendants' conduct occurred.

4          And we are aware that there are some cases that

5   look to the burdens on the parties, but we think those cases

6   focus primarily on the burden -- the burden to parties that

7   are actually present to -- present in the district.

8          We think the Career Colleges case is pretty

9   instructive on this point, and Media Plaintiffs are just not

10  present in the district in a way that those cases recognize

11  as being sufficient to establish that a substantial party

12  event has, in fact, occurred here.

13         THE COURT:  Okay.

14         Okay.  Let me hear from Plaintiffs' counsel on

15  those issues, and then we will talk about the motion for

16  expedited discovery.

17         MR. MODY:  Thank you, Your Honor.

18         MS. DOKUPIL:  Well, I would actually like to start

19  with venue.

20         THE COURT:  Do you think it is appropriate for me

21  to start with venue when they have challenged standing for

22  one of the key parties?

23         MS. DOKUPIL:  Absolutely I think venue comes first.

24  This is based on the Seariver Maritime vs. Pena case in the

25  Southern District of Texas.

1          And in that court it says that the Section 1391(e),

2     which is relevant here, makes no mention of standing, and

3     there is no case construing Section 1391(e) in which standing

4     was taken into consideration.  Plaintiffs' arguments on

5     standing are not probative on the venue issue.  And if

6     plaintiffs' claims raise a genuine issue of standing, the

7     question must be addressed by a court with proper venue.

8          So that says to me that venue comes first, and then

9     we look at standing once we are in a court of proper venue.

10          I think there might be a hypothetical scenario if

11     venue were found to be proper and then none of the Plaintiffs

12     had standing, and then obviously the case would be dismissed.

13          But, especially, if you are going into a factual

14     attack on jurisdiction where there is really going to be

15     quite a debate about standing, it really does seem that

16     should be in a court of proper venue.

17          And it is Texas's position, as Your Honor pointed

18     out earlier, that we can sue anywhere within our borders.

19     That is what the great weight of authority that has addressed

20     the question says.

21          And this is a case arising under 1391(e)(1) against

22     an officer or employee of the United States, and this is --

23     under part (c) it is -- it's -- venue is proper where the

24     Plaintiff resides if no real property is involved in the

25     action.

1          It has been the law for nearly 130 years that a

2     state resides within any point within its borders.

3          Defendants point out in their brief that the cases

4     that we cite rely on the, quote, flawed reasoning of

5     California vs. Azar, but that is, in fact, a rejection of the

6     exact argument that they have raised here, that 1391(c)(2)

7     controls and a state is an entity that can sue and be sued

8     and is limited to its principal place of business, which is

9     its capital.

10          But the great weight of authority goes very

11    strongly against that.  And, in fact, Defendants' argument

12    has been rejected twice by Texas Federal Courts in the last

13    year.

14          In Texas vs. Department of Homeland Security, they

15    said:  Consistent with what the Fifth Circuit and every other

16    federal court to have addressed this issue have held, Texas

17    resides at every point within the boundaries of the state,

18    including the Victoria Division.

19          The Northern District of Texas reached pretty much

20    the same conclusion in Texas vs. Garland.  Same argument.

21    And the court said:  By its plain terms, Section 1391(c)(2)

22    refers to corporations and unincorporated associations, not

23    sovereign states.

24          So Texas feels like its claim to venue is quite

25    strong and consistent with the great weight of authority for

1   over 100 years.

2          THE COURT:  Okay.

3          MS. DOKUPIL:  Okay.  To that end, if Texas is --

4   has venue at any point within its borders, including the

5   Eastern District, then Media Plaintiffs can also bring their

6   claims under the doctrine of pendent venue, which is very

7   similar to pendent jurisdiction.

8          It simply means that when you have claims that

9   arise under a common nucleus of operative fact, that the

10  venue can reach those other claims.

11         So if Your Honor doesn't have any further questions

12  on venue, I'd like to move on to standing.

13         THE COURT:  You may.

14         MS. DOKUPIL:  Great.

15         So let's start with the facial challenge to

16  standing.  And that is the only type of challenge that is

17  raised in the motion to transfer venue.  The factual attack

18  isn't raised until the motion to dismiss.

19         So on facial challenge, all Texas's allegations

20  should be taken as true for the purposes of standing and

21  venue.  And Texas has properly pled standing because it has

22  pled an injury to its sovereign interest in creating and

23  enforcing its laws that was caused by the Defendants and can

24  be addressed by injunctive relief.

25         Regarding injury-in-fact.  The Fifth Circuit has

1    held that states have a sovereign interest in the power to

2    enforce and create the legal code.  And pursuant to that

3    interest, states may have standing based on federal

4    assertions of authority to regulate matters they believe they

5    control, federal preemption of state law, and federal

6    interference with the enforcement of state law, at least

7    where the state statute at issue regulates behavior or

8    provides for the administration of state programs.  And that

9    is exactly what we have here in HB 20.

10          And in order to plead standing, Texas only needs to

11   establish a substantial risk of an identifiable trifle of

12   injury to demonstrate standing.  And to this end, this

13   answers the question that was brought up earlier about, does

14   Texas actually have to demonstrate that any enforcement has

15   been tried and failed?

16          And I would say no because that would be

17   inconsistent with only having to demonstrate a substantial

18   risk of an identifiable trifle.

19          What Texas has to show is that the risk of injury

20   is out there to its enforcement of its code.

21          And, also, the Supreme Court in Biden vs. Nebraska

22   has held that an agency action harms the state's performance

23   of its public function, and that is necessarily a direct

24   injury.

25          This is a case where the Department of Education's

1    loan forgiveness was challenged in the Supreme Court, and the
2    state was determined to have standing to challenge that.
3    Because when a federal law interferes with a state's exercise
4    of its sovereign power to create and enforce legal code, it
5    inflicts on the state the requisite injury-in-fact.

6              THE COURT:  And what was the state law in that
7    case?

8              MS. DOKUPIL:  This was MOHELA.  This was the
9    Missouri plan to run a loan program.  And so they were
10   fiscally harmed by the loan forgiveness program because they
11   could no longer collect the interest on the loans that they
12   had out.

13             So HB 20's stated purpose is to protect the free
14   exchange of ideas and information.  It is right in Section 1.
15   And so any federal policy or agency action that aims to
16   restrict that free exchange of information conflicts with the
17   purpose of the law and with Texas's sovereign interests.

