## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

|  |  |  |
|---|---|---|
| THE DAILY WIRE, LLC, et al., | § § § | |
| Plaintiffs, | § § | |
| v. | § § | Case No. 6:23-cv-609-JDK |
| UNITED STATES DEPARTMENT OF STATE, et al., | § § § | |
| Defendants. | § § § § | |

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS AND MOTION TO TRANSFER

"Congress shall make no law . . . abridging the freedom of speech, or of the press." U.S. CONST. amend. I. This provision enshrines "[o]ur profound national commitment to the free exchange of ideas." *Harte-Hanks Comms., Inc. v. Connaughton*, 491 U.S. 657, 686 (1989). Indeed, "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Ed. v. Barnette*, 319 U.S. 624, 642 (1943).

In this case, two media companies ("Media Plaintiffs") and the State of Texas allege that the U.S. Department of State acting through its Global Engagement Center is violating the First Amendment by "actively intervening in the news-media market to render disfavored press outlets unprofitable." Docket No. 1 ¶ 1. The complaint details several instances in which Defendants allegedly funded, promoted,

and marketed censorship technologies that suppressed the Media Plaintiffs' speech and limited the distribution of their reporting. *See id*. ¶¶ 54–166. For instance, Plaintiffs allege that the Global Engagement Center created an open-source platform cataloging censorship tools to "counter propaganda and disinformation." *Id*. ¶¶ 58, 81. The Center then promoted these tools to social media companies and encouraged their use against domestic media, including against Media Plaintiffs, "for the purpose of discrediting and demonetizing [them]." *Id*. ¶¶ 3–4, 38.

Defendants now move to dismiss the case, primarily arguing that Plaintiffs lack standing. Docket No. 33. Defendants also ask the Court to transfer the action to the District of Columbia because, they contend, venue is improper in the Eastern District of Texas. Docket No. 14.

As explained below, the Court rejects Defendants' arguments. The complaint sufficiently alleges that Plaintiffs have standing to challenge Defendants' actions, and venue is proper here under 28 U.S.C. § 1391. The Court thus denies both motions in large part. The Court grants Defendants' motion to dismiss Count Four because Plaintiffs have not identified a final agency action for the Court to review under the APA.

## I.

Plaintiffs are The Daily Wire, LLC; FDRLST Media, LLC ("The Federalist"); and the State of Texas. On December 6, 2023, they filed a sixty-seven-page complaint accusing the Defendants[1] of engaging in "one of the most egregious government

---

[1] Defendants are: (1) the United States Department of State; (2) the Global Engagement Center; (3) Antony Blinken, in his official capacity as Secretary of State; (4) Leah Bray, in her official

operations to censor the American press in the history of the nation." Docket No. 1 at 1.

As mentioned above, the complaint focuses largely on the Global Engagement Center ("GEC"), an interagency center funded by the State Department. Plaintiffs claim that GEC originated in a 2011 executive order as a center "to support federal agency communications in targeting 'violent extremism and terrorist organizations.'" *Id.* ¶ 49 (quoting *About Us—Global Engagement Center*, U.S. DEP'T OF STATE, https://www.state.gov/about-us-global-engagement-center-2/). By 2016, Congress directed the Secretary of State, in coordination with the Secretary of Defense, to "establish [GEC] within the Department of State." 22 U.S.C. § 2656 note (Global Engagement Center). GEC's purpose is "to direct, lead, synchronize, integrate, and coordinate efforts of the Federal Government to recognize, understand, expose, and counter foreign state and foreign non-state propaganda and disinformation efforts aimed at undermining or influencing the policies, security, or stability of the United States and United States allies and partner nations." *Id.* GEC's governing statute expressly prohibits the agency from using any funds "for purposes other than countering foreign propaganda and misinformation that threatens United States security." Docket No. 1 ¶ 59 (quoting National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, § 1287, 130 Stat. 2000, 2548, (2016)).

---

capacity as Deputy Coordinator of GEC; (5) James P. Rubin, in his official capacity as Coordinator for GEC; (6) Daniel Kimmage, in his official capacity as Principal Deputy Coordinator of GEC; (7) Alexis Frisbie, in her official capacity as Senior Technical Advisor of the Technology Engagement Team at GEC; and (8) Patricia Watts, in her official capacity as Director of the Technology Engagement Team at GEC.

Nevertheless, according to Plaintiffs, "many of GEC's activities and initiatives targeted speech spoken in America among Americans, including Media Plaintiffs' speech and press rights." *Id.* ¶ 54.  While claiming that Defendants attempt to conceal their censorship scheme from public view, *see id.* ¶ 260 (characterizing the alleged censorship scheme as "secretive"), Plaintiffs identify several public actions that they claim prove their theory.  For example, Plaintiffs allege that GEC funded a private entity called Park Capital Investment Group, LLC to "develop and manage multiple initiatives of GEC," including launching and maintaining the open-source platform "Disinfo Cloud." *Id.* ¶¶ 56–58.  Disinfo Cloud was a "repository to catalog an ever-growing list of CPD [Countering Propaganda and Disinformation] tools and technologies" to "counter adversarial propaganda and disinformation." *Id.* ¶¶ 65–66.  The CPD tools included "supposed fact-checking technologies, media literacy tools, media intelligence platforms, social network mapping, and machine learning/artificial intelligence technology." *Id.* ¶ 69.  Disinfo Cloud also provided information and reviews of these tools and technologies and "more intricate technical details" from their tools' creators. *Id.* ¶¶ 70–71.

Although Defendants contend that Disinfo Cloud was launched to fight only foreign propaganda, Plaintiffs allege that "the Disinfo Cloud repository of CPD tools and technologies included many that targeted American speech, including Media Plaintiffs." *Id.* ¶ 68.  Plaintiffs contend that the Administrator of Disinfo Cloud announced that the tools and technologies would be available to "anyone working in the counter-disinformation space"—and that access was provided to more than 2,000

users in "private industry, social media companies, academic, and civil society." *Id.*
¶¶ 73–74.  In 2019, Plaintiffs allege, GEC established a "Silicon Valley Engagement"
initiative and "marketed censorship technology to American companies, including the
major social media companies, such as Twitter (now X), Meta, LinkedIn, and others,"
"encourag[ing] [them] to join Disinfo Cloud to identify a 'technological solution' suited
to the specific tech company's needs to 'counter propaganda and disinformation.'" *Id.*
¶ 76 (quoting Margot Cleveland, *Government Is Marketing Censorship Tools to Big
Tech to Gag Conservatives*, The Federalist (April 11, 2023),
https://thefederalist.com/2023/04/11/government-is-marketing-censorship-tools-to-
big-tech-to-gag-conservatives/).  Defendants even invited users, "including American
technology companies," to "[w]rite to inform [GEC's Technology Engagement Team
("TET")] or Disinfo Cloud what your office needs to counter propaganda and
disinformation." *Id.* ¶ 81 (quoting *Defeat Disinfo*, U.S. Dep't of State,
https://www.state.gov/defeat-disinfo/).  Although GEC's TET discontinued Disinfo
Cloud, Plaintiffs allege that GEC relocated the information about the censorship tools
and technologies to a new platform. *Id.* ¶ 165.

