# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

THE DAILY WIRE, LLC *et al.*,

        Plaintiffs

    v.

UNITED STATES DEPARTMENT
OF STATE *et al.*,

        Defendants.

Civil Action No. 6:23-cv-00609 (JDK)

**DEFENDANTS' RULE 12(h)(3) MOTION TO DISMISS OR, ALTERNATIVELY, MOTION TO RECONSIDER MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS AND MOTION TO TRANSFER (DKT # 53)**

i

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................... 1

ISSUE STATEMENT ................................................................................................................ 3

BACKGROUND ........................................................................................................................ 3

    I.    Plaintiffs' Theories of Standing ........................................................................ 3

        A.    Texas ....................................................................................................... 4

        B.    Media Plaintiffs ..................................................................................... 4

    II.    This Court's Prior Ruling on Defendants' Rule 12(b)(1) Motion to Dismiss ............. 6

    III.    The Supreme Court's Decision in *Missouri* ................................................... 7

LEGAL STANDARD ............................................................................................................... 10

ARGUMENT ........................................................................................................................... 11

    I.    Under *Missouri*, Plaintiffs have failed to plausibly allege Article III standing. ............ 11

        A.    Under *Missouri*, Plaintiffs' alleged injuries are not traceable to Defendants. ... 13

            1.    Texas has not plausibly alleged a causal connection between Defendants' alleged conduct and any platform's actions allegedly violating HB 20 ........................................................................... 13

            2.    Media Plaintiffs have not plausibly alleged a causal connection between Defendants' actions and injury to themselves. ............................ 19

        B.    Under *Missouri*, Plaintiffs have not plausibly alleged ongoing or future injury-in-fact. ......................................................................................... 24

        C.    Under *Missouri*, Plaintiffs' injuries are not redressable by their requested relief ................................................................................................... 27

CONCLUSION ........................................................................................................................ 28

# TABLE OF AUTHORITIES

## CASES

*Alabama-Coushatta Tribe of Tex. v. United States,*
    757 F.3d 484 (5th Cir. 2014)................................................................................................10

*Arbaugh v. Y&H Corp.,*
    546 U.S. 500 (2006)...........................................................................................................10

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)...........................................................................................................12

*Austin v. Kroger Texas, L.P.,*
    864 F.3d 326 (5th Cir. 2017)................................................................................................10

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013).....................................................................................................11, 12

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006)...........................................................................................................10

*FDA v. Alliance for Hippocratic Med.,*
    602 U.S. 367 (2024).....................................................................................................21, 23

*Lane v. Halliburton,*
    529 F.3d 548 (5th Cir. 2008).........................................................................................10, 12

*Los Angeles v. Lyons,*
    461 U.S. 95 (1983).............................................................................................................13

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992)................................................................................... 11, 14, 20, 26

*Massachusetts v. EPA,*
    549 U.S. 497 (2007)...........................................................................................................14

*Mei Pang v. Levitt,*
    2024 WL 2108842 (W.D. Tex. Apr. 22, 2024) ...................................................................10

*Missouri v. Biden,*
    83 F.4th 350 (5th Cir. 2023).........................................................................................*passim*

*Missouri v. Biden,*
    680 F. Supp. 3d 630 (W.D. La. 2023) .................................................................................8

*Moody v. NetChoice, LLC,*
    144 S. Ct. 2383 (2024)..................................................................................................4, 14

*Murthy v. Missouri*,
  144 S. Ct. 1972 (2024) ............................................................................................*passim*

*NetChoice, LLC v. Paxton*,
  573 F. Supp. 3d 1092 (W.D. Tex. 2021) ...............................................................4

*O'Shea v. Littleton*,
  414 U.S. 488 (1974) .............................................................................................2, 13

*Raines v. Byrd*,
  521 U.S. 811 (1997) ...................................................................................................11

*Ramming v. United States*,
  281 F.3d 158 (5th Cir. 2001) ..................................................................................10

*Simon v. E. Ky. Welfare Rts. Org.*,
  426 U.S. 26 (1976) .....................................................................................................12

*Telephone & Data Sys., Inc. v. FCC*,
  19 F.3d 42 (D.C. Cir. 1994) .....................................................................................18

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) .............................................................................................11, 19

*United States v. Abbott*,
  2024 WL 3593683 (W.D. Tex. July 30, 2024) ....................................................10

## RULES

Federal Rule of Civil Procedure 12(h)(3) ..............................................................1, 10

Federal Rule of Civil Procedure 54(b) ...................................................................1, 10

## OTHER AUTHORITIES

*Statement on GARM*, Global Alliance for Responsible Media,
  https://perma.cc/UU9C-ZR4Y ..............................................................................4

## INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 12(h)(3), and in the alternative, Rule 54(b), Defendants move to dismiss the complaint for lack of subject-matter jurisdiction in light of the Supreme Court's recent decision in *Murthy v. Missouri*, 144 S. Ct. 1972 (2024), reversing *Missouri v. Biden*, 83 F.4th 350 (5th Cir. 2023), upon which this Court principally relied in rejecting Defendant's initial motion to dismiss.

In *Missouri*, the plaintiffs, two States and five individuals, alleged that federal agencies had pressured social media platforms—through direct and regular communications—to suppress protected speech online. The plaintiffs sought only injunctive and declaratory relief. Evidence showed that "various federal officials regularly spoke with the platforms" about various topics, and that the social media platforms in fact "targeted speech" on those topics in a variety of ways. 144 S. Ct. at 1982–84. But the Supreme Court held that the plaintiffs nonetheless lacked Article III standing, largely because their injuries derived from the independent actions of third parties—the social media platforms—and not from the federal government. *Id.* at 1985–86. The Supreme Court in *Missouri* clarified that it was not enough for the plaintiffs to show that the government communicated with social media platforms about moderating content and that the social media platforms moderated such conduct; rather, the plaintiffs were required to "show a substantial risk that, in the near future, at least one platform will restrict the speech of at least one plaintiff in response to the actions of at least one Government defendant." *Id.* at 1986.

That required showing had several components. Primarily, *Missouri* held that the plaintiffs needed to show, on a plaintiff-by-plaintiff, defendant-by-defendant, and platform-by-platform basis, "specific causation,"—*i.e.*, "that a particular defendant pressured a particular platform to censor a particular topic *before* that platform suppressed a particular plaintiff's speech on that topic." *Id.* at 1987–88. Moreover, the Supreme Court emphasized that the necessary chains of causation "must be

evaluated in light of the platform's independent incentives to moderate conduct." *Id.* at 1988. And even this showing was not enough for injunctive relief; rather, the Supreme Court emphasized that each plaintiff was required to show "a real and immediate threat of repeated injury" for prospective relief. *Id.* at 1986 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)). Past injury was not itself enough. Accordingly, the Court concluded that, "without proof of an ongoing pressure campaign," it would be "entirely speculative that the platforms' future moderation decisions [would] be attributable, even in part, to the defendants." *Id.* at 1993.

