**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

|  |  |
|---|---|
| THE DAILY WIRE, LLC, *et al.*,<br><br>    *Plaintiffs*,<br><br> v.<br><br>UNITED STATES DEPARTMENT OF STATE *et. al.*,<br><br>    *Defendants*. | Civil Action No. 6:23-cv-00609 (JDK) |

**JOINT MOTION FOR ENTRY OF CONSENT DECREE**

1

Plaintiffs and Defendants ("the Parties") hereby move the Court to enter their proposed Consent Decree, attached hereto as Exhibit A, which, if approved, would resolve all of the claims asserted by Plaintiffs in this case. For the reasons explained herein, good cause supports this joint motion.

## I.      INTRODUCTION

For nearly two years, and as described in more detail below, Plaintiffs, the Daily Wire, LLC and FDRLST Media, LLC ("Media Plaintiffs"), vigorously litigated First Amendment and *ultra vires* claims against the State Department, its Global Engagement Center ("GEC"), and several State Department officials (together, "Defendants") based on allegations that Defendants were "actively intervening in the news-media market to render disfavored press outlets unprofitable." *See* Complaint ¶ 1, ECF No. 1, *Daily Wire et al. v. Dep't of State et al.*, No. 6:23-c-609 (E.D. Tex.). Plaintiff, the State of Texas, likewise engaged in this litigation, challenging as *ultra vires* Defendants' activities on the ground that those activities interfered with its sovereign interests in protecting its citizens from viewpoint-based discrimination. Throughout that time, Defendants zealously defended against Plaintiffs' claims, principally arguing that Plaintiffs had not established sufficient injury to confer Article III standing.

However, upon taking office on January 20, 2025, President Trump determined that "[o]ver the last 4 years, the previous administration trampled free speech rights by censoring Americans' speech on online platforms, often by exerting substantial coercive pressure on third parties, such as social media companies, to moderate, deplatform, or otherwise suppress speech that the Federal Government did not approve." *See* Exec. Order No. 14,149, "Restoring Freedom of Speech and Ending Federal Censorship," 90 Fed. Reg. 8,243, 8,243 (Jan. 20, 2025). The President concluded that, "[u]nder the guise of combatting 'misinformation,' 'disinformation,' and 'malinformation,' the Federal Government infringed on the constitutionally protected speech rights of American citizens across the United States in a manner that advanced the Government's preferred narrative about significant

matters of public debate." *Id.* And Secretary of State Marco Rubio later stated that the State Department, through the GEC, had used taxpayer dollars to fund entities that disparaged the Media Plaintiffs, "in a direct bid to drive off their ad revenue and put them out of business." *See* Marco Rubio, *Rubio: To Protect Free Speech, The Censorship-Industrial Complex Must Be Dismantled*, THE FEDERALIST (Apr. 16, 2025), https://thefederalist.com/2025/04/16/rubio-to-protect-free-speech-the-censorship-industrial-complex-must-be-dismantled/.

To resolve this litigation in a manner that will address Plaintiffs' claims of unconstitutional and *ultra vires* conduct and prevent Plaintiffs' alleged injuries from recurring, the Parties agree to the terms set forth in the attached Consent Decree. *See* Exhibit A. The Parties respectfully request that the Court enter the attached proposed Decree, to be enforced upon approval by the Court and continuing until January 31, 2036.