18             The complaint enumerates several areas in which the
19   conduct of Defendants does implicate HB 20.

20             Now, at this point I'm going to say as though -- as
21   though HB 20 -- I am going to speak of it in its entirety and
22   then address the fact that it is currently enjoined in part.

23             So in its entirety, HB 20 requires certain media
24   platforms to disclose how they curate and promote content to
25   users, moderate content, use algorithms so that users can

1   make informed decisions.

2           It also requires a biannual transparency report

3   that includes how often the platform was alerted to illegal

4   or policy violating conduct by users either by employees or

5   automatic detection tools, and it also requires a biannual

6   transparency report that includes the actions taken to like

7   remove, demonetize, or deprioritize content or add a warning

8   to certain content.

9           It allows the Attorney General to bring a lawsuit

10  to enforce HB 20, and it prohibits the censorship of content

11  based on the viewpoint expressed or represented or the fact

12  that the user is within the State of Texas.

13          So these are all things that are on a collision

14  course with what we have alleged if facts are taken -- if the

15  allegations are taken as true, the State Department's effort

16  to censor different voices on a social media platform based

17  on their viewpoint or based on the fact that in the eye of

18  the people encouraging the censorship tools, it's

19  disinformation.

20          THE COURT:  Is the only provision that is enjoined,

21  or stayed I guess, the enforcement of which is stayed is the

22  AG's ability to bring an enforcement action?

23          MS. DOKUPIL:  No, it is a bit broader than that.

24          So the history of HB 20, first the district court

25  enjoined it, and then the Fifth Circuit overturned the

1  district court's injunction, but then they went ahead and

2  stayed the Fifth Circuit's mandate pending the appeal to the

3  Supreme Court.

4       But the only part that is up before the Supreme

5  Court is the ideas raised in the Solicitor General's

6  questions presented.  And those questions presented are only

7  two, whether the law's content moderation restrictions comply

8  with the First Amendment, and whether the law's

9  individualized explanation requirements comply with the First

10 Amendment.

11      So the whole statute is not exactly on the chopping

12 block at the Supreme Court.

13      The statute also has a very robust severability

14 provision.  So we think that, at a minimum, the transparency

15 requirements do not seem to be directly implicated by the

16 questions presented, and so those are likely to not

17 be -- they are not likely to be brought into the First

18 Amendment arguments.  And, at a maximum, the Supreme Court

19 may uphold the various parts that are currently up being

20 challenged.

21      So we think it is entirely premature to overturn

22 the strong presumption of constitutionality that attaches to

23 statutes on the speculation that the Supreme Court might

24 overturn the statute.  It is Texas's position that this law

25 is presumed constitutional until the Supreme Court says

1   otherwise.

2           THE COURT:  Well, and, here, the Fifth Circuit has

3   already upheld its constitutionality.

4           MS. DOKUPIL:  Also that.

5           THE COURT:  What is your argument -- I didn't

6   understand the argument that the Defendants' conduct, as

7   alleged in the complaint, affects the ability of Texas to

8   enforce the transparency provision.

9           MS. DOKUPIL:  There are a couple of different

10  points on that.

11          Well, first of all, if the -- so if the Defendants

12  are -- if the Defendants, as alleged, are censoring

13  technologies, I can see your point that, well, it seems that

14  the media platforms could just go ahead and comply with HB

15  20.

16          And yet I think this is a significant risk that it

17  might be difficult for them to do so.  They may not feel like

18  they want to let everybody know what they are doing.  They

19  may be strongly suggestive that it is not a thing -- but this

20  is something that I would have to explore further with

21  discovery because we do not have the evidence on that right

22  now.

23          Right now we are just saying on information and

24  belief as an allegation in a complaint that we think that

25  there could be issues.

1           THE COURT:  I wondered whether it was that the

2    social media platforms don't necessarily know or understand

3    the extent of the State Department's involvement in the

4    development of these technologies, and that might be a reason

5    why they can't comply with the transparency provision.  Is

6    that an allegation that you make in the complaint?

7           MS. DOKUPIL:  Not directly, although that is

8    something that I would explore further in discovery.  The

9    allegation that we do make in the complaint is that -- and

10   this is to the traceability point, that the Government action

11   can lead to third-party actions like -- Department of

12   Commerce v. New York makes this point, that traceability can

13   be based on -- the Government actions have a predictable

14   effect on the independent actions of third parties.

15          And to this point, I think the Missouri vs. Biden

16   case is very instructive.  That is a Fifth Circuit case from

17   last year.  And while it is up for review before the Supreme

18   Court right now, even just the statement of the case is very

19   instructive on this point.

20          Because in that case it details how a number of

21   departments of the Federal Government, including the White

22   House, the Surgeon General, the CDC, the FBI were engaged in

23   very specific detailed emails with people at social media

24   companies telling them, hey, why didn't you deprioritize this

25   thing that you know that is disinformation?  And the

1   statement of the case shows how the employees or executives

2   at the social media companies were -- basically could not

3   comply fast enough.

4         They were very capitulatory, and I think that --

5   that is more of the situation that I think could surface here

6   with further discovery is that the Government is the

7   Government.  The Government doesn't need to wield a big stick

8   to get things done.

9         The Government really all they need to say is, you

10   know, we'd like it better if you did it this other way.  And

11   Missouri vs. Biden shows us that that is all they had to say.

12   They didn't need to offer a benefit or a consequence.  They

13   just had to nudge.

14         THE COURT:  Mr. Mody said that there is not an

15   allegation in the complaint that any of the social media

16   platforms have violated HB 20.

17         Is that true, or would you take issue with that?

18         MS. DOKUPIL:  I would say that we -- any type of

19   censorship that restricts the free exchange of viewpoints and

20   ideas, which is the purpose of HB 20, would be a violation of

21   HB 20.

22         I would point out, although my colleague

23   representing Media Plaintiffs will have more specifics, but

24   there are definitely some very strong statements that have

25   been made about it.