Among the tools and technologies partially funded by GEC and promoted on
Disinfo Cloud were two media-rating companies—Global Disinformation Index
("GDI") and NewsGuard Technologies, Inc. *Id.* ¶¶ 3, 72–73, 101.  Plaintiffs allege
that "these entities generate blacklists of ostensibly risky or unreliable American
news outlets for the purpose of discrediting and demonetizing [them] and redirecting
money and audiences to news organizations that publish favored viewpoints." *Id.* ¶ 3.

Both GDI and NewsGuard included the Media Plaintiffs on their lists of disfavored news outlets. *Id.* ¶¶ 116, 122. Plaintiffs allege that GDI and NewsGuard work with the World Federation of Advertisers and its subsidiary, the Global Alliance for Responsible Media, to steer blue-chip advertisers away from Media Plaintiffs. *Id.* ¶ 102. And, again, Plaintiffs claim that Defendants, mostly acting through GEC, "funded and promoted" GDI and NewsGuard, which operate "to defund, deplatform, and discredit . . . Media Plaintiffs." *Id.* ¶¶ 3, 84, 114. Finally, GEC highlights on its .gov webpage several "counter-disinfo resources" that "offer commercial, non-profit, think tank, and academic technology solutions, dashboards, and research." *Id.* ¶ 174. Among these "counter-disinfo" "solutions, dashboards, and research" are entities that promote NewsGuard and GDI and "target the American press and/or American speakers." *Id.*

The complaint details other activities by GEC that, Plaintiffs say, "target[] both foreign and domestic speech, including Media Plaintiffs' speech." *Id.* ¶ 93. One such activity is managing a "tech testbed" to "test[] specific tools or technologies against a submitted proposal" to determine whether the tools are effective in countering supposed propaganda in "real operational" situations. *Id.* ¶ 91. Disinfo Cloud users, including "members of academia, the private sector, and tech vendors in the United States," were "encouraged to submit requests to test the technology against their needs." *Id.* ¶ 95. Plaintiffs further allege that GEC "continues to operate the testbed," which "continues to test and/or develop censorship technology that targets the American press and Americans' speech." *Id.* ¶¶ 171–72.

Plaintiffs also claim that GEC, through Disinfo Cloud, conducts "tech challenges" to "identify and 'advance' 'innovative counter-disinformation tech solutions.'" *Id.* ¶ 97 (quoting *Events-Technology Engagement Division*, U.S. DEP'T OF STATE, https://www.state.gov/upcoming-events-technology-engagement-division/). Plaintiffs allege that the tools and technologies identified through the tech challenges target both foreign and domestic media organizations and speech and include those used specifically to target Media Plaintiffs. *Id.* ¶ 99. For example, in 2021, GEC funded the U.S.-Paris Tech Challenge, which awarded $100,000 to GDI after it "pitched its technology that purported to assess the 'disinformation risk' of media outlets" and explained its goal to "disrupt the funding of so-called disinformation by steering away 'ad dollars' from disfavored media outlets." *Id.* ¶ 128 (quoting Global Engagement Center & Digital Forensic Research Lab, *U.S.-Paris Tech Challenge*, ATL. COUNCIL (Sept. 30, 2021), https://www.atlanticcouncil.org/event/u-s-paris-tech-challenge/). Plaintiffs allege that GEC "continues to host the tech challenges" and "award grants to fund the development of censorship technology or censorship enterprises that target the American press and Americans' speech." *Id.* ¶ 170.

In the spring and summer of 2020, the State Department co-sponsored a "COVID-19 misinformation and disinformation" tech challenge. *Id.* ¶ 142. The three winners were NewsGuard, Peak Metrics, and Omelas—"all American companies which offer censorship technologies that target Americans' speech broadcast to Americans," according to Plaintiffs. *Id.* ¶ 143. The prize included a $25,000 government-funded award, which the State Department paid through Disinfo Cloud.

*Id.* ¶ 144.  Plaintiffs claim that NewsGuard later volunteered to "help" the State Department by identifying and flagging those spreading alleged COVID disinformation and hoaxes, and that Peak Metrics' technology entered in the COVID challenge "monitors American speech, including that of the American press."  *Id.* ¶¶ 147, 150.

Plaintiffs allege that Defendants' actions harm the Media Plaintiffs by abridging their rights to free speech and free press and by reducing their advertising revenue, growth, and circulation.  *Id.* ¶¶ 1–3, 38.  They contend that Defendants harm the State of Texas by encouraging social media platforms to violate Texas House Bill 20, a state law prohibiting such platforms from censoring speech based on the viewpoint of its speaker.  *Id.* ¶ 5; TEX. CIV. PRAC. & REM. CODE § 143A.002(a).  Plaintiffs assert five claims against Defendants:  (1) abridgment of Media Plaintiffs' right to freedom of speech, (2) abridgment of Media Plaintiffs' right to freedom of the press, (3) *ultra vires* non-final agency action beyond statutory authority, (4) unlawful final agency action in violation of the Administrative Procedure Act, and (5) *ultra vires* action beyond constitutional bounds.  *Id.* ¶¶ 272–313.

As mentioned above, Defendants filed a motion to dismiss this case, primarily for lack of standing.  Docket No. 33.  Defendants also separately moved to transfer venue to the District of Columbia, asserting that Plaintiffs cannot satisfy venue in the Eastern District of Texas under 28 U.S.C. § 1391.  Docket No. 14.

## II. Motion to Dismiss

The Court first addresses the motion to dismiss, which challenges subject matter jurisdiction. *Sangha v. Navig8 Shipmanagement Priv. Ltd.*, 882 F.3d 96, 100 (5th Cir. 2018) (citing *Sinochem Int'l Co. v. Malay. Int'l Shipping*, 549 U.S. 422, 436 (2007); *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 587–88 (1999)). Although "there is no mandatory 'sequencing of jurisdictional issues,'" the "general expectation [is] that federal courts address subject matter jurisdiction at the outset" before resolving other non-merits issues. *Id.* (quoting *Sinochem*, 549 U.S. at 431). Defendants primarily attack Plaintiffs' standing—both facially and factually. Docket No. 14 at 15–26. They also argue (1) that Plaintiffs' APA claim should be dismissed because the complaint does not identify a final agency action and (2) that the claims against the individual Defendants in their official capacities should be merged with the claims against the agencies. *Id.* at 26–27.