The principles set forth by the Supreme Court in *Missouri* require dismissal of the complaint here. As this Court is aware, this case is brought by the State of Texas and two media outlets, The Daily Wire and Federalist Media (together, "Media Plaintiffs"), which allege that the State Department, through the Global Engagement Center ("GEC"), is funding, promoting, and marketing "tools" and "technologies" that are purportedly used by third-party social media platforms in ways that violate a Texas state law and by third-party social media platforms and other third-party companies in ways that suppress Media Plaintiffs' protected speech and limit the distribution of their reporting. Plaintiffs do not allege that Defendants have taken any direct action against them. Defendants previously moved to dismiss the complaint for lack of standing, in part on the basis that Plaintiffs' injuries (a) stem from the independent actions of third parties and are therefore neither traceable to Defendants nor redressable by an injunction targeted towards them, and (b) were wholly in the past and therefore insufficient to support prospective relief. This Court denied that motion in relevant part, concluding that the complaint sufficiently alleged facts supporting ongoing or future injury, traceability, and redressability based in large measure on the Fifth Circuit's then binding, but now reversed, opinion in *Missouri*, and describing this case as "indistinguishable" from that one as to standing. *See* Memo. Op. & Order Granting in Part and Denying in Part Mot. to Dismiss & Mot. to Transfer at 19, ECF No. 53 ("Op.").

2

Therefore, the complaint's allegations, even if proven, would suffer from the same Article III problems that foreclosed the plaintiffs' claims in *Missouri*. The complaint alleges that the GEC has communicated with social media platforms about disinformation technologies generally, and has promoted, marketed, or funded two companies that independently have created products that describe Media Plaintiffs in unfavorable terms. The complaint further alleges that social media companies and advertisers use those products in ways that interfere with a state law, and that Media Plaintiffs' revenue and circulation have decreased as a result. But the complaint does not plausibly allege that the GEC has ever pressured any social media platform or other private company to "censor" speech about any particular topic or Media Plaintiffs' speech, nor that any platform or private company has done so as a result of any such government pressure. Nor does the complaint allege facts establishing that an "ongoing pressure campaign" by Defendants was in place at the time the complaint was filed. *Missouri*, 144 S. Ct. at 1993. In short, Plaintiffs have not alleged that their purported injuries are caused by the GEC under the standard articulated by the Supreme Court in *Missouri*, or redressable by any injunction aimed at the GEC. The complaint should be dismissed for lack of subject-matter jurisdiction.

## ISSUE STATEMENT

Have Plaintiffs plausibly alleged Article III standing?

## BACKGROUND

### I.      Plaintiffs' Theories of Standing

This lawsuit alleges that the State Department, through the GEC, is "intervening in the news-media market to render disfavored press outlets unprofitable by funding the infrastructure, development, and marketing and promotion of censorship technology and private censorship enterprises to covertly suppress speech of a segment of the American press." Compl. ¶ 1, ECF No. 1. The Court is already familiar with the allegations in Plaintiffs' complaint. *See* Op. at 1–8. Accordingly, Defendants recount here only a summary of the allegations relevant to this motion, which pertain to

3

Plaintiffs' asserted injuries for Article III standing purposes.

### A.  Texas

Texas alleges that Defendants, acting primarily through the GEC, have interfered with its sovereign interest in creating and enforcing its legal code. Compl. ¶¶ 5, 234–39. According to Texas, HB 20—"a Texas statute that regulates social media companies as common carriers and prohibits them from censoring speech and press on their platforms"—was to become effective on December 2, 2021. *Id.* ¶¶ 234–35. At the time the complaint in this case was filed, and indeed at the time HB 20 was scheduled to take effect, Texas was enjoined from enforcing the statute, *see id.* ¶ 234, and it remains enjoined from doing so today, *see generally Moody v. NetChoice, LLC*, 144 S. Ct. 2383 (2024) (vacating and remanding the Fifth Circuit's decision which had reversed a decision by a district judge in the Western District of Texas on December 1, 2021, enjoining HB 20's enforcement against the major social media platforms, *NetChoice, LLC v. Paxton*, 573 F. Supp. 3d 1092 (W.D. Tex. 2021)). Texas alleges that Defendants "interfere with Texas's enforcement" of HB 20 by "induc[ing] social media companies to violate [it]." *Id.* ¶¶ 235, 237. For instance, Texas alleges that Defendants "marketed censorship technology to American companies, including the major social media companies," *id.* ¶ 76, and one of the GEC's employees held "a series of meetings with LinkedIn to discuss 'countering disinformation,' and set up similar meetings with other social media platforms," *id.* ¶ 78. Texas alleges that this employee "offered the social media companies access to Disinfo Cloud," *id.*, a catalog of Countering Propaganda and Disinformation technologies, *id.* ¶ 65, and "encourag[ed the companies] to use it to identify[], understand[], and address[] misinformation," *id.* ¶ 79 (citation omitted). *See also* Op. at 14 (finding that the complaint alleges that "Defendants, acting through GEC, are encouraging social media platforms to violate H.B. 20").

### B.  Media Plaintiffs

Media Plaintiffs claim that they have suffered past and ongoing injury because they have been

deemed "unreliable" or "risky" by third-party companies Global Disinformation Index, Ltd ("GDI") and NewsGuard Technologies, Inc. *See* Compl. ¶ 4. Media Plaintiffs allege that Defendants funded and promoted GDI and NewsGuard. *See id.* ¶ 125 ("GEC appears to have first funded GDI in 2021 through its U.S.-Paris Tech Challenge"); *id.* ¶¶ 142–44 (alleging that NewsGuard was a winner "of the COVID-19 misinformation and disinformation tech challenge" in spring and summer 2020 and received a $25,000 award). They claim that the Disinfo Cloud Twitter account displays two Twitter posts from 2021 "promoting GDI and NewsGuard" and that Defendants "continue[] to use" unspecified "research and reports" on Disinfo Cloud. *Id.* ¶¶ 87, 161–62. Media Plaintiffs also claim that these third parties "work with the World Federation of Advertisers … and its subsidiary, Global Alliance for Responsible Media … to steer blue-chip advertisers away from Media Plaintiffs." *Id.* ¶ 102.[1]

Media Plaintiffs further allege that, "upon information and belief," the GEC uses a "Silicon Valley Engagement initiative to domestically promote and market to the tech industry censorship technologies and censorship enterprises that silence, down-rank, de-amplify, deplatform, de-boost, demonetize, or denigrate segments of the American press and Americans' speech, including Media Plaintiffs." *Id.* ¶ 84. This is accomplished, Media Plaintiffs allege, through "sometimes quarterly" meetings between GEC's senior leadership and social-media platforms, which "focus on the 'tools and techniques' of stopping the spread of disinformation on social media." *Id.* ¶ 85.

Media Plaintiffs also allege, "upon information and belief," that the GEC has ongoing programs that target their speech. They allege that the GEC "continues to host tech challenges … to fund the development of censorship technology or censorship enterprises that target the American press and Americans' speech." *Id.* ¶ 170. They claim that the GEC operates a testbed program which

---

[1] As of August 9, 2024, the Global Alliance for Responsible Media has discontinued its activities. *Statement on GARM*, Global Alliance for Responsible Media, https://perma.cc/UU9C-ZR4Y.

"continues to test and/or develop censorship technology that targets the American press and Americans' speech," *id.* ¶¶ 171–72, and "maintains a platform" of such technologies, *id.* ¶ 173. And they claim that the GEC maintains a "Silicon Valley location" which "continues to promote and market censorship tools and technology that target segments of the American press and Americans' speech to the tech industry, the private sector, and academia." *Id.* ¶ 175. *See also* Op. at 23–24 (finding that the complaint alleges "ongoing conduct by Defendants that presently violates [Media Plaintiffs'] First Amendment rights").

## II.   This Court's Prior Ruling on Defendants' Rule 12(b)(1) Motion to Dismiss

Defendants previously moved to dismiss the complaint largely under Rule 12(b)(1) for lack of subject-matter jurisdiction, arguing that Plaintiffs lack Article III standing. Defs.' Mot. to Dismiss, ECF No. 33. This Court denied in part and granted in part Defendants' motion. *See* Op. As relevant here, this Court concluded that the complaint sufficiently alleges that Plaintiffs have standing. Op. at 1.