## II.    BACKGROUND

1.     On December 6, 2023, Media Plaintiffs, joined by the State of Texas, filed this suit against Defendants in the United States District Court for the Eastern District of Texas. Plaintiffs alleged in their Complaint and Motion for Preliminary Injunction that Defendants unlawfully intervened in the news media market to render disfavored press outlets unprofitable by funding and promoting the development of censorship technologies and private censorship enterprises. *See* Complaint and Pls.' Mot. for Prelim. Inj., ECF Nos. 1, 11, *Daily Wire*, No. 6:23-cv-609;*see also* U.S. Const. amend. I (government is prohibited from "abridging the freedom of speech"). Plaintiffs raised five claims: violation of the First Amendment, *see* Compl. ¶¶ 272-82 (Counts I and II); conduct in excess of Defendants' statutory and constitutional authority, *see id.* ¶¶ 283-300, 307-13 (Counts III and V); and conduct in violation of the Administrative Procedure Act ("APA"), *see id.* ¶¶ 301-06 (Count IV). Plaintiffs sought declaratory, preliminary, and permanent injunctive relief. *Id.* at 65-66 (Prayer for Relief).

2.    The lawsuit was initially filed based upon public information showing that GEC, through a grantee known as Park Capital Investment Group LLC, had funded and promoted certain technologies. For instance, GEC issued monetary awards to two private entities, the Global Disinformation Index ("GDI") and NewsGuard Technologies, Inc. ("NewsGuard"), which developed technologies that branded certain media outlets, including Media Plaintiffs, as "unreliable" or "risky" news sources. *See, e.g., id.* ¶¶ 3-4, 59, 87, 101-22. Media Plaintiffs allege that this designation resulted in the downgrading and reduced circulation of their websites. The suit was further initially based on "preliminary evidence" made available through discovery in *Missouri v. Biden*, No. 3:22-cv-1213 (W.D. La.), which Plaintiffs described as "showing a vast and unprecedented government-censorship complex." *See id.* ¶ 45. Plaintiffs represent that, in many cases, this preliminary evidence corroborated their core allegations in this suit. *See id.* ¶¶ 45-47.

3.    Plaintiffs followed their Complaint with a Motion for Preliminary Injunction on February 6, 2024, ECF No. 11, and a Motion for Expedited Preliminary-Injunction-Related Discovery on February 7, 2024, ECF No. 13.

4.    Defendants opposed Plaintiffs' motions and filed a Motion to Dismiss. *See* ECF Nos. 20, 32, & 33. Defendants also moved to transfer this case to the United States District Court for the District of Columbia. *See* ECF No. 14.

5.    On May 7, 2024, following oral argument, the Court denied Defendants' Motion to Dismiss (although it granted Defendants' Motion to Dismiss Plaintiffs' APA claim in Count IV) and also denied Defendants' Motion to Transfer Venue. *See* Order, ECF No. 53. The same day, the Court granted Plaintiffs' Motion for Expedited Discovery, finding that Plaintiffs had demonstrated good cause for conducting limited, expedited discovery on their then-pending Motion for Preliminary Injunction. *See* Order, ECF No. 54.

4

6.      The Court's order granting Plaintiffs expedited discovery authorized Plaintiffs to serve interrogatories and document production requests on Defendants and to serve no more than five third-party subpoenas, after which the Parties would confer regarding the need for depositions or additional third-party subpoenas. *See id.* at 6-7.

7.      The Court later granted Plaintiffs leave to serve additional third-party subpoenas, *see* Order, ECF No. 78, and the Parties agreed that Plaintiffs could depose four of Defendants' current or former employees or contractors as part of expedited discovery.

8.      The Court on June 13, 2024 denied, without prejudice, Plaintiffs' Motion for Preliminary Injunction, stating that Plaintiffs may file an Amended Motion for Preliminary Injunction after the close of expedited discovery. *See* Order, ECF No. 61.

9.      Throughout the remainder of the year, Plaintiffs, Defendants, and third parties engaged in a protracted discovery process that involved numerous disputes, required multiple, lengthy conferrals, and Plaintiffs' filing of one motion to compel discovery against a third party in another jurisdiction. *In re Subpoena to Disinformation Index, Inc.*, No. 1:24-mc-00963 (W.D. Tex. Aug. 21, 2024); *see also id.*, Order, ECF No. 11 (denying motion to compel).