1          There is -- Alexis Frisbie at the State Department
2     gave a talk about how the GEC is bridging the gap between
3     foreign information and domestic information, that there is
4     an embedded person in Silicon Valley, and people at GEC are
5     really happy to talk to private companies about the tools
6     they have for combating information.
7          So I think there are definitely strong hints that
8     HB 20 has been violated, but we would need discovery to get
9     strong evidence.
10         THE COURT:  Okay.
11         MS. DOKUPIL:  Okay.
12         So we have been talking a bit about traceability
13    and causation.  I would like to point out further on that,
14    that traceability doesn't require a showing of proximate
15    cause or that the Defendants' actions are literally the last
16    step in the chain of causation.
17         All we have to show really is that the Government
18    action created a predictable effect on the decisions of third
19    parties.
20         We -- and we feel like social media companies may
21    not really feel free to disregard censorship tools when the
22    Government suggests strongly to them that they should use
23    them.
24         On redressability, closely related, a Plaintiff has
25    shown redressability if the desired relief would lessen the

1    injury.  It doesn't have to be a complete cure.

2         And so in this case if the individual Plaintiff

3    censorship can also be traced -- I'm sorry, not the

4    individual Plaintiffs, but the -- if people who would be

5    protected by HB 20 are harmed by Government-coerced

6    enforcement of content moderation policies, then that

7    infringes on the State's interests, and stopping that

8    Government conduct would redress Texas's injury.

9         If Your Honor has no more questions on facial

10   challenge, I will move on to factual challenge.

11        THE COURT:  Okay.  You may.

12        MS. DOKUPIL:  Okay.

13        THE COURT:  Well, what is your position on whether

14   the Court should at this point engage in that analysis?

15        MS. DOKUPIL:  A couple of points on that.  If the

16   Court -- let me do this in reverse.  I don't believe that the

17   Court should engage in the analysis at all because the

18   factual attack is not really a factual attack, it is an

19   indirect attack on the merits.

20        However, if it were a proper factual attack, it is

21   not on a minor point, such as Your Honor mentioned earlier

22   like in the amount in controversy or diversity of

23   citizenship.

24        And in which case when it is not on a minor point,

25   at a minimum, we should have jurisdictional discovery before

1    we have a final ruling from the Court on a significant matter

2    in the case.

3            THE COURT:  Okay.

4            MS. DOKUPIL:  In a factual attack, the Defendants

5    present evidence that counters facts relevant to the

6    Plaintiffs' standing, and Plaintiffs are supposed to counter

7    that evidence by a preponderance of their own evidence.

8            But in a situation like we have here, there is

9    asymmetric information.  Most of the information lies with

10   the Government Defendants, which makes it very hard for us to

11   come up with affidavits that counter their affidavits without

12   jurisdictional discovery.

13           That said, it is our position that, in fact, this

14   is exactly the type of factual attack that goes to the heart

15   of the merits of the claim.

16           And the Fifth Circuit has said in Williamson vs.

17   Tucker that when you have jurisdictional facts that are

18   central to the merits of the dispute, going ahead and

19   resolving them as jurisdictional facts essentially deprives

20   the Plaintiffs of the protections provided by Rule 12(b)(6)

21   and Rule 56.

22           Because in a Rule 12(b)(6), it is a failure to

23   state a claim based on a facial challenge, and Rule 56 is the

24   proper venue for if you have a substantive issue in the case

25   that is a disputed issue of material fact.

1          And that is basically what we have here.  We

2     disagree as to whether or not Defendants are engaged in the

3     censorship of American media companies.  That is the heart of

4     the case.  That cannot be factual --

5          THE COURT:  Did y'all cite any cases where the

6     facts were similar to this situation?  I mean, I was reading

7     I think Pickett and the other cases that talk about where

8     jurisdiction is intertwined with the merits.  It seems like

9     those cases involved whether the statutory claim that gave

10    the Court jurisdiction and also would give the Plaintiffs the

11    relief was triggered in that particular case or not.

12         Here, it is -- I mean, as I was saying to Mr. Mody,

13    it is even more fundamental.  The issue is whether Plaintiffs

14    did -- or Defendants did what Plaintiffs are alleging they

15    did or not.

16         MS. DOKUPIL:  Right.

17         THE COURT:  But I haven't seen a case, preferably

18    from the Fifth Circuit, that pretty squarely and clearly says

19    that is inappropriate to resolve at this stage.

20         MS. DOKUPIL:  I think --

21         THE COURT:  It seems like it would be the logical

22    inference from the other cases, but I just haven't seen

23    anything on point.

24         MS. DOKUPIL:  I think Williamson is the closest,

25    and that is a case where the whole federal jurisdiction was

1  determined as to how a certain type of security was

2  classified, and the Williamson case has the longest

3  discussion of exactly how and when to apply a factual attack

4  and what it is good for and what it isn't.

5        The court -- and even in that case, though, it is

6  still more hived off than it is in our case, even though it

7  is fairly fundamental to the case and it involved -- if the

8  idea of a certain security was defined one way, then it was a

9  matter of state law, and there was no federal question

10 jurisdiction.  And if it was defined the other way, then it

11 was a federal question, you know.

12       And the Court has a very lengthy analysis of how it

13 would resolve it either way, and, you know, it ends up

14 talking about it --

15       THE COURT:  And ultimately says that it is

16 inappropriate to resolve that now; is that what you are

17 saying?

18       MS. DOKUPIL:  It partly did and partly didn't.

19 It's a halfway-in-between result.  But the language that it

20 frames it with is very strongly in favor of, if this is an

21 indirect attack on the merits, we are not doing it.

22       So, ultimately, I think they found the definition

23 of the security had enough procedural to it that they need to

24 talk about it.  But it is not as clear-cut as you might

25 like.

1              THE COURT:  Okay.

2              MS. DOKUPIL:  Okay.

3              THE COURT:  I am used to that.

4              MS. DOKUPIL:  Yeah.

5              So we would argue that basically when you distill

6     Defendants' attacks on standing into a few points, they are

7     all right squarely within the merits.

8              For example, Defendants didn't engage in any

9     censorship of American media, so nobody is injured.  Well,

10    that would be right at the heart of the First Amendment

11    claim.  Did you engage in censorship or not?  This is not a

12    jurisdictional claim; this is a merits claim.

13             Or even if Plaintiffs were injured, it was due to

14    the independent actions of third parties.  Well, this right,

15    again, goes to the merits or whether or not Defendants

16    engaged in censorship and they induced or influenced or

17    coerced third parties to do what they wanted them to do.

18             You know, even:  Does Defendants' conduct interfere

19    with HB 20?  Right again.  Did they engage in censorship or

20    not?  Right at the heart of the case.

21             Even -- you know, Media Plaintiffs' injury was only

22    in the past.  Once again, are they engaging in ongoing

23    censorship?