## A. Standing

Article III of the Constitution limits federal court jurisdiction to "cases" or "controversies." This ensures "that the Federal Judiciary respects 'the proper—and properly limited—role of the courts in a democratic society.'" *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984)); *see also Raines v. Byrd*, 521 U.S. 811, 828–29 (1997) ("Our regime contemplates a more restricted role for Article III courts . . . 'not some amorphous general supervision of the operations of government.'") (quoting *United States v. Richardson*, 418 U.S. 166, 192 (1974)). "One element of the case-or-controversy requirement is that [a

plaintiff], based on [its] complaint, must establish that [it has] standing to sue." *Raines*, 521 U.S. at 818.  A standing inquiry is "especially rigorous" where the merits of the dispute would require the Court to determine whether an action taken by one of the other two branches of the Federal Government is unconstitutional.  *Id.* at 819–20 (citing *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 542 (1986); *Valley Forge Christian Coll. v. Ams. United for Separation of Church & St., Inc.*, 454 U.S. 464, 473–74 (1982)).

Article III standing requires a plaintiff to plead and prove "an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'"  *Texas v. United States*, 809 F.3d 134, 150 (5th Cir. 2015) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).  "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).  But "[t]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement."  *Texas v. United States*, 809 F.3d at 151 (citing *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006)).  And "[w]hen considering whether a plaintiff has Article III standing, a federal court must assume *arguendo* the merits of his or her legal claim."  *N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*, 781 F.3d 182, 191 (5th Cir. 2015); *see also RLI Ins. Co. v. Roberts*, 819 F. App'x 227, 229 (5th Cir. 2020) ("[Defendant] cannot dispute that

[Plaintiff] suffered an Article III injury by arguing that [Plaintiff]'s claims fail on the merits.").

A defendant may challenge jurisdiction, including standing, in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1).  *Moore v. Bryant*, 853 F.3d 245, 248 n.2 (5th Cir. 2017).  When a defendant seeks dismissal under Rule 12(b)(1), the plaintiff bears the burden of proof.  *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).  A court should grant a Rule 12(b)(1) dismissal motion "only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief."  *Id.* (citing *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998)).

A motion to dismiss for lack of standing "may be either 'facial' or 'factual.'"  *Superior MRI Servs., Inc. v. All. Healthcare Servs., Inc.*, 778 F.3d 502, 504 (5th Cir. 2015).  In analyzing a facial attack on standing, the court assesses whether the plaintiff has sufficiently alleged standing in the complaint and accepts as true the complaint's well-pleaded, non-conclusory factual allegations.  *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981).  In a factual attack, the defendant "submits affidavits, testimony, or other evidentiary materials" to challenge the truth of the jurisdictional allegations.  *Superior MRI Servs.*, 778 F.3d at 504.  "To defeat a factual attack, a plaintiff must prove the existence of subject-matter jurisdiction by a preponderance of the evidence" and is "obliged to submit facts through some evidentiary method to sustain his burden of proof."  *Id.* (quotations omitted).  If, however, the defendant's jurisdictional attack is "intertwined with the merits of a

claim," then the court should defer ruling on the motion until summary judgment or trial. *Pickett v. Tex. Tech Univ. Health Sciences Ctr.*, 37 F.4th 1013, 1029 (5th Cir. 2022) ("If . . . a decision on the jurisdictional issue requires a ruling on the underlying substantive merits of the case, the decision should await a determination of the merits either by the district court or by the fact finder at trial.") (quoting Wright & Miller, 5B Fed. Prac. & Proc. Juris. § 1350 (3d ed. 2004)).

### 1. Texas

Defendants challenge Texas's standing both facially and factually.  The Court rejects the facial challenge because the complaint sufficiently alleges that Texas suffered a sovereign injury, which is fairly traceable to Defendants' actions and is likely to be redressed by a favorable decision.  The Court declines to resolve Defendants' factual attack at this stage of the proceeding.

### a. Injury

Injury is the first element of standing.  It requires "an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quotations omitted).  Here, Texas plausibly alleges an injury to its sovereign interest in enforcing H.B. 20, a state law prohibiting social media platforms from censoring speech based on viewpoint.

"[S]tates have a sovereign interest in 'the power to create and enforce a legal code.'" *Tex. Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393, 449 (5th Cir. 1999) (holding that Texas had standing to challenge the Federal Communication Commission's

12

regulation over an aspect of telecommunications that Texas believed it controlled) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982)).  "Pursuant to that interest, states may have standing based on (1) federal assertions of authority to regulate matters they believe they control, (2) federal preemption of state law, and (3) federal interference with the enforcement of state law."  *Texas v. United States,* 809 F.3d at 153; *see also Texas v. Nuclear Regul. Comm'n*, 78 F.4th 827, 836 (5th Cir. 2023) (a state has standing based on the "preemption of an existing state law" or "a conflict between federal and state law if the state statute at issue regulates behavior or provides for the administration of a state program.") (quoting *Texas v. United States*, 787 F.3d 733, 749 (5th Cir. 2015)).

For example, Texas had standing to challenge a federal license to store nuclear waste in Texas because issuing the license directly conflicted with a state law prohibiting the storage of nuclear waste in Texas.  *NRC*, 78 F.4th at 836.  The "enforceability conflict between the license and operation of the facility, which authorizes storage of high-level radioactive waste in Texas, and H.B. 7, which proscribes such storage," was "enough for Texas to assert an injury."  *Id*.  Similarly, Texas had standing to challenge federal guidance that "theoretically allow[ed] for abortions in cases prohibited by Texas law."  *Texas v. Becerra*, 623 F. Supp. 3d 696, 712 (N.D. Tex. 2022).  By "encourag[ing] [] hospitals and doctors to violate Texas abortion laws," the federal guidance "harm[ed] Texas's legitimate interest in the continued enforceability of its abortion laws" and "create[d] an

increased regulatory burden on Texas to prosecute more violation of its laws." *Id.*
at 714 (citing *Contender Farms, LLP v. USDA*, 779 F.3d 258, 266 (5th Cir. 2015)).

So too here.  The complaint is replete with allegations that Defendants, acting
through GEC, are encouraging social media platforms to violate H.B. 20 by
censoring "misinformation" and "disinformation"—*e.g.*:

- GEC encouraged "American companies, including the major social media companies, such as Twitter (now X)," to use censorship tools and technologies to "counter propaganda and disinformation." *See* Docket No. 1 ¶¶ 48, 73, 76–78, 85–86, 158.

- GEC established a "Silicon Valley Engagement" initiative that "pushed social media companies to join Disinfo Cloud," "maintained a Senior Advisor, Samaruddin K. Stewart ('Stewart'), as a permanent disinformation liaison between the government and Silicon Valley" for the purpose of marketing censorship technology to social media companies, and "encourag[ed]" those companies to "identify, understand, and address misinformation." *Id.* ¶¶ 76–78.

- TET and GEC's front office and senior leadership meets regularly with social media platforms to market and promote censorship tools that "abridged Media Plaintiffs' First Amendment rights." *Id.* ¶¶ 84–86.