As to Texas, the Court concluded that "Texas plausibly alleges an injury to its sovereign interest in enforcing H.B. 20." *Id.* at 12. The Court reasoned that the complaint alleged that Defendants engaged in a "pressure campaign" to encourage social media platforms to "censor[] 'misinformation' and 'disinformation,'" *id.* at 14, which the Court held to be conduct prohibited by HB 20, *id.* at 15. The Court also determined that the injury was traceable to Defendants. The Court did not discuss any specific examples of coercion or threats that Defendants purportedly made to social media companies; rather, drawing on an apparent reference to the White House in the now reversed Fifth Circuit opinion, the Court reasoned that "allegations that one of 'the most powerful office[s] in the world' repeatedly promoted and marketed the tools to social media companies" constituted *per se* "unrelenting pressure." Op. at 18 (quoting *Missouri*, 83 F.4th at 371). Indeed, the Court reasoned that this case is "indistinguishable" for purposes of standing from *Missouri*. *See* Op. at

19. There, the Fifth Circuit erroneously found a traceable injury based on the theory that social media platforms' "censorship decisions were likely attributable at least in part to the platforms' reluctance to risk the adverse legal or regulatory consequences that could result from a refusal to adhere to the government's directives." *Missouri*, 83 F.4th at 370.

The Court made similar conclusions regarding Media Plaintiffs. The Court concluded that the complaint alleged "specific details of past instances of alleged conduct" sufficient for establishing an ongoing injury because the complaint included allegations that "censorship tools and technologies" previously "promoted" by Defendants are being presently used by social media companies to suppress Media Plaintiffs' speech. Op. at 24–25 (quoting *Missouri*, 83 F.4th at 367 ("Past harm can constitute an injury-in-fact for purposes of pursuing injunctive relief if it causes continuing, present adverse effects[.]" (internal quotation marks and alterations omitted))). In support, this Court cited allegations that the GEC met with social media platforms to "market and promote" technologies, made certain information publicly and privately available, and operated a platform for testing technology; it did not cite any allegations that the GEC pressured any other entity to do anything. Op. at 23–24.

The Court additionally concluded that the complaint's allegations of "past censorship efforts" were also sufficient to establish future injury because Plaintiffs alleged a "strong likelihood that [Media Plaintiffs'] injuries will reoccur." *Id.* at 25 (citing *Missouri*, 83 F.4th at 367–68). And the Court held that Plaintiffs had adequately alleged that their injuries were traceable to Defendants, pointing to Plaintiffs' allegations that third parties "deplatformed and demoted Media Plaintiffs as a result" of Defendants' "deliberate efforts to market and promote the censorship tools and technologies." *Id.* at 27 (citing *Missouri*, 83 F.4th at 361–62).

## III.   The Supreme Court's Decision in *Missouri*

After this Court's ruling, the Supreme Court reversed the Fifth Circuit's decision in *Missouri* and held that the plaintiffs in that case lacked Article III standing. There, the States of Louisiana and

Missouri, and five individual social media users, sought preliminary injunctive relief against various Executive Branch officials and agencies based on allegations "that they pressured [social media] platforms to suppress protected speech in violation of the First Amendment." *Missouri*, 144 S. Ct. at 1981. In particular, the social media users alleged that "various platforms removed or demoted their COVID-19 or election-related content," and alleged the "Federal Government was behind it." *Id.* at 1984. And Louisiana and Missouri claimed that social media platforms "suppressed the speech of state entities and officials, as well as their citizens' speech." *Id.* The district court granted preliminary injunctive relief, *Missouri v. Biden*, 680 F. Supp. 3d 630 (W.D. La. 2023), which the Fifth Circuit affirmed in part, *Missouri v. Biden*, 83 F.4th 350 (5th Cir. 2023). The claims in that case were based on regular communications between federal entities, including the White House, the Centers for Disease Control and Prevention, the Surgeon General, and the FBI, and major social media platforms, about COVID-19 and U.S. election-related misinformation. *Missouri*, 144 S. Ct. at 1982 ("[V]arious federal officials regularly spoke with the platforms about COVID–19 and election-related misinformation."). The Supreme Court concluded, however, that none of the seven plaintiffs had standing as to any of the named defendants, reversing the judgment of the Fifth Circuit. *Id.* at 1985.

The Supreme Court explained that in order to have standing, "the plaintiffs must show a substantial risk that, in the near future, at least one platform will restrict the speech of at least one plaintiff in response to the actions of at least one Government defendant." *Id.* at 1986. That principle foreclosed plaintiffs' claimed content-moderation injuries, which all "depend[ed] on the *platform's* actions." *Id.* at 1986.

In particular, the Supreme Court held that the plaintiffs had not established "specific causation" because each plaintiff failed to make even the "threshold showing" "that a particular defendant pressured a particular platform to censor a particular topic *before* that platform suppressed a particular plaintiff's speech on that topic." *Id.* at 1987–88. Assessing the asserted "direct censorship

8

injuries" on a plaintiff-by-plaintiff, defendant-by-defendant, platform-by-platform, and topic-by-topic basis, the Court concluded that no plaintiff had established past injuries traceable to the government conduct at issue. *See id.* at 1987. "And even where the plaintiff, platform, time, content, and defendant line up, the links must be evaluated in light of the platform's independent incentives to moderate content." *Id.* at 1988.

The Court also rejected the contention that past instances of content moderation affecting the plaintiffs sufficed to confer Article III standing because there was no evidence that any of those episodes of content moderation had been caused by any action of the government. *Id.* at 1991–92. Ultimately, the Court concluded that the plaintiffs had not fairly traced instances in which they were subject to content moderation to alleged government pressure, as opposed to decisions the platforms reached in the exercise of their own independent judgment, *id.* at 1987, 1992, and the plaintiffs merely "speculat[ed] that the platforms' future moderation decisions [would] be attributable, even in part, to the defendants," *id.* at 1993; *see also id.* at 1986 (concluding standing was lacking where the plaintiffs' claims "depend on the *platform's* actions—yet the plaintiffs do not seek to enjoin the platforms from restricting any posts or accounts").

The Supreme Court also concluded that plaintiffs failed to show "'a real and immediate threat of repeated injury,'" as required to obtain prospective relief. *Id.* at 1986 (citation omitted). "[W]ithout proof of an ongoing pressure campaign," the Supreme Court determined it was "entirely speculative that the platforms' future moderation decisions [would] be attributable, even in part, to the defendants." *Id.* at 1993. Additionally, the Supreme Court concluded that it was insufficient to "claim[] broadly that 'the government' continues to communicate with the platforms about 'content-moderation issues.'" *Id.* (cleaned up). Rather, the plaintiffs were required to show that "each Government defendant continues to engage in the challenged conduct, which is 'coercion' and 'significant encouragement,' not mere 'communication'" about moderating content about specific

"topics." *Id.* (emphasis omitted).

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(h)(3) preserves a party's ability to move to dismiss for lack of subject-matter jurisdiction at any point in the litigation. Fed. R. Civ. P. 12(h)(3); *see Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006) ("The objection that a federal court lacks subject-matter jurisdiction … may be raised by a party, or by a court on its own initiative, at any stage in the litigation."). The parties asserting federal jurisdiction—here, Plaintiffs—bear the burden of establishing its existence. *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 487 (5th Cir. 2014); *see also Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) ("The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction."). It is "presume[d] that federal courts lack jurisdiction unless the contrary appears affirmatively from the record." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006). A plaintiff must allege a "plausible set of facts" that, if proven, would establish subject-matter jurisdiction. *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008).