10.     In total, Defendants produced to Plaintiffs approximately 3,700 documents in discovery (approximately 15,700 pages), approximately 1,350 of which were redacted in whole or in part based on Defendants' claims of deliberative-process privilege, which Plaintiffs disputed.

11.     Media Plaintiffs represent that third parties subpoenaed by Media Plaintiffs likewise withheld extensive relevant evidence.

12.     During the period of expedited discovery, on August 28, 2024, Defendants filed a renewed Motion to Dismiss Plaintiffs' Complaint or, alternatively, to reconsider the Court's prior opinion denying Defendants' earlier Motion to Dismiss. *See* ECF No. 72. That motion remains pending.

13.     Also, while expedited discovery was ongoing, on December 9, 2024, Defendants filed with the Court a Notice of Case Development, stating that the GEC was likely to be dismantled on December 23, 2024 pursuant to a statutory sunset provision, absent further action from Congress. *See* ECF No. 91. Defendants further informed the Court that on December 6, 2024, Defendants had transmitted a notification to Congress regarding its plan for the then-forthcoming termination of the GEC and its plan to realign the Center's staff and funding to other Department offices and bureaus for foreign information manipulation and interference activities in the event that its funding is not extended. *See id.* at 1.

14.     Defendants declined to provide Plaintiffs with a copy of the Congressional notification given the sensitivity of that document during the pendency of Congress's review. Defendants later provided the document to Plaintiffs, subject to the Protective Order entered in this case, after the Congressional review period ended. Defendants later informed Plaintiffs and the Court that following the GEC's termination, and consistent with its notification to Congress, Defendants began the realignment of staff and the reprogramming of funding from the GEC to a new office that was called the Counter Foreign Information Manipulation and Interference Hub ("R/FIMI Hub"). *See* Joint Status Report, ECF No. 113 at 2.

15.     Given the GEC's termination and the change in Administration, the Parties agreed to temporarily stay this case. *See, e.g.*, Joint Motion to Stay, ECF No. 98. The Court entered the stay on December 23, 2024. *See* Order, ECF No. 99.

16.     Then, following his inauguration, on January 20, 2025, President Trump signed Executive Order 14149, "Restoring Freedom of Speech and Ending Federal Censorship." *See* 90 Fed. Reg. 8,243 (Jan. 20, 2025).

17.     Thereafter, Secretary of State Marco Rubio ordered the closing of the R/FIMI Hub. On June 30, 2025, Defendants informed Plaintiffs that, following the State Department's policy and

6

programming review of the work of the R/FIMI Hub to ensure alignment with President Trump's priorities, the R/FIMI Hub had been closed. Defendants further represented that all employees of the former R/FIMI Hub, including contractors, had either been terminated or placed on administrative leave pending imminent implementation of a reduction in force.

18. Plaintiffs responded, in part, by asserting continuing harm flowing from the past unconstitutional and *ultra vires* activities and voicing concerns that Defendants, outside the now-shuttered GEC and R/FIMI Hub, act *ultra vires* and in violation of the Media Plaintiffs' First Amendment rights, including by facilitating attacks on the Media Plaintiffs through the programs and materials it funds with grants.

19. The stay in this matter expired on July 3, 2025. On July 10, 2025, the Parties filed a status report advising the Court of the recent developments described above and further explaining that they had agreed to attempt to resolve this case without additional litigation. *See* Joint Status Report, ECF No. 113. Since then, the Parties have agreed to resolve this case by Consent Decree—as opposed to continuing this costly and protracted litigation.

## III.    LEGAL PRINCIPLES

20. The First Amendment to the United States Constitution prohibits the Government from "abridging the freedom of speech, or of the press[.]" U.S. Const., amend. I. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion."); *see also New York Times Co. v. Sullivan,* 376 U.S. 254, 270 (1964) ("[D]ebate on public issues should be uninhibited, robust, and wide-open," and "it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.")