24             So any way you look at it, it is pretty squarely at

25    the center of the heart of the case, did they or are they or

1  will they continue to be engaging in censorship of American

2  media?  And so for that reason, it doesn't seem that it is

3  right for -- or proper to have a jurisdictional argument

4  about it.

5          THE COURT:  Okay.

6          MS. DOKUPIL:  And with regard to Texas

7  specifically, Texas's -- considering that Texas only has to

8  demonstrate a substantial risk of an identifiable trifle of

9  injury at this stage of the litigation, it is still even a

10  low bar.  And even considering Defendants' attack is factual,

11  Texas should still meet it.

12          And if this Court thinks that Texas has not met its

13  burden to survive a factual attack, then Texas would ask for

14  an opportunity for jurisdictional discovery.

15          If Your Honor has no more questions on standing, I

16  can move on to a couple of points about the APA claims.

17          THE COURT:  Okay.

18          MS. DOKUPIL:  All right.

19          So there are two different APA claims in this

20  complaint.  One is a final agency action claim and one is a

21  non-statutory cause of action.

22          Defendants, as you have heard, argue that there is

23  no final agency action, and so the Court doesn't have any

24  jurisdiction to hear the APA claims.  But this is an argument

25  that is only relevant to the final agency action claim.

1            There is a very nice roadmap in the case of Apter

2    vs. Department of Health and Human Services.  And this is a

3    Fifth Circuit case decided last year in 2003 -- '23.

4            And after the Court was presented, like here, with

5    three different claims, a final agency action, a non-final

6    agency action, performed ultra vires, and a common-law ultra

7    vires claim.  And that case was dealing with FDA posts about

8    off-label uses of ivermectin, such as:  Stop it.  You are not

9    a horse.

10           And this case had -- it turned out that the FDA

11   post had consequences for doctors with their state licensing

12   boards and positions with hospitals who expressed a different

13   view about ivermectin.

14           And what happened was that the Apter court

15   determined that the Plaintiffs had presented an ultra vires

16   non-statutory cause of action under the APA, similar to the

17   one that Plaintiffs bring here.  And because they found a

18   waiver of sovereign immunity on jurisdiction based on that

19   one, they didn't really address the other two.

20           But in order to present a non-statutory cause of

21   action under the APA, the Plaintiff needs to show that some

22   agency action affected him in a specific way, and it doesn't

23   have to be a final agency action.

24           You just have to show that the Plaintiff was

25   adversely affected or aggrieved by the action, and in so

1   doing, the Plaintiff has to show that his injury falls within

2   the zone of interest sought to be protected by the provision

3   that forms the legal basis for his complaint.

4           So, here, Plaintiffs have raised such an agency

5   action.  They have alleged that they are aggrieved.  And the

6   zone of interest is provided by the -- two different

7   provisions.

8           One is that the State Department should stick to

9   foreign policy, and the other one is the Antideficiency Act,

10  which basically says that an agency may only spend what has

11  been authorized by Congress and according to Congressional

12  guidelines.  You know, Plaintiffs are alleging here that both

13  of those have been violated.

14          THE COURT:  What is your answer to the question I

15  raised to Mr. Mody about when is it appropriate for a court

16  to consider whether the plaintiffs have identified final

17  agency action?  Should we wait for summary judgment, or is it

18  appropriate at the motion to dismiss stage?

19          MS. DOKUPIL:  Well, it is a bit unclear from the

20  pleadings, but one way it could come up at this stage is if

21  the Defendants were saying that sovereign immunity had not

22  been waived.  In that case, then you would have to address it

23  under 12(b)(1).  But I don't think that sovereign immunity

24  was quite squarely presented in the arguments here, so that

25  does make it more complicated.

1          THE COURT:  And just so I understand, you all are

2     raising alternative claims?  It is either final agency

3     action, or it is not, but either way you can bring a claim?

4          MS. DOKUPIL:  In this case, yes, I think that an

5     action would be final or not final.

6          THE COURT:  Okay.

7          MS. DOKUPIL:  I don't see it -- but we have a

8     non-statutory, non-final action that is fairly squarely on

9     all fours with Apter, and we can also make a claim under the

10    final agency action.

11         THE COURT:  Okay.

12         MS. DOKUPIL:  Yeah, because Apter defines an agency

13    rule very broadly to include even any statement an agency

14    might make.  Even a social media post can be an action.

15         Agency rules fall into two categories, substantive

16    and non-substantive.  So if it is a substantive rule, it

17    really needed to go through notice and comment.  And no one

18    is arguing that what we are challenging went through notice

19    and comment.

20         So for the sake of argument, hypothetically if we

21    argue that they are not substantive rules, then there can

22    still be a claim because a non-final agency action is still

23    an agency action.

24         Here, we are alleging that the Defendants are

25    making recommendations to private companies about using

1  technologies to downgrade American media companies they
2  believe as risky.
3          And very similarly to how the FDA took to social
4  media to say that certain medical treatments are too risky
5  and people who talk about them in a different way should not
6  be doing so, and that Plaintiffs have been adversely
7  affected.
8          So we have many examples in the complaint and the
9  motion for preliminary injunction about -- with public
10  statements by Defendants to say that their goal was to stop
11  advertising revenue from going to disfavored media outlets.
12  And my co-counsel will talk more about that.
13          But the most damning one I think is the founders of
14  GDI stating that their goal is to steer ad dollars away from
15  disfavored media and toward quality journalism.
16          And they are excited about the fact that over a
17  dozen ad tech companies covering 20 media markets used GDI's
18  technology, and they cut the number of ad options in half.
19          So it is very clear that the recipients of State
20  Department funding had a viewpoint that they were promoting
21  in the media.
22          Another item that I find fairly damning is that
23  they funded a training program for American teachers on media
24  literacy, which ultimately instructed teachers to install
25  NewsGuard, which is one of the technologies that has directly

1    harmed the Media Plaintiffs.

2           So we have a number of funding decisions being made

3    and a number of statements made that are clearly aimed at

4    cutting the influence of disfavored media outlets.

5           And as Apter says:  For purposes of determining

6    non-final agency action, we do not see any daylight between

7    an agency that uses imperative language in recommending a

8    course of action and an agency that uses imperative language

9    in prescribing a policy.

10          And this zone of interest test, as I mentioned

11   before, there is a couple of statutes, but it is not very

12   demanding.  All the Plaintiff has to do is bring claims that

13   are arguably within the zone of interest.