- Defendants "have provided 'significant encouragement' to social media . . . to limit the circulation and/or distribution of Media Plaintiffs' news reporting and speech." *Id.* ¶ 215.

And, according to Plaintiffs, the pressure campaign has worked.  Social media
companies are using these tools "to suppress Media Plaintiffs' speech and the
distribution of Media Plaintiffs' reporting, as well as to destroy Media Plaintiffs'
advertising opportunities." *Id.* ¶ 101; *see also id.* ¶¶ 102–04 (alleging that social
media companies utilize GDI and NewsGuard through the World Federation of
Advertisers and Global Alliance for Responsible Media to "steer blue-chip advertisers
away from Media Plaintiffs").

H.B. 20, meanwhile, expressly prohibits social media platforms from "censor[ing] a user, a user's expression, or a user's ability to receive the expression of another person" based on viewpoint.  TEX. CIV. PRAC. & REM. CODE § 143A.002(a). "Censor" is defined to mean "to block, ban, remove, deplatform, demonetize, de-boost, restrict, deny equal access or visibility to, or otherwise discriminate against expression."  *Id*. § 143A.001(1).  Thus, as in *NRC* and *Becerra*, Defendants' encouraging social media companies to deplatform or demonetize so-called misinformation and disinformation "directly conflict[s]" with Texas law.  *See NRC*, 78 F.4th at 836; *Becerra*, 623 F. Supp. 3d at 713–14.  Defendants' actions also assert federal authority over a matter that Texas believes it controls, creating an "enforceability conflict" that is "enough for Texas to assert an injury" here.  *See NRC*, 78 F.4th at 836; *Becerra*, 623 F. Supp. 3d at 714.  This "encouraged disregard" of Texas's anti-censorship law, moreover, creates an "increased regulatory burden" on Texas to prosecute more violations of H.B. 20.  *See Becerra*, 623 F. Supp. 3d at 714.

Defendants argue there is no enforceability conflict because GEC never *required* social media platforms to use censorship technology.  Docket No. 33 at 16. "[I]f HB 20 prohibits a social media company from using a particular technology in a particular way," Defendants contend, "then the company can simply choose not to use that technology as such."  *Id*.  But Defendants underestimate the power of the State Department to "significant[ly] encourage[]" private parties to act—especially during a global pandemic like COVID-19, a subject Defendants sought to control and regulate.  Docket No. 1 ¶ 215; *id*. ¶¶ 142–54.  Defendants' efforts, moreover, allegedly

paid off because, as noted above, social media platforms are allegedly deplatforming Media Plaintiffs based on their viewpoint. *Id.* ¶¶ 101–04. In any event, the federal agency in *NRC* never *required* a facility to violate Texas law by storing nuclear waste. 78 F.4th at 833–35. The agency in that case simply issued a license authorizing a private company to operate a storage facility, and yet the Fifth Circuit held that this action sufficiently injured Texas for purposes of standing. *Id.* at 833–34, 836.

Defendants also argue that no conflict exists because a district court enjoined Texas from enforcing H.B. 20 shortly before the law went into effect. Docket No. 33 at 16–17 (citing *NetChoice, L.L.C. v. Paxton*, 573 F. Supp. 3d 1092 (W.D. Tex. 2021)). But Texas does not need to initiate an enforcement action under H.B. 20 to allege Article III harm. *NRC* is again instructive. There, Texas had standing to challenge the storage-facility license before the facility was built—that is, before the law was ever violated. *NRC*, 78 F.4th at 836. Similarly, Texas had standing to challenge the federal guidance in *Becerra* before a provider violated the State's anti-abortion laws and necessarily before Texas initiated an enforcement action. 623 F. Supp. 3d at 714. Here, in contrast, Plaintiffs have alleged that Defendants are continuing to encourage social media platforms to censor and deplatform them—and that the platforms are obliging. This interference with the adherence to Texas law alone is an adequate injury to the State's sovereign interests to satisfy Article III. *See NRC,* 78 F.4th at 835–36; *Becerra*, 623 F. Supp. 3d at 705, 713–14.

Further, at the time Plaintiffs filed their complaint in this case, the Fifth Circuit had ruled that H.B. 20 was constitutional, found that the district court's preliminary injunction was an abuse of discretion, and vacated the injunction in its entirety. *See NetChoice, L.L.C. v. Paxton*, 49 F.4th 439 (5th Cir. 2022). Although the Fifth Circuit stayed its mandate pending Supreme Court review, the stay is necessarily temporary, and Texas is entitled to presume that it will be able to enforce H.B. 20 as upheld by the Fifth Circuit. Defendants claim that Texas's standing "rest[s] on pure speculation concerning the Supreme Court's forthcoming ruling." Docket No. 14 at 12. But it is Defendants who speculate that the Fifth Circuit's decision will be reversed and the injunction will be reinstated, thereby precluding Texas from enforcing H.B. 20.[2]

### b. Traceability

"[Traceability] requires a causal connection between the plaintiff's injury and the defendant's challenged conduct, [but] it doesn't require a showing of proximate cause or that 'the defendant's actions are the very last step in the chain of causation.'" *Inclusive Cmtys. Proj., Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019) (quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997)). Where, as here, the "causal relation between the claimed injury and the challenged action depends upon the decision of an independent third party[,] standing is not precluded, but it is

---

[2] Texas also argues that the Fifth Circuit upheld certain provisions of H.B. 20 that are "not part of the grant of certiorari" and that the State therefore "maintains, at a minimum, an interest in enforcing [these provisions]" "regardless of the Supreme Court's decision." Docket No. 41 at 26. Because the Court finds that Texas has sufficiently alleged an injury-in-fact as set forth above, the Court need not address Texas's alternative argument at this time.

ordinarily substantially more difficult to establish." *Missouri v. Biden*, 83 F.4th 350, 369 (5th Cir. 2023) (quoting *California v. Texas*, 593 U.S. 659, 675 (2021)), *cert granted sub nom. Murthy v. Missouri*, 144 S. Ct. 7 (2023). "'To satisfy that burden, the plaintiff must show at the least that third parties will likely react in predictable ways.'" *Id.* (quoting *California v. Texas*, 593 U.S. at 661). Indeed, courts routinely find that the injury is traceable to the challenged act when standing "does not rest on mere speculation about the decisions of third parties" but instead "on the predictable effect of [g]overnment action on the decisions of third parties." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019); *see also Missouri*, 83 F.4th at 370.

Here, Texas alleges that its injury is the predictable result of Defendants' deliberate efforts to market and promote the censorship tools and technologies to social media platforms. The Court agrees. As highlighted above, the complaint identifies several actions by Defendants, acting through GEC, to encourage and coerce platforms to demote and deplatform certain users. And, the complaint alleges, at least some social media platforms have in fact demoted and deplatformed certain users, thereby injuring Texas's sovereign interest. *See supra* Section II.A.1.a. Defendants contend that the complaint does not specify the coercion or threats they purportedly made to social media companies. But allegations that one of "the most powerful office[s] in the world" repeatedly promoted and marketed the tools to social media companies is sufficient to allege that the companies, "faced with [such] unrelenting pressure," likely "did, and would continue to, bend to the government's will." *See Missouri*, 83 F.4th at 371.