To the extent that the Court construes this motion as a motion to reconsider the Court's partial denial of Defendants' earlier motion to dismiss, *see* Op., reconsideration and dismissal would be appropriate. Federal Rule of Civil Procedure 54(b) allows courts to revise or amend "any order … that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties … at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." "[T]he trial court is free to reconsider and reverse its decision for any reason it deems sufficient." *Austin v. Kroger Texas, L.P.*, 864 F.3d 326, 336 (5th Cir. 2017). In particular, reconsideration may be appropriate "where there has been an intervening change in the controlling law." *Mei Pang v. Levitt*, 2024 WL 2108842, at *2 (W.D. Tex. Apr. 22, 2024); *see also United States v. Abbott*, 2024 WL 3593683 (W.D. Tex. July 30, 2024) (reconsidering ruling on standing, over opposition of the State of Texas, based in part on intervening appellate authority).

10

Here, reconsideration is appropriate because the Supreme Court's decision in *Missouri*, which was issued after this Court's prior ruling, constitutes an intervening change in the controlling law. *Missouri* clarified how to apply well-established standing principles to claims alleging that the government is pressuring private parties to suppress protected speech online, and, in particular, it reversed the Fifth Circuit opinion underlying key portions of this Court's prior decision. *See* Op. at 18–20 (analyzing traceability and redressability for Texas pursuant to the Fifth Circuit's *Missouri* opinion), *id.* 24–27 (analyzing injury, traceability, and redressability for Media Plaintiffs pursuant to the Fifth Circuit's *Missouri* opinion).

## ARGUMENT

### I.  Under *Missouri*, Plaintiffs have failed to plausibly allege Article III standing.

Article III of the Constitution limits the judicial power to "Cases" and "Controversies"—a requirement that is "fundamental to the judiciary's proper role in our system of government." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). As part of the case-or-controversy requirement, a plaintiff must have standing to sue. The "constitutional minimum of standing," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992), has three requirements: (1) an injury-in-fact, that is (2) "fairly traceable to the challenged action," (3) and "redressable by a favorable ruling." *Missouri*, 144 S. Ct. at 1986 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press" and "for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). Where, as here, "the plaintiff is not [it]self the object of the government action or inaction [it] challenges," the Supreme Court has recognized that "standing is … substantially more difficult to establish." *Lujan*, 504 U.S. at 562. Furthermore, the "standing inquiry" is "especially rigorous" in this case because "reaching the merits of the dispute would force" the court "to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines*, 521 U.S. at 819–20.

11

The Supreme Court's decision in *Missouri* applied these well-established principles to claims alleging that federal agencies pressured social media companies to "censor" online speech, and the Supreme Court's analysis requires dismissal of the complaint here. In *Missouri*, the Supreme Court evaluated Article III standing at the preliminary injunction stage, while here, standing is to be evaluated at the pleadings stage. To be sure, Plaintiffs need not prove facts establishing their standing at this stage of the litigation, but they must nevertheless plead a non-conclusory, plausible set of facts that would establish their standing under the legal principles set out by the Supreme Court in *Missouri*. *See Lane*, 529 F.3d at 557; *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

This Court stated in ruling on Defendants' Rule 12(b) motion to dismiss that "[t]his case is indistinguishable" from the *Missouri* litigation in relevant part, that is, with respect to Plaintiffs' theory of standing. Op. at 19. Since then, the Supreme Court in *Missouri* emphatically rejected the analysis underlying the Fifth Circuit's *Missouri* decision, upon which this Court and Plaintiffs relied. There, like here, the plaintiffs' theories of standing "depend on the *platform's* actions—yet the plaintiffs do not seek to enjoin the platforms from restricting any posts or accounts." 144 S. Ct. at 1986. Rather, the *Missouri* plaintiffs and Plaintiffs here both "seek to enjoin *Government agencies and officials* from pressuring or encouraging the platforms to suppress protected speech in the future." *Id.* This "one-step-removed, anticipatory nature of their alleged injuries presents the plaintiffs with two particular challenges." *Id.*

First, Plaintiffs have not alleged facts sufficient to support traceability, because their theory of standing "require[s] guesswork as to how independent decisionmakers will exercise their judgment." *Id.* at 1986 (quoting *Clapper*, 568 U.S. at 413); *see Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976). Traceability for claims alleging government-caused "censorship" of speech on social media platforms requires a "threshold showing … that a particular defendant pressured a particular platform to censor a particular topic *before* that platform suppressed a particular plaintiff's speech on that topic." *Missouri*, 144 S. Ct. at 1988. Furthermore, even where that timeline "line[s] up," those "links must be

evaluated in light of the platform's independent incentives to moderate content." *Id.* The complaint's allegations, accepted as true, fail to plausibly make that threshold showing for either Texas or Media Plaintiffs. And even if they did, the complaint contains allegations acknowledging that the platforms (and, as relevant for Media Plaintiffs, advertisers) have "independent incentives" to moderate content, *id.* at 1987. *E.g.*, Compl. ¶¶ 102–03 (describing wholly private agreements between the social media platforms and other third-party companies with respect to content moderation).

Second, Plaintiffs "request forward-looking relief," and therefore they must plausibly allege that they "face 'a real and immediate threat of repeated injury.'" *Missouri*, 144 S. Ct. at 1986 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)); *Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983). The vast majority of the allegations in the complaint describe conduct that predates the filing of complaint, much of it by several years, and those that describe ongoing conduct do so in generalized terms insufficient to allege immediate and traceable injury as required. *E.g.*, Compl. ¶¶ 161, 165, 170, 172–75 (alleging that GEC activities "target" "Americans," the "American press," or "Americans' speech" generally).

Finally, for many of the same reasons, Plaintiffs' injuries are not redressable by an injunction that targets the government rather than independent third parties, and where there is no allegedly "ongoing pressure campaign" (as opposed to mere communication with the platforms) that is causing Plaintiffs traceable injuries to enjoin in the first place. *Missouri*, 144 S. Ct. at 1993.

### A.  Under *Missouri*, Plaintiffs' alleged injuries are not traceable to Defendants.

#### 1.  Texas has not plausibly alleged a causal connection between Defendants' alleged conduct and any platform's actions allegedly violating HB 20.

Texas's theory of standing is that Defendants are "interfere[ing] with Texas's sovereign right to create and enforce a legal code"—that is, with HB 20, a presently enjoined state law that would regulate social media companies' content-moderation decisions. Compl. ¶¶ 234–39. Plaintiffs allege Defendants are doing so through their actions to "fund, develop, market, and/or promote" so-called

"censorship tools, technolog[ies], and … enterprises" to social media companies, with the companies in turn using those tools in ways that violate HB 20. *Id.* ¶¶ 234–35. But assuming that interfering with the enforcement of an enjoined state law—and one that is almost certainly unconstitutional in relevant part—can constitute injury-in-fact,[2] Texas has not alleged facts supporting any "causal connection" between Defendants' alleged actions—the funding, promotion, and marketing of so-called "censorship tools"—and the decisions of third-party social media platforms that allegedly violate HB 20. *Lujan*, 504 U.S. at 560. Applying the framework set forth by *Missouri*, Texas must, as a threshold matter, allege that "a particular defendant pressured a particular platform to censor a particular topic" in violation of HB 20 "*before* that platform suppressed" "particular … speech on that topic." 144 S. Ct. at 1988. And even where there is "pressure," that pressure must be tied to "discrete instance[s] of content moderation" for purposes of causation. *Id.* at 1987.[3]

In this Court's initial decision, the Court did not identify specific instances of alleged "pressure"—rather, following the then-binding but now reversed Fifth Circuit decision in *Missouri*, it found causation based on a presumed "pressure campaign," Op. at 14, by Defendants directed at the social media platforms "to demote and deplatform certain users" that it reasoned was enough to

---

[2] The Supreme Court indicated that the application of HB 20 relevant here—restricting content moderation by the major social media platforms—almost certainly violates the First Amendment, contrary to the Fifth Circuit's analysis. *NetChoice*, 144 S. Ct. at 2408 ("The reason Texas is regulating the content-moderation policies that major platforms use for their feeds is to change the speech that will be displayed there. Texas does not like the way those platforms are selecting and moderating content, and wants them to create a different expressive product, communicating different values and priorities. But under the First Amendment, that is a preference Texas may not impose."); *id.* at 2399 ("The Fifth Circuit was wrong in concluding that Texas's restrictions on the platforms' selection, ordering, and labeling of third-party posts do not interfere with expression.").