21.    Modern technology does not alter the Government's obligation to abide by the strictures of the First Amendment, for "[o]ur liberty depends on the freedom of the press, and that cannot be limited without being lost." 9 Papers of Thomas Jefferson 239 (J. Boyd ed. 1954) (quoted in *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 548 (1976)).

22.    Public debate serves an important role in our constitutional republic, and it is inappropriate for the United States Government to silence its critics by removing or limiting lawful speech from the marketplace of ideas or coercing third parties to do so, for "[r]eason and free inquiry are the only effectual agents against error." Thomas Jefferson, Notes on the State of Virginia 157-61 (William Peden ed., 1955) (1787).

23.    Further, that the government, politicians, media, academics, or anyone else applies labels such as "misinformation," "disinformation," or "malinformation" to speech does not render the speech constitutionally unprotected. *See United States v. Alvarez*, 567 U.S. 709, 718 (2012) (plurality op.) ("Absent from those few categories where the law allows content-based regulation of speech is any general exception to the First Amendment for false statements. This comports with the common understanding that some false statements are inevitable if there is to be an open and vigorous expression of views in public and private conversation, expression the First Amendment seeks to guarantee.").

24.    "[A]n agency's power is no greater than that delegated to it by Congress." *See Lyng v. Payne*, 476 U.S. 926, 937 (1986).

25.    Further, "[a]gency actions beyond delegated authority are ultra vires and should be invalidated." *Detroit Int'l Bridge Co. v. Gov't of Can.*, 192 F. Supp. 3d 54, 65 (D.D.C. 2016).

26.    The State Department's organic statute charges its Secretary with enumerated duties "respecting foreign affairs." 22 U.S.C. § 2656.

8

27. Similarly, Congress appropriates funds to the State Department solely for the "administration of foreign affairs." *See* Consolidated Appropriations Act, 2023.

28. In funding the GEC, Congress also expressly provided that "none of the funds authorized to be appropriated or otherwise made available to carry out this section shall be used for purposes other than countering foreign propaganda and misinformation that threatens United States national security." *See* National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, § 1287(h), 130 Stat. 2000, 2548 (2016).

## IV. <u>DISCUSSION</u>

29. Under the legal principles described above, Media Plaintiffs maintain that Defendants abridged their First Amendment rights and acted *ultra vires* by using taxpayer dollars to fund and/or promote tools and technologies that denigrated, demonetized, and/or limited the reach of Media Plaintiffs' speech, such as GDI and NewsGuard, while knowing those tools and technologies intentionally targeted domestic media outlets and knowing those entities had expressly stated their purpose for rating the press was to limit the reach of its speech and demonetize the organization.

30. Specifically, and as good cause in support of this joint motion, Plaintiffs represent that the discovery evidence shows as follows:

   a. Defendants used federal funding to promote approximately 300 tools, which they call "Countering Propaganda and Disinformation" ("CPD") tools and technologies, including ones that only (or mainly) impacted domestic speech and/or the domestic press. Defendants promoted those CPD tools and technologies using a variety of methods, including: a) social media; b) emails; c) newsletters sent on listservs; d) a State Department funded platform; e) Silicon Valley outreach; f) tech challenges and demos; and g) its webpage.

   b. Defendants encouraged private companies and other governmental and non-governmental organizations ("NGOs") to use these tools and technologies against domestic speech, repeatedly pushing social media and technology companies to use the tools and technologies to ferret out what it deemed misinformation and disinformation on topics of primarily domestic concern, including COVID-19 and the vaccines.

c.  Two technologies heavily championed by Defendants included the ones offered by NewsGuard and GDI, which branded the Media Plaintiffs "unreliable" or "risky." And both NewsGuard and GDI expressly professed their purpose was to demonetize elements of the press, while boasting of their success in reducing the circulation of media they downranked and depriving them of advertising funds.

d.  The State Department funded the testing of various CPD tools and technologies on a "testbed" for the purpose of further developing the technologies, including in cases where State Department officials knew a main target of the technology's blacklisting was the domestic media.