14          So moving on to the final agency action claim.  The

15   Court doesn't need to reach this, of course, if it believes

16   that the Plaintiffs have asserted a claim based on a

17   non-final agency action.

18          But the Apter court did not believe that mere

19   tweets rose to the level of a final agency action.  But here

20   we have more than that.  Here we have grants.  And the

21   decision to approve a grant is a final agency action.

22          And People for the Ethical Treatment of Animals vs.

23   Tabak from the District of Maryland in 2023, it says that:  A

24   grant is the consummation of the agency's decision-making

25   process that is of sufficient legal consequence to make the

1    action final under the APA.

2         And the Plaintiffs have detailed a number of

3    decisions for establishment of initiatives, any one of which

4    could be considered a final agency action.

5         Apter notes the test for whether an agency action

6    is final is whether it marks the consummation of the agency's

7    decision process and determines rights and obligations from

8    which legal consequences flow.

9         And, here, the grants and public statements

10   encouraging companies to talk to the State-Department-funded

11   entities for technology to combat disinformation are clearly

12   the consummation of a decision process that reflects agency

13   policy.  And so this prong is met.

14        But the second prong is a little more complicated.

15   The test is whether the agency's action is binding on itself.

16   In other words, has the agency dictated a legal position?

17        And we would argue that it has.  The agency has

18   made public statements, sometimes through its grantees, about

19   the importance of combating disinformation both abroad and

20   domestically.

21        It is made clear that the media companies should

22   adopt its favorite technology to suppress this speech of

23   disfavored viewpoints.

24        And the actions are implicitly taking the position

25   that certain speech by certain American media outlets is not

1   entitled to First Amendment protection.

2          So in Texas/EEOC, the Court said that the agency

3   action is binding once the program has been adopted and the

4   agency has committed itself to a particular position.

5          Further, in Texas vs. U.S., that is the DAPA case:

6   The final agency action is defined as substantive when it

7   doesn't give the agency any discretion to change the

8   initiative and grants funded and deployed.

9          And this is why it makes sense to consider a grant

10  to -- final action because, generally, once you issue a

11  grant, it is done for the duration of the grant period.

12         And, further, the mere possibility that an agency

13  might reconsider its advisory in light of informal discussion

14  or invited contentions of inaccuracy, it doesn't suffice to

15  make an otherwise final agency action non-final.  So just

16  because the agency could take it back doesn't definalize it.

17         So if there a final agency action, then Plaintiffs

18  have alleged facts to establish this Court's jurisdiction

19  over a claim based on that action.

20         Defendants have raised in their motion to dismiss

21  that there was no final agency action, but they haven't

22  argued that in the alternative if there is a final agency

23  action, that it was unreviewable or committed to agency

24  action or non-substantive.

25         But definitely the Plaintiffs would argue that if

1    there is a final agency action and it did not go through

2    notice and comment, then it was arbitrary and capricious

3    because it didn't consider the relevant costs.  It didn't do

4    a sufficiently reasoned analysis for wanting the grants.  It

5    didn't consider more limited options.  And it didn't take

6    into account the reliance interests.

7              But it is probably premature to explore all of

8    those different paths, forks in the road, flow charts at this

9    time.

10             THE COURT:  Okay.

11             MS. DOKUPIL:  If Your Honor has no further

12   questions, I will turn it over to my co-counsel.

13             THE COURT:  Okay.  Thank you.

14             MS. DOKUPIL:  Okay.

15             MS. LITTLE:  I'm Margaret Little representing Daily

16   Wire and the FDRLST Media.

17             On the question of how the Court should proceed, I

18   would agree that my co-counsel that the motion to transfer

19   should be decided first and largely because the motion to

20   dismiss is just poorly based, and this should be the Court

21   who decides it, so -- but I think the Court would be free to

22   change that order as well.

23             THE COURT:  Okay.

24             MS. LITTLE:  And so that is our position.

25             I will be brief on the motion to transfer venue

1   because co-counsel has handled it quite ably.

2         We do have an independent ground for finding venue

3   proper here, the substantial part of the events or admissions

4   have occurred in this venue, and it does not have to be the

5   best venue and the venue where the most relevant acts took

6   place.  It only has to have a substantial connection.

7         Also, the Court may consider the location of the

8   efforts -- the effects, rather, the effects of the alleged

9   conduct.

10         And, for example, here in Texas there was a report

11   prepared by the GDI Labs at the University of Texas that

12   listed in its, I think page 18 of our complaint, it lists the

13   10 worst media and the 10 best media.  And that is clearly --

14         THE COURT:  And that happened in Texas?

15         MR. MODY:  It happened in Texas at the University

16   of Texas at Austin but was distributed throughout the state,

17   throughout the University of Texas system, and to the

18   citizens of the State of Texas.  And those interests are

19   harmed in Tyler just as much as they are in Austin.

20         So, in addition, Daily Wire is a Texas LLP, and

21   both The Federalist and Daily Wire have multiple paid

22   subscribers within the Tyler Division.  They have reported on

23   things that would be of interest to people in the State of

24   Texas.  And to the extent that the Defendants' actions have

25   downgraded, discredited, or defunded their ability to

1   distribute their news media reporting in this district, we

2   think the Court easily can find jurisdiction.

3          We cited to the Court a case called Diesel Power,

4   which addresses the questions of what happens when the

5   conduct that is complained of in the complaint occurs on the

6   Internet.

7          And there the Court held that the venue where the

8   harm occurred where the interests were damaged was proper.

9          We also think the statute, 1391(b)(2) was amended

10  to allow people to sue the Government where these events -- a

11  substantial part of the events took place.

12         And, in fact, when Congress amended that statute,

13  one of the reasons given was that Congress was incensed that

14  Americans would have to sue in DC in order to hold the public

15  officials there accountable.

16         So we think it is contrary to that purpose of the

17  amendment of the statute and that venue is easily established

18  here.

19         And, finally, I would say my able co-counsel has

20  argued the point of pendent venue, and that would be an

21  independent reason to keep the case here.

22         THE COURT:  Okay.

23         MS. LITTLE:  Turning to the issues raised by the

24  motion to dismiss.  We think there are very, very substantial

25  allegations in the complaint that show ongoing, current, and

1   likely future harm that would be addressed by an injunction.

2           Those include the Media Literacy Now campaign which

3   negatively impacts the Media Plaintiff -- Plaintiffs.