Defendants argue that any harm to Texas resulted from "the decisions of independent actors" (the social media companies), not Defendants.  Docket No. 33 at 16 (first citing *Tel. & Data Sys., Inc. v. FCC*, 19 F.3d 42, 48 (D.C. Cir. 1994); and then citing *Clapper*, 568 U.S. at 414 n.5).  But the Fifth Circuit rejected this argument in *Missouri*.  There, the plaintiffs alleged that federal officials pressured social media platforms to censor certain content in violation of the First Amendment.  83 F.4th at 359.  The defendants argued that traceability was lacking because any censorship "was a result of 'independent decisions of social-media companies,'" not government officials.  *Id*. at 370.  The court disagreed, explaining that the platforms' "censorship decisions were likely attributable at least in part to the platforms' reluctance to risk the adverse legal or regulatory consequences that could result from a refusal to adhere to the government's directives."  *Id*.; *see also Dep't of Com.*, 139 S. Ct. at 2566 (holding that plaintiffs had satisfied the traceability requirement by "showing that third parties will likely react in predictable ways" in responding to certain government action).

This case is indistinguishable.

### c. Redressability

"To satisfy redressability, a plaintiff must show that 'it is *likely*, as opposed to merely *speculative*, that the injury will be redressed by a favorable decision.'" *Inclusive Cmtys. Proj.*, 946 F.3d at 655 (emphasis in original) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)).  "The relief

sought needn't completely cure the injury, however; it's enough if the desired relief would lessen it." *Id.* (citing *Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014)).

The Court can redress Texas's injury by granting the requested relief.  Texas does not ask the Court to "overturn the Western District of Texas's current injunction," as Defendants suggest.  Docket No. 33 at 17.  Rather, Texas properly seeks an injunction prohibiting Defendants from continuing to encourage social media platforms to violate H.B. 20.  Docket No. 1 at 65–66.  Although the platforms may independently enforce their own censorship policies, *see Missouri*, 83 F.4th at 371, the requested injunction would no doubt "lessen" the injury to Texas to a meaningful degree.  *See Inclusive Cmtys. Proj.*, 946 F.3d at 655; *see also Missouri*, 83 F.4th at 371 (holding that an injunction "restrain[ing] the officials from unlawfully interfering with the social-media companies' independent application of their content-moderation policies" would redress plaintiffs' injury); *Texas v. United States*, 40 F.4th 205, 219 (5th Cir. 2022) (injunction "would naturally redress Texas's harm to a meaningful degree.").

### d. Factual Attack

Defendants also factually attack Texas's standing.  They argue that "the evidence submitted with [their] motion demonstrates that GEC has made no efforts to block either public or private enforcement of HB 20, or otherwise interfere with compliance with the law, defeating Plaintiffs' assertions otherwise."  Docket No. 33 at 17.  For support, Defendants cite a declaration by Daniel Kimmage, the Principal Deputy Coordinator of GEC, stating that "GEC has not made any efforts to prevent

the State of Texas or any private actor from enforcing HB 20 against social media platforms, or to otherwise interfere with the State's efforts to maintain compliance with HB 20." *Id.*, Ex. 1.

As an initial matter, Mr. Kimmage's single, conclusory statement denying Plaintiffs' allegations is hardly sufficient to lodge a factual attack on jurisdiction. *See, e.g.*, *Harmouche v. Consulate Gen. of Qatar*, 313 F. Supp. 3d 815, 821 (S.D. Tex. 2018) (dismissing as conclusory a statement within an affidavit in support to a defendant's factual attack on jurisdiction); *Vasic v. Patent Health, L.L.C.*, 2013 WL 4716341, at *2 (S.D. Cal. Sept. 3, 2013) (denying a motion to dismiss for lack of subject matter jurisdiction because defendant's self-serving affidavit in support of its factual attack on jurisdiction also attacked the merits of plaintiff's case); *see also Evans v. Tubbe*, 657 F.2d 661, 663 (5th Cir. 1981) ("[T]he court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case."). In any event, the Court declines to resolve the factual dispute at this stage in the proceeding.

A district court may grant a Rule 12(b)(1) motion for lack of subject matter jurisdiction "on any one of three separate bases:  (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Pickett*, 37 F.4th at 1029 (quoting *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)). Regarding the third basis, a court may not resolve disputed facts on a Rule 12(b)(1) motion "where issues of fact are central both to subject matter jurisdiction and the claim on the merits." *Id*. at 1030 (quoting *Montez v. Dep't of the*

*Navy*, 392 F.3d 147, 150 (5th Cir. 2004)); *see also Montez*, 392 F.3d at 150 ("[R]esolution of the jurisdictional issue on a 12(b)(1) motion is improper" where the jurisdictional attack "is intertwined with the merits of a claim.").

And here, the dispute at issue—whether Defendants interfered with Texas's enforcement of H.B. 20—*is* the merits question. *See Worldwide Parking, Inc. v. New Orleans City*, 123 F. App'x 606, 608–09 (5th Cir. 2005) (quoting *Williamson*, 645 F.2d at 415) (reversing the grant of a motion to dismiss for lack of subject matter jurisdiction because "the district court's resolution of the factual issue . . . precluded federal jurisdiction because it doomed [plaintiff's] federal claim on the merits."). Defendants in fact concede that "some of the same facts are relevant to standing and to the merits." *See* Docket No. 45 at 3.  The Court thus determines at this stage only whether Plaintiffs stated a claim "by accepting [their] well-pleaded allegations as true and considering them in the light most favorable to [Plaintiffs]." *Pickett*, 37 F.4th at 1031.  Defendants can of course reassert their factual attack at summary judgment or trial. *See Texas v. Mayorkas*, 2023 WL 5616184, at *2 (S.D. Tex. Aug. 30, 2023) (denying motion to dismiss for lack of standing where the issue "is better resolved at the summary judgment stage where the Court can consider extra-record discovery evidence for standing").

## 2. Media Plaintiffs

Defendants also challenge Media Plaintiffs' standing both facially and factually.  Although Texas's standing satisfies the case-or-controversy requirement for the three claims brought by all Plaintiffs, the Court must determine whether

Media Plaintiffs adequately alleged standing for their First Amendment claims.  *See TransUnion*, 594 U.S. at 432.  As explained below, the Court rejects Defendants' facial challenge because Media Plaintiffs sufficiently allege an injury, the injury is fairly traceable to Defendants' actions, and a favorable decision will likely redress the injury.  The Court again declines to resolve the factual attack at this stage.