[3] *Massachusetts v. EPA*, 549 U.S. 497 (2007), does not change the relevant standard for what a State must show for traceability in a case like this. The Court in *Missouri* applied this traceability standard to Louisiana's and Missouri's claims that the platforms were suppressing the speech of state employees and officials. 144 S. Ct. at 1989.

establish traceability, Op. at 18.[4] That conclusion was based on a passage from the Fifth Circuit's decision, based on which this Court concluded that "allegations that one of 'the most powerful office[s] in the world' repeatedly promoted and marketed … tools to social media companies is sufficient to allege that the companies … likely 'did, and would continue to, bend to the government's will.'" Op. at 18 (quoting *Missouri*, 83 F.4th at 371).[5] This Court also relied on language from *Missouri* that "the platforms' 'censorship decisions were likely attributable at least in part to the platforms' reluctance to risk the adverse legal or regulatory consequences that could result from a refusal to adhere to the government's directives,'"[6] in rejecting Defendants' argument that any injury to Texas

---

[4] Defendants respectfully disagree with this Court's prior characterization of the complaint as alleging that the GEC "coerce[d]" the platforms in any way. Op. at 18. The complaint does not contain any allegations of coercion, directives, or threats—to the contrary, the complaint primarily alleges that Defendants "funded," "promoted," "marketed," or "discussed" certain technologies. At most, the complaint alleges that the GEC "pushed" or "encouraged" social media companies to join a website containing a repository of disinformation technologies, Compl. ¶¶ 76–77. But even those allegations would not establish traceability, because as further discussed below, encouraging companies to join a website does not plausibly allege that the companies were forced or otherwise pressured to use the technologies on that site in any particular way, much less in ways that injure Texas or Media Plaintiffs as required under *Missouri*'s traceability test. Any such theory therefore depends on "guesswork as to how independent decisionmakers will exercise their judgment" and fails. 144 S. Ct. at 1986. Finally, to be sure, the complaint does allege in one instance (¶ 37) broadly that the "federal government has coerced social media platforms to censor disfavored press and viewpoints," but that general allegation is conclusory and, even if it were not, is likewise insufficient to allege specific causation under *Missouri* for the same reason.

[5] Significantly, the reference in the Fifth Circuit's decision to "the most powerful office in the world" was not to the State Department. While the Fifth Circuit used that phrase to describe some of the other defendants in that case, such as the White House, the Fifth Circuit made clear that the State Department's communications with the platforms, in contrast, "[did] not appear coercive in tone, did not refer to adverse consequences, and were not backed by any apparent authority." 83 F.4th 371, 391; *id.* ("As for the State Department, while it did communicate directly with the platforms, so far there is no evidence these communications went beyond educating the platforms on 'tools and techniques' used by foreign actors."). Thus, the Fifth Circuit reversed the district court's injunction as to the State Department. *Id.* at 398.

[6] Defendants additionally respectfully note that there are no allegations in this case that the GEC or any other named Defendants issued any "directives" to anyone or threatened any legal or regulatory consequences. Moreover, the State Department has no power to impose such consequences on social media companies.

was the result of the platforms' independent actions. Op. at 19 (quoting *Missouri*, 83 F.4th at 370).

That is precisely the language and reasoning that the Supreme Court rejected in *Missouri*. In particular, the Supreme Court identified the "lack of specific causation findings with respect to any discrete instance of content moderation" to be "[t]he primary weakness" in the Fifth Circuit's opinion. 144 S. Ct. at 1987. The Supreme Court acknowledged that the Fifth Circuit found that the platforms "[had] engaged in censorship of certain viewpoints on key issues" while "the government has engaged in a years-long pressure campaign," and then inferred that the former was "likely attributable" to the latter. *Id.* (quoting *Missouri*, 83 F.4th at 370). The Supreme Court, however, "reject[ed] [that] overly broad assertion" as sufficient to show standing, explaining that that reasoning exemplified how the Fifth Circuit had erroneously "approached standing at a high level of generality," whereas Article III demands a more precise and rigorous traceability analysis. *Id.* As explained, to plausibly allege traceability here, Texas needs to allege facts showing that Defendants pressured particular platforms to "censor" speech about particular topics in ways that would violate HB 20; that those platforms did subsequently "censor" speech about those topics; and that they did so due to Defendants' actions rather than due to their independent economic incentives to moderate content. Texas has not done so. Just as the Supreme Court found a lack of traceability in *Missouri*, the same result obtains here. *See* Op. at 19 (finding that "[t]his case is indistinguishable" from the *Missouri* litigation for purposes of Texas's traceability).

Moreover, the allegations in the complaint regarding Defendants' purported interference with HB 20, accepted as true, do not otherwise satisfy the Supreme Court's *Missouri* standard for three reasons. First, rather than alleging any facts that Defendants "pressured" particular platforms with respect to any particular topics, the complaint alleges only in general terms that Defendants have communicated about, marketed, or promoted disinformation technologies to social media platforms. *See Missouri*, 144 S. Ct. at 1987 (standing cannot be approached "at a high level of generality"). For

16

instance, the complaint alleges that Defendants made "available" to the social media platforms Disinfo Cloud, an online repository of disinformation technologies (which no longer exists). Compl. ¶¶ 73, 165. Similarly, through the so-called Silicon Valley Engagement initiative, Defendants allegedly "marketed" disinformation technologies to social media companies or, at most, "encouraged" or "pushed" them to join an online repository of such technologies (but not to take any specific actions, much less actions that would have injured Texas). *Id.* ¶¶ 76, 77. Likewise, the complaint alleges that GEC employees held meetings with the platforms about misinformation and disinformation generally, *id.* ¶¶ 78, 85, or "highlighted" "tools and techniques" for companies generally, *id.* ¶ 86. But none of that amounts to "pressure" aimed at particular platforms to "censor" any particular speech about any particular topic. Those highly generalized allegations are not enough to allege traceability.