e.  Defendants heavily recruited social media and technology companies, academic institutions, for-profit and nonprofit organizations, and other agencies to join and use a platform called "Disinfo Cloud," which featured scores of tools and technologies targeting domestic speech and the domestic press.

f.  Defendants widely distributed an email of "COVID19-Useful Links," including to, among others, federal agencies, Capitol Hill staffers in Washington, DC, and listservs of academic and technology contacts. The companies linked in the email included several which focused heavily on domestic media, including NewsGuard and GDI, with Defendants promoting NewsGuard's offer of free services for a limited time. Those "services" included the so-called nutrition labels that label the Media Plaintiffs as unreliable.

g.  Defendants' collaboration with foreign governments and NGOs concerning what they branded "disinformation" involved no attempt to distinguish between countering "disinformation" emanating from foreign sources and speech by Americans and domestic media outlets.

h.  Defendants funded "media literacy" grants used to disparage the Media Plaintiffs and funded the development of gaming technology to be released to primarily domestic audiences to "cognitively inoculate" Americans from certain types of "misinformation."

i.  The GEC saw its mission as facilitating a "whole of society" approach to combatting mis/disinformation—both foreign and domestic—through, among other things, encouraging the adoption of CPD tools and technologies.

j.  Plaintiffs deposed two former contractors for Defendants, but when those witnesses were confronted with the documents showing Defendants' activities targeted both domestic and foreign speech, the deponents maintained the

activities were limited to combatting foreign disinformation to protect the national security interests of the United States.

k.  One deponent opined that GEC's mission could include addressing vaccine-hesitancy in South Africa, as that could constitute a national security threat to the United States if pushed by actors such as China and Russia for malicious purposes, because it could lead to mistrust in institutions which can lead to instability and chaos.

31.    To address these claims of unconstitutional and *ultra vires* conduct and prevent the alleged injuries from recurring, the Parties agree to the terms set forth in the attached Consent Decree. *See* Exhibit A.

## V.    **CONCLUSION**

Accordingly, and for good cause shown above, the Parties respectfully request that the Court enter the attached Consent Decree.

DATED: March 31, 2026                     Respectfully submitted,

/s/      *Margot J. Cleveland*

Margot J. Cleveland
Michigan Bar No. P83564
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Drive, Suite 300
Arlington, VA 22203
Telephone: (202) 869-5210
Facsimile: (202) 869-5238
Margot.Cleveland@ncla.legal

Zhonette M. Brown
Virginia Bar No. 97507
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Drive, Suite 300
Arlington, VA 22203
Telephone: (202) 869-5210
Facsimile: (202) 869-5238
Zhonette.Brown@ncla.legal

Counsel for The Daily Wire Entertainment LLC and FDRLST Media LLC

Ken Paxton
Attorney General

Brent Webster
First Assistant Attorney General

Ralph Molina
Deputy First Assistant Attorney General

Ryan D. Walters
Deputy Attorney General for Legal Strategy

Ryan G. Kercher
Chief, Special Litigation Division

/s/ *David Bryant*
David Bryant
Attorney in Charge
Senior Special Counsel
Texas Bar No. 03281500

Munera Al-Fuhaid
Special Counsel
Texas Bar No. 24094501

Office of the Attorney General of Texas
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100
David.bryant@oag.texas.gov
Munera.al-fuhaid@oag.texas.gov

Counsel for the State of Texas

BRETT A. SHUMATE
Assistant Attorney General

ALEXANDER K. HAAS
Director
Federal Programs Branch

JOSEPH E. BORSON
Assistant Director
Federal Programs Branch

/s/ *Steven M. Chasin*
STEVEN M. CHASIN (D.C. Bar #495853)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel: (202) 305-0747
Email: steven.m.chasin2@usdoj.gov
Counsel for Defendants