4           The Ad Fontes tool that is being promoted by the

5   State Department was shown to over 700 teachers in Germany

6   pursuant to a State Department grant.  Many of those were

7   American teachers who were instructed to use a Data Detox Kit

8   which recommends that students install NewsGuard which lowers

9   circulation.

10          In the briefing on the motion to dismiss, counsel

11  for the State Department suggested that -- or at least in the

12  argument -- sorry -- he suggested there was no compelled

13  speech here.  And I want to expand on that a little bit.

14          Because what happens when you install NewsGuard on

15  a school computer or a library computer is you get this

16  little stamp that says this is a 12.5 rating.  We don't think

17  these people are telling the truth.

18          When the Government does that, when it devotes

19  resources to blacklisting and labeling American news media as

20  unreliable, there is a compelled speech issue there because

21  that thing pops up on the student's computer or the library

22  computer, and it is self-incriminating.

23          Neither of my clients, Daily Wire or Federalist

24  wants to publish their material to have a stamp of Government

25  disapproval put on it when that stamp has been promoted,

1    developed, et cetera, by the Federal Government and in some

2    cases financed by the Federal Government.

3           So we think that there is obvious harm here.  This

4    is also a very developing story.  Counsel for State

5    Department likes to make a point of the fact that Media

6    Literacy Now campaign was not alleged in the complaint.

7           Well, that is just evidence of what is going on,

8    and that story did not break until long after the complaint

9    was filed.

10          That is also a very good indication of why we need

11   expedited discovery because this is an ongoing problem.  It

12   arose -- or at least a lot of it arose during COVID, and a

13   lot of attention was paid to misinformation, disinformation,

14   or what was called that.  And the Government's power was used

15   very recklessly, I would say, in that situation.  And nothing

16   in the laws permits the Government to devote resources and

17   divert resources to the suppression of American news media.

18          That violates any number of constitutional rights,

19   the First Amendment right, which was articulated in Grosjean.

20   That case says that the Government may not discredit media.

21          And then in the -- oh, gosh, the second case is

22   eluding me right now, but what it says is it can't interfere

23   with the finances or financially harm American news media.

24          Those are very important points here, and what has

25   happened is these NewsGuard, for example, loves to brag about

1    the fact that millions of advertising dollars are directed
2    away from these platforms.
3          Well, I think the idea that there is no harm or no
4    ongoing harm is fairly inconsistent with those statements
5    made by the very platforms that are working with the State
6    Department to discredit the media.
7          So there is definitely a lot of disputed facts
8    here.  We think that the submissions that were made by the
9    State Department in connection with their motion to dismiss
10   just are not -- cannot be squared with what the evidentiary
11   record is here.
12         They are also very carefully crafted.  They talk a
13   lot about foreign disinformation, but they don't say they
14   haven't, in fact, attacked domestic news media.  They are
15   very carefully crafted to not actually say that.  And the
16   reason is because that they essentially admit they have done
17   that in the past.  They allege this is old news.
18         I think it is just more evidence that we need to
19   know what happened and get to the bottom of this and to the
20   truth of the story.
21         So there is definitely injury here.  There is
22   definitely traceability.  You can follow the injury to the
23   Plaintiffs back to the State Department very directly, much
24   more directly, in fact, than in Missouri v. Biden.
25         Because once the State Department says use

1    NewsGuard or it provides funding for that, there is immediate
2    harm because what pops up is that stamp of disapproval.
3           Whereas, in Missouri vs. Biden you had an
4    intermediator -- intermediary -- excuse me -- a social media
5    intermediary that had to be, you know, asked, maybe coerced
6    to engage in a censorship.
7           Here, there is no intermediary here.  We think it
8    is much more direct.
9           And so by their own admissions the Media
10   Plaintiffs -- rather, the Defendants have set out a very
11   disturbing campaign.
12           I think it is also important to bring your
13   attention to the Office of Inspector General reports for 2020
14   and 2022, which shockingly show that something like 70
15   percent of the Global Engagement Center's personnel is
16   private sector.  And they admonish -- this is the Inspector
17   General -- admonishes the State Department for having no
18   controls over them, for allowing them to perform essentially
19   governmental functions, no accountability, no reporting.
20   These are very disturbing allegations, and they are not what
21   we put --
22           THE COURT:  One of the questions that I had reading
23   your complaint is whether there is any way that the State
24   Department could ever engage in this kind of conduct and try
25   to really limit it to technologies that would apply only to

1  foreign propaganda without it, as I mentioned earlier,

2  without it washing back on or filtering back down to domestic

3  speakers.

4          What is your position on that?

5          MS. LITTLE:  Yes, there is.  This is redressable.

6  We can craft an injunction that would allow the State

7  Department to continue to use tools and technology to work

8  with and counter foreign disinformation without affecting

9  domestic news media.

10         And that is not just our opinion.  That is the

11  opinion of Congress, which made it very clear an explicit

12  limitation on the powers of the Global Engagement Center,

13  that nothing in there was to permit them to do anything other

14  than counter foreign disinformation.  And so it is not just

15  our opinion, it is Congress's command that they do so.

16         THE COURT:  Okay.

17         MS. LITTLE:  I think my co-counsel very ably

18  addressed the redressability issues and the traceability.  I

19  guess one thing on traceability that I would like to

20  emphasize, and give me a moment and I will find what I

21  want -- it is a very low standard right now on traceability.

22  We just have to show that there is evidence that this was

23  connected to the activities of the Defendant, but there is no

24  requirement that the harm be actualized at this stage.  That

25  is to be developed in discovery.

1          So we think that the motion to dismiss is -- under

2     12(b)(1) is improper, and should not be granted.

3              THE COURT:  Okay.  Okay.

4              MS. LITTLE:  Thank you.

5              THE COURT:  Thank you.

6          Mr. Mody, I will give you a few minutes for

7     rebuttal, and then we can move on to the discovery, expedited

8     discovery issues.

9              MR. MODY:  Thank you, Your Honor, I appreciate

10    that.

11         I just wanted to address a few points that our

12    friends on the other side made.

13         They brought up the Missouri litigation, I think a

14    number of times.  I just wanted to make a few points about

15    that.

16         The first is, that case was pretty different than

17    this case in terms of the breadth of the allegations there

18    and the number of defendants, and that case was primarily

19    about direct communications between the Executive Branch and

20    the social media platforms.