### a. Injury

To establish injury, a plaintiff must allege that "he or she suffered 'an invasion of a legally protected interest that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo*, 578 U.S. at 339 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  Here, Plaintiffs allege actual injury by identifying ongoing conduct by Defendants that presently violates their First Amendment rights:

- TET and GEC's front office and senior leadership meets regularly with social media platforms to market and promote censorship tools that, upon information and belief, "abridged Media Plaintiffs' First Amendment rights."  Docket No. 1 ¶¶ 84–86.

- GEC's Disinfo Cloud Twitter account "remains live, displaying posts promoting GDI and NewsGuard, as well as providing links to the Disinfo Cloud Digest that promotes NewsGuard and other tools and technologies that target Americans."  *Id.* ¶ 161.

- "Upon information and belief, GEC continues to use the research and reports Disinfo Cloud authored about the 350-plus available censorship tools and technologies, including ones that target Media Plaintiffs."  *Id.* ¶ 162.

- "[U]pon information and belief, the information available at DisinfoCloud.com, including information about censorship tools and technologies that target the American press and Americans' speech, was moved to another platform."  *Id.* ¶ 165.

- TET "continues to host the tech challenges and, upon information and

23

belief, continues to award grants to fund the development of censorship technology or censorship enterprises that target the American press and Americans' speech." *Id.* ¶ 170.

- Upon information and belief, GEC continues to operate the testbed that "test[s] and/or develop[s] censorship technology that targets the American press and Americans' speech." *Id.* ¶¶ 171–72

- "Upon information and belief, [] GEC maintains a platform of censorship technology and tools, including those that target segments of the American press and Americans' speech." *Id.* ¶ 173.

- "GEC also maintains a 'Silicon Valley location' and, upon information and belief, continues to promote and market censorship tools and technology that target segments of the American press and Americans' speech to the tech industry, the private sector, and academia." *Id.* ¶ 175.

Defendants argue that these allegations are mere "labels and conclusions." Docket No. 33 at 19. But when viewed in context, including the specific details of past instances of alleged conduct, the allegations are more than sufficient to allege injury-in-fact at this stage in the proceeding. *See, e.g.*, *Jackson v. Wright*, 82 F.4th 362, 369 (5th Cir. 2023) ("At the motion to dismiss stage where we must accept all [plaintiff's] allegations as true, [plaintiff] has plainly alleged both a continuing and a future injury sufficient to confer standing for [plaintiff] to seek prospective relief.").

To be sure, as Defendants acknowledge, the complaint also includes numerous allegations of past harm. *See, e.g.*, Docket No. 1 ¶¶ 142–44, 160–67; Docket No. 33 at 19. But "[p]ast harm can constitute an injury-in-fact for purposes of pursuing injunctive relief if it causes 'continuing, present adverse effects.'" *Missouri*, 83 F.4th at 367 (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)); And here, Media Plaintiffs sufficiently allege that the harm from these injuries is ongoing, as required

to pursue injunctive relief.  The complaint, as noted above, specifies numerous instances in which Defendants, acting through GEC, promoted, funded, and marketed censorship tools and technologies to "the tech industry, the private sector, and academia" to censor "misinformation" and "disinformation," including Media Plaintiffs' speech.  *See supra* Section II.A.1.a.  The complaint also alleges that social media companies are presently using these tools "to suppress Media Plaintiffs' speech and the distribution of Media Plaintiffs' reporting, as well as to destroy Media Plaintiffs' advertising opportunities."  *See* Docket No. 1 ¶ 101; *see also id.* ¶¶ 102–04 (alleging that social media companies utilize GDI and NewsGuard through the World Federation of Advertisers and Global Alliance for Responsible Media to "steer blue-chip advertisers away from Media Plaintiffs").  These allegations sufficiently allege past injuries with "continuing, present adverse effects."  *See Missouri*, 83 F.4th at 368 (quoting *Lyons*, 461 U.S. at 102).

Past wrongs may also be evidence "of the likelihood of a future injury." *Missouri*, 83 F.4th at 367–68 (quoting *Crawford v. Hinds Cnty. Bd. of Supervisors*, 1 F.4th 371, 375 (5th Cir. 2021)).  And here, Media Plaintiffs contend that Defendants' past censorship efforts evidence a strong likelihood that their injuries will reoccur. In addition to alleging that Defendants are presently encouraging censorship, as noted above, Media Plaintiffs specifically allege that Defendants continue to engage with social media companies to discuss censorship strategies, Docket No. 1 ¶¶ 84–86; and continue to use GEC's Silicon Valley Engagement initiative to promote and market "tech industry censorship technologies and censorship enterprises" that harm

the American press, including Media Plaintiffs, ¶¶ 76–78, 175.

*Missouri* is again instructive.  There, social media users alleged that the federal government engaged in a similar censorship scheme to coerce social media companies to censor the users' opinions about COVID-19.  83 F.4th at 367.  The plaintiffs identified past censorship by the social media companies and alleged that this prior censorship "caused them to self-censor and carefully word social-media posts moving forward in hopes of avoiding suspensions, bans, and censorship in the future."  *Id.* at 368.  As here, the government in that case argued that the plaintiffs "have failed to demonstrate that the harm from these past injuries is ongoing or that similar injury is likely to reoccur in the future."  *Id.* at 367.  The Fifth Circuit rejected the argument, concluding that "these lingering effects of past censorship must be factored into the standing calculus."  *Id.* at 368 (citing *Lyons*, 461 U.S. at 102).  The plaintiffs' fears of future harm were not merely hypothetical concerns because of "the very real censorship injuries they have previously suffered to their speech on social media."  *Id.*  The plaintiffs, moreover, demonstrated a substantial risk of reoccurrence because the government "continue[s] to be in regular contact with social-media platforms concerning content-moderation issues today."  *Id.* at 369.

Accordingly, the Court finds that Media Plaintiffs have adequately alleged an injury-in-fact.

### b. Traceability

Defendants similarly argue that Media Plaintiffs' alleged injury is not traceable to Defendants because the injuries are "the result of the independent

action[s] of . . . third party" companies that are "not before the court."  Docket No. 33 at 20 (quoting *Inclusive Cmtys. Proj.*, 946 F.3d at 655).

The Court again rejects the argument.  As explained above, Media Plaintiffs allege that their First Amendment injuries are the predictable result of Defendants' deliberate efforts to market and promote the censorship tools and technologies to "the tech industry, the private sector, and academia."  *See supra* Section II.A.1.b.  The complaint identifies those efforts and alleges that the third parties deplatformed and demoted Media Plaintiffs as a result.  *See id*.  That is sufficient to allege traceability. *See Missouri*, 83 F.4th at 661–62; *Dep't of Com.*, 139 S. Ct. at 2566.