Second, rather than alleging that those platforms subsequently "censored" speech about any particular topics as a direct result of pressure from Defendants about those same topics, the complaint alleges only that the third-party social media platforms have entered into an agreement with other third parties—some of whom allegedly received discrete grants for other projects from Defendants years ago—in ways that allegedly "restrict content." Compl. ¶ 103. In particular, the complaint alleges that two particular companies (GDI and NewsGuard) "promoted" by Defendants "work with" an advertising firm (the Global Alliance for Responsible Media), and that firm "drove an agreement" between social media platforms and other advertisers pursuant to which the platforms "restrict content" about certain topics. *Id.* ¶¶ 101–03. The complaint does not allege that Defendants dictated this agreement—to which Defendants are not a party—or otherwise compelled or indeed had anything whatsoever to do with its terms.  None of those allegations support a plausible inference that, on a topic-by-topic and platform-by-platform basis, HB 20 is being undermined as a direct result of Defendants' alleged conduct, as required under *Missouri*. Indeed, this alleged chain—between Defendants, GDI and NewsGuard, advertising agencies, and the platforms—is far more attenuated

than the causal theories put forth in the *Missouri* litigation, where the record showed that federal agencies communicated directly and regularly with the platforms about specific topics. *See Missouri*, 144 S. Ct. at 1982–84. Ultimately, any conduct on the part of social media platforms to violate HB 20 is at least "one-step-removed," if not more, from any of Defendants' alleged conduct here, and therefore not traceable to Defendants. *Id.* at 1986.

Third and relatedly, the complaint contains no allegation that social media platforms did not also restrict content in ways that would have violated HB 20 "*before*" any of Defendants' alleged conduct, as required. *Id.* at 1988 (emphasis in original). In fact, as the Supreme Court observed in *Missouri* and as is widely known, the major social media platforms have "longstanding content-moderation policies," pursuant to which they "have taken a range of actions to suppress certain categories of speech" for years before HB 20 was passed. *Id.* at 1982. Thus, Plaintiffs' theory fails because, like the standing theories in *Missouri*, it depends on "guesswork as to how independent decisionmakers will exercise their judgment." 144 S. Ct. at 1986.

Those conclusions are reinforced by *Missouri*'s admonition that theories of injury dependent on the actions of social media platforms—some of the largest and most powerful companies in the world—must be analyzed "in light of the platform's independent incentives to moderate content." *Id.* at 1988. That is so "even where the … platform, time, content, and defendant line up" with respect to particular instances of content moderation. *Id.* at 1988. And Texas's HB 20 theory of injury warrants additional scrutiny because, unlike the claims in *Missouri*, it depends on third parties acting in ways that purportedly violate state law. *See Telephone & Data Sys., Inc. v. FCC*, 19 F.3d 42, 48 (D.C. Cir. 1994) (rejecting a theory of standing that "invite[d] [the court] 'to presume illegal activities' on the part of actors not before the court").

Here, the allegations in the complaint indicate that the platforms have strong independent incentives to moderate content, undermining any causal connection between Defendants' alleged

conduct and social media companies' alleged violations of HB 20. For example, the complaint alleges that the aforementioned Global Alliance, an organization that works with "more than 60 leading advertisers and major social media platforms," "drove an agreement across advertisers, agencies, and platforms" to set up an overall "framework" for limiting advertising support for certain types of content. Compl. ¶¶ 102–103. Again, there is no allegation that GEC or the State Department had anything to do with that apparently sprawling agreement between wholly private parties. *See generally id.* That the Global Alliance, numerous "blue-chip advertisers" including Fortune 500 companies, *see id.* ¶ 102 (listing Dell, Exxon Mobil, and Hilton among the parties to this agreement), and the major social media platforms—all sophisticated private entities—independently reached the described agreement strongly indicates that the social media platforms were "exercis[ing] their own judgment" and responding to "independent incentives to moderate content," rather than to conversations with the GEC, defeating traceability. *Missouri*, 144 S. Ct. at 1988. And more generally, as noted above, the platforms have moderated content pursuant to "longstanding … policies" independent of the GEC "[f]or years." *Id.* at 1982.

### 2. Media Plaintiffs have not plausibly alleged a causal connection between Defendants' actions and injury to themselves.

Because Media Plaintiffs bring claims under the First Amendment which Texas does not bring, *see* Compl. ¶¶ 272–82 (Counts I and II), their standing must be analyzed independently. *See TransUnion*, 594 U.S. at 431 ("[P]laintiffs must demonstrate standing for each claim that they press."). This principle is "critically important" here so as to avoid erroneously "treat[ing] the defendants, plaintiffs, and platforms each as a unified whole." *Missouri*, 144 S. Ct. at 1988. Media Plaintiffs' theory of standing is based primarily on an alleged connection between Defendants and GDI and NewsGuard, which Plaintiffs describe as "censorship enterprises" that "targeted Media Plaintiffs," and then further connections between GDI and NewsGuard and those companies' clients, who use their products in various ways that purportedly injure Media Plaintiffs. Compl. ¶¶ 4, 101–103. Neither GDI nor

NewsGuard is party to this case, nor are the social media companies or other private companies (advertisers) who allegedly use their products.

Under *Missouri*, Media Plaintiffs' theory of injury fails for reasons similar to those that defeat Texas's theory. That is because Media Plaintiffs' allegations, if proven, would not meet the required "threshold showing" that Defendants pressured particular social media companies or advertisers to suppress Media Plaintiffs' speech on a particular topic, or that any particular social media companies or advertisers subsequently did so as a result. 144 S. Ct. at 1988. Moreover, like in *Missouri*, Media Plaintiffs' purported injuries depend on an attenuated chain of causation: that Defendants compelled GDI and NewsGuard, themselves independent third parties, and that GDI and NewsGuard, on the government's say-so, caused social media companies and advertisers to make decisions in a way that caused cognizable harm to the Media Plaintiffs. Even if that attenuated causal chain could support Article III standing, Plaintiffs have not plausibly alleged facts that, if proven, could support that causal theory of harm.

The complaint primarily focuses on the ways GEC allegedly "promoted" and "funded" GDI and NewsGuard. It alleges that GEC issued a grant to GDI in 2021, Compl. ¶ 125, and a grant to NewsGuard in 2020, *id.* ¶¶ 142–43.[7] It does not allege future grants or future continued relationships with these companies. The complaint also alleges that years ago, in 2021, "Disinfo Cloud," tweeted twice regarding these companies, *id.* ¶ 87, and issued a newsletter that "featured" a NewsGuard "tool," *id.* ¶ 89. Then, separately, the complaint alleges that GDI and NewsGuard have created "blacklists"

---

[7] The complaint contains stray allegations about grants that the GEC or entities not named to this suit such as the National Endowment for Democracy issued to other companies such as PeakMetrics or Omelas. Compl. ¶¶ 135–154. But Plaintiffs do not allege any connection between those entities and Media Plaintiffs (let alone a connection that would satisfy traceability), instead alleging in vague terms that those companies "target[] the speech of Americans." *Id. Missouri* has made clear that kind of overly broad, generalized harm is plainly insufficient to meet Article III's requirement that Media Plaintiffs' injury be "concrete and particularized," 144 S. Ct. at 1996 (quoting *Lujan*, 504 U.S. at 560), and show causal links between a "particular defendant," "topic," and "plaintiff," *id.* at 1988.

that, if adopted by social media companies, would "reduce Media Plaintiffs' revenue" and "visibility on social media[] and ranking results from browser searches." *Id.* ¶ 123. But, again, these allegations of a handful of discrete instances of "promotion" or funding of NewsGuard or GDI generally do not amount to allegations of "pressure" by Defendants aimed at those companies or any social media companies or advertisers to suppress Media Plaintiffs' speech, let alone their speech on any particular topic. This theory of traceability fails for that fundamental reason.