21         But I do just want to point out that the Fifth

22    Circuit specifically carved out the State Department from its

23    injunction.  The Fifth Circuit found that State Department's

24    contacts with the social media platforms was solely about

25    learning how technology worked.  It wasn't about asking the

1    social media platforms to take anything down.

2              And the Fifth Circuit found that even after months

3    and months of discovery in that case, that there was nothing

4    to enjoin with respect to the State Department.

5              And so with respect to the Defendants here and how

6    Missouri may or may not play into that, I just wanted to

7    emphasize that.

8              We also think that, you know, to the extent that

9    Your Honor is inclined to disagree with us on our motion to

10   dismiss, the Supreme Court is almost certainly going to have

11   to address the standing issues in Missouri vs. Biden.  And

12   our -- excuse me, Murphy vs. Missouri before the Supreme

13   Court.

14             And so, you know, we do think that there would be

15   grounds to at least wait for some clarification about the

16   appropriate standing standard.  We don't think the Court

17   needs to wait to decide the motion, but we think that would

18   be an option.

19             THE COURT:  Okay.

20             MR. MODY:  With respect to Texas's standing, again,

21   I think the cases that Texas is citing, that is the EEOC case

22   and then the United States vs. Texas, I think that is the

23   DAPA case, and these involve direct conflict between federal

24   regulation or federal guidance and state law.

25             In EEOC, it was the EEOC guidance that directly

1    injured Texas as a state because it was impossible for Texas

2    to continue its ongoing policies and comply with federal law.

3         In DAPA there was a direct economic injury that was

4    found to the state as a result of the state being required to

5    provide driver's licenses.

6         I had a quick moment to review the NRC case that

7    Your Honor cited, and I think there the key point that I

8    would emphasize that it seems like there was a county that

9    wanted to specifically apply for a place to store nuclear

10   waste.  And there, essentially, the NRC issuing its license

11   was the but-for cause for them being able to store its waste

12   or not being able to store its waste.

13        And, of course, if it was able to store its waste,

14   then that would have directly conflicted with the HB 7, the

15   state law in that case.

16        And so, again, I am not sure where the exact line

17   is.  Your Honor, we were talking about coercion versus just

18   encouragement.  But we think that this case just falls far on

19   the side of there is no direct encouragement.  There is no

20   inducement, I guess I would say.  There is no incentive,

21   positive incentive to the platforms.  There is no negative

22   incentive.  No coercion.  Nothing kind of suggesting that the

23   Federal Government is going to penalize them.

24        The platforms are not required to make a choice

25   between doing something that the Federal Government is

1   telling them to do and complying with the state law.

2           And so we don't think that there is -- it meets the

3   kind of injury to the state sovereign interest there.

4           You asked about the GEC work, sort of how they

5   ensure that it is targeted for overseas.  And something I

6   should have mentioned, it's in the Kimmage declaration and

7   also in the NewsGuard declaration is, you know, the grantees

8   sign statements of work that kind of set out requirements

9   that say that that work is targeted overseas so they are able

10  to ensure this, at least with the grantees contractually.

11          And I think Your Honor asked this question about

12  ensuring that the technology itself only has one purpose.

13  And I think we make this point in our motion to dismiss reply

14  by -- you know, a lot of this technology it is -- depending

15  on what language, for instance, the technology is being used

16  to analyze, you know, it has multiple uses, and we think that

17  it is within the State Department's ability to assess or

18  develop technologies that have uses in terms of fighting

19  foreign disinformation.

20          It doesn't mean that that technology can never be

21  used in a context that would apply to domestic media, but we

22  don't think that that, you know, violates any law because we

23  don't think that any of that is sort of traceable back to --

24  traceable back to Defendants, and we think that --

25          THE COURT:  Well, it sounds like Plaintiffs'

1  counsel agrees with you on that point.

2          MR. MODY:  Yeah, I just wanted to --

3          THE COURT:  Yeah.

4          MR. MODY:  -- wanted to emphasize that.

5          There was a little bit of talk of the Media

6  Literacy Now allegations.  These were the allegations that

7  are in the opposition to the motion to dismiss.

8          Of course, you know, our position would be that it

9  is not in the complaint, and they would need to amend the

10  complaint for you to consider those allegations.  But I guess

11  just one point I want to highlight is that there is no

12  connection to the platforms or the advertisers that are the

13  source of -- the alleged source of injury to media

14  Plaintiffs.

15          I mean, their entire theory of injury is this sort

16  of demonetization through the advertisers or social media

17  platforms taking certain decisions.

18          There is no connection that is drawn between a

19  presentation to teachers and the injuries that they are

20  claiming in their complaint.  And we think that in and of

21  itself is fatal to that allegation.

22          We've made certain traceability arguments in our

23  papers, and then we don't think there is anything to enjoin

24  with respect to the Media Literacy Now project.  That was a

25  grant -- that was a presentation that -- that was a program I

think in 2021 or 2022.  There is no ongoing connection there.
There is no conduct that this Court could enjoin that would
redress any of these injuries.

On the APA and ultra vires claim, I just want to
clarify that, you know, the complaint pleads the APA claim I
think Count 4 separate from the ultra vires claims, and --
or, finally, just the action argument is about Count 4 of the
complaint there.  So I just wanted to respond to that.

THE COURT:  Okay.

MR. MODY:  And then the final point I wanted to
make with respect to the substantial part of the events test
under venue, I think that the Media Plaintiffs' argument
comes down to the fact that they have readers here.  I know
they talked about the report that was put out by UT, but I
believe that is outside this district.  I don't think that is
in the Eastern District of Texas.

But, in any event, I think they are basically left
with the argument that Media Plaintiffs and the Federalists
have readers in the Eastern District of Texas.  I think that
argument would basically -- I mean, if that were true, if
that were sufficient to establish venue, that would mean that
venue is proper everywhere.

And we just don't think that can be consistent with
the purpose of the venue statute.  We don't think that that
is a reasonable reading of substantial part of the events for

1    a news organization that has readers presumably throughout

2    the country to say that venue would be proper in every single

3    district in the country.

4              THE COURT:  Okay.  Thank you.

5              MR. MODY:  Thank you, Your Honor.

6              THE COURT:  Now, I would like to hear from

7    Plaintiffs on the motion for expedited discovery and

8    specifically what exactly it is that you are seeking.

9              I know the motion repeatedly says it is limited and

10   narrowly focused, but I don't know what it is.  Do you have

11   discovery prepared that you could submit to the Court and let

12   me evaluate it?