### c. Redressability

Finally, Media Plaintiffs' alleged injury is redressable.  Media Plaintiffs seek an injunction prohibiting Defendants from continuing to market and promote censorship tools that are used to demote and deplatform them.  Docket No. 1 at 66. Defendants argue that such an injunction would not actually cure Media Plaintiffs' harm because the third parties using these censorship tools may decide to demote and deplatform Media Plaintiffs anyway.  Docket No. 33 at 25.  But, as the Court explained above, the requested injunction would no doubt "lessen" the injury to Media Plaintiffs to a meaningful degree.  *Inclusive Cmtys. Proj.*, 946 F.3d at 655; *see also Missouri*, 83 F.4th at 371; *Texas v. United States*, 40 F.4th at 219.

### d. Factual Attack

Defendants also factually attack Media Plaintiffs' standing.  They argue that "the record contradicts Plaintiffs' version of events" and largely deny the allegations

in the complaint.  Docket No. 33 at 21.  GEC, Defendants contend, never funded, promoted, or encouraged the use of censorship technologies targeting Media Plaintiffs or other Americans.  *Id*. at 21–25.  GEC has also purportedly ended "many of the initiatives that Plaintiffs speculate are harming them here."  *Id*. at 20.  As a result, Defendants argue, Media Plaintiffs have not suffered any ongoing injury, any alleged injury is not traceable to their conduct (which never happened), and any "purported injuries are not redressable by the relief [Media Plaintiffs] seek."  *Id*. at 25.  The "record" that Defendants repeatedly reference in making this argument consists of three declarations from: Mr. Kimmage of GEC; Matthew Skibinski, General Manager of NewsGuard Technologies, Inc.; and Dr. Daniel Rogers, Co-founder and Director of Disinformation Index, Ltd.  *Id*., Exs. 1–3.

The Court is unconvinced that a defendant can "factually attack" jurisdiction in a Rule 12(b)(1) motion with self-serving declarations simply denying the allegations.  *See supra* Section II.A.1.d.  In any event, the Court declines to consider the argument at this stage in the proceeding.  As noted above, a court cannot resolve disputed facts on a Rule 12(b)(1) motion "where issues of fact are central both to subject matter jurisdiction and the claim on the merits."  *Pickett*, 37 F.4th at 1030 (quoting *Montez*, 392 F.3d at 150).  And here, the facts disputed by Defendants in their motion are the very facts underlying Media Plaintiffs' merits claims.  *See Worldwide Parking*, 123 F. App'x at 608–09; *see also* Docket No. 45 at 3(Defendants conceding that "some of the same facts are relevant to standing and to the merits.").

28

The Court thus accepts Media Plaintiffs' allegations as true and determines that they sufficiently establish standing at this stage in the proceeding. *Pickett*, 37 F.4th at 1031. And, as noted above, Defendants can resubmit their proof and re-raise their argument at summary judgment or trial. *See Mayorkas*, 2023 WL 5616184, at *2.

## B. Final Agency Action

Defendants seek to dismiss Count Four, which alleges "unlawful final agency action in violation of the Administrative Procedure Act." Docket No. 1 at 63. Defendants argue that the only "final agency action" identified in the complaint is "Defendants' [alleged] secretive scheme to suppress, defame, defund, discredit, and reduce the circulation of a segment of the press." Docket No. 33 at 26 (quoting Docket No. 1 ¶ 260). And, Defendants contend, this is not the kind of "specific and discrete final agency action" that the Supreme Court and Fifth Circuit require under the APA. *Id*. The Court agrees.

The APA provides for judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. "Final agency actions are actions which (1) 'mark the consummation of the agency's decisionmaking process,' and (2) 'by which rights or obligations have been determined, or from which legal consequences will flow.'" *Sierra Club v. Peterson*, 228 F.3d 559, 565 (5th Cir. 2000) (quoting *Bennett*, 520 U.S. at 178). "[W]hether an agency action is final is a jurisdictional issue, not a merits question." *Texas v. EEOC*, 933 F.3d 433, 440 n.8 (5th Cir. 2019). When reviewing finality, the Court must take a "pragmatic"

approach. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)).

Applying this law, courts have found that an agency "program" is typically not "final agency action" under the APA because it does not "mark the 'consummation' of the agency's decisionmaking process," or constitute "an identifiable action or event." *See Sierra Club*, 228 F.3d at 566 (first citing *Bennett*, 520 U.S. at 178; and then citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990)).  In *Lujan v. Nat'l Wildlife Fed'n*, for example, the Supreme Court held that the plaintiff had not challenged a particular final agency action when it challenged the Secretary of the Interior's entire "land withdrawal review program." 497 U.S. at 877–79.  Rather than limit its claim to a "single [agency] order or regulation, or even to a completed universe of particular [agency] orders and regulations," the plaintiff had challenged "the continuing (and thus constantly changing) operations of the [agency]" in implementing federal law.  *Id.*; *see also id.* at 890 n.2 (requiring the identification of a final "specific order or regulation, applying some particular measure across the board to all individual [agency decisions], for a challenge under the APA that could affect the operation of a program"); *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 490–91 (5th Cir. 2014) (affirming dismissal of an APA claim challenging various federal agencies' management of natural resources in national parks in Texas because the plaintiff failed to allege agency action, let alone final agency action).

Here, Plaintiffs have alleged that the "final agency action" is a censorship "scheme" consisting of a series of decisions, mostly by GEC, to fund, develop, market, and promote censorship tools and technologies in a variety of ways.  *See, e.g.*, Docket No. 41 at 7 ("Defendants' secretive scheme to suppress, defame, defund, discredit, and reduce the circulation of a segment of the press by, among other things, funding, marketing, and/or promoting censorship tools, technology and censorship enterprises operating in the United States—specifically the censorship-by-risk-rating technology and entities—constitutes final agency action under the APA.").  The complaint, however, does not describe these decisions in a way that "marks the consummation of the agency's decisionmaking process," but rather as "continuing (and thus constantly changing) operation[al]" choices.  *See Sierra Club*, 228 F.3d at 566; *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. at 877–79.  Such "day-to-day operations" are typically not "final agency action" subject to review under the APA.  *See Sierra Club*, 228 F.3d at 566.  The scope of Plaintiffs' claim, moreover, demonstrates that Plaintiffs broadly challenge Defendants' censorship scheme instead of a specific final agency action.  *See* Docket No. 1 ¶ 3 ("The full breadth of Defendant GEC's censorship scheme is currently unknown."); *see also Sierra Club*, 228 F.3d at 567.

Accordingly, the Court grants the motion to dismiss Plaintiffs' APA claim (Count Four) for lack of jurisdiction.

### C. Claims Against Official Capacity Defendants

Finally, Defendants ask the Court to dismiss Plaintiffs' claims "against the official capacity Defendants" because "an official capacity claim is essentially a claim

against the agency." Docket No. 33 at 27.  The Court denies the request.