The complaint also fails to establish traceability because, as the Supreme Court recently emphasized, "[t]he causation requirement … rules out attenuated links—that is, where the government action is so far removed from its distant (even if predictable) ripple effects that the plaintiffs cannot establish Article III standing." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 383 (2024) ("*Alliance*"). That rules out traceability here, because the links from Defendants, to several third-party entities, to the social media companies or advertisers, to the Media Plaintiffs are attenuated. For example, there are no allegations that the GEC "pressured" NewsGuard or GDI to describe Media Plaintiffs in the terms that Media Plaintiffs find objectionable. *See* Compl. ¶ 115 (alleging that GDI published a one-time report in 2022 listing Media Plaintiffs as among the riskiest news outlets, with no allegation that the GEC was connected to that report in any way, let alone that the GEC "pressured" or otherwise directed GDI to describe Media Plaintiffs as such), *id.* ¶ 122 (similarly alleging that "NewsGuard ranks [Media Plaintiffs] as 'unreliable' media outlets," with no allegation that the GEC was connected to that ranking in any way, let alone that the GEC "pressured" NewsGuard in relation to it). Furthermore, just as Plaintiffs have not alleged that social media platforms were not moderating content in ways that would violate HB 20 before Defendants' alleged conduct, Plaintiffs have not alleged that GDI and NewsGuard were not engaged in the activity that Plaintiffs find objectionable "before" Defendants had any interaction with them. *See Missouri*, 144 S. Ct. at 1988. Nor are there allegations that any advertisers or platforms subsequently suppressed or

restricted Media Plaintiffs' speech *as a result of* any such pressure from the GEC, as opposed to as a result of independent relationships with GDI and NewsGuard.

Tellingly, the complaint contains not a single allegation that Defendants have ever once discussed Media Plaintiffs or Media Plaintiffs' speech with *any* other third party, much less that Defendants ever pressured another entity to act towards Media Plaintiffs so as to cause them injury. The lack of any such allegations—particularly when compared with the evidence in *Missouri* showing that federal entities in fact discussed specific topics such as COVID-19 and election misinformation with the social media platforms, and the platforms suppressed speech about those topics, but which was nevertheless still insufficient to support Article III standing—is fatal under *Missouri*'s standard for traceability.

Moreover, even if Media Plaintiffs had alleged a causal chain in which "the plaintiff, platform, time, content, and defendant line up," 144 S. Ct. at 1988, the complaint shows that social media platforms and advertisers have independent incentives to "work with" NewsGuard and GDI, as explained above. *See* Compl. ¶¶ 102–03 (alleging the existence of a wholly private "agreement" and "framework" between "advertisers, agencies, and platforms" for "content [the Global Alliance] determined did not belong online" with no connection to Defendants). The complaint also describes how GDI and NewsGuard have relationships with licensees across industries, wholly independent of anything Defendants have done. *Id.* ¶¶ 106, 121. This further undermines traceability based on the GEC's alleged relationship with GDI and NewsGuard. And more generally, the social media platforms have had "longstanding" content moderation "policies" for years. *Missouri*, 144 S. Ct. at 1982.

The complaint also contains generalized assertions that unspecified "technologies," "tools," or "techniques" have been promoted or marketed by Defendants, which has "abridge[d] Media Plaintiffs' First Amendment rights." *E.g.*, Compl. at ¶¶ 84, 86, 93, 99, 157–59. This Court previously concluded that some of these allegations, "when viewed in context, including the specific details of

past instances of alleged conduct, … are more than sufficient to allege injury-in-fact." Op. at 24. But as explained, under *Missouri*, those "past instances of alleged conduct" are insufficient on their own to show standing to seek forward-looking relief. And in any event, this Court should not credit the kinds of conclusory allegations described above (which simply assert, without further explanation or detail, that Plaintiffs' First Amendment rights have been violated). Even if accepted as true, none of the allegations show that the unspecified "tools" that "abridge[] Media Plaintiffs' First Amendment rights" are used by any particular actor due to pressure from the GEC; rather, the complaint simply asserts that the GEC "promote[d]," *id.* ¶ 84, or "highlighted," *id.* ¶ 86, such tools (or variations of the same), which is far too generalized and attenuated under *Missouri* to allege traceability. *See* 144 S. Ct. at 1987 (there must be "specific causation" for "discrete instance[s] of content moderation"); *id.* (standing cannot be approached "at a high level of generality"); *see also Alliance*, 602 U.S. at 383.

Lastly, even with the benefit of inferences drawn in Plaintiffs' favor, their allegations of a "vast and unprecedented government-censorship complex," previously predicated on "[t]he preliminary evidence" in *Missouri*, are not factual allegations the Court should presume to be true. Compl. ¶¶ 45–46. As is now clear, even with "extensive discovery," and the significant burden that entailed for the *Missouri* defendants, none of the seven plaintiffs in *Missouri* was able to muster enough evidence to even establish the bare minimum of subject-matter jurisdiction. 144 S. Ct. at 1984. Not only that, the Supreme Court observed that "many" of the district court's factual findings on which the Fifth Circuit relied—and which underlie Plaintiffs' allegations of an "unprecedented government-censorship complex" here—"unfortunately appear[ed] to be clearly erroneous." *Id.* at 1988 n.4; *see* Compl. ¶¶ 45–47 & nn.18–19 (citing the *Missouri* district court's opinion for its factual findings).

Ultimately, this Court previously held that Media Plaintiffs' alleged injuries are traceable to Defendants and redressable by the requested relief for substantially the same reasons that it previously held that Texas's alleged injuries are traceable to Defendants, citing the Fifth Circuit's opinion in

*Missouri*. Op. at 26–27 (citing *Missouri* in "again reject[ing] [Defendants' traceability] argument[]" for the reasons "explained above"). Given the subsequent clarification from the Supreme Court regarding the correct standard for traceability in this setting and the Supreme Court's reversal of the Fifth Circuit's judgment, Media Plaintiffs have not shown traceability for essentially the same reasons that Texas has not done so.

### B. Under *Missouri*, Plaintiffs have not plausibly alleged ongoing or future injury-in-fact.

To obtain forward-looking relief, the plaintiffs "must face a real and immediate threat of repeated injury." *Missouri*, 144 S. Ct. at 1986; *see also id.* at 1993. The complaint's allegations, if proven, would not meet that separate and distinct burden. First, the "failure to [allege] traceability for past harms," as explained above, "substantially undermines [Plaintiffs'] standing theory" for purposes of demonstrating future injury. *Id.* at 1993. Second, in the context of claims alleging that the government is pressuring private parties to suppress protected speech, without allegations of "an ongoing pressure campaign" likely to cause particularized harm to Plaintiffs about particular topics, "it is entirely speculative that the platforms' future moderation decisions will be attributable, even in part, to the defendants" in ways that injure Plaintiffs. *Id.* The complaint has neither plausibly alleged that there are past injuries traceable to Defendants sufficient to support an inference of imminent ongoing or future injury, nor plausibly alleged that there is any "ongoing pressure campaign" by Defendants about particular topics that is currently injuring or will injure Plaintiffs in the future, as required. *Id.*

In its initial decision, this Court determined that the "allegations of past harm" in the complaint were sufficient for purposes of alleging ongoing or future injury-in-fact. Op. at 24–25. In support, the Court cited the Fifth Circuit's statement in *Missouri* that "[p]ast harm can constitute an injury-in-fact for purposes of pursuing injunctive relief if it causes 'continuing, present adverse effects.'" Op. at 24 (quoting 83 F.4th at 367). This Court also concluded that some of those harms were ongoing based on "alleg[ations] that social media companies are presently using these tools" to

injure Media Plaintiffs. Op. at 25. Second, this Court determined that "Defendants' past censorship efforts evidence a strong likelihood that their injuries will reoccur," relying heavily again on the Fifth Circuit's analysis in *Missouri*. Op. at 25–26 ("*Missouri* is again instructive."). In particular, when this Court rejected Defendants' argument that Plaintiffs have failed to plausibly alleged ongoing or future injury-in-fact, it cited *Missouri*'s statement that the "lingering effects of past censorship must be factored into the standing calculus," and that there was "a substantial risk of reoccurrence because the government 'continue[s] to be in regular contact with social-media platforms regarding content-moderation issues today.'" Op. at 26 (quoting *Missouri*, 83 F.4th at 367–69).