13             MS. LITTLE:  Yes, Your Honor.  It is probably not

14   quite final, but we could get it to you within a very short

15   period of time.  We have been working hard to focus it and

16   make it just what we said it would be --

17             THE COURT:  Okay.

18             MS. LITTLE:  -- which is focused on the narrow

19   issues that are -- address the claims raised by the

20   Government.  We think we can get those out probably I would

21   say within a week.

22             THE COURT:  Okay.

23             MS. LITTLE:  The other thing, I do want to address

24   a couple of things that were said on rebuttal on

25   redressability and the Media Literacy Project.

1              If you go on to the website and you watch those

2    presentations that will go to American teachers asking them

3    to do things like the Data Detox Kit and the -- to install

4    NewsGuard, the State Department's seal is right on the first

5    slide of every one of those presentations.  That is the

6    Government's seal that this is a good idea for school

7    children and people in libraries to install this technology.

8              That can be -- that makes it both traceable and

9    very redressable.  Those things should be taken down.  And we

10   have a multitude of things in our complaint that are still up

11   on live sites that can be taken down.  And so this injury is

12   indeed very redressable.

13             THE COURT:  Okay.  Now back to the discovery, so

14   what would your time table be?  I think somewhere I recalled

15   a couple of months and then a whole-day hearing on the

16   preliminary motion -- or preliminary injunction motion in

17   June.  Is that --

18             MS. LITTLE:  I think because this went out a little

19   bit further, maybe midsummer is more realistic.

20             THE COURT:  Okay.  Well, when you submit whatever

21   the proposed discovery that you are looking for the

22   preliminary injunction motion, if you could include your

23   proposed time table, that would be helpful.

24             MS. LITTLE:  Absolutely.  And we have that prepared

25   and we are going to foreshorten the normal time period so

1  that can be done quickly.

2         THE COURT:  And, obviously, if Defendants want to

3  respond to that notice, that is fine.  I am not going to take

4  up issues on scope of discovery.  We are not going to fight

5  about discovery.  But I just want to know what specifically

6  it is in Plaintiffs' dream world that they would be able to

7  get during this expedited discovery period in evaluating

8  their motion.

9         MS. LITTLE:  Well, just to give you a heads up, it

10  very much tracks what we would seek by way of injunctive

11  relief.  So these are the things that can be fixed now --

12         THE COURT:  Okay.

13         MS. LITTLE:  -- and stopped now.

14         THE COURT:  Okay.

15         Okay.

16         MS. LITTLE:  Thank you.

17         THE COURT:  Mr. Mody, do you or anyone else want to

18  respond on that point?

19         MS. CANEVARI:  Sure, Your Honor.  This is Dorothy

20  Canevari on behalf of the Defendants.

21         Just at the outset, did you say that when

22  Plaintiffs submit their proposed discovery, that the

23  Defendants would have an opportunity to respond to the scope?

24         THE COURT:  Yes.

25         MS. CANEVARI:  Okay.

1      THE COURT:  Then I said I am not looking for a

2  motion to quash or anything like that.  If you want to

3  respond to the point that this is way too broad, it should be

4  more narrowly limited, that sort of thing in relation to

5  their motion, the Plaintiffs' motion for expedited discovery,

6  I would consider that.

7      MS. CANEVARI:  Okay.

8      THE COURT:  Okay.

9      MS. CANEVARI:  Understood.

10      Just a few points.

11      First, it is Defendants' position that expedited

12  discovery before the motion to dismiss is decided would be

13  improper, as the Court needs to ensure itself of jurisdiction

14  before turning to expedited discovery.

15      If Defendants are given an opportunity to respond

16  to Plaintiffs' proposed interrogatories and requests for

17  production, I won't get into that now, but it is our position

18  that the scope of these requests are overbroad as for the

19  broad categories of information that Plaintiff has sought

20  expedited discovery on.

21      They are seeking things that are about conduct that

22  is years in the past and that are on a platform that is no

23  longer operational.  And those things are necessarily

24  overbroad to their motion for preliminary injunction.

25      And courts have found that expedited discovery is

1   improper when the information that a plaintiff seeks is not

2   necessary to their motion for preliminary injunction.

3         And, here, the Plaintiffs have said in their motion

4   for expedited discovery that they have sufficient open source

5   evidence to maintain their preliminary injunction motion.  So

6   we would say that the requests that Plaintiffs have at the

7   outset cannot be necessary if they believe that their motion

8   for preliminary injunction is sufficient at that stage.

9         THE COURT:  Okay.  I mean, it sounds like the harm,

10  if there is any harm to Defendants, would be pretty minimal

11  given that at that point merits discovery would begin anyway,

12  assuming the Court denies the motion to dismiss and the

13  motion to transfer.

14        MS. CANEVARI:  If the Court were to deny the motion

15  to dismiss and the motion to transfer, yes, so we would have

16  to, like, discuss with our client about the scope of

17  discovery.

18        And this case does present an APA claim, so we

19  would have to discuss with the agency whether an

20  administrative record would be the appropriate avenue here or

21  what discovery would look like.

22        But, again, for the burden on Defendants -- I mean,

23  the scope of the information that Plaintiffs seem to suggest

24  that they need is really broad, and it would be something

25  that could take months to decide and could result in a burden

1    on Defendants.

2             THE COURT:  Okay.

3             Okay.  Thank you.

4             MS. CANEVARI:  Thank you, Your Honor.

5             THE COURT:  Anything else from Plaintiffs on their

6    motion for expedited discovery?

7             MS. LITTLE:  No.

8             THE COURT:  Okay.

9             Okay.  Anything further from either side on any of

10   the issues today?

11            I think I have everyone's arguments.  The briefing

12   was very good, and I have tried to be as prepared as possible

13   today, but it always helps me to hear from you all who know

14   the case so well in thinking through these kind of difficult

15   issues.

16            And I appreciate the good arguments today and the

17   careful responses.  So I will take those motions under

18   advisement.

19            And unless there is anything further, we are

20   adjourned.

21            (Hearing adjourned.)

22

23

24

25

1

2                                    CERTIFICATION

3

4        I HEREBY CERTIFY that the foregoing is a true and correct

5        transcript from the stenographic notes of the proceedings in

6        the above-entitled matter to the best of my ability.

7

8        /s/ Shea Sloan                              May 3, 2024
         SHEA SLOAN, CSR, RPR
9        FEDERAL OFFICIAL COURT REPORTER

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25