Plaintiffs named the Department of State and the Global Engagement Center as Defendants, along with six individuals in their official capacities as officials of those agencies:  Antony Blinken, Secretary of State; Leah Bray, Deputy Coordinator of GEC; James P. Rubin, Coordinator of GEC; Daniel Kimmage, Principal Deputy Coordinator of GEC; Alexis Frisbie, Senior Technical Advisor of the Technology Engagement Team at GEC; and Patricia Watts, Director of the Technology Engagement Team at GEC.  Plaintiffs argue that, although GEC and the Technology Engagement Team currently reside in the State Department, these entities "could be shifted to another federal agency" and thus including the GEC and TET officials as defendants is necessary "to ensure the injunctive relief binds both the GEC and the TET."  Docket No. 41 at 30.  But Plaintiffs named GEC as a Defendant, so any injunction would bind the agency even if it is later "shifted to another agency."

Nevertheless, the Court is not persuaded that Defendants are entitled to dismissal of the officers in their official capacities.  They cite no authority requiring dismissal.  And courts routinely enjoin both agencies and individuals acting in their official capacities.  *See, e.g.*, *Missouri v. Biden,* 680 F. Supp. 3d 630, 729 (W.D. La. 2023), *aff'd in part*, 83 F.4th 350 (5th Cir. 2023); *Louisiana v. Biden*, 575 F. Supp. 3d 680, 685 (W.D. La. 2021), *aff'd*, 55 F.4th 1017 (5th Cir. 2022); *Texas v. EEOC*, 2018 U.S. Dist. LEXIS 30558, at *7 (N.D. Tex. Feb. 1, 2018), *aff'd in part*, 933 F.3d 433 (5th Cir. 2019); *Texas v. EPA*, 829 F.3d 405 (5th Cir. 2016); *Kentucky v.*

*Biden*, 571 F. Supp. 3d 715, 735 (E.D. Ky. 2021), *aff'd in part*, 57 F.4th 545 (6th Cir. 2023).

## III. Motion to Transfer

Defendants also move to transfer the case.  Docket No. 14.  They contend that "[t]his case lays venue in the wrong district and should be transferred to the most appropriate venue:  the United States District Court for the District of Columbia." *Id.* at 4.  The Court denies the motion.

Venue here is governed by 28 U.S.C. § 1391(e)(1), which states:

> A civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity . . . or an agency of the United States, or the United States . . . may . . . be brought in any judicial district in which (A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (C) the plaintiff resides if no real property is involved in the action.

If a case is filed in an improper venue, the court "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." *Id.* § 1406(a).

Venue is proper in the Eastern District of Texas because (1) this is a civil action in which Defendants are officers and agencies of the United States and (2) a plaintiff, the State of Texas, resides here.  *See* 28 U.S.C. § 1391(e)(1)(C); *Texas v. Garland*, 2023 WL 4851893 (N.D. Tex. July 28, 2023).

Defendants' principal argument against venue in the Eastern District of Texas is that Texas lacks standing and thus no plaintiff resides here.  Docket No. 14 at 5–9.  But, as explained above, Texas has standing.  *See supra* Section II.A.1.

Defendants also argue that, even if Texas has standing, the State does not "reside[]" in the Eastern District.  Docket No. 14 at 10–11.  They cite the residency provision of § 1391(c)(2) and contend that Texas resides only where it "maintains its principal place of business where it performs its official duties—that is, its capital, Austin, located in the Austin Division of the Western District of Texas."  *Id.* at 10. But the text of § 1391(c)(2) does not support that position.  The provision states:

> For all venue purposes, (2) an entity with the capacity to sue and be sued in its common name under applicable law, whether or not incorporated, shall be deemed to reside, if a defendant, in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question and, if a plaintiff, only in the judicial district in which it maintains its principal place of business.

The term "entity" is undefined in the statute but commonly means "[a]n organization (such as a business or a governmental unit) that has a legal identity apart from its members," not a state.  *Entity*, BLACK'S LAW DICTIONARY (11th ed. 2019).   The provision, moreover, refers to "entity" as one with "the capacity to sue and be sued . . . whether or not incorporated," which makes little sense if the term includes states. *See California v. Azar*, 911 F.3d 558, 569–70 (9th Cir. 2018) (noting that § 1391(c)(2) "explicitly refers to the incorporation status of the 'entity,' indicating that the term refers to some organization, not a state."); *Garland*, 2023 WL 4851893, at *4 ("Texas is not an 'entity' within the meaning of Section 1391(c)(2), given its plain reference to unincorporated associations."); *Pennsylvania v. Trump*, 351 F. Supp. 3d 791, 809 (E.D. Pa. 2019), *rev'd on other grounds sub. nom. Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 591 U.S. 657 (2020).  Likewise, the fact that "states, unlike corporations, do not have a principal place of business" is another indication

34

that § 1391(c)(2) does not apply states.  *Garland*, 2023 WL 4851893, at *4.  And, finally, "limiting [a state's] residency to a single district in the state would defy common sense."  *California v. Azar*, 911 F.3d at 570; *see also Garland*, 2023 WL 4851893, at *3 ("[C]ommon sense . . . make clear[s] clear that a state resides in every district and division within its borders."); *Pennsylvania*, 351 F. Supp. 3d at 809 ("[R]eading Section 1391 as Defendants suggest [to include states] would yield an absurd result.").[3]

Because § 1392(c)(2) does not apply to states, the State of Texas is deemed to "reside[] at every point within the boundaries of the state," including the Eastern District of Texas.  *E.g., Atlanta & F.R. Co. v. Western Ry. Co. of Ala.*, 50 F. 790, 791 (5th Cir. 1892).  Venue is thus proper here, and Defendants' motion to transfer is **DENIED**.

## IV. Conclusion

Plaintiffs have satisfied their burden to demonstrate standing at this stage of the case, and venue is proper in the Eastern District of Texas.  Plaintiffs, however, have not identified a final agency action for the Court to review under the APA. Accordingly, the Court **GRANTS IN PART** Defendants' Motion to Dismiss (Docket No. 33) and **DISMISSES** Count Four.  The Court **DENIES** Defendants' Motion to

---

[3]  In addition to those cited above, other courts have held that § 1391(c)(2) does not apply to states. *See, e.g., Florida v. United States*, 2022 WL 2431443, at *2 (N.D. Fla. Jan. 18, 2022); *Alabama v. U.S. Army Corp of Eng'rs*, 382 F. Supp. 2d 1301, 1329 (N.D. Ala. 2005).  *See also* Wright & Miller, 14D Fed. Prac. & Proc. Juris. § 3815 (4th ed. 2023) ("A state is held to reside in any district within it.").

Dismiss in all other respects.   The Court also **DENIES** Defendants' Motion to Transfer Venue (Docket No. 14).

So **ORDERED** and **SIGNED** this **7th**   day of  **May, 2024.**

JEREMY D. KERNODLE
UNITED STATES DISTRICT JUDGE