However, the Supreme Court specifically rejected the Fifth Circuit's conclusion that the *Missouri* plaintiffs had established ongoing injury and the reasoning cited above underlying that holding. First, the Supreme Court explained that "the past is relevant only insofar as it is a launching pad for … imminent future injury." *Missouri*, 144 S. Ct. at 1987. While the Fifth Circuit accurately quoted *Lyons*'s language regarding "continuing, present adverse effects," it erroneously applied that standard in too loose a manner. And second, the Supreme Court rejected the notion that simply being "in regular contact with social-media platforms regarding content-moderation issues today," *Missouri*, 83 F.4th 369, was sufficient for injunctive relief. That is, the Supreme Court explained that it is not enough to simply claim "broadly" that "the government continues to communicate with the platforms about content-moderation issues," as the plaintiffs attempted to do there (and as Plaintiffs do here). *Missouri*, 144 S. Ct. at 1993 (cleaned up). Instead, Plaintiffs must allege that Defendants "continue[] to engage in the challenged conduct, which is 'coercion' and 'significant encouragement,' not mere 'communication.'" *Id.* Moreover, Plaintiffs must "explicitly identif[y]" specific topics about which the government is allegedly coercing the platforms (or advertisers) to suppress content. *Id.* ("Plus, the plaintiffs have only explicitly identified an interest in speaking about COVID–19 or elections—so the defendants' discussions about content-moderation issues must focus on those topics."). Under

25

*Missouri*, Plaintiffs' theories of ongoing or future injury-in-fact fail for these very reasons.

With respect to the GEC's alleged past conduct, for the reasons already explained, none of Texas's or Media Plaintiffs' purported injuries are traceable to that past conduct. As *Missouri* stated, the "failure to [allege] traceability for past harms … substantially undermines [Plaintiffs'] standing theory" for purposes of demonstrating future injury. *Id.* at 1993.

The complaint also attempts to establish future injury for both Texas and Media Plaintiffs through a handful of generalized allegations about ongoing GEC activities that are purportedly injuring them. *See* Compl. ¶¶ 160–75. These allegations suffer from two structural flaws making them insufficient to establish particularized ongoing injury traceable to Defendants' conduct. First, many of the relevant paragraphs simply allege that GEC activities "target" "Americans," the "American press," or "Americans' speech" generally. *E.g.*, Compl. ¶¶ 161, 165, 170, 172–75. As explained *supra*, at 20 n.7, that kind of overly broad, generalized harm is plainly insufficient to meet the basic Article III requirement that a plaintiff's injury be "concrete and particularized," and therefore cannot establish standing. *Lujan*, 504 U.S. at 560; *see Missouri*, 144 S. Ct. at 1988 (a plaintiff must show that its "particular … speech" was suppressed). Indeed, accepting such allegations as sufficient to show ongoing injury to Media Plaintiffs or to Texas would repeat the same mistake that the Fifth Circuit made in "approach[ing] standing at a high level of generality." *Missouri*, 144 S. Ct. at 1987.

Second, even if the complaint alleges some ongoing injury to Texas or Media Plaintiffs, it suffers from the same traceability problem identified above—nowhere do Plaintiffs allege that Defendants are currently "pressur[ing]" particular platforms or advertisers to "censor" particular topics in violation of HB 20 or to target Media Plaintiffs specifically. Nor does the complaint allege that Defendants engage in ongoing "'coercion' or 'significant encouragement,'" distinct from "mere 'communication.'" *Id.* at 1993. At most, the complaint alleges that Defendants are communicating with unnamed third parties about various technologies or topics, or engaging in broad initiatives such

as the tech challenges, but that does not show ongoing injury traceable to Defendants. *Missouri*, 144 S. Ct. at 1993. Representative allegations are that the two aforementioned Twitter posts from 2021 discussing GDI and NewsGuard remain accessible, Compl. ¶ 161, that Defendants "use … research and reports … that target Media Plaintiffs" in unspecified ways, *id.* ¶ 162, that Defendants "promote," "market," or "recommend[]" technology to the private sector generally, *id.* ¶¶ 163–64, 167, 175, that Defendants "award grants to fund the development" of unspecified technologies through the tech challenges, *id.* ¶ 170, that Defendants "maintain[] a platform" of "tools and technologies," *id.* ¶ 173, and that Defendants "highlight[]" disinformation resources on the GEC website, *id.* ¶ 174. Simply put, none of these allegations are that Defendants are "pressuring" any particular companies to suppress Media Plaintiffs' speech or interfere with HB 20, let alone that any company is doing so "at the behest of the [D]efendants." *See Missouri*, 144 S. Ct. at 1987.

## C.  Under *Missouri*, Plaintiffs' injuries are not redressable by their requested relief.

For many of the same reasons that Plaintiffs have not alleged traceability or future injury, this Court "cannot redress" their alleged injuries, because they derive from the "independent action" of third-party social media platforms and other third-party companies. *Missouri*, 144 S. Ct. at 1986. That is, Plaintiffs "do not seek to enjoin the platforms" (or advertisers) but instead "seek to enjoin *Government agencies and officials*" from taking certain actions with respect to "the platforms … in the future." *Missouri*, 144 S. Ct. at 1986; *see* Compl. at 65–66 (Prayer for Relief). Similarly, Plaintiffs have not shown "continued pressure from [D]efendants" that could be stopped by any such injunction. *See Missouri*, 144 S. Ct. at 1995. Thus, there is no ongoing conduct on the part of the GEC causing harm to Plaintiffs that an injunction could redress.

Moreover, even if Plaintiffs have plausibly alleged ongoing injury from so-called "censorship" technologies that are now being used by independent third parties, an injunction targeted at Defendants would have no effect on the use of those technologies by those third parties. That is, "the

platforms remain free to enforce, or not to enforce, [their content moderation] policies—even those tainted by initial governmental coercion," and analogously, any advertiser remains free to use, or not use, "tools" or "technologies" that were allegedly promoted by Defendants, for any purpose they deem fit. *Id.* at 1995. Because none of the parties that are allegedly causing Plaintiffs' injuries are "parties to the suit, … there is no reason they should be obliged to honor an incidental legal determination the suit produced." *Id.*

## CONCLUSION

The Court should dismiss the complaint for lack of subject-matter jurisdiction.[8]

Dated: August 28, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

JOSHUA E. GARDNER
Special Counsel
Federal Programs Branch

JOSEPH E. BORSON
Assistant Director
Federal Programs Branch

*/s/ Arjun Mody*
JOSHUA M. KOLSKY (DC #993430)
Senior Trial Counsel
DOROTHY M. CANEVARI (NY #5989694)
CRISTEN C. HANDLEY (MO #69114)
ARJUN MODY (DC #90013383)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.

---

[8] This Court previously ordered expedited discovery in connection with Plaintiffs' forthcoming motion for preliminary injunction. That discovery is ongoing, and Defendants will continue to act in compliance with their discovery obligations unless and until this Court orders otherwise.

Washington, D.C. 20005
Tel: (202) 451-7723
Email: arjun.a.mody@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

On August 28, 2024, I electronically submitted this document to the clerk of the court of the U.S. District Court for the Eastern District of Texas using the court's electronic case filing system. I certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ *Arjun Mody*
Arjun Mody